UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAMIE MARTIN and DANEISHA SINGLETON, on behalf of themselves and all others similarly situated, and the Proposed New York Rule 23 Class, | : : : : | Case No. 15-cv-05237 (PAE/HBP) |
| Plaintiffs, | : : | |
| -against- | : : | |
| SPRINT/UNITED MANAGEMENT COMPANY and WALLACE MORGAN, INC., | : : : | |
| Defendants. | : : : | |

## SPRINT/UNITED MANAGEMENT COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ............................................................................................3

ARGUMENT ................................................................................................................8

     A.    Plaintiffs Fail to Show That They Are Similarly Situated to the Proposed
          Collective in Relevant Respects...............................................................8

     B.    The Proposed Collective Cannot Be Certified Because Plaintiffs Have
          Failed to Show That Sprint Was Their Employer.................................11

          1.    Control Imposed To Ensure Compliance Does Not Contribute to a
                Finding of Joint Employment. ....................................................13

          2.    Plaintiffs Cannot Justify A Nationwide Collective On a Joint
                Employment Theory. ...................................................................16

CONCLUSION.............................................................................................................19

## **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Almaraz v. Vision Drywall & Paint, LLC*,
   No. 2:11-CV-01983-PMP-PAL, 2014 U.S. Dist. LEXIS 66924 (D. Nev. May
   15, 2014) ..............................................................................................................15

*Baum v. Shoney's Inc.*,
   No. 98-423-cv-ORL-19B, 1998 WL 968390 (M.D. Fla. Dec. 3, 1998) ...............................3, 8

*Brickey v. Dolgencorp, Inc.*,
   272 F.R.D. 344 (W.D.N.Y. 2011).............................................................................8

*Carter v. Dutchess Cmty. Coll.*,
   735 F.2d 8 (2d Cir. 1984) .....................................................................................13

*Cleveland v. City of Elmendorf*,
   388 F.3d 522 (5th Cir. 2004) ................................................................................12

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
   595 F. Supp. 2d 200 (2009) ................................................................................3, 8

*Garcia v. Pace Suburban Bus Serv.*,
   955 F. Supp. 75, 76 (N.D. Ill. 1996) .......................................................................18

*Gate Guard Servs. L.P. v. Solis*,
   No. V–10–91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013)..............................................16

*Godlewska v. HDA*,
   916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human
   Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014)...............................................14, 18

*Grenawalt v. AT&T Mobility, LLC*,
   937 F. Supp. 2d 438 (S.D.N.Y. 2013), *appeal filed*, No. 15-949 (2d Cir. 2015)....................12

*Guillen v. Marshalls of MA, Inc.*,
   841 F. Supp. 2d 797 (S.D.N.Y. 2012)............................................................3, 8, 11, 12

*Hart v. Rick's Cabaret International*,
   967 F. Supp. 2d 901 (S.D.N.Y. 2013)...........................................................12, 13, 14

*Hoffman v. Sbarro*,
   982 F. Supp. 249, 261 (S.D.N.Y. 1997)........................................................................8

*Hugee v. SJC Group, Inc.*,
    No. 13 Civ. 0423, 2013 U.S. Dist. LEXIS 116471 (S.D.N.Y. Aug. 13, 2013) ......................14

*Jacobson v. Comcast Corp.*,
    740 F. Supp. 2d 683 (D. Md. 2010) ...........................................................................................15

*Jean-Louis v. Metro. Cable Commc'ns, Inc.*,
    838 F. Supp. 2d 111 (S.D.N.Y. 2011)...............................................................................17, 18

*Jeong Woo Kim v. 511 E. 5th St., LLC*,
    No. 12CV8096-FM, 2015 WL 5732079 (S.D.N.Y. Sept. 30, 2015) .....................................12

*Laroque v. Domino's Pizza, LLC*,
    557 F. Supp. 2d 346 (E.D.N.Y. 2008) ..................................................................................3, 8

*Lawrence v. Adderley Indus., Inc.*,
    No. CV-09-2309, 2011 U.S. Dist. LEXIS 14386 (E.D.N.Y. Feb. 11, 2011)....................15, 16

*Lepkowski v. Telatron Marketing Group*,
    766 F. Supp. 2d 572 (W.D. Pa. 2011) ....................................................................................14

*Lynch v. United Servs. Auto. Ass'n*,
    491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007).............................................................................19

*Morales v. Plantworks, Inc.*,
    No. 05-civ-2349, 2006 WL 278154 (S.D.N.Y. Feb. 2, 2006) ..............................................3, 8

*Moreau v. Air France*,
    356 F.3d 942 (9th Cir. 2003) ............................................................................................15, 18

*Morrison v. Int'l Programs Consortium, Inc.*,
    253 F.3d 5 (D.C. Cir. 2001) ....................................................................................................12

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)....................................................................................8, 9, 11, 19

*Okoro v. Pyramid 4 Aegis*,
    No. 11-C-267, 2012 U.S. Dist. LEXIS 56277 (E.D. Wisc. Apr. 23, 2012)............................12

*Romero v. K.B. Auto. Grp., Inc.*,
    No. 11-cv-386, 2012 WL 1514810 (S.D.N.Y. May 1, 2012) .............................................8, 11

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947)................................................................................................................18

*Sanchez v. JMP Ventures, L.L.C.*,
    No. 13 Civ. 7264 (KBF), 2014 WL 465542 (S.D.N.Y. Jan. 27, 2014) ....................................8

*Scholtisek v. Eldre Corp.*,
   229 F.R.D. 381 (W.D.N.Y. 2005)............................................................................8

*Specht v. City of Sioux Falls*,
   639 F.3d 814 (8th Cir. 2011) ...............................................................................12

*Steelman v. Hirsch*,
   473 F.3d 124 (4th Cir. 2007) ...............................................................................12

