UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

JAMIE MARTIN and DANEISHA SINGLETON *on
behalf of themselves and all others similarly situated, and
the Proposed New York Rule 23 Class*,

　　　　　　　　　　　　　　　Plaintiffs,

　　　　　　　-v-

SPRINT/UNITED MANAGEMENT COMPANY and
WALLACE MORGAN, INC.,

　　　　　　　　　　　　　　　Defendants.

------------------------------------------------------------------X

15 Civ. 5237 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

　　Plaintiffs Jamie Martin and Daneisha Singleton bring this action on behalf of themselves

and similarly situated persons, alleging violations of the Fair Labor Standards Act ("FLSA"), 29

U.S.C. §§ 201 *et seq.*, and New York Labor Law ("NYLL") §§ 650 *et seq.*  Plaintiffs allege that

defendants Sprint/United Management Company ("Sprint") and Wallace Morgan, Inc. ("Wallace

Morgan") maintained unlawful employment practices, including misclassifying their employees

as independent contractors and thereby failing to pay minimum wage or overtime compensation

at the statutorily required rates for employees.

　　Before the Court is plaintiffs' motion for conditional certification of a class under the

FLSA, which plaintiffs would define to include all persons across the nation whose job was to

gather Lifeline applications for Sprint's Assurance Wireless brand during the last three years.

Plaintiffs seek court-facilitated notice of this action to such persons, and production of contact

information for each putative class member.

For the reasons that follow, the Court (1) denies the motion for conditional certification of a nationwide class, but conditionally certifies a collective limited to employees of Wallace Morgan in New York City; (2) approves court-facilitated notice to the approved collective by means of first-class mail, email, and text message; and (3) grants in part and denies in part plaintiffs' motion for discovery of the contact information of the members of this smaller collective.

## I.      Background

### A.      Factual Allegations[1]

The Lifeline Program was founded in 1985 as part of the Universal Service Fund, a system of telecommunications subsidies and fees overseen by the Federal Communications Commission and designed to promote universal access to telecommunications services in the United States.  Prakash Decl., Ex. 2, at 1; *id.*, Ex. 3, at 1–2.  The program provides "discount[ed] phone service for qualifying low-income consumers."  *Id.*, Ex. 2, at 1.  Designated telecommunications carriers may provide Lifeline services to eligible consumers in exchange for

---

[1] These facts are drawn from the First Amended Complaint, Dkt. 48 ("FAC"); the declaration submitted by plaintiffs' counsel, Dkt. 54 ("Prakash Decl."), and accompanying exhibits; and the declarations filed by Martin, Singleton, and eight opt-in plaintiffs in support of the motion for conditional certification, Dkt. 55 ("Martin Decl."); Dkt. 56 ("Singleton Decl."); Dkt. 57 ("Armstrong Decl."); Dkt. 58 ("Arroyo Decl."); Dkt. 59 ("Cornaggia Decl."); Dkt. 60 ("Crowe Decl."); Dkt. 61 ("Gavidia Decl."); Dkt. 62 ("Kates Decl."); Dkt. 63 ("Pandy Decl."); Dkt. 64 ("Piper Decl.").  The Court also refers to a number of Sprint-issued documents, submitted as attachments to a declaration by Sprint's counsel, which are cited and relied on by plaintiffs in their reply brief.  Dkt. 71 ("Eichberger Decl."), Exs. A–L.  At the conditional certification stage, the Court may not "resolve factual disputes" or "make credibility determinations."  *Costello v. Kohl's Ill., Inc.*, No. 13 Civ. 1359 (GHW), 2014 WL 4377931, at *7 (S.D.N.Y. Sept. 4, 2014) (quoting *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)) (internal quotation marks omitted).  Accordingly, in resolving this motion, the Court assumes all non-conclusory facts alleged by plaintiffs to be true.

subsidies, which the carriers are required to pass through to the consumer. *See* 47 C.F.R. §§ 54.201, 54.403(a).

Sprint Corporation is a telecommunications company with a brand, Assurance Wireless, used solely in connection with wireless Lifeline services. Prakash Decl., Ex. 7, at 2. Defendant Sprint is the management company for a number of Sprint Corporation's subsidiaries, including Virgin Mobil, which administers the Assurance Wireless brand. FAC ¶¶ 41–44. Assurance Wireless's Lifeline service is currently offered in at least 40 states. Prakash Decl, Ex. 6, at 1–2; FAC, Ex. E, at 3.

Sprint does not itself engage in retail distribution of the Assurance Wireless brand. Rather, it relies on "grassroots outreach and marketing activities" to solicit potential customers. Prakash Decl., Ex. 7, at 2; *see* FAC ¶¶ 49, 51. For this purpose, Sprint arranges for the use of workers ("Agents") whose primary duty is to gather applications from consumers for possible enrollment in the Lifeline Program. FAC ¶ 63.[2]

Sprint retains the Agents through intermediary companies ("Sprint Partners") across the country. *Id.* ¶ 53. These include Wallace Morgan, a corporation headquartered in New York City. *Id.* ¶ 26. Some Sprint Partners contract directly with Sprint, whereas others contract with Sprint only through further intermediaries. *Id.* ¶ 54. Wallace Morgan, for instance, contracts with Credico (USA) LLC ("Credico"), which, in turn, contracts with Sprint. *Id.*

---

[2] According to plaintiffs, while such workers have varying titles, including "Account Executive," "Corporate Trainer," "Sales Associate," "Sales Representative," and "Entry Level Marketing Trainer," they are all tasked principally with engaging in consumer outreach. *See* Singleton Decl. ¶¶ 4–6; Martin Decl. ¶¶ 4–6; Armstrong Decl. ¶¶ 4–6; Piper Decl. ¶¶ 4–6; Kates Decl. ¶¶ 4–6; Cornaggia Decl. ¶¶ 4–6; Crowe Decl. ¶¶ 4–6; Pandy Decl. ¶¶ 4–6; Gavidia Decl. ¶¶ 8–9; Arroyo Decl. ¶¶ 4, 5, 8. The Court here uses the term "Agents" to refer to all persons who have this primary job duty.

Martin and Singleton worked for Wallace Morgan during spring 2015, first as "Account Executives" and later as "Corporate Trainers." FAC ¶¶ 6, 9, 64; Martin Decl. ¶¶ 2–4; Singleton Decl. ¶¶ 2–4. Leticia Piper and Jasmin Armstrong, two plaintiffs who later opted into this lawsuit, also worked for Wallace Morgan during that time, under the titles of "Sales Rep" and "Team Leader" (Piper), and "Sales Associate" (Armstrong). Piper Decl. ¶¶ 2, 4; Armstrong Decl. ¶¶ 2, 4. Six other opt-in plaintiffs allege that, at various points between November 2013 and June 2015, they were employed by other Sprint Partners. Aside from Wallace Morgan, the five Sprint Partners identified in the plaintiffs' declarations are: (1) On Point OC, located in Orange, California, *see* Gavidia Decl. ¶ 2; (2) Signals United, located in Orange and Los Angeles, California, *see* Gavidia Decl. ¶ 2; Pandy Decl. ¶ 2; (3) Looped In, located in San Bernardino, California, *see* Gavidia Decl. ¶ 2; Arroyo Decl. ¶ 2; Cornaggia Decl. ¶ 2; (4) Red Ten NYC, located in New York City, *see* Kates Decl. ¶ 2; and (5) Event Horizon Marketing, located in Tampa, Florida, *see* Crowe Decl. ¶ 2.

Regardless of the identity of the Sprint Partner that hired her or the job title she held,[3] all plaintiff-declarants ("declarants") make certain common factual allegations. Each attests that her "primary job duty" was "collect[ing] applications from consumers who wanted to enroll in the Lifeline Assistance Program through Assurance [Wireless]."[4] Each attests that, although she was

---

[3] Solely for ease of reference, the Court uses the pronoun "she" when referring to the declarants collectively.

[4] Singleton Decl. ¶¶ 4–6; Martin Decl. ¶¶ 4–6; Armstrong Decl. ¶¶ 4–6; Piper Decl. ¶¶ 4–6; Kates Decl. ¶¶ 4–6; Cornaggia Decl. ¶¶ 4–6; Crowe Decl. ¶¶ 4–6; Pandy Decl. ¶¶ 4–6; Gavidia Decl. ¶¶ 4, 8, 9, 11, 13; Arroyo Decl. ¶¶ 4, 5, 8. Each declarant states that her sole responsibility was to collect applications from consumers. *Id.* Each states that she did not have the authority to sell anything, approve applications, or interact with consumers once their applications were submitted. *Id.*

directly hired by a Sprint Partner, she perceived herself to be an employee of Assurance Wireless.[5]  In their brief, plaintiffs explain that this perception on the part of each declarant was based on the "great degree of control" that Assurance Wireless, through Sprint, exercised over Agents.  Pl. Br. 7.  This control included (1) mandating training on Sprint's Standard Operating Procedures; (2) requiring Agents to "agree to abide by all the rules, regulations, and policies of Assurance Wireless"; (3) issuing standard talking points and marketing materials for Agents to use in their daily work; and (4) monitoring Agents' outreach efforts by collecting each application completed by consumers.  *Id.* 7–8 (citing Prakash Decl., Ex. 10 ("Assurance Wireless Standard Operating Procedures"); *id.*, Ex. 11 ("Agent Acknowledgment Form")).  It is on this basis that plaintiffs allege that Sprint and the respective Sprint Partners "jointly employed" the declarants and all other Agents.  *Id.* at 7; *see* FAC ¶ 63.

