**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMIE MARTIN and DANEISHA SINGLETON, on behalf of themselves and all others similarly situated, and the Proposed New York Rule 23 Class | Case No. 15-cv-05237 (PAE/HBP) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| SPRINT UNITED MANAGEMENT CO., CREDICO (USA), LLC, and WALLACE MORGAN, INC., | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

<u>INTRODUCTION</u>................................................................................................1

<u>ARGUMENT</u>....................................................................................................2

I.    <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>.........................2

II.   <u>FIELD AGENTS ARE EMPLOYEES UNDER THE FLSA AND NYLL</u>.................3

     A.    **LEGAL STANDARDS FOR DETERMINING EMPLOYEE STATUS**..........3

          1.    **The FLSA's Economic Realities Test**...........................4

          2.    **New York Labor Law (NYLL) Common Law Test**............5

     B.    **DEFENDANTS CONTROLLED FIELD AGENTS' WORK**........................6

          1.    **Control Through Written Guidelines and Mandatory Training**..........6

          2.    **Control Through Audits**................................................7

          3.    **Control Over the Field Agents' Job Duties**.....................9

          4.    **Control Over Where the Field Agents Can Work**................9

          5.    **Control Over the Field Agents' Schedules**....................10

          6.    **Control Over the Field Agents' Appearance and Tools They Use**...............11

          7.    **Additional indicia of control under NYLL**....................12

     C.    **DEFENDANTS CONTROL FIELD AGENTS' PROFIT AND LOSS**..........14

     D.    **FIELD AGENTS DO NOT PERFORM SKILLED WORK**..........15

     E.    **PERMANENCE OR DURATION OF THE WORKING RELATIONSHIP**................16

     F.    **FIELD AGENTS ARE INDISPUTABLY INTEGRAL TO DEFENDANTS' BUSINESS**................19

**III.    THE   OUTSIDE   SALES   EXEMPTION   DOES   NOT   APPLY   TO PLAINTIFFS**..................................................................................................19

    **A.    LEGAL STANDARD AND BURDEN** ..................................................19

    **B.    DEFENDANTS   CANNOT   PROVE   THAT   FIELD   AGENTS' PRIMARY DUTY IS "SALES" WITHIN THE MEANING OF THE FLSA AND NYLL**..................................................................................20

        **1.    Lifeline Phones and Services are Provided Free of Charge**.................20

        **2.    Additional Minutes or Text Messages are not Sold by Plaintiffs** .........24

    **C.    PLAINTIFFS DO NOT OBTAIN ORDERS OR CONTRACTS FOR SERVICES WITHIN THE MEANING OF THE FLSA AND NYLL**...........25

    **D.    FIELD   AGENTS   ARE   THE   TYPE   OF   WORKERS   THAT   THE FLSA SEEKS TO PROTECT** ...........................................................26

**IV.    ALL THREE DEFENDANTS ARE LIABLE AS EMPLOYERS**...........................27

    **A.    LEGAL STANDARD** ......................................................................27

    **B.    SPRINT IS LIABLE AS A JOINT EMPLOYER OF WALLACE MORGAN'S EMPLOYEES**.................................................30

        **1.    Sprint has the power to hire and fire Field Agents**...............................30

        **2.    Sprint supervises and controls Field Agents' employment**.................31

        **3.    Sprint determined the rate and method of payment** ...........................33

        **4.    Maintenance of employment records**...................................................34

        **5.    The remaining *Zheng* "functional control" test factors** ......................35

    **C.    CREDICO JOINTLY EMPLOYED FIELD AGENTS** .............................36

        **1.    Credico's power to hire and fire Field Agents** .....................................36

        **2.    Credico's supervision of Field Agents**..................................................37

        **3.    Credico determined the payment field agents received**......................38

        **4.    Credico maintained Field Agents' employment records**......................39

        **5.**      **The remaining *Zheng* "Functional Control" test factors** ....................39

    **D.**     **DEFENDANTS' ASSOCIATION WITH EACH OTHER IS FURTHER EVIDENCE OF JOINT EMPLOYMENT** ...................................41

**<u>CONCLUSION</u>** .....................................................................................................44

## TABLE OF AUTHORITIES

**CASES**

*Aimable v. Long & Scott Farms,*
20 F.3d 434 (11th Cir. 1994) .................................................................................31

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).................................................................................................3

*Ansoumana v. Gristede's Operating Corp.,*
255 F. Supp. 2d 184 (S.D.N.Y. 2003)............................................13, 15, 16, 18, 42

*Antenor v. D & S Farms,*
88 F.3d 925 (11th Cir. 1996) ...........................................................................27, 29

*Arnold v. Ben Kanowsky, Inc.,*
361 U.S. 388 (1960)...............................................................................................20

*Baker v. Flint Eng'g & Const. Co.,*
137 F.3d 1436 (10th Cir. 1998) .............................................................................16

*Barfield v. NY City Health and Hospitals Corp.,*
432 F. Supp. 2d 390 (S.D.N.Y. 2006)....................................................................36

*Barfield v. NY City Health and Hospitals Corp.,*
537 F. 3d 132 (2d Cir. 2008)...............................................................28, 31, 35, 39

*Barrientos v. Taylor,*
917 F. Supp. 375 (E.D.N.C. 1996)........................................................................34

*Beauford v. ActionLink, LLC,*
781 F.3d 396 (8th Cir. 2015) .................................................................................25

*Brock v. Superior Care, Inc.,*
840 F.2d 1054 (2d Cir. 1988).............................................................5, 8, 13, 14, 16, 17

*Bynog v. Cipriani Grp., Inc.,*
1 N.Y.3d 193, 770 N.Y.S.2d 692 (2003) ..................................................................5

*Cano v. DPNY, Inc.,*
287 F.R.D. 251 (S.D.N.Y. 2012) ...........................................................................35

*Carter v. Dutchell Comm. College,*
735 F.2d 8 (2d Cir. 1984) ..........................................................................28, 30, 41

*Chen v. St. Beat Sportswear, Inc.*,
364 F. Supp. 2d 269 (E.D.N.Y. 2005) ........................................................40

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012) ........................................................19, 21, 22, 26, 27

*Clements v. Serco*,
530 F.3d 1224 (10th Cir. 2008) ...............................................................22

*Davis v. JP Morgan Chase & Co.*,
587 F.3d 529 (2d Cir. 2009) ...................................................................20

*E. Coast Indus., Inc. v. Becconsall*,
301 N.Y.S.2d 778 (N.Y. Dist. Ct. 1969) .......................................................6

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
268 F.R.D. 181 (S.D.N.Y. 2010) ...............................................................6

*In re Enterprise Rent–A–Car v. Enterprise Holdings, et al.*,
683 F.3d 462 (3d Cir. 2012) ...................................................................42

*Flood v. Just Energy Mkt. Corp.*,
2017 WL 280820 (S.D.N.Y. Jan 20, 2017) ....................................................25

*Gayle v. Harry's Nurses Registry, Inc.*,
2009 WL 605790 (E.D.N.Y. Mar. 9, 2009),
*aff'd*, 594 F. App'x 714 (2d Cir. 2014) ...........................................8, 13, 17, 18

*Glatt v. Fox Searchlight Pictures, Inc.*,
293 F.R.D. 516 (S.D.N.Y. 2013) ...............................28, 30, 33, 34, 35, 39

*Goldberg v. Whitaker House Co-op.*,
366 U.S. 28 (1961) ..............................................................................13

*Greenawalt v. AT&T Mobility, LLC*,
642 Fed. Appx. 36 (2d Cir. 2016) ..........................................................35, 40

*Gustafson v. Bell Atl. Corp.*,
171 F. Supp. 2d 311 (S.D.N.Y. 2001) .......................................................10, 16

*Hall v. DIRECTV, LLC*,
846 F.3d 757 (4th Cir. 2017) ............................................................. 42, 43, 44

*Hart v. Rick's Cabaret Int'l, Inc.*,
967 F. Supp. 2d 901 (S.D.N.Y. 2013)................................................... *passim*

*Herman v. RSR Sec. Servs.*,
172 F.3d 132 (2d Cir. 1999) ......................................................8, 13, 30, 32, 33, 34, 36

*Hernandez v. Jrpac Inc.*,
2016 WL 3248493 (S.D.N.Y. June 9, 2016) ........................................................28, 29

*Hodgson v. Griffen & Brand of McAllen, Inc.*,
471 F.2d 235 (5th Cir. 1973) ..................................................................................31

*Jewel Tea Co. v. Williams*,
118 F.2d 202 (10th Cir. 1941) ................................................................................26

*Kalloo v. Unlimited Mech. Co. of NY*,
977 F. Supp. 2d 187 (E.D.N.Y. 2013) .....................................................................11

*Kinney v. Artist & Brand Agency LLC*,
2015 WL 10714080 (S.D.N.Y. Nov. 25, 2015)...........................5, 13, 15, 16, 17, 18, 25

*Kirsch v. Fleet Street, Ltd.*,
148 F.3d 149 (2d Cir. 1998).....................................................................................10

*Luna v. Gon Way Constr., Inc.*,
2017 WL 835321 (E.D.N.Y. Feb. 14, 2017)............................................................10

*Luna v. HDMP LLC*,
2014 WL 12543796 (E.D.N.Y. Aug. 28, 2014)...................................................10, 14

*Lee v. ABC Carpet & Home*,
186 F. Supp. 2d 447 (S.D.N.Y. 2002) .....................................................................14

*Mahoney v. Amekk Corp.*,
2016 WL 6585810 (E.D.N.Y. Sept. 30, 2016) ........................................................ 10

*Marcus v. AXA Advisors, LLC*,
307 F.R.D. 83 (E.D.N.Y. 2015) ..............................................................................19

*McCluskey v. J.P. McHale Pest Mgmt.*,
147 Fed. Appx. 203 (2d Cir. 2005).........................................................................20

*Metevier v. CARR Properties, Inc.*,
2016 WL 5793742 (S.D.N.Y. Sept. 30, 2016)...............................................5, 11, 13

*Miranda-Albino v. Ferrero, Inc.*,
455 F. Supp. 2d 66 (D.P.R. 2006)............................................................................20

*Murphy v. ERA United Realty,*
251 A.D.2d 469, 674 N.Y.S.2d 415 (2d Dep't 1998) ................................................... 5

*Nationwide Mut. Ins. Co. v. Darden,*
503 U.S. 318 (1992) ......................................................................................................27

*Reiseck v. Universal Commc'ns of Miamai, Inc.,*
591 F.3d 101 (2d Cir. 2010) .........................................................................................20

*Rutherford Food Corp. v. McComb,*
331 U.S. 722 (1947) .......................................................................................4, 33, 41

*Saleem v. Corp. Transp. Grp., Ltd.,*
52 F. Supp. 3d 526 (S.D.N.Y. 2014) .............................................................................9

*Salinas v. Comm. Interiors, Inc.,*
848 F.3d 125 (4th Cir. 2017) .......................................................................... 31, 41-43

*Scantland v. Jeffry Knight, Inc.,*
721 F.3d 1308 (11th Cir. 2013) .....................................................................................9

*Schultz v. Capital Int'l Securs., Inc.,*
466 F.3d 298 (4th Cir. 2006) .......................................................................................42

*Schwind v. EW & Assocs., Inc.,*
357 F. Supp. 2d 691 (S.D.N.Y. 2005) .....................................................................8, 15

*Thomas v. City of Hudson,*
1996 WL 280828 (N.D.N.Y. May 20, 1996) .................................................14, 15, 36

*Tony & Susan Alamo Found. v. Sec'y of Labor,*
471 U.S. 290 (1985) ........................................................................................................4