*Thornton v. Charter Commc'ns, LLC*,
   No. 4:12CV479 SNLJ, 2014 U.S. Dist. LEXIS 135523 (E.D. Mo. Sept. 25,
   2014) ....................................................................................................................15

*Valdez v. Cox Commc'ns Las Vegas, Inc.*,
   No. 2:09-CV-01797-PMP-RJJ, 2012 U.S. Dist. LEXIS 50574 (D. Nev. Apr.
   11, 2012) ..............................................................................................................15

*Vasto, et al., v. Credico (USA) LLC, et al.*,
   No. 1:15-cv-06503 (N.D. Ill.) .................................................................................2

*Zampos v. W&E Commc'ns*,
   970 F. Supp. 2d 794 (N.D. Ill. 2013) ...................................................................15

*Zheng v. Liberty Apparel Co. Inc.*,
   355 F.3d 61 (2d Cir. 2003)..............................................................13, 17, 18, 19

**STATUTES**

28 U.S.C. § 1404(a) ......................................................................................................2

29 U.S.C. § 216(b) ......................................................................................................11

FLSA ............................................................................................................... passim

New York Labor Law ...............................................................................................12, 13

**OTHER AUTHORITIES**

47 C.F.R. Part 54.......................................................................................................4, 5

47 C.F.R. § 54.410(d)(1)(i)-(vi) .......................................................................................4

47 C.F.R. § 54.410(d)(2) .................................................................................................5

47 C.F.R. § 54.410(d)(3) .................................................................................................5

47 C.F.R. § 54.417 .........................................................................................................5

47 C.F.R. § 54.420 .........................................................................................................5

## INTRODUCTION

Plaintiffs seek a nationwide collective, claiming failure to pay minimum wage and overtime, but almost none of the employers who determined what to pay those people ("agents"), how many hours they would work and on which days, what brands they would market, where their work would be performed, and what exactly they would do, are before the Court. Declarations submitted with Plaintiffs' motion list at least eight companies in addition to Defendant Wallace Morgan, Inc. ("Wallace Morgan"), and they do not purport to provide a complete list.[1]

Ignoring the diversity of their actual employers, and their exclusive control over wages and schedules, Plaintiffs hang their national ambitions on claims against Defendant Sprint/United Management Company ("Sprint").  But Sprint had no control over any relevant aspect of the agents' employment.  It did not classify them as independent contractors; it did not determine (or have any role in suggesting) what they would be paid, or how, or when, agents would be scheduled to work, or for how long on a given day.  Nothing in any of Plaintiffs' submissions suggests that Sprint dictated such matters, or even that it had the right to do so.

Sprint's sole, attenuated connection to the agents arises from its contracts with a handful of third-party vendors to provide marketing services for Sprint's Lifeline Program brand: Assurance Wireless.  None of these contracts dictates the vendors' employment relationships, however, and different vendors have adopted different approaches.  Searching for some link among agents to justify a national collective, Plaintiffs rest their entire argument on a joint employer theory, trying to find uniform control over employment matters in the few requirements that Sprint imposes on the marketing of its Lifeline Program brand.  The requirements Sprint imposes do not concern employment matters, though; they merely

---

[1] *See* Declaration of Edgar Arroyo ("Arroyo Decl."), ¶¶6-7 (attesting that he worked for a company called Looped In, and naming Signals United, On Point OC, Smart Circle, and two unnamed companies in Ohio and Colorado); Declaration of Harold Crowe, Jr. ¶2 (attesting that he worked for Event Horizon Marketing); Declaration of Michael Kates ¶2 (attesting that he worked for Red Ten NYC).

implement the Lifeline Program's federal initiative to provide discounted cell phones and service to qualified low-income users.  Federal law strictly regulates the presentation of such offers to potential customers, and nearly all of the Sprint-generated requirements on which Plaintiffs here rely simply pass on those mandates.  Such requirements are irrelevant to a joint-employer analysis, as a matter of law.  While Sprint is not asking the Court to decide the joint employer issue now, the relationships among each of Sprint's third-party vendors, their subcontractors and agents are individualized.  Moreover, Plaintiffs' inability to show that Sprint controlled relevant terms of employment means that they cannot tie this diverse collection of agents, employed by a variety of unnamed companies with unspecified employment rules, into a single collective.

As to the Named Plaintiffs and their declarants, Sprint contracted with Credico (USA) LLC ("Credico") – yet another relevant company that is not before the Court – and it appears that Credico in turn contracted with Wallace Morgan, which in turn contracted with the Named Plaintiffs and only two of the named Opt-Ins.  Other Opt-Ins/declarants worked for different third party vendors and/or those third party vendors' subcontractors, such as 20/20 Communications Inc. D/B/A/ 20/20 Companies ("20/20") and Open Door Marketing.  Credico itself is an independent business that markets the services and products of its clients, of whom Sprint is but one.  Sprint's contract with Credico says nothing about the terms of employment of any individual; Credico simply provides marketing services for Sprint's brand Assurance Wireless.  The details of employment or contracting with actual agents are left entirely to Credico or its subcontractors.  Credico is currently a defendant in a proposed national collective action in which agents – necessarily including many of those whom Plaintiffs here seek to represent – allege that Credico, not Sprint, is the entity that controlled the details of their wages and work hours with respect to marketing services provided to all of Credico's clients, not just Sprint.[2]

---

[2] The case was originally filed in the Northern District of Illinois; however, on November 9, 2015, the court granted the Plaintiffs' motion to transfer the case pursuant to 28 U.S.C. § 1404(a) to the Southern District of New York. *Vasto, et al., v. Credico (USA) LLC, et al.*, No. 1:15-cv-06503 (N.D. Ill.) (ECF. No. 46).