Each declarant claims that, notwithstanding her ostensible status as an employee, she was classified as an independent contractor.[6]  As such, each claims, rather than being paid hourly wages, she was paid a piece-work rate, specifically, a "flat rate of no more than $10" for each application she secured that was accepted by Assurance Wireless.[7]  However, by each declarant's account, had she been recognized and treated as an employee, she would have been

---

[5] Singleton Decl. ¶¶ 2–3; Martin Decl. ¶¶ 2–3; Armstrong Decl. ¶¶ 2–3; Piper Decl. ¶¶ 2–3; Kates Decl. ¶¶ 2–3; Cornaggia Decl. ¶¶ 2–3; Crowe Decl. ¶¶ 2–3; Pandy Decl. ¶¶ 2–3; Gavidia Decl. ¶¶ 2–3; Arroyo Decl. ¶¶ 2–3.

[6] Singleton Decl. ¶ 13; Martin Decl. ¶ 13; Armstrong Decl. ¶ 12; Piper Decl. ¶ 13; Kates Decl. ¶ 13; Cornaggia Decl. ¶ 13; Crowe Decl. ¶ 13; Pandy Decl. ¶ 13; Gavidia Decl. ¶ 18; Arroyo Decl. ¶ 15.

[7] Singleton Decl. ¶¶ 9, 10; Martin Decl. ¶¶ 9, 10; Armstrong Decl. ¶¶ 9, 10; Piper Decl. ¶¶ 9, 10; Kates Decl. ¶¶ 9, 10; Cornaggia Decl. ¶¶ 9, 10; Crowe Decl. ¶¶ 9, 10; Pandy Decl. ¶¶ 9, 10; Gavidia Decl. ¶¶ 15, 16; Arroyo Decl. ¶¶ 11, 12.

owed significant statutory minimum wages based on her hours.  That is because each declarant claims she was required to attend mandatory morning meetings, and to "work long days, starting early in the morning and ending after the close of business," at which point she was required to report back to the office.[8]  In light of these long hours, each declarant claims, her pay in certain weeks fell short of the required minimum wage.[9]  Further, each alleges, because her hours regularly exceeded 40 hours in a week, she was entitled to—but did not receive—overtime pay.[10]  Finally, each declarant alleges that she observed—during morning meetings and work in the field—that other Agents working for the same Sprint Partner had the "same job duties" and were "paid in the same manner" as she.[11]

Specifically as to Martin and Singleton, the FAC alleges that each worked between 8 a.m. and 7 p.m., five days per week, for a total of 55 hours, when classified as an Account Executive, and between 7:30 a.m. and 7:30 p.m., six days per week, for a total of 72 hours, when classified as a Corporate Trainer.  FAC ¶ 97.  By limiting compensation to a flat rate of $10 per approved application, Sprint and Wallace Morgan "routinely" caused Martin and Singleton to work for less

---

[8] Singleton Decl. ¶¶ 11, 16, 19; Martin Decl. ¶¶ 11, 16, 19; Armstrong Decl. ¶¶ 11, 14, 17; Piper Decl. ¶¶ 11, 15, 17; Kates Decl. ¶¶ 11, 16, 19; Cornaggia Decl. ¶¶ 11, 16, 19; Crowe Decl. ¶¶ 11, 16, 19; Pandy Decl. ¶¶ 11, 16, 19; Gavidia Decl. ¶¶ 17, 21, 24; Arroyo Decl. ¶¶ 13, 18, 22.

[9] Singleton Decl. ¶ 11; Martin Decl. ¶ 11; Armstrong Decl. ¶ 11; Piper Decl. ¶ 11; Kates Decl. ¶ 11; Cornaggia Decl. ¶ 11; Crowe Decl. ¶ 11; Pandy Decl. ¶ 11.  Two opt-in plaintiffs allege only that "it is possible" that they did not make at least the minimum wage of $7.25 per hour. Arroyo Decl. ¶ 13; Gavidia Decl. ¶ 17.

[10] Singleton Decl. ¶ 12; Martin Decl. ¶ 12; Piper Decl. ¶ 12; Kates Decl. ¶ 12; Cornaggia Decl. ¶ 12; Crowe Decl. ¶ 12; Gavidia Decl. ¶ 12; Pandy Decl. ¶ 12; Arroyo Decl. ¶14.  One opt-in plaintiff does not mention overtime payments in his declaration.  *See* Gavidia Decl.

[11] Singleton Decl. ¶ 21; Martin Decl. ¶ 22; Armstrong Decl. ¶ 19; Piper Decl. ¶ 19; Kates Decl. ¶ 22; Cornaggia Decl. ¶ 21; Crowe Decl. ¶ 21; Gavidia Decl. ¶ 26; Pandy Decl. 22; Arroyo Decl. ¶ 24.

than the minimum wage, and to work more than 40 hours per week without overtime pay.  *Id.*
¶¶ 104, 119–21.  The FAC identifies one week in which Martin worked approximately 55 hours
and was paid $180—which amounts to $3.27 per hour—and no overtime compensation.  *Id.* ¶
122.

### B.    Procedural History

On July 7, 2015, plaintiffs filed the original complaint, on behalf of themselves and other
similarly situated employees, against Wallace Morgan and Assurance Wireless, LLC, alleging
that these defendants failed to pay minimum wage and overtime compensation, in violation of
the FLSA and NYLL.  Dkt. 1.  On September 1, 2015, and September 14, 2015, respectively,
Wallace Morgan and Assurance Wireless, LLC each filed an answer.  Dkts. 31, 35.

On October 13, 2015, plaintiffs amended the complaint to replace Assurance Wireless,
LLC with Sprint as a defendant.  FAC.  On October 27, 2015, Wallace Morgan and Sprint each
filed an answer.  Dkts. 66, 67.  Since plaintiffs initiated this lawsuit, 22 additional putative
collective members have filed notices of consent to join this action.  Dkts. 17, 26, 27, 33, 36, 37,
46, 47, 49–51, 65, 68, 69, 76, 79, 80–85.

On October 23, 2015, plaintiffs filed a motion for conditional certification pursuant to 29
U.S.C. § 216(b), Dkt. 52, and a memorandum of law in support, Dkt. 53 ("Pl. Br.").  That day,
plaintiffs' counsel submitted a declaration in support of conditional certification, Prakash Decl.,
as did the named plaintiffs and eight opt-in plaintiffs.  Dkts. 55–64.  On November 13, 2015,
Wallace Morgan and Sprint filed briefs in opposition.  Dkt. 70 ("Sprint Br."); Dkt. 73 ("WM
Br.").  Sprint also filed a declaration by its counsel, Eichberger Decl., and a Sprint Manager of
Program Managers, Dkt. 72 ("Buongiovanni Decl.").  On November 19, 2015, plaintiffs replied.
Dkt. 77 ("Pl. Reply Br.").

## II.      Applicable Legal Standards

The FLSA provides that an action may be maintained against an employer "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  "Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (quoting *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).[12]

"In determining whether to exercise this discretion . . . the district courts of this Circuit appear to have coalesced around a two-step method," which the Second Circuit has endorsed as "sensible." *Id.* at 554–55; *see, e.g.*, *Romero v. H.B. Auto. Grp., Inc.*, No. 11 Civ. 386 (CM), 2012 WL 1514810, at *8 (S.D.N.Y. May 1, 2012); *Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819 (GEL), 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006); *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997).

"The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers*, 624 F.3d at 555.  "The court may send this notice after plaintiffs make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.* (quoting *Sbarro*, 982 F. Supp. at 261).  Although "[t]he 'modest factual showing' cannot be satisfied simply by

---

[12] *Hoffmann-La Roche* involved the parallel provision of the Age Discrimination in Employment Act, which incorporated the FLSA's enforcement provisions, including § 216(b).  "*Hoffmann-La Roche's* interpretation of § 216(b) . . .  binds us in FLSA cases as well." *Myers*, 624 F.3d at 554 n.9.

'unsupported assertions,' . . . it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist." *Id.* (quoting *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991)); *accord Damassia*, 2006 WL 2853971, at *3 ("[A] plaintiff's burden at this preliminary stage is 'minimal.'") (collecting cases); *Sbarro*, 982 F. Supp. at 261 ("The burden on plaintiffs is not a stringent one."). "A court need not evaluate the underlying merits of a plaintiff's claims to determine whether the plaintiff has made the minimal showing necessary for court-authorized notice." *Damassia*, 2006 WL 2853971, at *3; *accord Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 105 (S.D.N.Y. 2003); *Sbarro*, 982 F. Supp. at 262.

"At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Myers*, 624 F.3d at 555.

## III.   Discussion

### A.      Conditional Certification

Plaintiffs move for conditional certification of the following collective:

> [A]ll person [sic] who worked as account executives, corporate trainers, sales
> reps, or similar titles and whose job was to gather applications for enrollment in
> the Lifeline Program through Assurance Wireless at any time three years prior to
> the filing of the initial complaint in this action through the date the collective list
> is prepared.

Dkt. 52, at 1.

The Court's analysis of plaintiffs' motion proceeds as follows: The Court first inquires whether plaintiffs have adequately alleged a nationwide policy or practice of Sprint's that is

responsible for the alleged FLSA violations, such that all Agents, regardless of which Sprint Partner hired them, could be included in the conditionally certified collective.  Finding that plaintiffs have failed to make such a showing, the Court next considers whether the facts alleged are sufficient to support conditional certification of a more narrowly tailored class.  The Court concludes that, on the record before it, conditional certification of a class limited to Agents employed by Wallace Morgan in New York City, but not other Credico subcontractors, is appropriate at this time.

### 1.   Conditional Certification of a Nationwide Class of All Sprint Agents

Plaintiffs seek conditional certification of a class of "all person[s]" across the country whose job was to gather Lifeline applications for Assurance Wireless—regardless of which Sprint Partner directly employed them.  Dkt. 52, at 1.  To justify such conditional certification, plaintiffs must show a "factual nexus" that binds all Agents together as victims of a common unlawful practice.  *Sbarro*, 982 F. Supp. at 261; *see Vasquez v. Vitamin Shoppe Indus. Inc*., No. 10 Civ. 8820 (LTS), 2011 WL 2693712, at *3 (S.D.N.Y. July 11, 2011) ("As Plaintiff proposes a nationwide class, he bears the burden of showing a nationwide policy or plan pursuant to which [plaintiffs are subjected to FLSA violations].").  For the reasons that follow, plaintiffs have failed to do so.