*Topo v. Dhir,*
2004 WL 527051 (S.D.N.Y. Mar. 16, 2004) ...............................................................19

*Torralba v. Little India Stores,*
2016 WL 771192 (S.D.N.Y. Feb. 29, 2016) ................................................................13

*Torres v. Gristede's Operating Corp.,*
No. 04 Civ. 3316(PAC), 2011 WL 4571792 (S.D.N.Y. Sept. 23, 2011) ....................37

*Usery v. Pilgrim Equip. Co.,*
527 F.2d 1308 (5th Cir. 1976) .......................................................................................4

*Walling v. Twyeffort, Inc.*,
158 F.2d 944 (2d Cir. 1946)..................................................................................13

*Wirtz v. Keystone Readers Serv., Inc.*,
418 F.2d 249 (5th Cir. 1969) .........................................................................23, 25

*Wright v. Goord*,
554 F.3d 255 (2d Cir. 2009)....................................................................................3

*Young v. Cooper Cameron Corp.*,
586 F.3d 201 (2d Cir. 2009)..................................................................................20

*Zheng v. Liberty Apparel Co. Inc.*,
355 F.3d 61 (2d Cir. 2003)............................................................................ *passim*

**REGULATIONS**

29 C.F.R. § 541.500(a)...................................................................................19, 26

29 C.F.R. § 541.500(a)(1)(ii)..................................................................................26

29 C.F.R. § 541.501 .........................................................................................21, 25

29 C.F.R. § 541.503 ...............................................................................................24

29 C.F.R. § 785.6 .....................................................................................................3

29 C.F.R. § 791.2(a).................................................................................................28

47 C.F.R. § 54.410 ..................................................................................................23

Indiana Code 38-8-16.6-12 ....................................................................................21

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 ..................................................19

**RULES**

Fed. R. Civ. P. 56(a) .................................................................................................2

Fed. R. Civ. P. 56(c)(1)............................................................................................3

**STATUTES**

29 U.S.C. § 206.........................................................................................................3

29 U.S.C. § 207.........................................................................................................3

29 U.S.C. § 203(d) ............................................................................................ 27, 30

29 U.S.C. § 203(e)(1)................................................................................................. 3

29 U.S.C. § 203(g) .................................................................................................... 3

29 U.S.C. § 203(k) .................................................................................................. 20

29 U.S.C. § 213(a)(1) .............................................................................................. 19

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ........................................ *passim*

New York Labor Law ...................................................................................... *passim*

## OTHER CITATIONS

Wage & Hour Division, U.S. Dep't Labor, Administrator's Interpretation No. 2015-1,
2015 WL 4449086 (July 15, 2015) .......................................................................4, 18

Wage & Hour Division, U.S. Dep't Labor, Administrator's Interpretation No. 2016-1
(Jan. 20, 2016).......................................................................................................27, 28

Wage & Hour Division, U.S. Dep't of Labor, Opinion Letter,
1999 WL 1002391 (Apr. 20, 1999) ......................................................................22, 24

Wage & Hour Division, U.S. Dep't Labor, Opinion Letter,
2014 WL 2816951 (June 19, 2014) ...........................................................................32

## <u>INTRODUCTION</u>

While this lawsuit concerns misclassified employees and unpaid minimum and overtime wages under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and New York Labor Law (NYLL), it is really a case about holding those who exercise control over someone else's work responsible for fair pay.

Defendant Sprint, through its brand Assurance Wireless, participates in a government-funded welfare program that provides free cellphone services to qualifying low-income consumers. For its part, Sprint receives a substantial monthly subsidy from the federal government for each qualifying low-income consumer that it provides Lifeline service to. Sprint is currently the second largest provider of wireless Lifeline services. Not wanting to directly hire its own employees to collect applications from the potentially qualified-low income consumers for participation in this program—but still wanting to control nearly every aspect of these employees' work and application process—Sprint recruits third-party companies to assist it in providing "outreach" services, but only if they agree to abide by Sprint's *many* terms and conditions. Defendant Credico is one such company that agreed to perform outreach services for Sprint. But Credico, like Sprint, chose not to directly hire its own employees to collect applications either, instead opting to also subcontract out this work. Credico subcontracted with Defendant Wallace Morgan to hire and train Field Agents, the Plaintiffs in this case, to collect Assurance Wireless applications.

Under this business structure, Credico and Wallace Morgan have both implemented additional rules and policies that Field Agents must follow to ensure compliance with Sprint's many conditions. These rules dictate what Plaintiffs can and cannot do, what they can and cannot say, where they can and cannot work, what they must wear, and their schedules.  The many rules

enforced against Plaintiffs prevented them from performing their job duties in any way other than how Defendants mandated.  And, under this business structure, Defendants remain in constant contact with each other, each supervising and auditing Plaintiffs' work to ensure their many rules are followed.

Despite this control, Plaintiffs were classified as "independent contractors" to until fall of 2015 when they were reclassified as W2 employees.  But now, Defendants claim that they are still not jointly and severally liable for failing to pay Plaintiffs and the putative Rule 23 class members minimum and overtime wages because Plaintiffs are exempt outside salespersons. Defendants make this remarkable claim even though Plaintiffs' primary job duty was to collect applications from potentially qualifying low-income consumers who wished to participate in a government-funded program and obtain a *free* cellphone and services, not to engage in "sales" as defined under the law.

Because there are no genuine issues of material fact that Field Agents were economically dependent on Defendants and were in no way in business for themselves, that Defendants are, jointly and severally, Plaintiffs' employers and that they cannot plainly and unmistakably prove that Plaintiffs are outside sales exempt, the Court should grant Plaintiffs' motion for partial summary judgment motion in its entirety.

## ARGUMENT

## I.   LEGAL STANDARD FOR SUMMARY JUDGMENT

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R.

Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 911 (S.D.N.Y. 2013).

## II.    FIELD AGENTS ARE EMPLOYEES UNDER THE FLSA AND NYLL

Defendants exercise significant control over the Field Agents who perform the Assurance Wireless outreach services that the three of them contracted with one another to provide. Defendants dictate the minutiae of the Field Agents' work through rules governing everything, from what they can say, to where they can work, and to how they must perform their simple job of collecting Assurance Wireless applications. Despite this and being reclassified from independent contractors to now outside sales exempt employees, at least one Defendant, Credico, continues to contend that Plaintiffs were properly classified as independent contractors.[1] Credico is wrong. Plaintiffs are employees.

### A.    LEGAL STANDARDS FOR DETERMINING EMPLOYEE STATUS

The FLSA requires covered employers to pay non-exempt employees minimum wages and overtime premiums for all hours worked over forty in a workweek. 29 U.S.C. §§ 206, 207. The Act defines "employee" simply as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" means "to suffer or permit to work." § 203(g); 29 C.F.R. § 785.6. The FLSA provides "the broadest definition of 'employ' that has ever been included in

---

[1] Notably, Credico is the only Defendant who wished to brief this issue. *See* ECF Nos. 231, 234, 240.

any one act." *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 69 (2d Cir. 2003). After all, Congress enacted the law to protect those whose livelihoods depend upon the business of others. *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1315 (5th Cir. 1976). The U.S. Supreme Court has consistently construed the FLSA liberally in furtherance of that goal. *See* Wage & Hour Div., U.S. Dep't Labor, Administrator's Interpretation No. 2015-1, 2015 WL 4449086, at *2 (July 15, 2015) (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)).

Neither subjective beliefs nor contracts determine whether a worker qualifies as an employee. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 922 (S.D.N.Y. 2013) (*citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) ("This inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor label does not take the worker from the protection of the Act"). Instead, coverage is focused on "whether, as a matter of economic reality," the worker is economically dependent upon the alleged employer or is instead in business for himself. *Hart*, 967 F. Supp. 2d at 922.

### 1.    The FLSA's Economic Realities Test

An "economic realities" test governs whether a worker is an employee or an independent contractor under the FLSA. The relevant factors include: (1) the degree of control exercised by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *Hart*, 967 F. Supp. 2d at 912. "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn

from those facts—whether workers are employees or independent contractors—is a question of law." *Metevier v. CARR Properties, Inc.*, 2016 WL 5793742, at *8 (S.D.N.Y. Sept. 30, 2016) (citing *Kinney v. Artist & Brand Agency LLC*, 2015 WL 10714080, at *11 (S.D.N.Y. Nov. 25, 2015)). No factor is dispositive: "[r]ather, the test is based on a totality of the circumstances" analysis, with the ultimate question being whether the "workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock v. Superior Care*, 840 F.2d 1054, 1059 (2d Cir. 1988).

## 2. New York Labor Law (NYLL) Common Law Test

"Many courts in this Circuit have applied the economic realities test to determine whether an employer/employee relationship exists under the FLSA *and* the NYLL." *Hart*, 967 F. Supp. 2d at 922. However, the Second Circuit has noted that the FLSA and NYLL analyses may differ, and the New York Court of Appeals has articulated a different standard than the FLSA inquiry. *Id.* The New York Court of Appeals has articulated five factors relevant to determining control under NYLL, which include whether the worker: (1) worked at her own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule. *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 695 (2003).

These factors, however, are not exhaustive, and New York courts commonly consider a variety of other factors in making the determination. *See Hart*, 967 F. Supp. 2d at 923 (also looking to the economic realities test to determine employee status under the NYLL); *see also Murphy v. ERA United Realty,* 251 A.D.2d 469, 470–71, 674 N.Y.S.2d 415 (2d Dep't 1998) (considering factors such as requiring workers to wear company uniform, follow company procedures, attend mandatory meetings, sign in and out of the office, and coordinate vacation

time with supervisor); *E. Coast Indus., Inc. v. Becconsall,* 301 N.Y.S.2d 778, 779–80 (N.Y. Dist. Ct. 1969) (factors important in evaluating control included the employer's authority to decide the timing and selection of each job and employer's right to discharge or fire the employee). Yet in the end, "the critical determinant is the degree to which the purported employer exercises control in fact over the results produced or the means used to obtain them." *Hart*, 967 F. Supp. 2d at 924 (citing *Edwards v. Publishers Circulation Fulfillment, Inc.,* 268 F.R.D. 181, 184 (S.D.N.Y.2010)).

### B.     DEFENDANTS CONTROLLED FIELD AGENTS' WORK

The undisputed facts of this case show that Defendants exercised a great degree of control over their Field Agents. This control establishes Plaintiffs' employee status.

### 1.     Control Through Written Guidelines and Mandatory Training

The presence of employer-imposed written guidelines for Field Agents' conduct indicates control and weighs in favor of employee status. *See Hart*, 967 F. Supp. 2d 901 (concluding that guidelines that restricted entertainers' behavior, schedule, appearance, and method that work "compellingly indicate that [defendant] had significant control over the dancers").

Defendants' written Standard Operating Procedures (SOPs) detail the rules that apply to Field Agents' work. (Pls.' 56.1 ¶¶ 46, 49, 51-55.) The SOPs govern the topics of hiring Field Agents, how Field Agents are to collect Assurance Wireless Lifeline applications, who they can collect applications from, where they can work, what they are to wear, what they can say, how they can promote the Assurance Wireless brand, how they are to interact with potential applicants, and scheduling. (*See, id.* ¶¶ 49, 51-55) (stating the Field Agents, when first meeting a potential applicant: (1) "must utilize an approved pitch that meets AW standards;" (2) "must explain to the potential [applicant] the Assurance Wireless application process;" (3) "must

…explain the Assurance Wireless coverage areas…follow the Assurance Wireless sales guidelines at all times[;] and explain and identify the acceptable documentation required for proof of eligibility"); (*Id.* ¶ 49(a)(4)) (Field Agents "may not post, print, or publish any marketing materials or advertisements (print, radio, social media, etc. … conduct public appearances or interviews… or offer Assurance Wireless products …on…websites"); (*Id.* ¶ 52) (stating Field Agents are subject to fines, suspension and/or removal from the program if they work outside their assigned territory); (*Id.* ¶ 55) (stating Field Agents may be fined, suspended, or terminated if they allow others to submit applications using their Agent ID).