The details of employment or contract would similarly vary among other third-party vendors who market Assurance Wireless through other companies or individual agents, and which set their own requirements and expectations.   Thus, Plaintiffs' motion seeking a nationwide collective must do more than suggest a joint employer theory.   Rather, plaintiffs seeking even conditional certification must show that they are similarly situated to the rest of the proposed collective in relevant respects: that is, with respect to the particular unlawful policy or practice that gives rise to their claims.[3]   Here, it makes no difference if Sprint, following federal law, requires that agents (working with Wallace Morgan, under contract to Credico) collect certain customer information and proof of qualification for the Lifeline Program; what matters is that agents be similarly situated with respect to the determinants of compliance with the FLSA. And those subjects, the only ones that count, were determined entirely by other companies. Plaintiffs accordingly cannot show that they are similarly situated to the enormous collective they propose to represent, and their motion should be denied.

## STATEMENT OF FACTS

Starting in 2011, Sprint, like other carriers, began providing discounted cellular phones and service to low-income consumers through the federally-administered Lifeline Program, subject to detailed federal requirements.   In addition to mass marketing activities, Sprint contracts with independent third-party vendors to market its Lifeline Program brand, Assurance Wireless, directly to qualified consumers.   *See* Declaration of Vincent Buongiovanni ("Buongiovanni Decl."), ¶¶11-12.   These vendors, which Sprint calls Outreach Agencies ("OAs"), typically provide direct marketing services not only to Sprint but also to a variety of companies, including other Lifeline Program service providers.   *Id.* at ¶¶14.   Credico, for

---

[3] *See, e.g.*, *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 207 (2009) ("The similarly situated analysis, then, centers upon the features which make the particular policy or practice unlawful."); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 801-802 (S.D.N.Y. 2012) (noting "a collective action is inappropriate as to all employees of a common employer without a showing that the other employees are similarly situated to the plaintiff ***with respect to the harm suffered by that plaintiff***") (emphasis added) (citing *Baum v. Shoney's Inc.*, No. 98-423-cv-ORL-19B, 1998 WL 968390 (M.D. Fla. Dec. 3, 1998)); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008); *Morales v. Plantworks, Inc.*, No. 05-civ-2349, 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006).

example, provides these services under contract to financial institutions, retailers, membership services organizations, and consumer goods manufacturers.  *Id.*  Sprint's relationship with the OAs to market their brand Assurance Wireless is no different than its relationship with other indirect dealers, such as RadioShack or the local mobile retailer, to market Sprint's other brands such as Boost and Virgin Mobile.  *Id.* at ¶¶9-10, 14.

With respect to OAs marketing the Assurance Wireless brand, each OA operates differently.  *See, e.g., id.* at ¶¶13, 15, 19-26, 30.  Some OAs, like 20/20, assign their agents to market the Assurance Wireless brand in addition to the OA's other brands.  *Id.* at ¶¶20-21.  Other OAs elect to contract with other independent companies to work directly with agents in the field. *Id.* at ¶¶22.  As relevant here, for example, Credico chose to contract with Wallace Morgan, among others, to provide marketing services for Sprint's Assurance Wireless brand in addition to the other marketing services it has Wallace Morgan provide.   Sprint has no contractual relationship with Wallace Morgan or with any other subcontractor used by Credico or other OAs. Sprint's only contract relevant to this dispute is with Credico, and that agreement puts the burden on Credico to ensure that any subcontractors it retains comply with Credico's commitments to Sprint.

Credico's and other OAs' commitments arise largely from Sprint's obligation to comply with federal law, which regulates Sprint's provision of services under the Lifeline Program, ensuring that the phones and services for which Sprint will receive reimbursement are provided only to eligible subscribers.  *See generally* 47 C.F.R. Part 54; *see also* Buongiovanni Decl., ¶16. Among other things, FCC regulations require Sprint to ensure that every potential subscriber receives certain detailed information about the terms and eligibility requirements of the Lifeline Program offer.  *See* 47 C.F.R. § 54.410(d)(1)(i)-(vi).  FCC regulations also require all Lifeline Program providers, including Sprint, to collect at least eight items of information from each potential subscriber, including name, residential and billing addresses, whether the address is permanent, date of birth, the last four digits of the individual's Social Security Number, and proof of eligibility under either income-based criteria or based on the individual's participation

in certain qualifying federal programs, such as Medicaid.  47 C.F.R. § 54.410(d)(2).  Sprint also must obtain nine separate affirmations from the potential subscriber, under penalty of perjury. 47 C.F.R. § 54.410(d)(3).  Sprint must keep records sufficient to prove compliance by it and those companies marketing its Assurance Wireless brand.  *See* 47 C.F.R. §§ 54.417, 54.420.

To ensure compliance with these requirements, Sprint has created a set of Standard Operating Procedures ("SOPs"), which require OAs' and/or subcontractors' agents who speak to potential applicants to certify that they have received proper training in an online Agent Acknowledgement Form ("AAF"), and has established a software mechanism for accepting applications that ensures the agents collect and submit complete and proper information. Buongiovanni Decl., ¶¶27-28, 31; Declaration of Nicole Eichberger ("Eichberger Decl.")[4], Exhibit ("Ex.") G;[5] *see also id.* at Ex. H.  For example, the SOPs require that an agent's pitch "clearly indicates only qualified applicants may receive a [L]ifeline service," and lists questions that must be asked and information collected to meet the requirements of 47 C.F.R. Part 54. Eichberger Decl., Ex. G.  Sprint also conducts "mystery shopper" audits in which Sprint employees pose as customers to ensure that agents are providing and collecting the information required by the regulations. *Id.*

Sprint does not, however, regulate the employment or contractor relationship between individual agents and the OAs, nor with the OAs' subcontractors.  The contract with Credico does not dictate whether Credico should provide services to Sprint by hiring employees, using individual independent contractors, or seeking to engage third-party subcontractor companies.  In fact, what if any, employment relationship exists among the OAs, subcontractors and/or agents varies.  *See, e.g.,* Buongiovanni Decl., ¶¶19-26, 30.  For example, one OA's subcontractor, UPI

---

[4] Although Sprint believes the collective should not be conditionally certified for the reasons set forth in this brief, attached to the Eichberger Decl. at Exhibits K & L is Sprint's proposed changes to the Plaintiffs' proposed notice to the proposed collective.  In addition, Sprint does not agree to Plaintiffs' proposed notices attached as Exhibits 17 and 18 to the A. Prakash Declaration.