> ### a.   *Plaintiffs have not demonstrated an official Sprint policy giving rise to the allegedly unlawful employment practices.*

To support the claim that all members of the putative collective are similarly situated, plaintiffs point to several Sprint policies, which Sprint acknowledges bind all Sprint Partners nationwide.  Pl. Br. 7–10; Pl. Reply Br. 5–7; *see* Sprint Br. 5.

For example, Sprint's Assurance Wireless Outreach Agency Program Standard Operating Procedures ("SOPs") impose various requirements on Sprint Partners.  These include that (1) all

Agents be trained and certified before conducting Assurance Wireless marketing; (2) all Agents deliver a "pitch" that conveys accurate information and courteous customer service; (3) all Agents wear professional attire in the field, including Assurance Wireless badges and t-shirts; (4) Sprint Partners obtain approval before using third parties to carry out the Assurance Wireless service; (5) Sprint Partners have at least one Account Manager dedicated to overseeing Assurance Wireless marketing; (6) Sprint Partners conduct events only in approved locations, and ensure that events are "staffed appropriately to meet/exceed productivity objectives"; and (7) Sprint Partners submit to audits in which Sprint employees pose as customers to ensure that Agents are complying with the SOPs and federal requirements.  Pl. Reply Br. 5–7 (citing Eichberger Decl., Ex. G ("SOPs")).

Sprint further requires of Sprint Partners that, before an Agent can engage in Assurance Wireless marketing, she must submit to a background check and complete an online Agent Acknowledgment Form ("AAF") certifying that she has been trained as to, and has agreed to abide by, all rules set forth in the SOPs.  Pl. Br. 8 (citing Prakash Decl., Ex. 11 ("AAF"); SOPs § 5(4)(a)(iv)).

Finally, plaintiffs point to the "Master Agreement" between Sprint and Credico, which plaintiffs claim is "a template" for all contracts between Sprint and the Sprint Partners.  This agreement: (1) limits Agents' ability to work for Sprint's competitors; (2) gives Sprint discretion over Agents' continued marketing of Assurance Wireless; (3) allows Credico to subcontract only if granted permission by Sprint; (4) states that Sprint may pay Credico additional fees for staffing of Sprint-requested events; (5) identifies the locations where Credico may operate; and (6) provides for bonus payments to Agents who meet certain qualifications.  Pl. Reply. Br. 6 (citing

Eichberger Decl., Ex. A ("Sprint-Credico Contract") ¶¶ 2–9; *id.*, Ex. D ("Sprint-Credico

Contract Amendment No. 3") ¶ II(A)(2)(i)).

These policies do indeed satisfactorily establish, at least at this preliminary stage, some

common practices that Sprint mandates across Sprint Partners and that bear, *inter alia*, on the

activities of Agents.  Critically, however, for purposes of determining the viability of a collective

for which conditional certification is sought, "the relevant practice that binds FLSA plaintiffs

together" must be "the one that is alleged to have violated the statute itself."  *Guillen v.*

*Marshalls of MA, Inc.* (*Guillen II*), No. 09 Civ. 9575 (LAP), 2012 WL 2588771, at *1 (S.D.N.Y.

July 2, 2012); *see Myers*, 624 F.3d at 555 (conditional class certification is appropriate only after

"plaintiffs make a modest factual showing that they and potential opt-in plaintiffs together were

victims of a common policy or plan *that violated the law*" (internal quotation marks and citation

omitted) (emphasis added)).  Applying this principle, courts in this Circuit have held that the fact

of a common job description or a uniform training regimen does not, alone, make those persons

subject to it "similarly situated" under the FLSA.  *See, e.g.*, *Khan v. Airport Mgmt. Servs., LLC*,

No. 10 Civ. 7735 (NRB), 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011) ("[P]laintiff's

reliance on the centralized job descriptions maintained by defendants is misplaced."); *Sprint*

*Nextel*, 2009 WL 7311383, at *3 (denying conditional certification where, as to practices of

general application, plaintiff pointed only to a presumptively lawful official policy, and, in

alleging FLSA violations, relied solely upon her deposition testimony as to her own treatment).

Here, the Sprint documents on which plaintiffs rely are conspicuously silent as to how

Agents are to be classified and paid.  Yet it is *these practices*, not the ones addressed in the

Sprint documents, that are the core determinants of whether Sprint choreographed nationwide

policies that violated the FLSA.  To be sure, the SOPs do indirectly bear on Sprint Partners'

utilization of the Agents, insofar as they require that events be "staffed appropriately to meet/exceed productivity objectives." SOPs § 5(1)(e). But they do not require, even implicitly, that any Agent work a specific or minimum number of hours (or events) per week. Nor do the SOPs prescribe the compensation any Agent is to be paid, or how the Agent is to be classified (*e.g.*, as an employee or independent contractor).

Similarly, although the Sprint-Credico Contract provides that Sprint will pay Credico between $16 and $35 for each approved Lifeline application, it is silent as to the wages and hours of Agents. Sprint-Credico Contract ¶ 9(a); Eichberger Decl., Ex. F ("Sprint-Credico Contract Amendment No. 5") ¶ II(A)(1)(a).[13] On the contrary, it expressly provides that *Credico* "has full control over its own employee relations, and will exercise complete control over the hiring, conduct, training, supervision, performance and termination of its employees." Sprint-Credico Contract ¶ 2(e)(ii). And of course, even if the Sprint-Credico Contract had dictated the compensation and schedules of the Agents who worked for Credico, this would not evidence a *nationwide* policy of Sprint, as opposed to one governing the subset of Sprint's business administered by Credico.[14]

---

[13] An amendment to the Sprint-Credico Contract provides for a one-time $500 Agent Retention Bonus paid to Credico for any Agent who meets certain qualifications. Sprint-Credico Contract Amendment No. 3 ¶ II(A)(2)(i). But it does not contain any provisions regarding Agents' routine compensation.

[14] This case thus is a far cry from those where nationwide conditional certification has been granted based on evidence of a company's "national policy" that itself gave rise to the alleged FLSA violations. *Compare Guttentag v. Ruby Tuesday, Inc.*, No. 12 Civ. 3041 (HB), 2013 WL 2602521, at *2 (S.D.N.Y. June 11, 2013) (certifying collective where defendant had nationwide policy that was "at least . . . reticent to pay for overtime work by its employees, as well as a centralized staffing and labor budget management system"); *Flood v. Carlson Rest. Inc.*, No. 14 Civ. 2740 (AT), 2015 WL 260436, at *3 (S.D.N.Y. Jan. 20, 2015) (certifying collective where plaintiffs presented evidence of defendants' consolidated control over individual T.G.I. Friday's employees' wages and schedules, including handbooks with information related to compensation and time-keeping policies, and centralized human resources and time-keeping systems); *and*

In sum, although the documents on which plaintiffs rely show some ways in which all Agents across the country are similarly treated at Sprint's hand, they do not so establish with regard to the employment conditions material to this lawsuit.  Indeed, in light of the documents' comprehensive regulation of Agents' customer-facing conduct, their silence as to Agents' pay and hours arguably gives rise to the contrary inference—explicitly stated in the Sprint-Credico Contract—that the Agents' hours and pay arrangements were instead set by an entity below Sprint and more proximate to the Agents (*e.g.*, the Sprint Partner or an intermediary such as Credico).  The written policies which plaintiffs cite, silent as they are as to Agents' wages, hours, or employment classification, thus do not supply evidence of an unlawful policy that would justify certification of a nationwide collective.

> b.    *A Sprint-wide policy cannot be inferred from plaintiffs'*
>       *declarations.*

In contrast to the Sprint documents, the declarations submitted by Martin, Singleton, and eight opt-in plaintiffs do allege employment practices that violate the FLSA.  As noted above, these declarants—who worked for Sprint Partners in parts of New York, Florida, and California—allege that they: (1) were misclassified as independent contractors; (2) were paid a flat rate of $10 per approved application, not based on their hours worked; (3) were required to

---

*Zivali v. AT & T Mobility LLC*, 646 F. Supp. 2d 658, 660 (S.D.N.Y. 2009) (certifying collective where employees nationwide were subject to a specific timekeeping system that "systematically failed to fully account for the hours worked by non-exempt employees"); *with Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) ("The Court declines to hold that facially-lawful policies, which encourage store management to make productive use of employees' time or to report for work when scheduled, can form the equivalent of a 'common policy or plan that violate[s] the law,' merely because they *indirectly* might encourage the minimization of overtime." (citation omitted)); *and Eng–Hatcher v. Sprint Nextel Corp.*, No. 07 Civ. 7350 (BSJ), 2009 WL 7311383, at *3–4 (S.D.N.Y. Nov. 13, 2009) (denying certification of proposed collective and class action where plaintiff alleged that legal reward policies to maximize sales and minimize overtime "incentivized" managers to act illegally).

work long days; (4) regularly worked more than 40 hours in a week without overtime pay; and (5) received pay that often fell short of minimum wage. They further allege that they observed that their coworkers were treated similarly. On the basis of these common experiences, plaintiffs ask the Court to infer a nationwide Sprint policy to foment unlawful practices.