Defendants require each Field Agent to review and sign a copy of the Sprint SOPs when s/he is hired.  (*Id.* ¶ 45.)  Field Agents must also pass Sprint's mandatory online training, which outlines the rules within the SOPs and goes into even greater detail as to what Field Agents are "expected to know and how to present [themselves] and act."  (*Id.* ¶¶ 34, 36-38.)  Field Agents' failure to comply with SOPs results in discipline and possible discharge. (*Id.* ¶ 50, 52, 55, 56.) Defendants enforce their SOPs through discipline such as fines, suspension or termination (*i.e.* making a Field Agent "inactive" or "deactivating" the Field Agents' code).  (*Id.*)  These facts indicate employee status. *Hart*, 967 F. Supp. 2d at 917 (concluding the employer's written threat to impose fines on non-compliant workers "even if largely retracted, is strong evidence of its control over them").

### 2.    Control Through Audits

Defendants' continuous monitoring of the Field Agents' job performance is further evidence of their control. Importantly, "[employee] status does not require the continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees"; thus, even if an employer's control is "restricted, or exercised only

occasionally," the employee may still be entitled to the protections of the FLSA." *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (rejecting argument that the court should only consider the control defendant exerted over the plaintiffs, not his authority over management, noting "[s]uch a contention ignores the relevance of the totality of the circumstances"); *see also Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) ("[a] defendant need not supervise or monitor an employee on a daily basis to be found to exercise 'control' over that employee as contemplated by the FLSA."); *Superior Care*, 840 F.2d at 1060.

Each of the Defendants conduct audits on the Field Agents to ensure compliance with the written SOPs. Wallace Morgan must perform "self-audits" within 15 business days of the Field Agents' hire and a least 2 times every 3 months thereafter. (Pls.' 56.1 ¶ 136.) Credico audits Field Agents "every day," to ensure they are complying with the SOPs and Credico's Compliance Improvement Plan. (*Id.* ¶¶ 149-150.) Similarly, Sprint audits Field Agency by conducting "mystery shops" where a Sprint employee represents himself as a potentially qualifying applicant and observes whether the Field Agent is performing the job properly in compliance with the SOPs. (*Id.* ¶¶ 141-144.) In addition to this, Sprint monitors the Field Agents' application submissions on a daily basis to ensure applications are properly submitted. (*Id.* ¶¶ 158-159.) These audits are indicative of employee status. *See Gayle v. Harry's Nurses Registry, Inc.*, 2009 WL 605790, at *8 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 F. App'x 714 (2d Cir. 2014) (concluding nurse was employee where her notes were "scrutinized every two weeks" and a nursing supervisor spent 4-5 hours per month with her in the field); *Superior Care*, 840 F.2d at 1060 ("Although the supervisor made job site visits only once or twice a month, the nurses were

well aware that they were subject to such checks as well as to regular review of their nursing notes.").

### 3.    Control Over the Field Agents' Job Duties

Field Agents have a simple job: collect Assurance Wireless Lifeline applications.  How Field Agents complete this task, however, is tightly controlled by Defendants—not the Field Agents.  Rather than being able to determine for themselves the manner and method by which to collect applications, Field Agents are specifically required to collect applications in the manner and method dictated by Defendants.  They can only collect applications out on the street.  They cannot post, print, or publish any marketing materials or advertisements (print, radio, social media, etc.) or conduct public appearances or interviews or market Assurance Wireless on any website.  (Pls.' 56.1 ¶¶ 37, 49(a)(4), 90.)  The SOPs and training guidelines detail step-by-step what Field Agents must do obtain an application from a potentially qualified applicant.  (*Id.* ¶¶ 49, 51, 60, 62-65) (describing what Field Agents must say in their opening pitch; questions they must ask; when they must hand out certain documentation; and what they must say after an application is submitted).  These undisputed facts, again, prove employee status.

### 4.    Control Over Where the Field Agents Can Work

Courts have determined that requiring workers to report where they are working indicates employee status—not independent contractor status.  *See Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 538–39 (S.D.N.Y. 2014) (citing *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1314 (11th Cir. 2013)) (requiring drivers to provide periodic updates regarding the status of their assignments indicative of employee status).

Rather than being able to determine for themselves where to collect Assurance Wireless applications, Field Agents are limited to specific pre-approved and assigned territories, and must

report their specific locations to Defendants.  Indeed, Field Agents are strictly prohibited from collecting applications from outside the approved territory or in violation of any of Credico's exclusivity restrictions with Sprint.  (Pls.' 56.1 ¶¶ 52, 53, 93, 94, 95, 169.)  They are forbidden from collecting applications from potentially qualified customers in front of a Boost Mobile store or a community center.  If they are caught collecting outside of the approved areas, Field Agents are subject to discipline or termination.  (*Id.* ¶¶ 52, 95.)  Moreover, Field Agents must report where they will be working each day, and this information is recorded in Sprint's computer system called "Quickbase." (*Id.* ¶¶ 170, 199, 200, 202-203.)  Requiring workers to report where they will be and restricting where they can work is indicative of employee status.

### 5.    Control Over the Field Agents' Schedules

Particularly relevant to the control factor is whether a worker is "free to set his own schedule and take vacations when he wishe[s]." *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 171 (2d Cir. 1998).  And where an employer structures or restricts a worker's routine by requiring attendance at meetings, this can indicate a degree of control.  *See Hart,* 967 F. Supp. 2d at 923–24 (requiring dancers to attend meetings was indicative of employee status); *see also Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001) (employee status where schedule was determined by the employer and he had little discretion over when and how long to work); *Luna v. HDMP LLC*, 2014 WL 12543796, at *3 (E.D.N.Y. Aug. 28, 2014) (fact that defendants set the hours for employee's position weighed in favor of employee status); *Mahoney v. Amekk Corp.*, 2016 WL 6585810, at *7 (E.D.N.Y. Sept. 30, 2016) (finding plaintiff was protected under the FLSA when she did not work at her own convenience and she ended her shifts at a specific hour); *Luna v. Gon Way Constr., Inc.*, 2017 WL 835321, at *6 (E.D.N.Y. Feb. 14, 2017)

(requiring employees to begin and end their shifts at a specific hour indicative of employee status).

Field Agents were required to sign in once they got to the office and indicate on the sign-in sheets the time they arrived.  (Pls.' 56.1 ¶ 68.)  They were instructed to "[b]e in early every day," "[n]ever be late for a meeting," and "[h]ave 100% attendance." (*Id.* ¶¶ 67, 70.)  They were also provided with a suggested schedule (Stip. Facts ¶ 66) that required them to attend meetings in the office from 7:30 – 9:15 a.m., then work out in the field, and later report back to the office to return their tablet by 6:30 p.m.  (Pls.' 56.1 ¶¶ 71, 75.)  Field Agents could not choose when or what days they wanted to work.  (*Id.* ¶ 69) (instructing Agents that "[n]o show and no call means no job" and requiring them to bring a doctor's note if they are ill).  And as noted by Wallace Morgan's corporate representative, Field Agents would need to be in the field no later than 10:00 a.m., otherwise there "wasn't enough time in the day for them to generate enough sales to have a good income."  (*Id.* ¶ 177.)

Imposing a schedule and disciplining Field Agents for failing to abide by the schedule has the effect of imposing a "fixed schedule" on them, establishing their employee status.  To the extent Defendants claim that this schedule was often waived in practice, "[t]his argument is of limited assistance" to Defendants as their own documents clearly show they retained the discretion to discipline Field Agents for tardiness or absences.  *See Hart*, 967 F. Supp. 2d. at 925.

### 6.    Control Over the Field Agents' Appearance and Tools They Use

The fact that Defendants pay for and provide the supplies and equipment Field Agents use to do their work indicates employee status. *Metevier.*, 2016 WL 5793742, at *8 (employee status found where defendants paid for supplies that were ordered by plaintiff); *Kalloo v. Unlimited Mech. Co. of NY*, 977 F. Supp. 2d 187, 202 (E.D.N.Y. 2013) (employee status found

where plaintiff was directed to wear defendants' branded clothing and defendant provided equipment and materials).

Defendants did not allow Field Agents to choose what they wanted to wear, what marketing materials to distribute, and how to otherwise present their chosen image or style to potentially qualified Assurance Wireless applicants. (Pls.' 56.1 ¶¶ 49(a)(4), 76-77, 96-97, 101.) Rather, they required that Field Agents meet the *Assurance Wireless* image.  For example, Field Agents are required to wear Assurance Wireless t-shirts or "professional dress" and their Assurance Wireless name badges must be clearly visible at all times. (*Id.*  ¶¶ 76-77.) Field Agents can only distribute the marketing materials Sprint provides them with; they cannot distribute their own materials. (*Id.* ¶¶ 96-97, 101.) They also have to use the tablets Credico provides to be able to submit Assurance Wireless Lifeline applications. (*Id.* ¶¶ 65, 99.)  These undisputed facts prove employee status.

### 7. Additional indicia of control under NYLL

Other potential indicia of control commonly listed under the New York common law test include whether the workers were on a fixed schedule, worked at their own convenience, were on Defendants' payroll, could engage in other employment, or received fringe benefits.  (*See supra* § II.A.2.)  As discussed above, there is ample evidence showing that Defendants imposed a fixed schedule on Field Agents, they were not free to work at their own convenience, and while they could engage in other employment (if they had time), and even if they did, this fact is probative of very little.  (*See supra* § II.B.5.)

The remaining factors under NYLL similarly weigh in favor of employee status.  Field Agents are on Wallace Morgan's payroll, and the Defendants are responsible for determining the rate of pay Field Agents receive and when they would be paid.  (Pls.' 56.1 ¶¶ 78-89, *see*

*generally* ¶¶ 184-198.)  Moreover, Field Agents go through an interview process and are hired by Wallace Morgan.  (Stip. Facts ¶ 33; Pls.' 56.1 ¶ 24.)  They may be fired by any Defendant for any reason at any time.  (Pls.' 56.1 ¶¶ 50, 55, 56, 95, 152-154, 182-183.)  Taken together, these facts prove Plaintiffs should have been classified as employees. *See Goldberg v. Whitaker House Co-op.,* 366 U.S. 28, 32–33 (1961) (finding homeworkers "employees" where putative employer had power to hire and fire them); *Herman,* 172 F.3d at 140 (finding the first *Brock* factor satisfied where putative employer hired employees and "on occasion, supervised and controlled employee work schedules and the conditions of employment"); *Walling v. Twyeffort, Inc.,* 158 F.2d 944 (2d Cir. 1946) (finding tailors, who occasionally did jobs for more than one employer and hired employees to work for them employees rather than independent contractors); *Kinney,* 2015 WL 10714080, at *13 (fact that defendants determined "the method of [plaintiffs] pay, his commission rate, and when and how he would get paid by them" weighed in favor of employee status); *Torralba v. Little India Stores,* 2016 WL 771192, at *6 (S.D.N.Y. Feb. 29, 2016) (concluding employer exercised control where they hired plaintiff, paid him, and instructed him on how to approach any "decisions for the store"); *Metevier,* 2016 WL 5793742, at *8 (S.D.N.Y.) (finding control factor weighed in favor of employee status where plaintiff was on the defendants' payroll); *Ansoumana v. Gristede's Op. Corp.,* 255 F. Supp. 2d 184, 191 (S.D.N.Y. 2003) (fact that defendants hired, fired, transferred and paid the delivery workers weighs substantially in favor of finding an employment relationship); *Gayle,* 2009 WL 605790, at *6 (finding control met because defendants had the power to end their association with plaintiff unilaterally for failure to maintain patient confidentiality or for providing false information on the application).