[5] Curiously, Plaintiffs submit a table of contents for Sprint's SOPs, but not the SOPs themselves.  The complete SOPs are attached to the Eichberger Decl. as Ex. G.  None of them concerns the employment details on which Plaintiffs rest their claims.  *Id.*

Marketing Corp., uses employees who receive a W-4 as compared to others who may use independent contractors. *Id.* at ¶23. Moreover, the OA contract says nothing at all about the terms and conditions under which any individual agent should work, and does not require the OAs even to report those details to Sprint. *Id.* For example, the OAs and/or subcontractors can tell the agents which brands to market on a given day. *Id.* at ¶20. In fact, the contract specifies that Credico retains "full control over its own employee relations, and will exercise complete control over the hiring, conduct, training, supervision, performance and termination of its employees." Eichberger Decl., Ex. A.

Named Plaintiffs Martin and Singleton only worked for Wallace Morgan over the course of a few months. Amended Complaint ("Am. Cmp."), ¶¶6, 9. During that time, Wallace Morgan was a Credico subcontractor. Neither Named Plaintiff worked for another Credico subcontractor or OA. Named Plaintiffs' declarations say they were treated as independent contractors, paid a fixed amount for each approved application, required to work long hours, attended a "mandatory morning meeting" with motivational speeches every day, practiced in small groups, reported back to the office at the end of the day, and so forth. *See, e.g.*, Declaration of Jamie Martin ("Martin Decl."), ¶10-21. Even accepting these untested statements as true – which Sprint has no way to know – none of these requirements can be found in any Sprint materials, and Sprint did not impose any of these procedures on either Credico or Wallace Morgan. Even more importantly, Sprint has no way of knowing what other OAs and/or subcontractors required on a daily basis for the other declarants and the putative collective. *See, e.g.*, Buongiovanni Decl., ¶¶15, 20, 29-30, 34. What is known is that the requirements discussed by Plaintiffs do not appear in Sprint's contract with Credico, in the SOPs, in the AAF Form, or in anything else on which Plaintiffs rely to support a nationwide collective.[6] *See* Eichberger Decl., Exs. A-I.

---

[6] Similarly, Credico apparently imposes requirements that go well beyond the few areas covered by Sprint's SOPs. For example, Eichberger Decl., Ex. J, is a detailed checklist covering agent appearance, required equipment, and procedures that was prepared by Credico, not by Sprint. *See also* Buongiovanni Decl., ¶30.

For example, the SOPs concerning event scheduling do not address which workers are required to attend or how long they are to work.  *See* Eichberger Decl., Ex. G; Buongiovanni Decl., ¶¶29-30.  Most of the details are left to the OA: identifying the event, working up a schedule, obtaining necessary permits, event staffing, and the like.  *Id.*  "Agents may only perform Assurance Wireless activities at times and locations known to and approved by OA" – not by Sprint – and "any variance from scheduled hours or event locations must receive prior approval *from OA management*."  Eichberger Decl., Ex. G. Hiring of agents, similarly, is left entirely to the OA; Sprint's only requirement is that the OA conduct a background check.  Buongiovanni Decl., ¶¶25-26.  Sprint also has no say over which agents are assigned to market Sprint's brand versus other clients' brands, and those assignments can change on a daily, weekly and/or monthly basis depending on the OA and/or subcontractor.  Buongiovanni Decl., ¶¶15, 20, 29-30.

Because the details of the workday and compensation policy were not dictated by Sprint, and because Sprint contracted with a variety of OAs during the proposed class period, merely naming Sprint (but not Credico, Looped In, Event Horizon Marketing, or any other OA and/or subcontractor) cannot ensure that all of the individual agents Plaintiffs want to include in the collective will have been subject to the same terms and conditions.  For example, at least one OA hires employees, rather than using independent contractors.  Buongiovanni Decl., ¶¶21, 23.  Another – Open Door Marketing, a subcontractor of OA 20/20, with no relation to Credico – holds no morning meetings, and does not require agents to come to the office at either the beginning or end of the day.  *Id.* at ¶30.  In addition, agents of other OAs and non-Credico subcontractors do not have to follow a "daily checklist" that Credico requires its subcontractors and their agents follow when marketing Assurance Wireless.  *Id.*  Thus, the only facts that Plaintiffs cite to explain the basis for their alleged "long days, starting early in the morning and ending after the close of business," leading to the alleged denial of minimum wage and overtime, are neither controlled by Sprint nor shared by the collective Plaintiffs seek to represent.  *See, e.g.,* Martin Decl. ¶11; Buongiovanni Decl., ¶¶29-30.

## ARGUMENT

**A.   Plaintiffs Fail to Show That They Are Similarly Situated to the Proposed Collective in Relevant Respects.**

Not every similarity among the members of a proposed collective contributes to a finding that those individuals are "similarly situated" under the FLSA.  As Plaintiffs concede, they must show that the potential collective members are "similarly situated to the named plaintiff ***with respect to the FLSA violations alleged***."[7]  As the Second Circuit has held, plaintiffs must show that they and the proposed collective "together were victims of a *common* policy or plan *that violated the law.*"  *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (emphasis added) (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.)).[8] "The similarly situated analysis, then, centers upon the features which make the particular policy or practice unlawful."  *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 207 (2009).  "The notice and opt-in process outlined by the FLSA is not a discovery device to determine whether conditional certification is appropriate."  *Sanchez v. JMP Ventures, L.L.C.*, No. 13 Civ. 7264 (KBF), 2014 WL 465542, at *2 (S.D.N.Y. Jan. 27, 2014).