This leap does not logically follow. Even assuming that Sprint directly employed each of the eight declarants—*i.e.*, that there were no intermediary organizations between Sprint and these Agents—it is questionable whether such a numerically and geographically limited number of declarations would suffice to permit the inference of a unitary practice across all states. *See Ahmed v. T.J. Maxx Corp.*, No. 10 Civ. 3609 (ADS), 2013 WL 2649544, at *14 (E.D.N.Y. June 8, 2013) (allegations from assistant store managers in New York, Connecticut, and Arkansas were insufficient basis on which to infer "a factual nexus between the Plaintiffs and the thousands of Assistant Store Managers working in more than 4,000 stores across nationwide [sic]"). Indeed, courts in this Circuit have commonly rejected the notion that a plaintiff can meet her burden for justifying nationwide certification merely by providing declarations of plaintiffs from more than a single geographic area. *Ahmed v. T.J. Maxx Corp.*, No. 10 Civ. 3609 (ADS), 2015 WL 2189959, at *10 (E.D.N.Y. May 11, 2015) ("[T]he fact that the Plaintiff presented evidence from [Assistant Store Managers] in nine states, without more, does not, as the Plaintiff suggests, show that the Defendants had a *de facto* illegal policy."). As Judge Woods has explained:

> The existence of many or widespread plaintiffs is, at best, evidence from which an inference might be drawn about the existence of a common illegal policy or plan. The probity of drawing such an inference, however, will turn in part on the number of plaintiffs from whom the Court has evidence compared to the size of the pool of potential opt-in plaintiffs. It may also be affected by the commonality of the substantive testimony or affirmations that the plaintiffs provide. While the required factual showing for conditional certification is modest, the mere existence of a certain number of plaintiffs, covering a sufficiently widespread

geographic area, should not be expected by itself to give rise to a legally sufficient basis to find that plaintiffs are similarly situated across the nation.

*Costello*, 2014 WL 4377931, at *6.

Courts have been especially hesitant to grant conditional certification of a vast class where structural considerations—such as a company's stratified or decentralized structure or the presence of intermediary entities between the company and the members of the putative collective—cast doubt on the claim that uniform company policies governed workers across a sprawling geographic area. *See, e.g.*, *Sprint Nextel*, 2009 WL 7311383, at *3 (declining to certify collective based on theory that individual store managers at Sprint locations nationwide implemented *de facto* common policy of under-compensating workers for overtime); *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 667 (S.D.N.Y. 2013) (declining statewide certification where "[n]othing in the record suggests that [the alleged FLSA violations] exist in other territories, which are managed and supervised by different people"). That logic is persuasive here, inasmuch as each declarant (and presumably each member of the putative collective) was separated from Sprint by one intermediary (the Sprint Partner) if not more (as with the declarants who worked for Wallace Morgan, which interacted with Sprint indirectly through Credico).

To be sure, plaintiffs are not required to submit evidence expressly implicating *every* Sprint Partner nationwide. *See Amador v. Morgan Stanley & Co. LLC*, No. 11 Civ. 4326 (RJS), 2013 WL 494020, at *6 (S.D.N.Y. Feb. 7, 2013). But they must, at a minimum, furnish evidence demonstrating that the declarants are a representative sample of the putative nationwide class. *See Guillen v. Marshalls of MA, Inc.* (*Guillen I*), 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) (affidavits of five Assistant Store Managers from nine of the 820 Marshalls stores nationwide was insufficient basis on which to conclude that unlawful policies were implemented at all Marshalls stores).

16

No such showing has been made here.  The declarants collectively represent employees from only six Sprint Partners, two of which (Wallace Morgan and Red Ten NYC) are subcontractors of one intermediary (Credico),[15] and three of which (Looped in, Signals United, and On Point OC) appear to be subcontractors of another (Smart Circle).[16]  And while the parties have not had an occasion to provide a complete list of Sprint Partners across the nation,[17] every indication is that this group is sizable in number.[18]

---

[15] *See* FAC ¶ 54 (noting that Wallace Morgan is a Credico subcontractor); Sprint-Credico Contract, at 19 ("Schedule 1") (listing Red Ten NYC as a Credico subcontractor).

[16] *See* Arroyo Decl. ¶ 7 ("On some Saturdays, our managers would hold meetings between Assurance Wireless [Agents] from Looped In and people with similar jobs who worked for two other companies: Signals United and On Point, OC.  My belief was that these three companies were all related to Smart Circle."); Gavidia Decl. ¶ 5 (noting that his managers at Signals United and Looped In had previously worked at On Point OC, and that he "believe[s] that all three . . . managers reported to the head of Smart Circle . . . at all times.").  On the present record, it is not clear whether the remaining Sprint Partner (Event Horizon Marketing) is also a subcontractor of Credico, Smart Circle, or another intermediary, or whether it contracts with Sprint directly.

[17] *See* Sprint Br. 9 ("Nor is there any representation that the . . . companies described as employers in the declarations is a complete list.  So there is no way to know how many other companies were involved in determining wages and hours for the members of the proposed nationwide collective, or whether the individuals who worked with those unnamed companies had similar experiences.").

[18] Sprint markets Assurance Wireless in at least 40 states.  *See* Prakash Decl, Ex. 6, at 1–2; FAC, Ex. E, at 3.  The FAC states that, apart from the six Sprint Partners represented by the named plaintiffs and declarants, "[o]ther Sprint Partners include *but are not limited to*: Red Ten; Signals United; Looped In; 2020 Marketing (which became Open Door Marketing); Cromex, Inc.; On Point OC; Smart Circle; and Red Crown."  FAC ¶ 59 (emphasis added).  In their declarations, opt-in plaintiffs Arroyo and Gavidia allude to additional Sprint Partners in Ohio and Colorado to which their former colleagues were sent to work.  Arroyo Decl. ¶ 6; Gavidia Decl. ¶ 10.  Schedule 1 of the Sprint-Credico Contract reveals that Credico alone contracts with at least 15 subcontractors.  Sprint-Credico Contract, at 19.  And the omission from this contract of Wallace Morgan and Cromex, Inc. ("Cromex")—a Sprint Partner/Credico-subcontractor identified in the FAC—reveals that this list is not exhaustive.

Moreover, plaintiffs have not come forward with any evidence that would situate the decision to implement the wage-and-hour practices of which they complain above the level of the declarants' immediate employers or the intermediary companies with which some of these employers contract.  *Cf. Brickey*, 272 F.R.D. at 348 ("Although [p]laintiffs have offered some evidence that certain Dolgencorp managers [maintained unlawful practices], plaintiffs have not shown that such activity was widespread or common practice, or that the managers did so because they were instructed, compelled, forced, or encouraged to do so by other [company] policies.").  Plaintiffs do not, for instance, make any concrete factual allegations to the effect that Agents employed by other Sprint Partners were subject to the same unlawful practices, or that the wage, hour, and classification practices that they protest were imposed by, or derived from, Sprint itself. [19]  *Compare Guillen I*, 750 F. Supp. 2d at 477 (denying nationwide collective certification where plaintiff "ha[d] no personal knowledge about how stores, other than those at which he was an employee, operated"), *with Costello*, 2014 WL 4377931, at *5 (granting conditional certification where plaintiff testified that she attended districtwide meetings encompassing approximately 14 Kohl's stores, where she was informed by employees of other stores that they were subjected to similar FLSA violations).  Plaintiffs' unsworn claims in their briefs that their experiences are shared by Agents nationwide, *see* Pl. Br. 15–16, are inadequate to fill this void, and, in any event, "too conclusory to support certification of all [Agents] absent any factual details" concerning the wage-and-hour policies of other Sprint Partners, or the basis

---

[19] Martin and Singleton do allege that, based on the morning meetings they attended with Agents employed by Cromex, they came to "believe that employees who worked for . . . Cromex also performed the same job duties that [they did], were paid in the same manner as [they were], and were subject to the same rules as [them]."  Martin Decl. ¶ 22; Singleton Decl. ¶ 21.  However, because Wallace Morgan and Cromex are both Credico subcontractors, these observations do not, without more, logically indicate a policy imposed at the Sprint level.

for this knowledge.  *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 459 (E.D.N.Y. 2014)

(nationwide conditional certification not appropriate where, "[c]ontrary to Plaintiffs' personal

knowledge as to the pay practices at the stores in which they worked, Plaintiffs' assertions about

the pay practices at other stores across the country are conclusory and unsupported").[20]

On this point, *Xavier v. Belfor USA Group, Inc.*, 585 F. Supp. 2d 873 (E.D. La. 2008) is

illustrative.  There, plaintiffs alleging overtime violations moved for conditional certification of a

class including all individuals who worked for a construction company, Belfor USA, performing

manual labor either directly or indirectly through various subcontractors throughout the nation.

*Id.* at 875.  During the relevant time period, Belfor utilized 2,100 subcontractors at different job

sites across at least 44 states.  *Id.* at 880.  The district court held that the plaintiffs had failed to

establish that they were similarly situated to potential opt-in plaintiffs nationwide because they

had not shown that their "circumstances and experiences with the payroll practices of the specific

subcontractor were similar to the remaining workers who worked for [the other] 2,100 or so

subcontractors who contracted with Belfor."  *Id.*  Rather, the court observed, "[t]here is simply

no evidence of a generally applicable policy or practice."  *Id.*  So too, here.  As in *Xavier*,

plaintiffs' declarations fail to establish that plaintiffs are similarly situated to Agents who have

worked for the many other Sprint Partners across the country.

---

[20] Sprint represents that individual Sprint Partners—not Sprint—control Agents' workday and
compensation, and that such policies vary across Sprint Partners.  Sprint Br. 6–8; Buongiovanni
Decl. ¶ 25.  Indeed, Sprint represents, at least one Sprint Partner hires Agents as employees,
rather than as independent contractors.  Sprint Br. 7; Buongiovanni Decl. ¶ 23.  At this
preliminary stage, of course, the Court has no occasion to make any finding of fact on this issue,
*see Lynch*, 491 F. Supp. 2d at 368, and today's ruling denying nationwide certification does not
rely on Sprint's factual representations.  The Court's ruling is instead based on plaintiffs' failure
to meet their burden of adducing adequate evidence of a nationwide practice giving rise to the
alleged FLSA violations.