13

Finally, although Field Agents were not given "fringe benefits" such as health insurance or retirement plans, the lack of fringe benefits does not weigh against their employee status.  *See Hart*, 967 F. Supp. 2d at 925 (concluding that "[t]o assign this factor weight would effectively allow any employer to control, under New York law, a worker's status simply by labeling her an independent contractor and denying her employee benefits." );  *see also Luna*, 2014 WL 12543796, at *5 ("[T]o place great weight on the allocation of benefits or the use of certain tax forms would effectively allow any employer to control, under New York law, a worker's status simply by labeling her an independent contractor and denying her employee benefits."). This same reasoning holds true here.  Field Agents did not receive benefits because they were classified as independent contractors.  Under the totality of the circumstances, their non-receipt of fringe benefits is "unimportant."  *Hart*, 967 F. Supp. 2d at 925.

## C.    DEFENDANTS CONTROL FIELD AGENTS' PROFIT AND LOSS

When deciding whether this factor weighs in favor or against employee status, the Court should consider whether plaintiffs "invested significantly more of their own money" than Defendants when collecting Assurance Wireless Lifeline applications. *Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 455–56 (S.D.N.Y. 2002) (citing *Thomas v. City of Hudson,* 1996 WL 280828, at *8 (N.D.N.Y. May 20, 1996) (holding that failure to provide sufficient evidence that plaintiff police dog handlers invested more of their own money in the City's program weighs in favor of the plaintiff); *Superior Care,* 840 F.2d at 1060 (finding the fact that the nurses "have no independent investment in the business" weighs in favor of plaintiffs).

Here, the undisputed facts show that Field Agents made no investment in the Assurance Wireless brand or in Defendants' businesses.  Field Agents were provided with Assurance Wireless t-shirts, marketing materials, and tablets to use to collect applications from potentially

qualified low-income consumers. (Pls.' 56.1 ¶¶ 98-101.)   The only possible item that Field Agents may have purchased to perform their job is a fold-out table. (*Id.* ¶ 101.) And while Defendants will undoubtedly argue that Plaintiffs had an opportunity for profit because they worked on a commission, or that they could "hustle" to collect more applications, arguments about hustling or working faster or harder have been repeatedly rejected. *Kinney*, 2015 WL 10714080, at *15 ("To the contrary, where a worker is commission based, but puts none of his own money at risk, this factor may actually weigh in favor of a finding of 'employee' status."); *see also Schwind*, 357 F. Supp. 2d at 701 (noting that "[a]lthough plaintiff had an opportunity for profit because he worked on commission, he did not invest significantly in EWA with his own money"); *Thomas*, 1996 WL 280828, at *8 (holding that lack of sufficient evidence that plaintiffs invested more of their own money in employer's programs weighs in favor of finding of employee status); *Ansoumana*, 255 F. Supp. 2d at 191 (factor weighed in favor of employee where workers did not have to make an up-front purchase in order to be hired or assigned work). Here, Field Agents are "far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments." *Hart*, 967 F. Supp. 2d at 920 (citations and quotation omitted).   As such, this factor weighs in favor of employee status.

### D.   FIELD AGENTS DO NOT PERFORM SKILLED WORK

Field Agents did not perform skilled work.  No formal sales training or sales experience is needed to be hired as a Field Agent.  (Pls.' 56.1 ¶ 102); *see Hart*, 967 F. Supp. 2d at 920 (fact that dancers had no prior experience or formal training weighed in favor of no skill).  Any "skill" they may have acquired was learned on-the-job through Defendants' detailed training and atmosphere meetings. (Pls.' 56.1 ¶ 104.) The training they received provided instruction on

exactly how they were to perform their job, and even controlled what they could say when they first addressed potential applicants.  (*Id.* ¶¶ 37, 38, 41, 51) (instructing Field Agents they "are never to use the phrase 'Get your free phones'").

Defendants will argue, however, that Field Agents exercised "independent initiative" when collecting applications so they could make more money.  But this is not the type of "skill" required for independent contractor status, which has been recognized by this Court.  *Hart*, 967 F. Supp. 2d at 920 ("Although efforts by dancers to cultivate customers surely enhanced the money the customers paid them, such 'hustling' is not skilled work."); *see also Ansoumana*, 255 F. Supp. 2d at 191 (delivery workers did not exercise skill and independent initiative); *Gustafson*, 171 F. Supp. 2d at 326 (concluding that plaintiff's duties as a chauffeur "required no specialized skill or initiative, suggesting that plaintiff was an employee rather than an independent contractor"); *Superior Care,* 840 F.2d at 1060 (reasoning that nurses who had technical skills weighed factor slightly in favor of independent contractor status but not enough to tip the balance in the company's favor). Consideration of this factor, like the other factors, weighs in favor of a finding of employee status.

### E.    PERMANENCE OR DURATION OF THE WORKING RELATIONSHIP

"Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." *Kinney*, 2015 WL 10714080, at *14 (quoting *Baker v. Flint Eng'g & Const. Co.,* 137 F.3d 1436, 1442 (10th Cir. 1998)).  Similarly, when the record does not show that the parties "ever entered into a contract for [p]laintiff to provide specific services for only a limited duration; reevaluated the relationship on a periodic basis; or, in establishing the relationship, set a definite end date for

[p]laintiff's job," it is "evident that the parties had a long-term, stable work relationship," which indicates employee status. *Kinney*, 2015 WL 10714080, at *16.

Here, Field Agents worked for Defendants with no specific end date. The "Independent Sales Representative Agreement" they were required to sign contains no fixed employment period or contract-completion date. (Pls.' 56.1 ¶ 105.) As with any typical employment relationship, the Field Agents' employment was indefinitely at will; Defendants could terminate the relationship at any point. (*Id.* ¶¶ 50, 55, 56, 95, 152-154, 182-183.)

Defendants' anticipated argument that Field Agents are independent contractors because the "Independent Sales Representative Agreement" they signed states that they may work for other employers should be rejected. Courts routinely recognize that employees may work for more than one employer without losing FLSA protection. *See Hart*, 967 F. Supp. at 921 ("That dancers were free to work at other clubs or in other lines of work, and that they were not permanent employees, do not distinguish them from countless workers in other areas of endeavor who are undeniably employees under the FLSA"); *Superior Care*, 840 F.2d at 1060 (employees may work for more than one employer without losing their benefits under the FLSA); *Gayle*, 2009 WL 605790, at *8 ("the irregular nature of plaintiff's work for defendants is no bar to a finding that she was an employee within the meaning of the FLSA").

F.    **FIELD AGENTS ARE INDISPUTABLY INTEGRAL TO DEFENDANTS' BUSINESS**

When evaluating this factor "[t]he question is not whether [P]laintiff's individual services were essential to the business, but whether the type of work performed by [P]laintiff was integral to [the business]." *Gayle*, 2009 WL 605790, at *8. Without Field Agents, very few applications would be collected for Sprint's Assurance Wireless Lifeline program. Sprint admits that it "does not rely on retail distribution." (Pls.' 56.1 ¶¶ 106-109.) "Assurance Wireless handsets and

17

service are not available in any retail locations, big box store or otherwise….[and it] does not engage in any online sales." (*Id.* ¶ 107.) Instead, Sprint relies on "grassroots outreach and marketing efforts in low-income communities" such as those in which Field Agents work.  (*Id.* ¶ 108.)  Moreover, Credico, which describes itself as a company that "outsources the face-to-face marketing service for [its] clients," cannot claim that the workers who go out and actually perform these services are not integral to its business. (*Id.* ¶ 17.)  And the Assurance Wireless campaign represents 38% of Credico's business.  (*Id.* ¶ 135.)  Nor can Wallace Morgan, which primarily performed services on the Assurance Wireless campaign, claim that Field Agents are not essential considering their collection of Assurance Wireless applications constituted 75% of its business.  (*Id.* ¶ 31.)

Because Field Agents are indisputably integral part of Defendants' business as key participants in the Assurance Wireless Lifeline program, this factor supports employee status. *See Gayle*, 2009 WL 605790, at *8 (nurses were integral to company that provided in-home nursing care); *Kinney*, 2015 WL 10714080, at *17 (plaintiff who placed clients with buyers for business that represented celebrity talent for commercial endorsements was integral to defendants' business); *Ansoumana*, 255 F. Supp. 2d at 191–92 ("[D]efendants concede that they are engaged primarily in the business of providing delivery services to retail establishments and that plaintiffs perform the actual delivery work. Thus, [P]laintiffs' services constitute an integral part of [Defendants'] business.").

Based on the foregoing, there is no question that Field Agents, just like "most workers" are employees under the FLSA's and NYLL's broad definitions.  *See* W&H U.S. Dep't of Labor, *Administrator's Interpretation No. 2015-1* (July 15, 2015) (concluding that "most workers are employees under the FLSA's broad definitions"); *Hart*, 967 F. Supp. 2d at 922 (citing NYLL §

190(2), and noting that "'[e]mployee' is defined nearly identically…in the FLSA and NYLL")). Indeed, the economic realities and critical question of control under New York common law overwhelmingly weigh in favor of employee status.  Plaintiffs were economically dependent on Defendants and summary judgment should be granted in their favor on the issue of whether they are employees covered by the FLSA's and NYLL's minimum wage and overtime provisions. *See Hart*, 967 F. Supp. 2d at 924 ("[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)."); *see also Topo v. Dhir*, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004) ("There is general support for giving FLSA and the New York Labor Law consistent interpretations.").

## III.    THE OUTSIDE SALES EXEMPTION DOES NOT APPLY TO PLAINTIFFS

Defendants contend that even if this Court determined that Plaintiffs are employees covered by the FLSA and NYLL, they are not entitled to minimum or overtime wages because they qualify for the "outside sales exemption." Defendants are wrong.

### A.    LEGAL STANDARD AND BURDEN

The FLSA's protections do not apply to workers "employed 'in the capacity of outside salesman.'"  29 U.S.C. § 213(a)(1); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2161 (2012). An outside salesperson is an employee "(1) [w]hose primary duty is: (i) making sales…; or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer," and (2) [w]ho is customarily and regularly engaged away from the employer's place of business in performing such primary duty.[2] 29 C.F.R. § 541.500(a); *see also* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (noting that the NYLL's overtime provision is subject to the FLSA exemptions); *Marcus v. AXA Advisors, LLC*,

---

[2] Plaintiffs do not dispute they were regularly engaged away from Defendants' place of business when performing their primary job duty of collecting Assurance Wireless Lifeline applications.

307 F.R.D. 83, 95 (E.D.N.Y. 2015) (applying the FLSA's outside-sales standards to New York

labor laws). A sale "includes any sale, exchange, contract to sell, consignment for sale, shipment

for sale, or other disposition." 29 U.S.C. § 203(k).

Importantly, exemptions from the FLSA's requirements "are to be narrowly construed

against the employers seeking to assert them and their application limited to those establishments

plainly and unmistakably within their terms and spirit." *Davis v. JP Morgan Chase & Co.*, 587

F.3d 529, 531 (2d Cir. 2009) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

Defendants bear the burden of establishing the outside-sales exemption applies. *See Young v.*

*Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009). Moreover, "[b]ecause the FLSA is a

remedial law, [courts] must narrowly construe [this] exemption[]." *Reiseck v. Universal*

*Commc'ns of Miamai, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010).