Plaintiffs' claims of minimum wage and overtime violations depend entirely on policies or practices that were determined by entities other than Sprint.  There is no evidence that Sprint dictated how many days per week an agent should work, or how many hours per day, or how much they should be paid.  Those matters were all determined by Wallace Morgan or the other companies described in Plaintiffs' declarations but not before the Court.  Moreover, what these policies were and how they were implemented would vary by OA and subcontractor.

---

[7] Pl. Mem. at 14 (quoting *Romero v. K.B. Auto. Grp., Inc.*, No. 11-cv-386, 2012 WL 1514810, at *1 (S.D.N.Y. May 1, 2012) (internal quotations and brackets omitted; emphasis added)).

[8] *See also Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 347 (W.D.N.Y. 2011) (quoting *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y. 2005)); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 801-802 (S.D.N.Y. 2012) (noting "a collective action is inappropriate as to all employees of a common employer without a showing that the other employees are similarly situated to the plaintiff *with respect to the harm suffered by that plaintiff*") (emphasis added) (citing *Baum v. Shoney's Inc.*, No. 98-423-cv-ORL-19B, 1998 WL 968390 (M.D. Fla. Dec. 3, 1998)); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008); *Morales v. Plantworks, Inc.*, No. 05-civ-2349, 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006); *Romero*, 2012 WL 1514810, at *9.

Evidence of precisely what those policies were, who distributed them and/or who implemented them is not before the Court.  Instead, Plaintiffs have their declarants lined up to say, in identical phrases, that they "work[ed] long days" and "regularly worked more than 40 hours in a week," but the unsurprising parallels in the wording of these lawyer-drafted declarations is the only similarity presented.  *E.g.*, Martin Decl., ¶¶11-12.  We are not told how many hours any of them worked, on what brands and clients, on what schedule, or whether the schedule was rigorously followed or varied from day-to-day or week-to-week.  The declarants themselves seem unsure; some of them are not even willing to attest that their work schedules denied them the minimum wage, saying only that such a violation is "possible."  *See* Arroyo Decl., ¶13; Declaration of Frank Gavidia Decl., ¶17.  (The others all say that "there were times" that they received less than minimum, with no indication of when, how often, or by how much).  None of these self-serving statements come close to proving that the Named Plaintiffs, the Opt-Ins and the declarants, let alone the rest of the proposed collective were together as a whole "victims of a *common* policy or plan *that violated the law*," which would warrant even conditional certification.  *See*, *e.g.*, *Myers*, 624 F.3d at 555 (emphasis added).

Nor is there any representation that the eight companies described as employers in the declarations is a complete list.  So there is no way to know how many other companies were involved in determining wages and hours for the members of the proposed nationwide collective, or whether the individuals who worked with those unnamed companies had similar experiences.  Opt-In Arroyo reports, for example, that "[w]hile [he] worked at Looped In," co-workers were sent to Ohio and Colorado to start new companies collecting Lifeline applications.  Arroyo Decl., ¶6.  Though any employees of those companies presumably would be included in the proposed collective, there is no evidence at all about those companies' practices with regard to weekly work schedules or wage payments.

Plaintiffs complain that answering these questions demands too much of them, that their "lenient" burden is merely to show that they all complain of the same mistreatment.  Whether or not that would be sufficient where the members of the proposed collective were all employed by

the same entity, it cannot be adequate here, where the Plaintiffs' own evidence establishes that they were employed by a variety of third parties, *and* that those third parties – not Sprint – established the wage and hour practices about which they complain.

Unable to show that the proposed collective members were subjected to any single policy or plan with respect to wages or work hours, Plaintiffs instead rely on irrelevant similarities about alleged dress codes and customer qualification procedures.  They point out that Sprint offers the same Lifeline phones and plans nationwide; that Sprint's SOPs include provisions relating to event and agent scheduling, agent appearance, and the like (though they provide only the Table of Contents, not the procedures themselves); that Sprint issued standard talking points and marketing materials; that agents must submit an online form agreeing to follow the SOPs; and that Sprint sporadically sent "mystery shoppers" to check on agents' presentations to customers.  Pl. Mem. at 7-9.  They add that their declarants "considered themselves" to be working for Sprint, though without offering any facts on which the declarants allegedly drew such conclusions.  *Id.* at 7.

None of this matters.  Plaintiffs present no reason, and there is none, to believe that the things Sprint required were inconsistent with any obligations under the FLSA.  Sprint did not require Credico, much less its subcontractors, to use independent contractors rather than employees; nor did Sprint, even allegedly, dictate how many agents should be retained, how or how much any agent was to be paid, or how many hours an agent would work in a given week. Nor is there any basis on this record to conclude that any requirements from Sprint so straightjacketed Credico or its subcontractors that they had no choice but to design wage and hour requirements in an unlawful way.

For example, the section of the SOPs on "Events and Agent Scheduling" merely requires that events be "staffed appropriately to meet/exceed productivity objectives," and requires the company with which Sprint contracts to make up accurate schedules.  Eichberger Decl., Ex. G. Nothing in the SOPs requires any particular agent to work any specific number of hours or number of events per week.  *Id.*  Other SOP requirements are even further from matters related to

the FLSA; they require Sprint's contractor companies to ensure that agents and events have a professional appearance, that agents be trained, and that they clear a background check. *Id.* None of these requirements prevents or impinges on a contractor's or subcontractor's ability to comply with the FLSA. Similarly, Sprint's agreement with Credico provides that Sprint will pay Credico $35 per approved Lifeline application, with no restrictions requiring that agents be paid on a similar basis. Eichberger Decl., Ex. D. The agreement leaves compensation of agents entirely to Credico. *Id.* And, compensation of other agents by other OAs is similarly determined on an individualized basis.