The existence of an intermediary company does not, of course, preclude a finding of a nationwide practice attributable to a common principal such as Sprint. One can readily imagine a scenario in which a company with nationwide operations imposed a common policy as to wages, hours, or employment classifications that bound the intermediaries proximate to the affected workers. But, particularly given the sweep of the proposed nationwide collective here, spanning workers in more than 40 states, solid evidence of such a policy, not conjecture, is necessary. The Court will not simply assume that a practice of several subcontractors is common to *every* other subcontractor with ties to the collective as plaintiffs have defined it. *See Anjum v. J.C. Penney Co.*, No. 13 Civ. 460 (RJD), 2015 WL 3603973, at *7 (E.D.N.Y. June 5, 2015) (bids for nationwide conditional certification may require more evidentiary support than bids for certification of more localized collectives).[21] The need for some tangible proof of a nationwide practice is particularly acute here, in light of the obvious alternative explanation, to wit, that the relevant employment practices were authored by intermediaries below Sprint.[22]

---

[21] The court in *Xavier* distinguished *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d 793 (E.D. La. 2007), on which plaintiffs rely, *see* Pl. Reply Br. 4, on this ground. 585 F. Supp. at 880 (*Lima* did not govern request for conditional certification of nationwide class because, there, the court conditionally certified a collective limited to workers of "only two contractors performing manual labor services directly or indirectly through a subcontractor in the Gulf Coast area . . . for a limited period of time"). Plaintiffs' reliance on *Ondes v. Monsanto Co*., No. 11 Civ. 197 (JAR), 2011 WL 6152858 (E.D. Mo. Dec. 12, 2011), is similarly misplaced, because, there, while the defendant company employed nine staffing agencies to hire employees, the plaintiff sought only to certify a class that consisted of employees at one Missouri location. *Id.* at *4, *5 n.3.

[22] *Nicholson v. UTi Worldwide, Inc.*, No. 09 Civ. 722 (JPG), 2011 WL 250563 (S.D. Ill. Jan. 26, 2011), on which plaintiffs rely, is for this reason—and others—distinct. There, although some employees were hired by temporary staffing agencies, not by UTi directly, all worked onsite at UTi's forklift facilities under the supervision of UTi supervisors. *Id.* at *4–5. There was thus a direct nexus between UTi and the members of the putative collective that is lacking here, where the available evidence indicates that Agents work in the field and report only to supervisors employed by their Sprint Partners, and that the Sprint Partners maintain their own offices and management structures.

Under these circumstances, plaintiffs' declarations fail to adequately show that the policies they protest are traceable in some way to the one company (Sprint) that would unite the existing plaintiffs, including opt-ins, and the balance of the nationwide putative class. Because "there may be vast differences in the practices of individual [Sprint Partners] across the country," *Guillen I*, 750 F. Supp. 2d at 478, the eight declarants' descriptions of their personal experiences are "too thin a reed on which to rest a nationwide certification," *Vasquez*, 2011 WL 2693712, at *3; *accord Guillen II*, 2012 WL 2588771, at *1 ("Plaintiff's argument for conditional nationwide class certification is fatally flawed insofar as it would require this Court to ignore Plaintiff's inability to point to a factual nexus between his own wage and hour claim and the claims of thousands of other Marshalls Assistant Store Managers . . . across 830 Marshalls stores across the country."); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (E.D.N.Y. 2008).[23]

---

[23] Plaintiffs cite a few cases in which courts have applied a more lenient standard that is apparently satisfied by a plaintiff's "bare allegations" of a nationwide scheme. *See, e.g.*, *Edwards v. Multiband Corp.*, No. 10 Civ. 2826 (MJD), 2011 WL 117232, at *4 (D. Minn. Jan. 13, 2011) (finding "colorable basis" standard satisfied by plaintiff's unsupported allegations that unlawful wage-and-hour policies applied uniformly across subcontractors); *Lang v. DirecTV, Inc.*, No. 10 Civ. 1085 (NJB), 2011 WL 6934607, at *7–8 (E.D. La. Dec. 30, 2011) (certifying nationwide class based on plaintiffs' unsubstantiated allegations that DirecTV enforced national scheduling and compensation policies, "affecting all technicians, no matter for which [subcontractor] they worked for"). However, the weight of case law in this Circuit requires a concrete, *i.e.*, non-conclusory, showing. *See Sharma*, 52 F. Supp. 3d at 459 (nationwide certification not warranted where "plaintiffs' assertions about the pay practices at other stores across the country are conclusory and unsupported"); *She Jian Guo v. Tommy's Sushi Inc.*, No. 14 Civ. 3946 (PAE), 2014 WL 5314822, at *3 (S.D.N.Y. Oct. 16, 2014), *reconsideration denied*, 2014 WL 7373460 (S.D.N.Y. Dec. 29, 2014) ("[V]ague, conclusory, and unsupported assertions do not suffice. . . . Although plaintiffs' burden at this stage is modest, it is not non-existent, and certification is not automatic." (internal quotation marks and citations omitted)); *Morales v. Plantworks, Inc.*, No. 05 Civ. 2349 (DC), 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006) ("[P]laintiffs have offered only a conclusory allegation in their complaint; they have offered nothing of evidentiary value."). And while the *Lang* court granted conditional certification on the premise that the defendant company could later seek decertification if certification proved unjustified, *see* 2011 WL 6934607, at *7, here, "[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the

c.      Conclusion

The Court holds that neither Sprint's official documents nor plaintiffs' declarations, whether viewed separately or together, supply credible evidence of a unitary Sprint policy governing the hours, wages, or employment classifications of the many Agents who constitute the proposed collective.  Plaintiffs' bid for collective certification of a class of all persons nationwide who gathered applications for Assurance Wireless is, therefore, denied.[24]

## 2.      Conditional Certification of a Credico-Wide Class

For the first time in their reply brief, plaintiffs alternatively request certification of a class limited to Agents who, in the last three years, marketed Assurance Wireless's Lifeline Program through Credico, either directly or through one of its subcontractors.  Pl. Reply Br. 9.  In support, plaintiffs point to the Sprint-Credico Contract, Credico's "Daily Checklist," and the declarations of five plaintiffs who worked for Credico subcontractors, as purported evidence that "Agents who worked through Credico are similarly situated."  *Id.*  For much the same reasons reviewed above, this evidence is insufficient to sustain such certification.

First, as noted, the Sprint-Credico Contract does not contain any provisions regarding the hours or general compensation of individual Agents.  The Daily Checklist is similarly silent on

---

matter should not proceed as a collective action because the class members are not similarly situated."  *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 803 (S.D.N.Y. 2012), *adopted*, *Guillen II*, 2012 WL 2588771 (internal quotation marks and citation omitted).

[24] This holding is not a merits determination.  Plaintiffs, of course, remain at liberty to attempt to establish that Sprint, based on a joint-employer theory, is accountable for any FLSA violations that are found to have occurred.  *See Lynch*, 491 F. Supp. 2d at 368; *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005) (focus at certification stage "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated . . . with respect to their allegations that the law has been violated" (internal quotation marks omitted)).

any employment conditions that might implicate the FLSA. *See* Eichberger Decl., Ex. J. These documents, therefore, do not support a Credico-wide policy with respect to wages, hours, or employment classification.

Moreover, the declarants provide testimony about the policies of only three Credico subcontractors—Wallace Morgan, Cromex, Inc., and Red Ten NYC—all of which are located in New York City.[25] No declarant purports to have personal knowledge about the policies of other Credico subcontractors that engage in marketing for Assurance Wireless. Nor do they allege that the unlawful policies to which they were subject derived from Credico, as opposed to the Sprint Partner that directly hired them. The declarations thus fail to supply a basis on which the Court could infer a common FLSA-violative policy spanning all Sprint Partners that contract with Sprint through Credico. *See Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 557–60 (S.D.N.Y. 2013) (limiting notice to employees in six out of 33 New York locations where plaintiffs failed to allege facts supporting an inference of a common policy across all stores); *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 444–45 (S.D.N.Y. 2012) (conditionally certifying a modified class of employees in only one of defendant's divisions where plaintiff adduced evidence of a common practice with respect to only this one location); *Monger v. Cactus Salon & SPA's LLC*, No. 08 Civ. 1817 (FB), 2009 WL 1916386, at *2 (E.D.N.Y. July 6, 2009) (denying conditional certification of employer's 25 other locations, where "[p]laintiffs'

---

[25] Opt-in plaintiff Michael Kates submitted a declaration with regard to his experience at Red Ten NYC; Martin, Singleton, and opt-in plaintiffs Piper and Armstrong submitted declarations with regard to their experiences at Wallace Morgan. Martin and Singleton further allege that, based on the morning meetings they attended with Agents employed by Cromex, they "believe that employees who worked for . . . Cromex also performed the same job duties that [they did], were paid in the same manner as [they were], and were subject to the same rules as [them]." Martin Decl. ¶ 22; Singleton Decl. ¶ 21. Cromex is a Credico subcontractor that serves as a Sprint Partner and shares office space with Wallace Morgan. FAC ¶¶ 59, 61.

only evidence that other locations' employees are similarly situated is that they 'believe' that all hair stylists and shampoo assistants are subject to the same polices[;] [t]hey offer no basis for this belief; they name no individuals at other salons who are similarly situated; and they provide no documentary evidence that policies are the same at different . . . locations").

Plaintiffs, therefore, have not met their modest burden of establishing a factual nexus linking all members of the proposed Credico-wide collective. The deficiency of plaintiffs' 11th-hour application is especially acute given the scale of the proposed collective. The record does not reflect the number of subcontractors that would be covered by a Credico-wide class. But Schedule 1 of the Sprint-Credico Contract identifies 15 approved Credico subcontractors across 10 states, and there may well be many more.[26] As such, plaintiffs' proposed Credico-based collective would, again, geographically span the nation.