## B.   DEFENDANTS CANNOT PROVE THAT FIELD AGENTS' PRIMARY DUTY IS "SALES" WITHIN THE MEANING OF THE FLSA AND NYLL

### 1.   <u>Lifeline Phones and Services are Provided Free of Charge</u>

Field Agents do not make sales.[3] They collect applications from potentially qualified

applicants for possible enrollment in a government-funded welfare program. (Pls.' 56.1 ¶¶ 1, 6,

19, 30, 58, 110.) If the application is approved, Sprint provides the individual with a cellphone

***free of charge***. (*Id.* ¶ 6.) The standard talk minutes and text messages are also ***free***. (*Id.* ¶ 114.)

There is not even a contract between Sprint and the qualified applicant for the free phone or free

services. (*Id.* ¶ 113.) Moreover, even Sprint admits that there is no sale involved in providing

qualified low-income consumers a free cellphone. Recently, in October 2015, when another

---

[3] Defendants will put great weight on the fact that Plaintiffs sometimes referred to their work as "sales," but how Plaintiffs referred to their work is irrelevant. When analyzing the exemption, courts must "look beyond labels and job descriptions and inquire into the specifics of the actual tasks [the employees] perform[]." *Miranda-Albino v. Ferrero, Inc.*, 455 F. Supp. 2d 66, 77 (D.P.R. 2006); *McCluskey v. J.P. McHale Pest Mgmt.*, 147 Fed. Appx. 203, 206 (2d Cir. 2005).

provider of free Lifeline services, TracFone, sought a declaratory judgment declaring as unenforceable and unlawful state laws and regulations that imposed 911 taxes and fees on Lifeline customers who receive free wireless Lifeline services, Sprint provided comments as to why those laws would unlawfully reduce the value of Lifeline assistance program and constitute an impermissible use of Lifeline funds.  (*Id.* ¶ 111.)  Indeed, in challenging a state assessment of an enhanced prepaid wireless charge on retail transactions to help finance that state's 911 fund, Sprint explained that its "[n]o-fee Lifeline service does not involve a ***retail transaction*** and does not constitute a prepaid service since the 'seller' ([Sprint]) does not collect a fee from the consumer (the Lifeline end user).  In short, the provision of service is ***not a purchase*** by the Lifeline end user." (*Id.*) (emphasis added).  Sprint went on to articulate that there are other reasons why the 911 fee does not apply, noting "the statute requires '[a] seller (to) collect the enhanced prepaid wireless charge from the consumer with respect to each retail transaction' (Indiana Code 38-8-16.6-12). (*Id.*) As there is no retail transaction, there is no ability for a seller to collect the charge."). This makes sense because one cannot sell, or collect a charge, for a free product or service.  As Sprint acknowledges, Field Agents simply do not make "sales" as that term is defined under the FLSA, 29 C.F.R. § 541.501.

Defendants would still be unable to prove plainly and unmistakably that Field Agents are outside sales exempt even under the Supreme Court's interpretation of what constitutes a "sale" in the pharmaceutical sales industry. *See SmithKline*, 132 S. Ct. at 2171-72 (concluding that in the pharmaceutical drug sales industry, pharmaceutical sales representatives are outside sales exempt under the "other disposition" phrase which includes "those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a particular commodity").  Unlike the pharmaceutical sales representatives in *SmithKline*, Field Agents are not making "other

disposition" under the statute since there is no sale of a commodity, as Sprint readily admits. Unlike in *SmithKline*, Field Agents could not have been collecting Assurance Wireless applications to "ensure the eventual disposition of the products that [Sprint] sells" when Sprint admits it does not sell any products.  132 S. Ct. at 2172.  There is no retail transaction or purchase of any commodity between Sprint and the consumer.  Instead, Sprint, through Field Agents that it contracts with Credico and Wallace Morgan to provide, is merely gathering and collecting from low-income consumers an application for enrollment in a government-funded assistance program, if they qualify. (Pls.' 56.1 ¶¶ 1, 6, 19, 30, 58, 110.)

In this respect, Field Agents are analogous to the college recruiters who the *SmithKline* Court specifically distinguished its exempt pharmaceutical sales representatives from. 132 S. Ct. at 2174. In 1999, the DOL considered the job of a college recruiter, whose primary job duty (just like the Field Agents' here) consisted of "identifying qualified customers…[and] inducing their application to the college."  Wage and Hour Division, U.S. Dep't of Labor Op. Ltr., 1999 WL 1002391, at *2 (Apr. 20, 1999).  The college, in turn, would then decide "whether to make a contractual offer of its educational services to the applicant."  *Id.*  The Supreme Court agreed that these college recruiters were not exempt outside-salespersons because they were "employees who were incapable of selling any good or service because their employer had yet to extend an offer." *SmithKline*, 132 S. Ct. at 2174.

Similarly, in *Clements v. Serco*, 530 F.3d 1224, 1227 (10th Cir. 2008), the court found civilian military recruiters employed by Serco who contracted with the U.S. Army were not outside sales exempt.  The recruiters were hired "to recruit potential applicants for the U.S. Army," which required them to be out in the community, informing individuals about the opportunity to serve and distributing publicity materials to high school and college students.  *Id.*

at 1226.  Once a recruit expressed interest, the recruiters would set up an interview and administer pre-screening tests to determine if the recruit met the minimum requirements for enlistment.  *Id.*  The court concluded that although the military recruiters "engaged in sales training and 'sold' the idea of joining the Army to potential recruits, they did not engage in sales work as defined by the Department of Labor regulations. . . The touchstone for making a sale, under the Federal Regulations, is obtaining a commitment."  *Id.*  at 1227.  Here, the recruiters "merely cultivated a list of persons who seemed receptive to the idea of joining the Army."  *Id.* (*citing Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 253 (5th Cir. 1969)).  Because they never **obtained a commitment** (binding or non-binding), they were not making "sales."  *Id.*

Here too, Field Agents inform potentially qualifying low-income consumers about the Assurance Wireless Lifeline program, help them fill out an application if they are interested participating in this benefit program, and submit the application.  At the time the application is submitted, and the Field Agents' job is done, Defendants have yet to extend any kind of offer or make any sort of approval decision regarding the applicants' eligibility.  Only after it is determined that the applicant meets the eligibility requirements imposed by the Lifeline regulations (47 C.F.R. § 54.410), then they may they be offered a free phone.  But even if they are offered the phone, the enrollee does not have to *accept* it, i.e., activate their free cellphone, as there are no contracts between the qualifying low-income consumer and Sprint.  The applicants never commit to accepting the Assurance Wireless Lifeline service, they simply commit to filling out an application to see if they qualify for such service.  As a result, Field Agents' work is not "sales" as defined by section 3(k) of the FLSA.

### 2.   Additional Minutes or Text Messages are not Sold by Plaintiffs

After a Lifeline application is approved, and the enrollee activates their free cellphone, s/he has the option to purchase additional minutes or text messages at discounted rates.  (Pls.' 56.1 ¶ 115.)  But Plaintiffs have no role in these add-ons. (*Id.* ¶ 114.) Field Agents do not have the authority to upsell or offer additional data or minutes to an applicant. (*Id.*) And as Sprint's contract with Wallace Morgan makes explicitly clear: "Wallace Morgan must not (and must ensure that each of its representatives and employees do not)…charge any price, cost, tax, or other charge for the Assurance Wireless handsets or devices to approved Assurance Wireless customers."  (*Id.*)  They also cannot change any of Assurance Wireless' "service offers (e.g. the rates charged by [Assurance Wireless] and the terms and conditions under which [Assurance Wireless] provides communications services to customers)."  (*Id.*)  If an enrollee wishes to add minutes or texts, they must add money to their account with a Virgin Mobile top up card, credit card, debit card or through Paypal.  (*Id.* ¶ 115.)

> Again, the DOL's guidance regarding the college recruiters is instructive:
>
> Ordinarily, an individual who regularly performs recruitment for a college is not engaged in making sales of the college's services, or obtaining contracts for its services.  Rather, college recruitment activity appears analogous to sales promotion work, since, like a promotion person who solicits customers for a business, the college recruiter is engaged in identifying qualified customers, i.e., students, and inducing their application to the college, which in turn decides whether to make a contractual offer of its educational services to the applicant.

Wage and Hour Division, U.S. Dep't of Labor, 1999 WL 1002391, at *2 (Apr. 20, 1999).

At best for Defendants, Plaintiffs' work in gathering applications may stimulate later sales that are unconnected with the applications Plaintiffs gathered and that are ultimately made by someone else. This, however, does not equate to exempt outside sales work.  *See* 29 C.F.R. § 541.503 ("[P]romotional activities designed to stimulate sales that will be made by someone else

are **not** exempt outside sales work.") (emphasis added); *see also Wirtz*, 418 F.2d at 253 (concluding "student salesmen" who went door-to-door and gave order cards to a "student manager," who then verified the customer met the company's qualifications and passed the order on to a "verifier" were not outside salesmen as they did not "make sales of their own."); *Beauford v. ActionLink, LLC*, 781 F.3d 396 (8th Cir. 2015) (affirming that brand advocates who simply promoted products so employees of retail stores could make sales were not outside salesmen under the FLSA).

### C.   PLAINTIFFS DO NOT OBTAIN ORDERS OR CONTRACTS FOR SERVICES WITHIN THE MEANING OF THE FLSA AND NYLL

Similarly, Field Agents do not "obtain orders or contracts for sale **for which a consideration will be paid by the client or customer.**" 29 C.F.R. § 541.501; *see Kinney*, 2015 WL 10714080, at *20 (concluding employer fell short of proving employee was outside sales exempt where employee offered employers services to clients but did not actually obtain binding commitments for those services). Field Agents spend their day collecting applications for the Lifeline program—a program that was created for the sole purpose of providing phone services to individuals who could not afford them. (Pls.' 56.1 ¶¶ 1-2, 58.) The Lifeline program is federally funded with specific eligibility requirements. (*Id.* ¶ 36.) There is no money or other consideration exchanged by any applicant, and there is no commitment from either Sprint or the applicant that services will be rendered merely because an application is submitted, or even if the application is approved. (*Id.* ¶¶ 112-113.) As such, *Flood v. Just Energy Mkt. Corp.* is inapplicable here. 2017 WL 280820 (S.D.N.Y. Jan 20, 2017) (concluding door-to-door salespersons who solicited customers for electric power and natural gas were outside-sales exempt). Moreover, the fact that the federal government provides Sprint a monthly subsidy for

each of qualifying low-income consumers it enrolled in the Lifeline program is irrelevant because the government is not Sprint's "client or customer."  *See* 29 C.F.R. § 541.500(a)(1)(ii).

### D.    FIELD AGENTS ARE THE TYPE OF WORKERS THAT THE FLSA SEEKS TO PROTECT

When Congress enacted the outside-sales exemption in 1938, it was intended to cover traditional door-to-door salespeople who, through a commission-based compensation system, "earn as much or as little as [their] ability and ambition" merit. *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941). Congress exempted outside salespeople in recognition that employers may have difficulty tracking the hours that they worked because of their freedom from supervision and control over their work schedules. *Id.* Congress recognized that these workers would not need overtime protection because, as commissioned workers, they could control the amount of their pay, which would generally increase or decrease depending on the amount of work they performed.  *Id.* And, as the Supreme Court recently recognized, the outside sales exemption "is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that set them apart from the nonexempt workers entitled to overtime pay." *SmithKline*, 132 S. Ct. 2156 (concluding that representatives who earned "an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related [sales tasks]…are hardly the kind of employees that the FLSA was intended to protect.").