The lack of any connection between Sprint's requirements and the mandates of the FLSA means that Plaintiffs offer no basis on which the Court can conclude that they are similarly situated to the proposed collective and those individuals' contractual or employment relationships with third party companies. *See, e.g., Romero*, 2012 WL 1514810, at *1; *Guillen*, 841 F. Supp. 2d at 801-802. Even if Wallace Morgan, hypothetically, misclassified named Plaintiff Martin as an independent contractor, required her to work six 12-hour days a week and paid her less than minimum wage to do so, that would offer no basis to conclude that each employee of each other contractor or subcontractor company across the country was treated similarly by his or her employer. The only thing that links these individuals' work situations is that on some days they were assigned to collect Lifeline applications for Sprint's Assurance Wireless brand. That similarity has nothing to do with the basis of Plaintiffs' claims, however, and so fails to make even a "modest factual showing" that Plaintiffs and the collective they hope to represent "together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555. Plaintiffs' motion should be denied.

### B.  The Proposed Collective Cannot Be Certified Because Plaintiffs Have Failed to Show That Sprint Was Their Employer.

The FLSA does not apply to every interaction in the business world; an individual has a right of action under the statute only against his or her *employer*. *See* 29 U.S.C. § 216(b). Proof that an individual is an employee subject to the protections of the Act, and that the defendant is

his or her employer, are not affirmative defenses; the burden is on the plaintiff to establish these prerequisites to suit.[9]  Sprint's alleged status as Plaintiffs' employer is a question of law.[10]  Sprint does not ask the Court to rule now on whether Sprint was Plaintiffs' joint employer.  But because Plaintiffs' demand for a nationwide collective depends entirely on their claim that Sprint employed them, they should be required to make some showing that they will be able to prevail on the merits of that point, even at this stage.  After all, "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."  *Guillen*, 841 F. Supp. 2d at 803.

The undisputed evidence shows that any attempt to answer that question will be individualized, depending on the individual, the subcontractor and/or the OA.  Plaintiffs will not, now or eventually, be able to show enough control by Sprint of the terms and conditions of employment to be deemed the joint employer of the Plaintiffs (or of the unknown employees who worked for other companies).  As this Court explained in *Hart v. Rick's Cabaret International*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013), the standard for joint employment in the Second Circuit considers a variety of formal and functional factors to determine whether, "in light of 'economic reality,'" the entity in question exerted sufficient control over the plaintiffs' terms and conditions of employment to be deemed their employer.[11]  The formal control factors

---

[9] *See, e.g.*, *Specht v. City of Sioux Falls*, 639 F.3d 814, 819-20 (8th Cir. 2011) ("Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for [the] purposes of the Act."); *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007) ("A plaintiff bears the burden of establishing that she is an employee under the FLSA.").

[10] *See, e.g.*, *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 n.3 (D.C. Cir. 2001) ("Whether an individual is an 'employee' within the meaning of the FLSA is a legal question."); *cf. also Cleveland v. City of Elmendorf*, 388 F.3d 522, 526 (5th Cir. 2004) ("Whether an individual is an employee or a volunteer is a question of law for the court to determine."); *Okoro v. Pyramid 4 Aegis*, No. 11-C-267, 2012 U.S. Dist. LEXIS 56277, at *17 (E.D. Wisc. Apr. 23, 2012) ("The question of whether an individual is a volunteer is a matter of law to be determined by the court.").

[11] The test is the same under New York law.  *See Grenawalt v. AT&T Mobility, LLC*, 937 F. Supp. 2d 438, 448 (S.D.N.Y. 2013), *appeal filed*, No. 15-949 (2d Cir. 2015) ("The FLSA and NYLL define employment almost identically. Consequently, courts in this circuit hold that the New York Labor Law embodies the same standards for joint employment as the FLSA.") (internal quotation marks and citations omitted); s*ee also Jeong Woo Kim v. 511 E. 5th St., LLC*, No. 12CV8096-FM, 2015 WL 5732079, at *9 (S.D.N.Y. Sept. 30, 2015) ("The definitions of the

include the ability to hire and fire, to supervise and control employees and their work schedules, and to determine the rate and method of payment, and maintenance of employee records. *See, e.g.*, *Hart*, 976 F. Supp. 2d at 939 (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). If the proposed joint employer lacks formal control, a court then must consider the six functional factors, which include:

> (1) whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the putative joint employer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

*Id.* at 939-40 (quoting *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71-72 (2d Cir. 2003)). Plaintiffs have failed to show that this analysis may be answered on a collective and not individualized basis, let alone may reasonably result in a conclusion that Sprint jointly employed them and/or other members of the proposed collective. We review the application of these factors to the facts of this case in Part B.2., below. As a preliminary matter, however, most of the Sprint requirements on which Plaintiffs rely to justify a national collective are irrelevant to the joint-employer analysis, as discussed in Part B.1., below.

### 1.    Control Imposed To Ensure Compliance Does Not Contribute to a Finding of Joint Employment.

In assessing the degree of control a potential employer exercises, courts regularly hold that requirements a company imposes to ensure compliance with law, or even merely aimed at quality control, should not be considered evidence of control that establishes a joint employment

---

term 'employer' under the FLSA and NYLL are coextensive. Thus, under either of the statutes, when a court is asked to determine whether an individual is an employer, the overarching concern is whether the alleged employer possessed the power to control the workers in question, . . . with an eye to the 'economic reality' presented by the facts of each case.") (internal quotation marks and citations omitted).

relationship, because control to ensure such compliance is a natural part of arm's-length subcontractor relationships as well. *See, e.g., Hart*, 967 F. Supp. 2d at 916 (holding "where a club implements regulations to assure compliance with law, those regulations are not evidence of the club's control over its dancers"). As the court explained in *Godlewska v. HDA*, 916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014):

> Exercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions. This is especially true where the quality control's purpose is to ensure compliance with the law or protect clients' safety. . . .Quality control and compliance-monitoring that stem from the nature of the business – that is, from the nature of the goods or services being delivered – are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer. Differences in the purpose and focus of the control produce divergent conclusions.