The Court "cannot justify certifying a class of plaintiffs, likely numbering in the hundreds, on the basis of such thin factual support" as that presented here. *Laroque*, 557 F. Supp. 2d at 356; *accord Guillen v. Marshalls of MA, Inc*., 841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012), *adopted*, *Guillen II*, 2012 WL 2588771 (denying nationwide certification where plaintiff relied on affidavits from five Assistant Store Managers who all worked in stores in the New York City area); *Vasquez*, 2011 WL 2693712, at *3 (denying certification where movant relied

---

[26] That neither Wallace Morgan nor Cromex appears on this schedule reveals that it is not comprehensive. The filings in a separate suit pending before this Court involving Credico indicate that there may be far more Credico subcontractors than identified in the schedule produced here. *See* Plaintiff's Motion for Conditional Certification and Judicial Notice, *Vasto et al. v. Credico (USA) LLC*, No. 15 Civ. 9298, Dkt. 62, at 7 (S.D.N.Y. Dec. 22, 2015) (alleging that Credico "operates a network of over 100 subsidiary companies across the United States, including Cromex, Assurance International, Vaeley Marketing Group, Inc., Wallace Morgan, Marketing on 6th, Renegade Global, and others," and that "[t]hese companies are located throughout the country, including in Illinois, New York, Arizona, California, Nevada, Massachusetts, Texas, and New Jersey").

upon a uniform job description and evidence from a limited, "geographically concentrated cluster"); *Ahmed*, 2013 WL 2649544, at *13 (rejecting nationwide certification where evidence was from an "extremely limited" geographic region).

Accordingly, on the record at hand, the Court declines to conditionally certify a Credico-wide class.

### 3.    Conditional Certification of a Wallace Morgan/New York Class

Although plaintiffs have not established the existence of an unlawful policy on the part of Sprint or Credico, they have adequately demonstrated that all Agents employed by Wallace Morgan in New York City are similarly situated with regard to the alleged FLSA violations.[27]

The FAC alleges that all Agents at Wallace Morgan are classified as independent contractors, have set schedules of 11–12 hours per day, 5–6 days per week (amounting to a total of 55–72 hours), and are paid only a flat rate of $10 per approved application.  FAC ¶¶ 95, 104, 114, 117.  More specifically, the FAC alleges that, during their tenure at Wallace Morgan, Martin and Singleton were consistently required to work more than 40 hours per week, while, at all times, receiving no more than $10 per application.  *Id.*  ¶¶ 97, 104, 117, 122.  As a result, the FAC alleges, Martin and Singleton's rights under the FLSA to a minimum wage and to overtime pay were routinely denied.  *Id.* ¶¶ 119–22.  In their declarations, Martin and Singleton attest that other Agents employed by Wallace Morgan "performed the same job duties that [they did], were paid in the same manner as [they were], and were subject to the same rules as [them]."  Martin Decl. ¶ 22; Singleton Decl. ¶ 21.

---

[27] In their reply brief, plaintiffs clarify that, contrary to Wallace Morgan's suggestion, *see* WM Br. 3–5, they are not "claiming that Wallace Morgan applied a policy beyond its operation in New York."  Pl. Reply Br. 9 n.10.

These allegations are corroborated by the declarations of Piper and Armstrong.  Both allege that, while working at Wallace Morgan, they were "required [to] work long days, starting early in the morning and ending after the close of business," while being subject to the same flat-rate payment scheme described by Martin and Singleton.  Piper Decl. ¶¶ 9–12; Armstrong Decl. ¶¶ 9–11.  And, like Martin and Singleton, Piper and Armstrong allege that they observed that their coworkers with similar job titles[28] performed the same job duties, and were subject to the "same rules" and payment scheme.  Piper Decl. ¶ 19; Armstrong Decl. ¶ 19.  The Court can fairly infer that these "rules" included the requirement to work long hours, and that the other Wallace Morgan Agents were thereby similarly denied minimum wage and overtime pay as required by the FLSA.  *See She Jian Guo*, 2014 WL 5314822, at *3 (affidavits establishing that three named plaintiffs were denied overtime and minimum wage support inference that other restaurant employees at single location worked similar shifts for comparable pay).

Plaintiffs have, therefore, "made the modest showing that is required of them at this preliminary stage" to justify conditional certification of a Wallace Morgan-wide class:  They have shown that "they were subjected to certain wage and hour practices at [Wallace Morgan] and to the best of their knowledge, and on the basis of their observations, their experience was shared by members of the proposed class."  *Iglesias–Mendoza v. La Belle Farm, Inc*., 239 F.R.D. 363, 368 (S.D.N.Y. 2007); *see, e.g.*, *Cohen*, 686 F. Supp. 2d at 331 (granting conditional certification of all research associates at one company based on two affidavits); *Khamsiri v. George & Frank's Japanese Noodle Rest. Inc*., No. 12 Civ. 0265 (PAE), 2012 WL 1981507, at *1 (S.D.N.Y. June 1, 2012) (granting conditional collective certification based on employee's

---

[28] Piper worked first as a "Sales Rep" and later as a "Team Leader."  Piper Decl. ¶ 4.  Armstrong worked under the title of "Sales Associate."  Armstrong Decl. ¶ 4.

sworn allegations that she and other employees were paid less than the statutory minimum and not compensated for overtime); *Caspar v. Personal Touch Moving, Inc*., No. 13 Civ. 8187 (AJN), 2014 WL 4593944, at *5 (S.D.N.Y. Sept. 15, 2014) (granting conditional certification based on five affidavits from employees, stating that each worked in excess of 40 hours per week but did not receive overtime compensation).

Wallace Morgan argues that conditional certification is unwarranted because there has been no finding as to whether the members of the putative collective were exempt from the FLSA, either as independent contractors or as outside salespersons.  WM Br. 1, 6–7.  "At the crux of this argument is [d]efendants' contention that [their] classification of all [Agents] as exempt is proper and that the [Agents'] job description . . . is facially lawful." *Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160 (JPO), 2012 WL 260230, at *5 (S.D.N.Y. Jan. 27, 2012).

It is premature, however, to resolve this merits issue.  *Id.*  The FAC contains sufficient allegations to make the claim of employee status plausible.  And at the conditional certification stage, "a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated." *Lynch*, 491 F. Supp. 2d at 368; *see also Young*, 229 F.R.D. at 54; *Sbarro*, 982 F. Supp. at 262 ("[T]he Court need not evaluate the merits of plaintiffs' claims in order to determine that a definable group of similarly situated plaintiffs can exist here.").[29]  Here, plaintiffs have established that they are similarly situated to all other

---

[29] Indeed, conditional certification is routinely granted in cases that involve claims by the defendant that an independent-contractor or outside-salesperson exemption applies.  *See, e.g.*, *Jeong Woo Kim v. 511 E. 5th St., LLC*, 985 F. Supp. 2d 439, 447 (S.D.N.Y. 2013) (independent-contractor exemption); *In re Penthouse Executive Club Comp. Litig.*, No. 10 Civ. 1145 (NRB), 2010 WL 4340255, at *4 (S.D.N.Y. Oct. 27, 2010) (same); *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825 (PKC), 2011 WL 2207586, at *6 (S.D.N.Y. June 2, 2011) (outside-salesperson exemption); *Ack v. Manhattan Beer Distributors, Inc.*, No. 11 Civ. 5582 (CBA), 2012 WL 1710985, at *5 (E.D.N.Y. May 15, 2012) (same).

Agents employed by Wallace Morgan with regard to the alleged overtime and minimum wage violations.  No more is required at this stage.[30]

In a separate argument, Wallace Morgan argues that "the mere classification of a group of employees . . . as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes."  WM Br. 9 (citing *Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012)).  But *Jenkins* is inapposite.  Plaintiffs here rely on more than the asserted misclassification of Agents as exempt as the basis for their FLSA claims.  Their declarations identify discrete wage-and-hour practices at Wallace Morgan as the source of the allegedly systematic overtime and minimum wage violations.

Finally, Wallace Morgan opposes conditional certification on the ground that plaintiffs have not shown that they and the proposed collective "have sufficient interest in this action."  WM Br. 7.  This Circuit does not impose such a requirement at this stage.  *See Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) (citing *Braunstein v. E. Photographic Labs., Inc.*, 600 F.2d 335, 336 (2d Cir. 1978)) ("FLSA plaintiffs are not required to show that putative members of the collective action are interested in the lawsuit in order to

---

[30] Wallace Morgan is similarly wrong to claim that the potential need for individualized inquiries into whether an FLSA exemption applies precludes conditional certification.  Wallace Morgan is at liberty later to seek decertification if, following discovery, the need for an individualized assessment of this issue becomes apparent.  *See Francis v. A & E Stores, Inc.*, No. 06 Civ. 1638 (CS), 2008 WL 4619858, at *3 n.3 (S.D.N.Y. Oct. 16, 2008) ("[Cases] denying conditional certification where fact-specific inquiry might be required[ ] seem to be against the weight of authority in undertaking that analysis at the first stage of the certification process, rather than evaluating at the decertification stage whether the need for individual analysis makes a collective action inappropriate."); *In re Penthouse*, 2010 WL 4340255, at *4 (argument that class certification is improper because the issue of whether plaintiffs qualified as independent contractors will require an individualized inquiry "borders on specious").

obtain authorization for notice of the collective action to be sent to potential plaintiffs."); *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 622 (D. Conn. 2007) ("[I]dentifi[cation] [of] other potential class members who would want to participate in this action, . . . at this preliminary stage, is not required in the Second Circuit.").  In any event, the declarations of Martin, Singleton, Piper, and Armstrong are "more than sufficient" to support conditional certification of Wallace Morgan-wide collective.  *Jeong Woo Kim*, 985 F. Supp. 2d at 449.[31]

The Court, therefore, approves collective certification of a class limited to all Wallace Morgan employees in New York City whose job was to gather applications for enrollment in the Lifeline Program during the relevant time period.

### B.    Proposed Judicial Notice and Consent Form

"Upon authorizing the distribution of notice to potential opt-in plaintiffs, the district court maintains 'broad discretion' over the form and content of the notice."  *Chhab v. Darden Rest., Inc.*, No. 11 Civ. 8345 (NRB), 2013 WL 5308004, at *15 (S.D.N.Y. Sept. 20, 2013) (quoting *Gjurovich*, 282 F. Supp. 2d at 106 (*citing Hoffmann–La Roche*, 493 U.S. at 170)).