With this legislative intent and framework in mind, this Court should conclude that the outside sales exemption does not apply to Plaintiffs.  Plaintiffs are low-wage workers who, through this lawsuit, have brought claims for unpaid *minimum wages*.  For example, during her period of employment, Plaintiff Martin earned a total of $980.00, averaging $196.00 per week. (Pls.' 56.1 ¶ 83.)  Plaintiff Singleton earned $1,300.00, averaging $260.00 per week.  (*Id.*) They

are not the exempt employees who "typically earn[] salaries well above the minimum wage" and enjoy other benefits that "set them apart from the nonexempt workers entitled to overtime pay." *SmithKline*, 132 S. Ct. at 2173.   Similarly, this is not a situation in which the kind of work is "difficult to standardize to any time frame…making compliance with the overtime provisions difficult." *SmithKline*, 132 S. Ct. at 2173.   Wallace Morgan itself has implemented a daily schedule for Field Agents to abide by, in which they come into the office around 7:00 a.m., go out into the field at 10:00 a.m., and then report back to the office to return their tablets around 7:00 p.m. (Pls.' 56.1 ¶ 71.)   And because Field Agents are provided tablets and required to use their tablets for their, Defendants would have no difficulty in tracking Field Agents' work hours. Finally, as discussed above Field Agents are not free supervision but rather tightly controlled. Unlike the employees in *SmithKline*, Plaintiffs *are* the kinds of employees that the FLSA was intended to protect.

## IV.   ALL THREE DEFENDANTS ARE LIABLE AS EMPLOYERS

### A.   LEGAL STANDARD

The FLSA defines "employer" broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has emphasized that this is an expansive definition with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992).   "The concepts of employment and joint employment under the FLSA [is] notably broader than the common law concepts of employment and joint employment, which look to the amount of control that an employer exercises over an employee." Wage & Hour Div., U.S. Dep't Labor, Administrator's Interpretation No. 2016-1 (Jan. 20, 2016) (citing *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996)).

An individual may simultaneously have multiple "employers" for the purposes of the FLSA, in which case, "all joint employers are responsible, both individually and jointly, for compliance with all the applicable provisions of the [FLSA]." 29 C.F.R. § 791.2(a).   A joint employment relationship exists "[w]here the employers are not completely dissociated with respect to the employment of a particular employee" and therefore "share control of the employee, directly or indirectly." *Id.*  Courts and the DOL "may consider joint employment to achieve statutory coverage, financial recovery, and future compliance, and to hold all responsible parties accountable for their legal obligations."   Wage & Hour Div., U.S. Dep't Labor, Administrator's Interpretation No. 2016-1 (Jan. 20, 2016).

Courts in this district employ nearly identical tests to determine the joint employer status under both the FLSA and the NYLL. *Hernandez v. Jrpac Inc.*, 2016 WL 3248493, at *21 (S.D.N.Y. June 9, 2016).  In determining whether an employer-employee relationship exists, courts traditionally apply the "economic reality" analysis for both statutes, much like the independent contractor analysis. *Id.* (*citing Hart*, 967 F. Supp. 2d at 940); *see also Barfield v. New York City Health and Hosp. Corp.*, 537 F.3d 134, 141 (2d Cir. 2008).  The Second Circuit has analyzes "formal control" factors, such as, whether the alleged employer:  (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.[4]  *Carter v. Dutchell Comm. College*, 735 F.2d 8, 12 (2d Cir. 1984). The

---

[4] The DOL recently scrutinized these factors as "not consistent" with the "expansive language" of the FLSA.  Wage & Hour Div., U.S. Dep't Labor, Administrator's Interpretation No. 2016-1 (Jan. 20, 2016) (citing *Zheng*, 355 F.3d at 69).  The DOL declared that the "FLSA rejected control as the standard for determining employment, and [stated that] any vertical joint employment analysis must look at more than the potential joint employer's control over the employee." *Id.*  Consistent with this concern, the Second Circuit makes clear that, while these four factors "can be *sufficient* to establish employer status," they are not "*necessary* to establish an employment relationship." *Zheng*, 355 F.3d at 69 (emphasis in original); *see also Glatt v. Fox Searchlight Pictures, Inc.*, 293 F.R.D. 516 (S.D.N.Y. 2013) ("The fact that all four formal control factors weigh in favor of finding Searchlight was a joint employer is sufficient to find Searchlight was [p]laintiffs' employer even if no functional control factors were satisfied.").

Second Circuit also analyzes "functional control" factors, including: (1) whether the alleged employers' premises and equipment were used for the plaintiffs' work; (2) whether the subcontractors had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to alleged employers' process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the alleged employers' or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the alleged employers. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71-72 (2d Cir. 2003).

No one factor standing alone is dispositive, but rather the tests look at "the totality of circumstances." *Hernandez*, 2016 WL 3248493, at *21; *see also Zheng*, 355 F.3d at 77 (holding the factors are "nonexclusive and overlapping," and a court "need not decide that every factor weighs against joint employment" in order to grant summary judgment on the joint employer issue); *see also Antenor*, 88 F.3d at 933 (recognizing the joint employer test is not a "mathematical formula" and that the absence of one or more criteria "does not preclude a finding" that an entity is a joint employer"). Summary judgment may be granted to the plaintiffs "even when isolated factors point against imposing joint liability." *Zheng*, 355 F.3d at 77.

## B.   SPRINT IS LIABLE AS A JOINT EMPLOYER OF WALLACE MORGAN'S EMPLOYEES[5]

### 1.   Sprint has the power to hire and fire Field Agents

"This factor focuses on the '*power* to hire and fire,' not whether that power was exercised." *Glatt*, 293 F.R.D. at 526 (emphasis added) (*citing Carter*, 735 F.2d at 12). Sprint cannot deny it has this power. Sprint contracts with Credico to hire a street team of Field Agents to promote the Assurance Wireless Lifeline program and collect applications from potentially qualifying low-income consumers; but there is nothing in the contract preventing Sprint from hiring its own Field Agents. (Pls.' 56.1 ¶ 19.) Sprint has simply chosen to set up a vertical employment model where it is not directly employing Field Agents. (*Id.* ¶¶ 19, 21-24.) And while it is not directly involved in the Field Agents' interview, Sprint has the power to issue a "recruiting ban" in which each ISO that Credico subcontracted with must stop hiring Field Agents. (*Id.* ¶ 171.) Sprint may also terminate any Field Agent "whom it finds, in its reasonable judgment, unacceptable." (*Id.* ¶ 182.) If a Field Agent performs her job poorly, Sprint may "in its sole discretion" terminate that Field Agent.[6] (*Id.*) The record is littered with instances where Sprint exercised its power and actually ordered either Credico or Wallace Morgan to terminate a Field Agent. (*Id.*) Even if Sprint only exercised this power occasionally, the simple fact that it *could* fire Field Agents shows joint employment. *See Herman*, 172 F.3d at 139 ("[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the

---

[5] This section focuses on Sprint and Credico because there is no question that Wallace Morgan is the Field Agents' employer. *See* 29 U.S.C. § 203(d). As discussed *supra* section II, Plaintiffs were not independent contractors but rather employees of Wallace Morgan. Moreover, Wallace Morgan, like Sprint and Credico, hired, fired, maintained employment records, and oversaw the Field Agents on a day-to-day basis. (Pls.' 56.1 ¶¶ 24, 30, 71, 83, 219.) Wallace Morgan also cut Plaintiffs' paychecks, held daily meetings, and reclassified Field Agents from independent contractors to W-2 employees in 2015. Even Wallace Morgan does not contend in its pre-motion summary judgment letters that it is not Plaintiffs' employer. (*See* ECF Nos. 234, 238, 251.)

[6] To terminate a Field Agent, Sprint will "deactivate" an Agents ID code. (*Id.* ¶ 182.) When that code is deactivated, the Field Agent can no longer submit applications to Assurance Wireless. (*Id.*)

significance of its existence."); *see also Barfield*, 537 F.3d at 144 (defendant was a joint employer where it had the "undisputed power to hire and fire at will agency employees referred to work on hospital premises).

### 2. Sprint supervises and controls Field Agents' employment

Sprint's supervision, control, and constant monitoring of Field Agents further establishes it is a joint employer.  Sprint created the SOPs Field Agents must strictly adhere to, which as discussed above, dictate the manner and method by which Field Agents must collect Assurance Wireless Lifeline applications, who they can collect applications from, where they can work, what they can wear, and what they can say to potential applicants.  (Pls.' 56.1 ¶¶ 48, 49.)  Sprint determines the territory where Field Agents can collect applications, and requires that they (1) only work within that territory and (2) report where within that territory they will be each day.  (*Id.* ¶ 93-94, 202, 230.)  To ensure Field Agents comply with its rules, Sprint requires constant auditing of Field Agents' performance. (*Id.* ¶¶ 136-155.) Sprint required Wallace Morgan complete and submit "self-audits" of the Field Agents within the first 15 days of their employment.  (*Id.* ¶ 136.) Credico was required to perform regular audits of Field Agents, and Sprint performed its own audits and "mystery shops," where it observes the Field Agents performing their job without their knowledge. (*Id.* ¶ 143-146, 148.)  Sprint's audits would criticize Field Agents for many things including what they said in their "sales pitch," for not having enough or having too much merchandising with them, for not handing out documents at the correct time, and not wearing the appropriate Assurance Wireless gear.[7]  (*Id.* ¶ 143-146.)

---

[7] The fact that Sprint may not have communicated the feedback from its audits directly with Field Agents is of little importance, as "it is well-settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor." *Aimable v. Long & Scott Farms*, 20 F.3d 434, 441 (11th Cir. 1994); *see also Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 148 (4th Cir. 2017) ("We also give little weight to the fact that Commercial's foremen generally spoke only to J.I.'s supervisors and did not speak to Plaintiffs directly."); *Hodgson v. Griffen & Brand of McAllen, Inc.*, 471 F.2d 235, 238 (5th Cir. 1973) (simply because the defendant speaks to the

In addition to these audits, "every day" Sprint monitors how many Field Agents are working and their productivity. (*Id.* ¶ 158; *see also id.* ¶ 159 (daily recap email from Sprint to Wallace Morgan providing number of applications and Field Agents working each day). If the number of applications is low, Sprint will notify either Credico or Wallace Morgan. (*Id.* ¶ 160.) Goals and strategies to improve production can be discussed at Wallace Morgan's "atmosphere" meetings (which Sprint occasionally attends), or during the weekly phone call between Credico, Sprint, and Wallace Morgan's ISO owner Tommy Smith. (*Id.* ¶ 147.) Sprint has even participated in "all rep calls" directly with Field Agents and provided information about updates and news regarding its Assurance Wireless Lifeline program. (*Id.* ¶ 174.) If there is overproduction, where too many applications are being submitted, Sprint can and has even demanded that Field Agents be pulled from the field. (*Id.* ¶ 170.)

While the status of a joint employer "does not require continuous monitoring of employees, looking over their shoulders at all times," on this record, it is clear Sprint did. *Herman*, 172 F. 3d at 139. The requirements imposed on Field Agents are in place to protect Sprint's chosen image for the Assurance Wireless brand—not to ensure compliance with Lifeline Regulations or other safety standards as Sprint will argue. *See* Wage & Hour Division, U.S. DOL Op. Ltr., 2014 WL 2816951, at *5 (June 19, 2014) (noting when entities "perform additional functions beyond those required by the federal Medicaid program," or "choose to implement high-control mechanisms for assuring compliance," they "should be aware that these functions may be viewed as strong indicators of employer status."); *Hart*, 967 F. Supp. 2d at 916 (explaining that although "maintaining an atmosphere perceived as 'upscale' may have helped the [c]lub in its marketing or assisted it to appeal to a higher-end customer base, those goals had

---

crew leaders "rather than speaking directly to the [workers] does not negate a degree of apparent on-the-job control over the [workers].").

nothing to do with providing a safe and law-abiding venue.   Rather, they helped Rick's NY achieve its business ends.")   Sprint's exercise of substantial supervision and tight control over Field Agents and their working conditions establishes joint employer status. *See Glatt*, 293 F.R.D. at 527 (factor showed joint employment where plaintiffs were required to send daily call sheets to putative employer); *Herman*, 172 F.3d at 137 (affirming district court's finding that defendant supervised and controlled employee work schedules where he "kept himself apprised of [] operations by receiving periodic reports from employees").