*Id*. at 259-61 (citations omitted).

Thus, for example, in *Lepkowski v. Telatron Marketing Group*, 766 F. Supp. 2d 572, 579 (W.D. Pa. 2011), a call center employee alleged that a client of the center was her joint employer because the client "directly trains Plaintiff and other class members concerning [its] products, procedures, and protocols and oversees the day-to-day work of Plaintiff and other class members by, inter alia, monitoring the content of phone calls between the class members and [client's] customers to ensure that the class members are following detailed [client] procedures and protocols.'" The court held that "these measures reflect precisely the type of quality control and customer service supervision that courts have consistently held to be 'qualitatively different' from the control exercised by an employer over an employee," and thus, "cut[] against a finding of joint employership." *Id*. at 579-80.

In *Hugee v. SJC Group, Inc.*, No. 13 Civ. 0423, 2013 U.S. Dist. LEXIS 116471 (S.D.N.Y. Aug. 13, 2013), security guards were held not to be jointly employed even though the defendant company in question (a) required guards to report arrival and departure times and to

fill out the defendant's timesheets, (b) visited retail customers where plaintiff was assigned to work and inspected his work approximately once a month; and (c) provided training to ensure compliance with its quality standards.

Other courts reach uniform conclusions, holding that quality control and compliance standards do not contribute to a finding of joint employment. *See Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2003) (holding no control by airline indicative of joint employment of subcontractor's employees, in part because "much of the indirect supervision or control exercised by Air France over the ground handling employees was purportedly to ensure compliance with various safety and security regulations, such as ensuring that food equipment was properly stowed or that the plane's load was adequately balanced.   Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly"); *Thornton v. Charter Commc'ns, LLC*, No. 4:12CV479 SNLJ, 2014 U.S. Dist. LEXIS 135523 (E.D. Mo. Sept. 25, 2014) (finding cable company, Charter, not joint employer of installers employed by a subcontractor (Mainline) because "[i]t is well-established that measures such as tracking on-time arrivals, requiring Mainline to ensure quality performance and service, assistance with billing and activation for Charter customers, and requiring that Mainline technicians follow Charter technical specifications when installing Charter equipment are typical in a contractor relationship and do not establish joint employment. . . .[T]his type of quality control and compliance monitoring stem from the nature of the cable provider business and the need to provide reliable service to customers, not the nature of the relationship between the technicians and the cable provider, and do not establish joint employment by the cable provider.");[12] *Almaraz v. Vision Drywall & Paint, LLC*, No. 2:11-CV-01983-PMP-PAL, 2014 U.S. Dist. LEXIS 66924 (D. Nev. May 15, 2014) (holding control "to ensure compliance with project specifications" did not

---

[12] Many other cases also involving cable installers reach the same results.  *See, e.g.*, *Zampos v. W&E Commc'ns*, 970 F. Supp. 2d 794 (N.D. Ill. 2013); *Lawrence v. Adderley Indus., Inc.*, No. CV-09-2309, 2011 U.S. Dist. LEXIS 14386 (E.D.N.Y. Feb. 11, 2011); *Valdez v. Cox Commc'ns Las Vegas, Inc.*, No. 2:09-CV-01797-PMP-RJJ, 2012 U.S. Dist. LEXIS 50574 (D. Nev. Apr. 11, 2012); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683 (D. Md. 2010).

support finding of joint employment); *Gate Guard Servs. L.P. v. Solis*, No. V–10–91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013) (finding insufficient indicia of control where the rules imposed were "either required by the Occupational Safety & Health Administration or Texas Private Security Bureau rules and regulations, or [were] quality control and/or safety provisions that [were] mandated by the oil and gas companies or landowner").

To justify a nationwide collective, Plaintiffs therefore must find indicia of joint employment other than those imposed to ensure compliance with law or quality control.  As shown in the following section, they cannot do so.

### 2. Plaintiffs Cannot Justify A Nationwide Collective On a Joint Employment Theory.

Nearly all of the Sprint requirements on which Plaintiffs rely are imposed merely to ensure compliance or quality control, similar to the same requirements of Sprint's other indirect dealers.  The SOPs, for example, do not regulate the employment relationship, but focus instead on ensuring that prospective Lifeline applicants receive the information that federal regulations require Sprint to provide, and that the applicants provide the necessary information to ensure that they are qualified for Lifeline service.  *See* Eichberger Dec., Ex. G; Buongiovanni Decl., ¶¶27-28.  Sprint's "mystery shop" audits, the use of electronic tablets to collect information and submit applications, and the AAF form, requiring agents to certify that they have received training in the requirements for interactions with prospective applicants, all serve the same purpose.  *See* Pl. Brf. at 7-10 (relying on these requirements).  *See also*, Eichberger Decl., Exs. G, H; Buongiovanni Decl., ¶28.