Plaintiffs seek approval of a judicial notice and consent form (the "Notice"), Prakash Decl., Ex. 16, which they propose be distributed to all putative class members via (1) first class mail, (2) email, and (3) text message.[32]  Pl. Br. 22–23.  Additionally, they request authorization

---

[31] The Court also rejects Wallace Morgan's claim that "additional discovery is necessary" before the Court can certify a collective.  *See* WM Br. 1.  The allegations in the FAC and plaintiffs' declarations are sufficient.  The Court is "not obliged to wait for the conclusion of discovery before it certifies the collective action and authorizes notice."  *Iglesias–Mendoza*, 239 F.R.D. at 368; *see also Lynch*, 491 F. Supp. 2d at 369 ("Because courts do not weigh the merits of the claim, extensive discovery is not necessary at the notice stage.").

[32] Plaintiffs propose a special "Text Notice" that states: "If you gathered applications for Lifeline phones and services through Assurance Wireless at any time since [three years prior to initial complaint], you may be entitled to join a lawsuit claiming back pay.  For additional information

to send a reminder notice ("Reminder Notice") to potential plaintiffs who have not yet opted into the action 15 days before the close of the notice period.  Pl. Br. 24; Prakash Decl., Ex. 19.

As a threshold matter, plaintiffs are directed to revise the Notice to reflect the Court's restriction of the proposed collective to include only those Agents employed by Wallace Morgan in New York City.  Defendants raise a number of additional objections to the scope, content, and manner of delivery of the notice.  WM Br. 10–17; Sprint Br. 5 n.4; Eichberger Decl., Exs. K, L. The Court addresses these objections in turn.

### 1.    Scope of the Notice

Plaintiffs propose that the Notice be sent to all Agents who gathered Lifeline Applications for Assurance Wireless within the three-year period preceding the commencement of this lawsuit, and that potential opt-ins be given 60 days to join the collective action.  Pl. Br. 22–23; Notice, at 1.  Wallace Morgan argues that (1) a two-year limitations period is more appropriate; (2) the limitations period should be measured from the date the Court grants conditional certification, rather than from the date of filing of the complaint; and (3) the opt-in period should be less than 60 days. WM Br. 12–13.

"The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions, but allows a three-year limitations period for 'a cause of action arising out of a willful violation.'"  *Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 141 (2d Cir. 1999) (citing 29 U.S.C. § 255(a)).  When willfulness is disputed, courts typically apply the three-year limitations period in defining the scope of a collective action.  *Gaspar v. Pers. Touch Moving, Inc.*, No. 13 Civ. 8187 (AJN), 2014 WL 4593944, at *6–7; *Hamadou*, 915 F. Supp. 2d at 668.  Because the

---

about the case, including how to join, please call the workers' attorneys at 612-256-3200."
Prakash Decl., Ex. 17.

parties here dispute the applicability of the willfulness standard, *compare* FAC ¶¶ 128–37, 141

(alleging willfulness), *with* WM Br. 12 ("There has not been . . . a showing [of willfulness] in

this case."), the Court will apply the three-year standard.

"[B]ecause the three-year statute of limitations period for willful FLSA violations runs

for each individual plaintiff until that individual opts into the action, notice is generally directed

to those employed within three years of the date of the mailing of the notice." *Bittencourt v.*

*Ferrara Bakery & Cafe Inc.*, 310 F.R.D. 106, 116 (S.D.N.Y. 2015) (citing 29 U.S.C. §§ 255,

256; *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011)).

Plaintiffs argue that the Court should toll the statute of limitations to "avoid inequitable results."

Pl. Reply Br. 10 n.14.  However, equitable tolling is appropriate "only in rare and exceptional

circumstances," *Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 150 (2d Cir. 2013)

(internal quotation marks and citation omitted), "where a plaintiff has been prevented in some

extraordinary way from exercising his rights," *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir.

1996) (citation omitted).[33]  Plaintiffs here have not alleged any such unusual or extraordinary

circumstances.[34]  Moreover, less than two and a half months have transpired since the filing of

---

[33] In determining whether to toll the statute of limitations, the Court should also consider whether
the plaintiff has "acted with reasonable diligence during the time period she seeks to have
tolled." *Zerilli–Edelglasss v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (internal
quotation marks omitted).

[34] That Wallace Morgan and original defendant Assurance Wireless, LLC obtained extensions of
the time to answer the original complaint does not constitute "extraordinary circumstances"—
especially because these extensions were brief and occurred before the filing of the FAC.  *See*
*Guzman v. Three Amigos SJL Inc.*, No. 14 Civ. 10120 (GBD), 2015 WL 4597427, at *10
(S.D.N.Y. July 30, 2015) (three-and-a-half month delay between filing of plaintiffs' motion and
its resolution "is not of a magnitude that would justify tolling"); *and Mark v. Gawker Media*
*LLC*, No. 13 Civ. 4347 (AJN), 2014 WL 5557489, at *3 (S.D.N.Y. Nov. 3, 2014) (11-month
delay in resolving plaintiffs' conditional approval motion not "extraordinary" and thus did not
justify equitable tolling from the date the motion was filed).

the FAC.  The Court, therefore, declines to equitably toll the statute of limitations "with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date." *Trinidad*, 962 F. Supp. 2d at 564 n.14 (quoting *Hamadou*, 915 F. Supp. 2d at 668) (internal quotation marks omitted).  Accordingly, the Notice shall be directed to all Agents employed by Wallace Morgan within three years of the date of issuance of the court-approved Notice.

Finally, the Court approves the proposed 60-day opt-in period.  While Wallace Morgan argues that this period is too long, it fails to explain this objection, except as a matter of self-interest, or to suggest a more appropriate duration.  WM Br. 13.  Sixty-day opt-in periods are common in FLSA collective actions, *Whitehorn*, 767 F. Supp. 2d at 452 (collecting cases); *Diaz v. S & H Bondi's Dep't Store*, No. 10 Civ. 7676 (PGG), 2012 WL 137460, at *8 (S.D.N.Y. Jan. 18, 2012) (same).  The Court finds a period of that length reasonable here.[35]

### 2.    Content of the Notice

With regard to the content of the Notice, defendants first argue that the proposed Notice's cursory statement that "Defendants deny the Plaintiffs' claims" does not adequately represent defendants' positions and defenses.  WM Br. 11; *see also* Eichberger Decl., Ex. L, at 2.  Indeed, courts frequently direct plaintiffs to include a more expansive account of defendants' denials, as well as the status of the action, in the introduction section of a collective action notice.  *Anjum*,

---

[35] Wallace Morgan does not object to the distribution of the proposed Reminder Notice.  "Given that notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt-in, [the Court] find[s] that a reminder notice is appropriate."  *Chhab*, 2013 WL 5308004, at *16; *accord Michael v. Bloomberg L.P.*, No. 14 Civ. 2657 (TPG), 2015 WL 1810157, at *4 (S.D.N.Y. Apr. 17, 2015); *Lopez v. JVA Indus., Inc.*, No. 14 Civ. 9988 (KPF), 2015 WL 5052575, at *4 (Aug. 27, 2015).  Plaintiffs are, therefore, authorized to distribute the Reminder Notice 15 days before the close of the 60-day opt-in period.

2015 WL 3603973, at *15; *see also Enriquez v. Cherry Hill Mkt. Corp.*, No. 10 Civ. 5616 (FB),
2012 WL 440691, at *4 (E.D.N.Y. Feb. 10, 2012) (approving language informing potential
plaintiffs that defendants intend to move to decertify the collective action). "[P]roportionality" is
"the key to assessing whether a proposed notice adequately captures the defendant's position."
*Hernandez v. Merrill Lynch & Co.*, No. 11 Civ. 8472 (KBF), 2012 WL 1193836, at *5 (S.D.N.Y.
Apr. 6, 2012) (collecting cases). Here, "[i]n review of the proposed notice, it is clear that
plaintiffs' description of their case is lengthier [and more detailed] than the description of
defendants' position." *Id.* at *5. Accordingly, plaintiffs are directed, in consultation with the
defense, to amend the Notice to include (1) a more fulsome statement of defendants' positions
and defenses, and (2) an explicit statement that the Court has not yet made any determination on
the merits of plaintiffs' claims. The Court expects counsel to work together harmoniously to
agree upon such text.

Second, Wallace Morgan asks that the Notice include contact information for defense
counsel. WM Br. 14. Enclosure of such information is routine, and it, too, should be included in
plaintiffs' Notice. *See, e.g.*, *Gonzalez v. Scalinatella, Inc.*, No. 13 Civ. 3629 (PKC), 2013 WL
6171311, at *4 (S.D.N.Y. Nov. 25, 2013); *Limarvin v. Edo Rest. Corp.*, No. 11 Civ. 7356
(DAB), 2013 WL 371571, at *3 (S.D.N.Y. Jan. 31, 2013); *Bah v. Shoe Mania, Inc.*, No. 08 Civ.
9380 (LTS), 2009 WL 1357223, at *4 (S.D.N.Y. May 13, 2009).[36]

Third, Wallace Morgan requests that the Notice advise potential opt-ins that they may
retain their own counsel. WM Br. 14. Plaintiffs do not object to this request. Pl. Reply Br. 9–10
n.13. Courts frequently approve language clarifying that opt-in plaintiffs are "not required to

---

[36] The Court approves Wallace Morgan's proposed language cautioning potential opt-in
plaintiffs not to contact defense counsel directly if they choose to join the action. Plaintiffs
should include this language in the Notice, as well.

accept plaintiffs' counsel as their own." *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 678 F. Supp. 2d 89, 95 (E.D.N.Y. 2010); *accord Siewmungal v. Nelson Mgmt. Grp. Ltd.*, No. 11 Civ. 5018 (BMC), 2012 WL 715973, at *4 (E.D.N.Y. Mar. 3, 2012); *Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 274 (S.D.N.Y. 2012).  Plaintiffs should modify the Notice to provide such clarification.