### 3.   Sprint determined the rate and method of payment

Throughout this litigation, Sprint consistently maintained it had no involvement in how Plaintiffs were paid.   (*See* ECF No 233 at 10) (citing Order on Cond. Cert., ECF. No. 86).) Discovery shows that Sprint's assertion is simply untrue.

The record undisputedly shows that Sprint "*de facto*" set Field Agents' wages.   *See Zheng*, 355 F.3d at 72 (*citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729-30 (1947) ("[A]lthough it did not literally pay the workers, the [alleged employer] *de facto* set the workers' wages, because the boners did no meat boning for any other firm and shared equally in the funds paid to the boning supervisor.")). Sprint is the defendant in this lawsuit that has an agreement with the Federal Communications Commission (FCC) to provide Lifeline services, and it is the one that receives a subsidy from the federal government for providing these services.   (Pls.' 56.1 ¶¶ 3, 8.) From these "Lifeline support" funds, Sprint solely decides how much it will allocate to Credico, and determined to pay a flat-fee for each approved application Field Agents collect. (*Id.* ¶ 184) (stating Credico "shall be compensated… $16 per [a]pproved [a]pplication" and "[t]he compensation structure is subject to change by Sprint"). Sprint determines whether to adjust this amount and when it will offer "spiffs" or "bonuses" to Field Agents and what those amounts will

be, which are typically awarded for reaching job-performance goals.  (*Id.* ¶ 185) (providing a $500 bonus to Field Agents who generate at least 175 applications and met other requirements). Sprint also dictates when pay will be withheld, for example, if there is evidence of fraud or issues that require investigation. (*Id.* ¶ 186.)  Based on the compensation it receives, which is detailed in Sprint's weekly and monthly commission reports, Credico, in turn, pays Wallace Morgan who in turns pays Field Agents.  (*Id.* ¶¶ 188-189.)

Through its control of this payment set up, Sprint *de facto* set the wages for all Field Agents, and this factor similarly shows Sprint is a joint employer.  *See* Glatt, 293 F.R.D. at 528 (factor showed joint employment where employer withheld pay until interns signed an employment agreement, even though employer "may not have had the power to set employees' rate of pay, it was involved in their method of pay"); *Herman*, 172 F.3d at 140 ("little evidence" showed defendant determined plaintiffs' rate of payment, "[b]ut he did participate in the method of payment"); *Barrientos v. Taylor*, 917 F. Supp. 375 (E.D.N.C. 1996) (finding joint employment because a farm labor contractor's dependence on the cash from the farm owner allowed him no discretion in setting the pay rates for plaintiffs, concluding that "[e]ssentially, the [farm owner] dictated what plaintiffs would receive").

### 4.    Maintenance of employment records

Through its Quickbase system, Sprint maintains and has access to Field Agents' names, contact information, as well as the locations Field Agents will be working on a given workday. (Pls.' 56.1 ¶¶ 202, 206-208.)  Sprint also provides Commission Reports with data showing the time, date, and number of applications Field Agents submit each day. (*Id.* ¶ 188; Stip. Facts ¶ 80.)  Sprint requires that Credico store other employment records, such as IRS documents and the Sprint SOP signature page each Field Agent must sign, and that these documents be made

available upon Sprint's request.  (Pls.' 56.1 ¶¶ 49(f)(2)i), 221.)  Sprint also requires Wallace Morgan to maintain certain employment records including records of all training for seven (7) years, and to agree to transfer files to Credico and Sprint after 7 year period.  (*Id.* ¶ 221.)  These facts indicate joint employer status.  *See Glatt*, 293 F.R.D. at 528 (requiring staff to sign confidentiality agreements and employment agreements indicative of joint employer status); *Barfield*, 537 F. 3d at 144 (holding alleged employer with time records "apparent failure to organize these records in a way that readily alerted it to when an employee … worked more than 40 hours in a given week, does not alter the fact that" this factor supports joint employment).

### 5.    The remaining *Zheng* "functional control" test factors

Several of the functional control factors set forth in *Zheng* similarly prove Sprint is the Field Agents' employer. As described above, *see supra* section IV.B.2, Sprint exercised significant supervision over the Field Agents.  Their day-to-day work was closely monitored and audited by Sprint, and their job duties were dictated through Sprint's SOPs. *See Greenawalt v. AT&T Mobility, LLC*, 642 Fed. Appx. 36 (2d Cir. 2016) (written orders directing plaintiffs on how to perform their job duties indicated putative employers control).  Sprint even reserved the right to inspect Wallace Morgan's offices to ensure compliance with its SOPs.  (Pls.' 56.1 ¶¶ 221); *see Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012) (finding allegation that the proposed franchisor defendant "had the right to inspect the [franchisee's] stores to ensure compliance with all of their policies" supported joint employer status).  Sprint also provided Field Agents with nearly all of the tools they needed to perform their job.  The record indisputably shows that Field Agents do not provide their own equipment.  (*See supra* § II.B.6.)

Field Agents also perform a discrete-line job that is integral to Sprint's Assurance Wireless brand. While this factor has limited application outside the context of a product

manufacturing line,[8] Sprint cannot dispute that Field Agents—the workers who actually collect applications for Assurance Wireless Lifeline services—play an integral role in Assurance Wireless' business, which exists solely to provide Lifeline services to qualified applicants. (*See* discussion *supra* § II.B.F.)

Finally, Field Agents worked predominately for Sprint. Field Agents were only allowed to work on one campaign at a time, and at Wallace Morgan, a majority of the work performed was done for Sprint's Assurance Wireless campaign. (Pls.' 56.1 ¶ 176.) Moreover, the schedule they were expected to maintain and the hours they needed to work in order to "have a good income" is further proof that Field Agents worked predominantly for Sprint. (*Id.* ¶ 177.) Based on the foregoing, there is no question that the first, third, fifth, and sixth *Zheng* factors weigh in Plaintiffs' favor, and further prove that Sprint is a joint employer, liable for Field Agents unpaid wages.

## C.   CREDICO JOINTLY EMPLOYED FIELD AGENTS

### 1.   Credico's power to hire and fire Field Agents

As part of this vertical business model in which Sprint contracts with Credico for workers to collect Lifeline applications, Credico subcontracts that work out to ISO owners, such as Thomas Smith, who are then responsible for hiring and the day-to-day management of the Field Agents who work on the Assurance Wireless campaign. (Stip. Facts ¶ 15-17; Pls.' 56.1 ¶¶ 30-31.) Credico's power to hire Thomas Smith is indicative of joint employment.[9] *See Herman,* 172 F.3d at 140 (Although Defendant's "hiring involved mainly managerial staff, the fact that

---

[8] *Barfield v. New York City Health and Hospitals Corp.,* 432 F. Supp. 2d 390, 393 n. 1 (S.D.N.Y. 2006) ("[The third] factor was raised by the *Zheng* court in the particular context of a production line ... and therefore may be less relevant here.").

[9] Credico not only hired Tommy Smith to provide it with Field Agents who would collect applications for the Assurance Wireless campaign, but it later promoted him to work as a "consultant," where he works with other ISO owners. (Stip. Facts ¶¶ 26-27, 30.)

[Defendant] hired individuals who were in charge of the [Plaintiffs] is a strong indication of control."); *Torres v. Gristede's Operating Corp.*, 2011 WL 4571792, at *2 (S.D.N.Y. Sept. 23, 2011) ("There is no evidence that [Defendant] hired any class member, but there does not have to be. It stands uncontradicted that he hired managerial employees."). Moreover, Credico, like Sprint, has the power to terminate or suspend a Field Agent by "deactivating" their Agent ID Code, (Pls.' 56.1 ¶ 183), weighing in favor of employer status.

### 2.     Credico's supervision of Field Agents

Credico adds yet another level of supervision that Field Agents are subject to when performing their job duties.  Above and beyond enforcing Sprint's SOPs, Credico has created a number of its own SOPs that Field Agents must follow. (Pls.' 56.1 ¶¶ 51-56.)  And Credico, like Sprint, conducts audits to evaluate the Agents' job performance and provides feedback to the Field Agents. (*Id.* ¶¶ 148-150.)  Credico has even implemented a Compliance Improvement Plan, in which it clearly sets forth the rules that Agents must follow and the consequences for not following them.  (*Id.* ¶¶ 151-154.)  For example, if an Agent does not wear any Assurance Wireless branding in the field, or forgets to hand out an Assurance Wireless magnet, these violations together would result in "immediate termination."  (*Id.* ¶ 152-154.)  If a Field Agent collects an application outside of its pre-approved territory, he or she must pay a fine.  (*Id.* ¶¶ 52, 155.) When problems or "escalations" arise between a Field Agent and a potentially qualified applicant, Wallace Morgan must inform Credico, and Credico will investigate and resolve the matter. (*See, e.g.*, *id.* ¶ 157.)  Moreover, Credico monitors the applications Field Agents submit and if it discovers that Field Agents knowingly submitted another application for an existing Lifeline customer, they were terminated.  (*Id.* ¶¶ 51, 155.)  Taken together, Credico's actions amount to supervision "indicative of an employment relationship." *Zheng*, 355 F.3d at 74.

### 3.    Credico determined the payment field agents received

As noted above, under the vertical payment scheme, Sprint determined the flat-rate amount Credico received for every approved application collected. (Pls.' 56.1 ¶ 184.) After determining the portion it would keep for itself, Credico next determined how much the Field Agents and ISO owners would receive.  (*Id.* ¶ 189.) These amounts are set forth in Credico's "Commission Schedules;" however, as stated in those documents, "no sale is considered final or commissionable until approved by Credico and [Sprint]." (*Id.* ¶¶ 191-196.) Depending on the time period, Field Agents were to receive anywhere from $4 to $10 for each approved application, while the ISO owners received $2.50 to $7.00.  (*Id.* ¶¶ 193-195.)  These rates were also reflected in the Office Payment Summaries Credico provided to Wallace Morgan, which listed each Field Agent by name and the total sum they were to receive each pay period.  (*Id.* ¶ 197.)  Wallace Morgan, in turn, ensured that its Field Agents were paid these amounts when it cut and distributed the Field Agents' paychecks. (*Id.* ¶ 198.) And while Credico will claim it provided Office Payment Summaries as a "convenience" to Wallace Morgan, its documents state otherwise, instructing: "Offices **must** pay agent commission following the established rates on the commission policy; **no deviation on commission should be made**." (*Id.* ¶ 191 (emphasis added).)