The few requirements not directly linked to compliance concerns – requiring agents to dress professionally, to wear badges that mention Assurance Wireless, and the like – are imposed to maintain the Assurance Wireless brand and to reassure potential applicants that they are dealing with authorized agents of a reputable company.  Buongiovanni Decl., ¶¶28.  But those few items fall far short of sustaining a claim of joint employment.  *See, e.g.*, *Lawrence*, 2011 U.S. Dist. LEXIS 14386, at *25 ("Nor does the requirement that technicians wear uniforms and

identification badges identifying themselves as being associated with [the putative joint employer] render them employees . . . .  The requirement to wear such identifying materials does not affect the economic reality of the relationship . . ., but merely allows consumers to be assured of the technicians' *bona fides*.").

        a.    <u>Formal Control</u>.  None of the formal control factors support a finding that Sprint is Plaintiffs' joint employer, let alone whether that determination can be made on a nationwide collective basis.  There is not even a claim that Sprint has any involvement in hiring, and it cannot require that an agent be fired, either – only that he or she ceases marketing the Assurance Wireless brand.  That does not prevent an OA or subcontractor from assigning the worker to other clients, and in fact, that happens frequently with or without Sprint.  Buongiovanni Decl., ¶¶14, 20; *see also Jean-Louis v. Metro. Cable Commc'ns, Inc*., 838 F. Supp. 2d 111, 124 (S.D.N.Y. 2011).  Similarly, there is no allegation, nor could there be, that Sprint controlled the rate of pay for any agent, nor that Sprint maintained any employment records – the only records Sprint maintains reflect agents' acknowledgement of training, which Sprint needs to comply with the FCC's audit and recordkeeping requirements.  Buongiovanni Decl., ¶¶16, 28.  In fact, the evidence shows each of these factors were determined individually depending the OA and/or subcontractor.  Buongiovanni Decl., ¶31.

      The final formal factor, the extent to which the proposed joint employer controls employee work conditions and schedules, "can be misinterpreted to encompass run-of-the-mill subcontracting relationships."  *Zheng*, 355 F.3d at 74.  "[E]xtensive supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Id.* at 75.  Analysis of this particular factor is fact based and often individualized.  Here, the question of whether there is such control is individualized because each of the putative collective members worked for different companies who may or may have been subcontractors of other companies.  With respect to Named Plaintiffs, not only is the inquiry fact-based but, as pleaded, there is no such control.  Sprint simply does not determine when agents will work – how many hours per day, or how many days per week nor how many

- 17 -

agents the OA (much less a subcontractor) should retain.  "Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time."  *Godlewska*, 916 F. Supp. 2d at 259 (citing *Moreau v. Air France*, 356 F.3d 942, 950 n.5 (9th Cir. 2004); *Garcia v. Pace Suburban Bus Serv*., 955 F. Supp. 75, 76 (N.D. Ill. 1996); *Jean-Louis*, 838 F. Supp. 2d at 126).  Nor does Sprint require morning meetings, nor any particular schedule of reporting to an office.  The OA or its subcontractors exclusively control these details – and, again, it is that control over pay and work hours, exclusively in the hands of the OA, that gives rise to Plaintiffs' claims.  And, as detailed above, each of these inquiries is individualized and cannot be answered on holistic basis.

b.      Functional Control.  Plaintiffs have no basis for obtaining a nationwide collective under the *Zheng* functional control factors for establishing a joint employer relationship, either. The Second Circuit applies these factors – as well as "any other factors [the district court] deems relevant to its assessment of the economic realities" – to distinguish those who "function as employers of the plaintiffs" from "mere business partners of plaintiffs' direct employer."  355 F.3d at 72, 76.  The joint employer analysis is not intended "to subsume typical outsourcing relationships," but rather "to expose outsourcing relationships that lack a substantial economic purpose."  *Id.* at 76.  "[I]t is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA."  *Id*.

Thus, for example, in *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), from which the Second Circuit derived its list of functional factors, the Supreme Court held a slaughterhouse to be a joint employer along with the boning supervisor who hired the individual workers, because the individuals were working in the slaughterhouse, under direct supervision of slaughterhouse employees; the slaughterhouse controlled work schedules; work passed from one boning supervisor to another without material changes; and the individuals were not part of any organization that could shift from one slaughterhouse to another.  *Zheng*, 355 F.3d at 70, 72. Here, by contrast, agents do not work on Sprint's premises; their day-to-day work is not monitored by Sprint at all, except to the extent necessary to ensure compliance with federal

regulations; there are material differences between Sprint's contracts with various OAs; and agents not only can, but regularly do, shift to work on behalf of other clients of the OAs and their subcontractors, not exclusively for Sprint.   In *Rutherford*, the contract between the slaughterhouse and boning supervisor "had no substantial, independent economic purpose; instead, it was most likely a subterfuge meant to evade the FLSA or other labor laws."  *Id*. at 72. Here, Sprint's contracts with the OAs are legitimate, arm's-length transactions with stand-alone suppliers of marketing services.  Buongiovanni Decl., ¶¶10-13.

At least, Plaintiffs have not shown otherwise.  Plaintiffs have not established any basis on which this Court could conclude that Sprint exerted sufficient control over the terms and conditions of agents' employment to justify treating them as a single collective.  Sprint does not ask the Court to "resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations,"[13] but Plaintiffs' burden, even if "modest," requires some showing that permits the Court to conclude that the proposed collective is similarly situated as to things that matter – that they "together were victims of a common policy or plan that violated the law."  *Myers*, 624 F.3d at 555.  Their inability to show that Sprint employed them precludes such a finding, and their motion for a nationwide collective must be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for conditional certification and court-authorized notice should be denied.

Dated: November 13, 2015

<div style="margin-left:40%">

Respectfully submitted,
SPRINT/UNITED MANAGEMENT COMPANY

By its attorneys,

By:   */s/ Elise M. Bloom*
       Elise M. Bloom

</div>

---

[13] Pl. Brf. at 14 (quoting *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)).

Gregory I. Rasin
Steven D. Hurd
Mark W. Batten (*pro hac vice pending*)
Nicole A. Eichberger (*pro hac vice*)
Eleven Times Square
New York, New York 10036-8299
Phone: 212.969.3000
Fax: 212.969.2900
ebloom@proskauer.com
grasin@proskauer.com
shurd@proskauer.com
*Attorneys for Defendant,*
*Sprint/United Management Company*