Fourth, Wallace Morgan contends that putative opt-in plaintiffs should be directed to send their consent forms to the Clerk of Court, rather than to plaintiffs' counsel, on the theory that the latter practice implicitly discourages opt-in plaintiffs from selecting other counsel. WM Br. 17.  Courts in this District are split on this issue.  *Compare Fonseca v. Dircksen & Talleyrand Inc.*, No. 13 Civ. 5124 (AT), 2014 WL 1487279, at *5 (S.D.N.Y. Apr. 11, 2014) (opt-in forms should be returned to plaintiffs' counsel to reduce the burden on opt-in plaintiffs and the court), *with Hernandez v. Fresh Diet Inc.*, No. 12 Civ. 4339 (ALC) (JLC), 2012 WL 5936292, at *2 (S.D.N.Y. Nov. 21, 2012) (consent forms must be submitted to the Clerk of Court to avoid discouraging opt-in plaintiffs from retaining their own counsel).  The majority of courts, however, have directed opt-in plaintiffs to mail the consent forms to plaintiffs' counsel.  *See, e.g.*, *Cordova v. SCCF, Inc.*, No. 13 Civ. 5665 (LTS), 2014 WL 3512820, at *6 (S.D.N.Y July 16, 2014); *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 128 (S.D.N.Y. 2014); *Gonzalez*, 2013 WL 6171311, at *4; *Delaney v. Geisha NYC, LLC*, 261 F.R.D. 55, 59–60 (S.D.N.Y. 2009).  Because the revised Notice will clarify that opt-in plaintiffs may retain their own attorneys, there is no reason to depart from the majority approach here.  *See Delaney*, 261 F.R.D. at 60 ("Because the notice states that opt-in plaintiffs can select their own counsel, there is only a minimal risk that opt-in plaintiffs will be discouraged from seeking their own counsel.").  Therefore, the opt-in forms shall be returnable to plaintiffs' counsel.

Fifth, Wallace Morgan argues that the Notice must provide more information about what participating in the case entails.  WM Br. 15–16.  Specifically, Wallace Morgan asks that the Notice inform potential opt-ins that they may be required to respond to written questions, be deposed, and testify at trial.  *Id.* at 15.  Courts in this District routinely approve similar requests.  *See, e.g.*, *Whitehorn*, 767 F. Supp. 2d at 450 (language notifying prospective class members of "the possibility that they will be required to participate in discovery and testify at trial . . . is routinely accepted"); *Romero v. Flaum Appetizing Corp.*, No. 07 Civ. 7222 (BSJ), 2009 WL 2591608, at *6 (S.D.N.Y. Aug. 17, 2009).  A brief explanation of the potential responsibilities of opt-in plaintiffs is warranted here, as it will help putative class members make an informed decision about whether to join this action.[37]

### 3.   Distribution of the Notice

Wallace Morgan argues that distribution of the Notice should be limited to first-class mail because plaintiffs have not demonstrated special circumstances that warrant email or text message delivery, which Wallace Morgan contends may "distort[ ] . . . and compromise[ ] the integrity of the notice process."  WM Br. 16.  Plaintiffs argue that email and text message distribution are necessary here given the high turnover of Agents and the likelihood that mailing addresses in defendants' records may be outdated.  Pl. Br. 23.

---

[37] However, the Court rejects Sprint's request that the Notice inform plaintiffs that they "may be assessed a pro rata share of the costs [of litigation]" if they do not prevail.  *See* Eichberger Decl., Ex. L, at 3.  Although some courts have permitted such language, *see, e.g.*, *Cordova*, 2014 WL 3512820, at *7, "others have found language about potential costs to be inappropriate [g]iven the remote possibility that such costs for absent class members would be other than de minimis, and the risk of an in terrorem effect that is disproportionate to the actual likelihood that costs . . . will occur in any significant degree."  *Bittencourt*, 310 F.R.D. at 117–18 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).  The Court finds this reasoning persuasive.

Courts in this Circuit routinely approve email distribution of notice and consent forms in FLSA cases. *See, e.g.*, *In re Deloitte & Touche, LLP Overtime Litig.*, 11 Civ. 2461 (RMB) (THK), 2012 WL 340114, at *2 (S.D.N.Y. Jan. 17, 2012) (allowing email notice because "communication through email is the norm"); *Pippins v. KPMG LLP*, No. 11 Civ. 0377 (CM), 2012 WL 19379, at *14 (S.D.N.Y. Jan. 3, 2012) ("given the reality of communications today," email notice is appropriate). Courts have also permitted text message distribution where, as here, the nature of the employer's business facilitated a high turnover rate among employees. *Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14 Civ. 2625 (RJS), 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015); *see also Chamorro v. Ghermezian*, No. 12 Civ. 8159 (TPG), Dkt. 17, ¶ 2(1) (S.D.N.Y. Feb. 25, 2013). The Court thus authorizes email distribution of the Notice and dissemination of the Text Notice, as well as delivery of the Notice by first class mail.

Wallace Morgan also asks the Court to order plaintiffs' counsel to cease and desist from initiating unauthorized communication with putative class members following conditional certification of the proposed collective. WM Br. 17. However, "[i]n order for the Court to issue a restraint on communications with a putative class, it 'must be based upon a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.'" *Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 164 (N.D.N.Y. 2008) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981)). Here, there is no record of any abuse or of any misleading statements by plaintiffs' counsel that would jeopardize "timely, accurate, and informative" notice to the putative class. *Hoffmann-La Roche*, 493 U.S. at 172. The Court, therefore, declines to restrict plaintiffs' counsel's communications with potential opt-in plaintiffs.

### C.    Production of Agents' Contact Information

Finally, plaintiffs seek expedited disclosure, in electronic form, of the names, mailing addresses, telephone numbers, email addresses, dates/locations of employment, and Social Security numbers of all prospective class members.  Pl. Br. 25.  Defendants do not oppose this request.

In light of the broad remedial purposes of the FLSA, the Court has "the power to direct [defendants] to produce the names and contact information of potential plaintiffs."  *In re Penthouse*, 2010 WL 4340255, at *5.  Courts in this District commonly grant requests for the production of names, mailing addresses, email addresses, telephone numbers, and dates of employment in connection with the conditional certification of a FLSA collective action.  *Chhab*, 2013 WL 5308004, at *17; *see, e.g.*, *Chowdhury v. Duane Reade, Inc.*, No. 06 Civ. 2295 (GEL), 2007 WL 2873929, at *6 (S.D.N.Y. Oct. 2, 2007); *In re Penthouse*, 2010 WL 4340255, at *5; *Capsolas v. Pasta Res., Inc.*, No. 10 Civ. 5595 (RJH), 2011 WL 1770827, at *5 (S.D.N.Y. May 9, 2011); *Ji Li v. Ichiro Rest. Inc.*, No. 14 Civ. 10242 (AJN), 2015 WL 6828056, at *5 (S.D.N.Y. Nov. 5, 2015).  The Court, therefore, grants plaintiffs' request for such information—limited, of course, to Agents employed by Wallace Morgan during the relevant period.[38]

"Although defendants do not specifically oppose the request to produce social security numbers, [the Court] nevertheless conclude[s] that it is unnecessary to require that disclosure at this time."  *Ji Li*, 2015 WL 6828056, at *5.  While, in light of privacy concerns, courts in this District typically decline to compel production of social security numbers, *see, e.g.*, *In re Penthouse*, 2010 WL 4340255, at *5; *Damassia*, 2006 WL 2853971, at *8, such discovery is

---

[38] In light of the narrowed scope of the approved collective, production of the location of Agents' employment is not necessary.

often permitted where demonstrably necessary to effectuate notice, *see Whitehorn*, 767 F. Supp. at 448 (collecting cases).  Here, while plaintiffs contend that Social Security numbers will assist them in obtaining the most current mailing addresses for putative class members, Pl. Br. 25 n.7, they have not demonstrated the necessity for this sensitive information.  *See Delaney*, 261 F.R.D. at 60 ("If Plaintiffs find that a large number of notices are returned as undeliverable, the Court can consider the [request for disclosure of Social Security numbers] at that time."); *Chowdhury*, 2007 WL 2873929, at *6 (denying production of Social Security numbers where plaintiff had "not demonstrated that such information will aid in further reducing the already low number of notices that were returned undeliverable").

Accordingly, the Court directs defendants, within 10 days from the entry of this Order, to produce to plaintiffs' counsel, in an electronic format, the names, mailing addresses, telephone numbers, email addresses, and dates of employment of all Wallace Morgan employees whose job was to gather applications for enrollment in the Lifeline Program through Assurance Wireless during the three years preceding issuance of a Court-approved Notice.[39]

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for conditional certification of a collective consisting of all Wallace Morgan employees who gathered applications for enrollment in the Lifeline Program through Assurance Wireless at any point during the three years preceding the issuance of a Court-approved Notice.  However, the Court denies plaintiffs' motions for conditional certification of a broader collective, defined to include either all Agents nationwide or all those employed by Credico.

---

[39] Based on the deadlines set forth below, the Court expects that the Notice will issue by January 19, 2016.

Defense counsel is directed to, within 10 days from the entry of this Order, produce to plaintiffs' counsel the names, mailing addresses, telephone numbers, email addresses, and dates of employment of all putative class members.

Plaintiffs' counsel is directed to provide defense counsel, by January 8, 2016, a revised Notice, consistent with this Order.  Defense counsel, in turn, is directed to notify plaintiffs' counsel, by January 13, 2015, of any remaining objections to the Notice.  Plaintiffs' counsel shall, by January 15, 2016, submit a revised, agreed-upon, Notice to the Court.

Finally, plaintiffs' counsel shall distribute the Notice to putative class members within five days of the Court's approval of the revised Notice, and shall distribute the Reminder Notice 15 days before the close of the opt-in period.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 52.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: January 4, 2016
       New York, New York

39