Finally, Wallace Morgan's president made clear at his deposition that in 2015, he reclassified the Field Agents from independent contractors to outside sales employees upon the advice of Credico.  (*Id.* ¶ 81.)  Credico advised him that reclassifying the Field Agents would provide "extra protection" in terms of confidentiality agreements and arbitration agreements, which would stand up more readily in an employee relationship than an independent contractor relationship."  (*Id.*)  In 2016, Credico changed its subcontractor agreement to require that all of

its ISOs classify their field agents as W-2 employees. (*Id*.) Given Credico's heavy involvement

in determining the Field Agents' employee status and pay this factor clearly weighs in Plaintiffs'

favor. *See Barfield*, 537 F. 3d at 145 ("The fact that Bellevue calculated the hours Barfield

worked and that it then paid the agencies an hourly rate for those hours, so that the agencies, in

turn, paid Barfield an hourly rate for the exact same hours, indicates that Bellevue exerted some

control over Barfield's pay.")

### 4.      Credico maintained Field Agents' employment records.

Credico cannot plausibly claim it did not maintain the Field Agents' employment records.

As noted above, it tracked—and even calculated—the pay that each Field Agent received, and

kept these records within its systems. (Stip. Facts ¶ 81-83, 85-87; Pls.' 56.1 ¶¶ 197-198, 215-

217.)  Credico also required that Field Agents complete Sprint's online training, and submit new-

hire paperwork in which it required Field Agents to sign a copy of the "Independent Sales

Representative Agreement" they were given. (*Id*. ¶ 218, 220 (personnel file of Field Agent

maintained and produced by Credico).) Credico maintained records of Field Agents' trainings.

(*Id*. ¶¶ 220, 221.)  These facts again support that Credico is a joint employer of the Field Agents.

*See Glatt*, 293 F.R.D. at 528 (requiring staff to sign confidentiality agreements and employment

agreements indicative of joint employer status); *Barfield*, 537 F. 3d at 144 (2d Cir. 2008);

*Cordova*, 2014 WL 3512838, at *5 (finding the complaint "plausibly pleaded facts suggestive of

joint employment," such as the provision of "materials for use in training ... and monitoring

employee performance").

### 5.      The remaining *Zheng* "Functional Control" test factors

Analysis of the *Zheng* factors further proves Credico is an employer.  First, as noted

above, Credico heavily supervised the Field Agents job performance. (*See supra* § IV.C.2.)

Second, Credico provided the tablets Field Agents used to collect Assurance Wireless Lifeline applications.  (Pls.' 56.1 ¶ 99.) Third, Field Agents perform a discrete-line job that is integral to Credico's business. Credico describes itself as a company that outsources face-to-face marketing service for its clients. (*Id.* ¶ 17.) It cannot claim that Field Agents—the ones who perform these services—are not integral to their process of production.  And fourth, as noted above, Field Agents work predominantly for Credico. (*See supra* § II.B.5.)

Additionally, responsibilities under Credico's contracts can pass from one ISO to another without material changes to the Field Agents' job duties. *Zheng*, 355 F.3d at 71–72 (fourth factor weighs in favor of joint employment when employees are "tied to an entity…rather than to an ostensible direct employer"). Under Credico's business model, ISOs are interchangeable, and when one ISO closes "the *same* employees would continue to do the *same* work in the *same* place" for a new ISO.  *See id.*; *Greenawalt v. AT&T Mobility, LLC*, 642 Fed. Appx. 36 (2d Cir. 2016).  Field Agents frequently transfer from one Credico ISO to another; all they need to do is submit an "Agent Transfer Form." (Pls.' 56.1 ¶¶ 128-129.)  Indeed, numerous Field Agents who worked for an ISO called "Red Ten" were transferred to the ISO "Plato Group DBA Wallace Morgan" where they still worked on the Assurance Wireless campaign. (*Id.* ¶ 129.)  Because each ISO is still subject to Sprint's SOPs, there is no material change in the working relationships between Field Agents and Credico. *See Lopez,* 14 F. Supp. 2d at 422 (evidence that when a contractor went out of business there was no material change in working relationship between plaintiff workers and defendant manufacturer supported joint employment under factor four); *see also Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 285 (E.D.N.Y. 2005) (finding fourth factor satisfied where laborers' responsibility passed without material change even after supervisors left their positions and contracts were abandoned).

40

Again, there is no question that—just like the *Carter* factors—the first, third, fourth, fifth, and sixth *Zheng* factors weigh in Plaintiffs' favor and prove Credico is an employer subject to liability in this action.

### D.   DEFENDANTS' ASSOCIATION WITH EACH OTHER IS FURTHER EVIDENCE OF JOINT EMPLOYMENT

The Fourth Circuit recently abandoned use of its economic realities test (which was similar to the Second Circuit's *Carter* and *Zheng* test), for the joint-employer inquiry, finding it to be an ill fit for the issue.  In *Salinas v. Comm. Interiors, Inc.*, the appellate court held that the economic realities test should be limited only to the independent contractor inquiry because the factors "improperly focus on the relationship between the employee and putative joint employer, rather than on the relationship between the putative joint employers" and because the factors "incorrectly frame the joint employment inquiry as a question of an employee's 'economic dependence' on a putative joint employer."[10]  848 F.3d 125, 137 (4th Cir. 2017).

The appellate court traced this improper application back to various appellate courts' erroneous reliance on *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), which involved a meat boners misclassified as independent contractors, who worked for multiple entities. *Salinas*, 848 F.3d at 138.  The *Salinas* court noted that the *Rutherford Food* analysis "principally addressed" the independent contractor question, "not whether Kaiser and its [middle men] were joint employers."  *Id.*  Thus, while *Rutherford Food*'s economic realities factors provides "the prism though which courts should distinguish employees from independent contractors, . . . it does not capture key ways" in which putative joint employment relationships exist.  *Id.* at 139.

---

[10] The Fourth Circuit further criticized these tests for their utilization of common-law tests for determining whether agency relationships exist when the scope of coverage under the FLSA is much broader.  *Salinas*, 848 F.3d at 135–36 (quoting the U.S. Supreme Court's recognition that "Congress intended for the FLSA to 'stretch[] the meaning of 'employee' to cover some parties who might not qualify as such under strict application of traditional agency law principals'") (quoting *Darden*, 503 U.S. at 326)).

The Fourth Circuit now focuses on the "relationship between *the employer* who uses and benefits from the services of the workers and *the party that hires or assigns the workers to that employer*." *Id.* at 137 (quoting *Schultz v. Capital Int'l Securs., Inc.*, 466 F.3d 298, 306 (4th Cir. 2006)); *see also Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 193 (S.D.N.Y. 2003). The question should be whether or not the alleged "'two or more employers are acting *entirely independently* of each other and are *completely disassociated* with respect to the' individual's employment," so to better track the analysis laid out long ago in the DOL regulations. *Salinas*, 848 F.3d at 133–43 (quoting 29 C.F.R. § 791.2(a)).[11]

To answer this question, the Fourth Circuit directs courts to determine whether (1) two or more entities "share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of a worker's employment, and whether (2) the two putative employers enjoy a "combined influence over the terms and conditions of a worker's employment." *Id.* at 129-30. This analysis does not ask whether one employer exercised more control over another, rather "turns on the relative association or disassociation between entities." *Id.* at 141 ("The district court therefore erred by weighing the degree of control exercised by [one putative joint employer] against that exercised by [the other]. The court should have instead weighed the agents' control against the total control exercised by [both joint employers]."); *see also In re Enterprise Rent–A–Car v. Enterprise Holdings, et al.*, 683 F.3d 462, 468 (3d Cir. 2012) ("[W]here two or more employers ... share or co-determine

---

[11] In cases where "employee" status and joint employer status are both at issue, the Fourth Circuit advocates that courts first determine "whether a defendant and one or more additional entities shared, agreed to advocate responsibility for, or otherwise codetermined the key terms and conditions of the plaintiff's work." *See Hall v. DIRECTV, LLC*, 846 F.3d 757, 767 (4th Cir. 2017) (citing *Schultz v. Capital Int'l Securs., Inc.*, 466 F.3d 298 (4th Cir. 2006)). This is because the question of whether a worker is an employee "depends in large part upon the answer to the first step." *Id.* Specifically, if the court decides two or more entities are joint employers, than the court must look at the entities' "*combined* influence over the terms and conditions of the worker's employment" to determine employee status. *Id.* If, on the other hand, the entities are disassociated, then the independent contractor question must be answered "with regard to *each* putative employer separately." *Id.*

those matters governing essential terms and conditions of employment—they constitute 'joint employers' under the FLSA.").

The *Salinas* analysis, while crafted by another circuit, is particularly useful here considering the business structure that exists between the three defendants, acting as a cross-check on the economic realities test to ensure adherence to long established DOL regulations and the expansive definition of employer under the FLSA. Here, the record indisputably shows that Sprint, Credico, and Wallace Morgan are "not completely disassociated"—indeed, they are inextricably intertwined. In the context of the Field Agents at issue, Sprint, Credico, and Wallace Morgan are all working together to operate the same business process to collect Assurance Wireless Lifeline applications. Sprint contracts with Credico for workers to collect applications. Credico in turns contracts with Wallace Morgan for these workers. Even Sprint and Wallace Morgan have a contract with one another outlining the terms of conditions of Wallace Morgan's role as an office authorized to work on the Assurance Wireless campaign. Sprint and Credico supply Field Agents with all the tools they need, they set forth the rules they must follow, they both review the job performance of the Field Agents, and they both play a role in determining the Field Agents' pay. When put together, there is very little that both Sprint and Credico do not control as it relates to the Field Agents' work conditions.

Indeed, the relationship between these Defendants is similar in structure to the relationship between the defendants in *Hall.* There, plaintiff-technicians worked for DIRECTV, an intermediary provider, and a subcontractor. *Hall*, 846 F.3d at 762. Like Sprint, DIRECTV dictated aspects of the technicians' work through agreements with the providers who directly employed them, including by requiring background checks and by providing training materials. *Id.* DIRECTV required technicians to wear DIRECTV shirts and to carry DIRECTV

identification cards. *Id.* DIRECTV also mandated technicians check in with DIRECTV before and after completing each assigned job and to conduct work strictly according to DIRECTV's standardized policies and procedures. *Id.* DIRECTV audited the work performed by the technicians. *Id.* While the direct employers had formal firing authority, "DIRECTV used its centralized work-assignment system to effectively terminate technicians by ceasing to assign them work." *Id.* at 773. And while subcontractors issued the paychecks, "DIRECTV played an integral role in setting Plaintiffs' compensation" because it set the payment method. *Id.* Further, the middle manager "implemented DIRECTV's hiring and training criteria," relayed scheduling decisions, and required technicians to obtain DIRECTV trainings and obtain DIRECTV equipment. *Id.* Each of these facts is present with regard to Sprint, Credico, Wallace Morgan and the Field Agents. And because no reasonable jury could conclude that Defendants are "completely disassociated" with respect to the Field Agents' work, summary judgment for Plaintiffs on their employer status is appropriate.

## CONCLUSION

Whether through an examination of the regulations or the economic realities test, all three Defendants are jointly and severally liable for failing to pay Plaintiffs, who are indisputably not independent contractors or outside sales employees, minimum wages and overtime pay. Based on the foregoing, the Court should grant Plaintiffs' partial motion for summary judgment.

Respectfully submitted,

Dated: April 21, 2017

s/ Rachhana T. Srey
Rachhana T. Srey, MN Bar No. 340133*
srey@nka.com
Brittany B. Skemp, MN Bar No. 0395227*
bskemp@nka.com
NICHOLS KASTER, PLLP
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
*admitted pro hac vice*

Joseph Fitapelli
jfitapelli@fslawfirm.com
Brian Schaffer
bschaffer@fslawfirm.com
Frank Mazzaferro
fmazzaferro@fslawfirm.com
FITAPELLI & SCHAFFER, LLP
475 Park Avenue S., 12th Floor
New York, NY 10016
Telephone: (212) 300-0375
Fax: (212) 564-5468

**ATTORNEYS FOR PLAINTIFFS**