UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                 :

JAMIE MARTIN and DANEISHA      :
SINGLETON on behalf of themselves and all   :
others similarly situated, and the Proposed   :
New York Rule 23 Class,             :
                                 :

           Plaintiffs,             :
                                 : Civil Action No. 15 Civ. 05237 (PAE) (HBP)

     v.                        :
                                 :

SPRINT/UNITED MANAGEMENT      :
COMPANY, CREDICO (USA) LLC, and   :
WALLACE MORGAN, INC.,         :
                                 :

           Defendants.         :
-----------------------------------------------------------x

# DEFENDANT CREDICO (USA) LLC'S CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF CREDICO'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Jennifer H. Rearden
Gabrielle Levin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 48th Floor
New York, NY 10166-0193

Theodore J. Boutrous, Jr. (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197

Jason C. Schwartz (admitted *pro hac vice*)
Greta B. Williams (admitted *pro hac vice*)
Ryan C. Stewart (admitted *pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

*Attorneys for Defendant Credico (USA) LLC*

May 12, 2017

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ...................................................................................... 4

ARGUMENT ........................................................................................................... 8

I.  CREDICO WAS NOT PLAINTIFFS' JOINT EMPLOYER .......................... 8

    A.  Joint Employer Standard ............................................................................ 8

    B.  Credico Cannot Be Held Liable as a Joint Employer as a Matter of Law ................. 11

        1.  Credico Did Not Exercise Formal Control Over Sales Agents ......................... 11

        2.  The Functional Control Factors Also Weigh Against a Finding That Credico Jointly Employed Plaintiffs ................. 24

    C.  Plaintiffs' Reliance on Fourth Circuit Authority is Irrelevant ..................... 30

II.  PLAINTIFFS' CLAIMS FOR MINIMUM WAGE AND OVERTIME FAIL BECAUSE THEY WERE EXEMPT OUTSIDE SALESPERSONS ................. 32

    A.  Plaintiffs Were Unmistakably Engaged to Make Sales and/or Obtain Orders or Contracts for Assurance Wireless Services ................. 33

        1.  The Fact that the Government Pays for Certain Assurance Wireless Phones and Services Does Not Negate That Plaintiffs Made the Sales and Obtained the Orders ................. 35

        2.  All Parties in this Case—Including Plaintiffs Themselves—Considered Their Work To Be Sales ................. 38

    B.  Plaintiffs' Work Also Exhibits All The "External Indicia" Of Sales ................. 40

    C.  Plaintiffs' Remaining Arguments Are Baseless and Irrelevant ................. 43

        1.  The Fact that Assurance Wireless Applications Could Be Rejected Under Lifeline Regulations Or Cancelled By the Customer Does Not Negate Plaintiffs' Exempt Status ................. 43

        2.  The Exemption Applies to Plaintiffs Even Though They, Individually, Did Not Earn Many Commissions ................. 45

III.  PLAINTIFFS WERE PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS ................. 46

A.    Plaintiffs Were Independent Contractors Under the FLSA ........................................ 47

B.    Plaintiffs Were Independent Contractors Under the NYLL ....................................... 53

CONCLUSION ............................................................................................................................ 55

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................8

*Ansoumana v. Gristede's Operating Corp.*,
255 F. Supp. 2d 184 (S.D.N.Y. 2003)..........................................51, 52

*Barfield v. New York City Health & Hosps. Corp.*,
537 F.3d 132 (2d Cir. 2008).....................................................10

*Barfield v. New York City Health and Hosp. Corp.*,
537 F.3d 132 (2d Cir. 2008)..................................22, 23, 25, 26

*Baum v. AstraZeneca L.P.*,
605 F. Supp. 2d 669 (W.D. Pa. 2009)...........................................40, 43

*Boyd v. AWB Ltd.*,
544 F. Supp. 2d 236 (S.D.N.Y 2008).............................................30

*Brock v. Superior Care*,
840 F.2d 1054 (2d Cir. 1988)...................................................52

*Browning v. Ceva Freight LLC*,
885 F. Supp. 2d 590 (E.D.N.Y. 2012)..............................50, 52, 54, 55

*Bynog v. Cipriani Grp.*,
1 N.Y.3d 193 (N.Y. 2003)......................................................47

*Cameron v. Cmty. Aid for Retarded Children, Inc.*,
335 F.3d 60 (2d Cir. 2003).....................................................8

*Carter v. Dutchess Cmty. Coll.*,
735 F.2d 8 (2d Cir. 1984)......................................................10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................8

*Chen v. Street Beat Sportswear, Inc.*,
364 F. Supp. 2d 269 (E.D.N.Y. 2005)...........................................18

*Chenensky v. N.Y. Life. Ins. Co.*,
2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009)......................................33, 41

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012) ............................................................34, 36, 37, 39, 44, 46

*Clements v. Serco Inc.*,
530 F.3d 1224 (10th Cir. 2008) ....................................................................44

*Cordova v. SCCF, Inc.*,
2014 WL 3512838 (S.D.N.Y. July, 16 2014) ..............................................23

*Crosby v. Cox Commc'ns, Inc.*,
2017 WL 1549552 (E.D. La. May 1, 2017) ..................................................17

*Dailey v. Just Energy Mktg. Corp.*,
2015 WL 97103 (N.D. Cal. July 23, 2015) ............................................33, 44

*Desimone v. Allstate Ins. Co.*,
2000 WL 1811385 (N.D. Cal. Nov. 7, 2000) ..........................................50, 53

*Diaz v. Consortium for Worker Educ., Inc.*,
2010 WL 3910280 (S.D.N.Y. Sept. 28, 2010) ..............................................16

*Flood v. Just Energy Mktg. Corp.*,
2017 WL 280820 ........................................33, 38, 39, 40, 41, 42, 43, 44

*Gagen v. Kipany Prods., Ltd.*,
27 A.D.3d 1042 (N.Y. App. Div. 2006) ........................................................54

*Glatt v. Fox Searchlight Pic., Inc.*,
293 F.R.D. 516 (S.D.N.Y. 2013) ............................................................12, 24

*Godlewska v. HDA*,
916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human
Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014) ..........................11, 14, 16, 17, 18, 19, 23

*Godoy v. Rest. Opportunity Ctr. of N.Y., Inc.*,
615 F. Supp. 2d 186 (S.D.N.Y. 2009) ....................................................46, 47

*Gold v. N.Y. Life Ins. Co.*,
730 F.3d 137 (2d Cir. 2013) ........................................................................32

*Goldberg v. Whitaker House Coop., Inc.*,
366 U.S. 28 (1961) ........................................................................................9

*Gonzalez v. Allied Barton Sec. Servs.*,
2010 WL 3766964 (S.D.N.Y. Sept. 7, 2010) ..............................................14

*Gustafson v. Bell Atl. Corp.*,
171 F. Supp. 2d 311 (S.D.N.Y. 2001) .................................................................52

*Hall v. DIRECTV, LLC*,
846 F.3d 757 (4th Cir. 2017) .............................................................................30

*Hart v. Rick's Cabaret International, Inc.*,
967 F. Supp. 2d 901 (S.D.N.Y. 2013).................................................47, 48, 50, 52

*Herman v. RSR Sec. Servs. Ltd.*,
172 F.3d 132 (2d Cir. 1999)...........................................................................9, 13

*Hernandez v. Chefs Diet Delivery, LLC*,
915 N.Y.S.2d 623 (N.Y. App. Div. 2011) ...........................................................54

*Ithaca Coll. v. NLRB*,
623 F.2d 224 (2d Cir. 1980)...............................................................................30

*Jacobson v. Comcast Corp.*,
740 F. Supp. 2d 683 (D. Md. 2010) ......................................14, 15, 17, 18, 19, 31

*Jean-Louis v. Metro. Cable Cmmc'ns., Inc.*,
838 F. Supp. 2d 111 (S.D.N.Y. 2011)........................9, 10, 11, 15, 16, 19, 22, 31

*Jewell Tea Co. v. Williams*,
118 F.2d 202 (10th Cir. 1941) ...........................................................................42

*Kinney v. Artist & Brand Agency LLC*,
2015 WL 10714080 (S.D.N.Y. Nov. 25, 2015).......................44, 51, 52, 53, 54, 55

*Lawrence v. Adderly Ind., Inc.*,
2011 WL 666304 (E.D.N.Y. Feb. 11, 2011).........................................................31

*Lepkowski v. Telatron Mktg. Grp., Inc.*,
766 F. Supp. 2d 572 (W.D. Pa. 2011).................................................................18

*Lin v. Comprehensive Health Mgmt., Inc.*,
2009 WL 976835 (S.D.N.Y. Apr. 9, 2009).....................................................12, 17

*Lopez v. Acme Am. Envtl. Inc.*,
2012 WL 6062501 (S.D.N.Y. Dec. 6, 2012) ..........................................................9

*Menes v. Roche Labs. Inc.*,
2008 WL 6600518 (C.D. Cal. Jan. 7, 2008) ........................................................38

Page(s)

*Miranda-Albino v. Ferrero, Inc.*,
    455 F. Supp. 2d 66 (D.P.R. 2006) ........................................................................38

*Moreau v. Air France*,
    356 F.3d 942 (9th Cir. 2004) .................................................................17, 19, 29

*Nielsen v. DeVry, Inc.*,
    302 F. Supp. 2d 747 (W.D. Mich. 2003) ........................................40, 41, 42, 45

*Rodriguez v. Metro Cable Commc'ns, Inc.*,
    No. 21517/2008 (N.Y. Sup. Ct. July 26, 2011) ...................................................31

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947)..........................................................................................9, 15

*Salinas v. Commercial Interiors, Inc.*,
    848 F.3d 125 (4th Cir. 2017) ........................................................................30, 31

*Schwind v. EW & Assocs.*,
    357 F. Supp. 2d 691 (S.D.N.Y. 2005)..................................................................50

*Scott v. Harris*,
    550 U.S. 372 (2007).................................................................................................8

*Scruggs v. Skylink, Ltd.*,
    2011 WL 6026152 (S.D. W. Va. Dec. 2, 2011)...................................................53

*Sellers v. Royal Bank of Canada*,
    2014 WL 104682 (S.D.N.Y. Jan. 8, 2014) ..........................................................49

*Spicer v. Pier Sixty LLC*,
    269 F.R.D. 321 (S.D.N.Y. 2010) ...........................................................................9

*Taylor v. Waddell & Reed Inc.*,
    2010 WL 3212136 (S.D. Cal. Aug. 12, 2010) ...............................................19, 50

*Thomas v. City of. Hudson*,
    No. 95-CV-0070, 1996 WL 280828 (N.D.N.Y. May 20, 1996)............................51

*Thornton v. Charter Commc'ns, LLC*,
    2014 WL 4794320 (E.D. Mo. Sept. 25, 2014)......................................................17

*Torres v. Gristede's Corp.*,
    2011 WL 4571792 (S.D.N.Y. Sept. 23, 2011)......................................................13

*Vasto et al., v. Credico (USA) LLC, et al.*,
   Case No.: 15-cv-9298 (S.D.N.Y.), Dkt. No. 1 ..................................................39

*Wang v. Hearst Corp.*,
   203 F. Supp. 3d 344 (S.D.N.Y. 2016).........................................................9

*Yacklon v. E. Irondequoit Cent. Sch. Dist.*,
   733 F. Supp. 2d 385 (W.D.N.Y. 2010) .....................................................14

*Zahr v. Wingate Creek Acquisition Corp.*,
   827 F. Supp. 1061 (S.D.N.Y. 1993).........................................................8

*Zampos v. W & E Commc'ns, Inc.*,
   970 F. Supp. 2d 794 (N.D. Ill. 2013) ......................................................18

*Zhao v. Bebe Stores, Inc.*,
   247 F. Supp. 2d 1154 (C.D. Cal. 2003) ...........................................12, 16, 18

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003)...............................9, 10, 11, 13, 15, 17, 24, 25, 26, 27, 28, 29, 31

## Statutes

29 U.S.C. § 203(d) ...................................................................................9

29 U.S.C. § 203(k) .................................................................................33

29 U.S.C. § 206(a) ...................................................................................8

29 U.S.C. § 207(a)(1) ...............................................................................8

29 U.S.C. § 213(a)(1) .............................................................................32

29 U.S.C. § 201 ........................................................................................1

NYLL § 190(3) .........................................................................................9

NYLL § 650 ..............................................................................................2

## Other Authorities

Black's Law Dictionary (10th ed. 2014)...................................................37

Credico's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ..........................1

Page(s)

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................8

**Regulations**

29 C.F.R. § 541.200 ...............................................................................45

29 C.F.R. § 541.500 ..........................................................................40, 42

29 C.F.R. § 541.500(a)(1) ...................................................................32, 37

29 C.F.R. § 541.500(a)(1)(i) ......................................................................37

29 C.F.R. § 541.500(a)(1)(ii) .................................................................37, 38

29 C.F.R. § 541.500(a)(2) ...................................................................32, 37

29 C.F.R. § 541.500(c).............................................................................45

29 C.F.R. § 541.501 .........................................................................36, 37

29 C.F.R. § 541.501(a).............................................................................33

29 C.F.R. § 541.501(b).............................................................................33

29 C.F.R. § 541.503(c).........................................................................33, 43

29 C.F.R. § 791.2 ...................................................................................9

12 NYCRR § 142-2.2 ...............................................................................32

12 NYCRR § 142-2.14(c)(5) .......................................................................32

## PRELIMINARY STATEMENT

There is no dispute that Plaintiffs had _zero_ contact with Credico during the time they worked as sales agents for Credico's subcontractor, Wallace Morgan, or that Credico had _zero_ involvement in any aspect of Plaintiffs' recruitment, hiring, firing or work schedule. This may explain why Plaintiffs did not name Credico as a defendant in the first two iterations of their complaint. _See_ Credico's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Cr. 56.1") ¶¶ 210-211 (Dkt. Nos. 1 & 48).[1] Plaintiffs, understandably, never considered Credico to be their employer. _See id._ at ¶¶ 138, 142. Nor can Credico be considered Plaintiffs' employer as a matter of law. A joint employer finding in this case would run afoul of well-established Second Circuit precedent, and run the risk of bringing hundreds of legitimate subcontractor relationships into the realm of the Fair Labor Standards Act, 29 U.S.C. § 201 _et seq._ ("FLSA" or the "Act")—precisely what the Second Circuit has instructed courts to avoid. But, even if the Court does not rule in Credico's favor on the joint employer question, it should grant summary judgment on the ground that Plaintiffs were exempt from minimum wage and overtime requirements as outside salespersons. There is no factual dispute as to how Plaintiffs spent their time working—on the street, selling cell phones and cell phone service—which makes this case ideally suited for summary judgment. Finally, summary judgment is also proper because Plaintiffs were independent contractors.

Named plaintiffs Martin and Singleton ("Plaintiffs") worked as sales agents for defendant Wallace Morgan, Inc. ("Wallace Morgan") for approximately five weeks in early 2015. Stip.

---

[1] For a complete recitation of undisputed and material facts, Credico respectfully refers the Court to the Stipulated Facts ("Stip. Facts"), Dkt. No. 259, and to Cr. 56.1, filed contemporaneously herewith in accordance with Rule H of the Court's Individual Rules. For purposes of Credico's opposition to Plaintiffs' Motion for Summary Judgment, Credico respectfully refers the Court to Credico's Responses and Objections to Plaintiffs' Statement of Material Facts ("Cr. Resp."), also filed herewith.

Facts ¶¶ 2, 4, 49-50; Cr. 56.1 ¶¶ 61.  As sales agents, Plaintiffs worked on the Assurance Wireless campaign selling phones and services that defendant Sprint offers to qualifying low-income households under the federally subsidized Lifeline Program.  Stip. Facts ¶¶ 37, 52; Cr. 56.1 ¶ 22.  In this action, Plaintiffs assert claims for minimum wage and overtime under the FLSA and New York Labor Law § 650 *et seq.*  ("NYLL") for those few weeks they worked at Wallace Morgan.  Plaintiffs also claim that Sprint and defendant Credico (the client broker that subcontracted with Wallace Morgan to provide direct sales services on Sprint's Assurance Wireless campaign) are equally liable as their joint employers.

The undisputed evidence, however, establishes that Plaintiffs' claims against Credico must fail as a matter of law for three independent reasons.

*First*, as a threshold matter, Credico did not control Plaintiffs' employment such that it can be held liable as a joint employer.  Indeed, Plaintiffs' deposition testimony and interrogatory responses demonstrate that Credico did not interview them, did not hire them, did not compensate them, did not fire them, did not control their daily or weekly work schedules, did not train them, and did not supervise or direct their day-to-day work.  Stip. Facts ¶¶ 32, 46, 47, 55-56; Cr. 56.1 ¶¶ 63-69, 80-81, 83-84, 91-92, 97-98, 99, 119, 127.  It was Wallace Morgan—and Wallace Morgan *alone*—that did so.  *Id.*  In fact, the named Plaintiffs admit that they have never even spoken to a single Credico employee about their work.  Cr. 56.1 ¶ 99.  As another Wallace Morgan sales agent (and opt-in plaintiff) aptly put it:  "[Credico] is just a word to me."  *Id.* ¶ 145.  On these facts, Credico cannot be held liable as a joint employer under well-settled Second Circuit authority.  Recognizing this, Plaintiffs ask the Court to apply an "entirely new" joint employer doctrine from the Fourth Circuit that explicitly rejects binding Second Circuit precedent.  The Court should decline this invitation.  Applying the proper law of this Circuit, the Court should

grant summary judgment in Credico's favor on the issue of joint employer liability.

*Second*, even assuming Credico did jointly employ Plaintiffs, their own testimony makes clear that Plaintiffs' work as sales agents was exempt from minimum wage and overtime requirements under the FLSA's and NYLL's outside sales exemption. Indeed, Plaintiffs' deposition testimony demonstrates that their work fit neatly within both prongs of the exemption: their primary duty was soliciting potential customers for Assurance Wireless phones and service, and they exclusively performed that duty outside of Wallace Morgan's office. Stip. Facts ¶ 52; Cr. 56.1 ¶¶ 107-108; *see also* Pls' Br. at 19, n.2. Nevertheless, Plaintiffs now ask the Court to find that they did not "make sales" because the customers themselves do not pay for the phones and phone service (rather, the government pays Sprint to provide it). But those arguments improperly place form over function. Plaintiffs were salespersons, plain and simple. They were responsible for identifying potential qualified customers and convincing them to choose Assurance Wireless's Lifeline service over its competitors. When Plaintiffs were successful in doing that, they received a commission. Under these facts, the Court should hold Plaintiffs were exempt outside salespersons.

*Third*, even if Plaintiffs were not exempt outside salespersons, they were not entitled to minimum wage and overtime because Wallace Morgan properly classified them as independent contractors. After a brief, initial training period, Wallace Morgan sales agents were free to perform their work with no supervision or guidance other than what was necessary to meet Sprint's obligations to comply with federal law as a provider of Lifeline services. But the law is well-settled that supervision to ensure compliance with contractual warranties of quality or with the law has no bearing on the employee-independent contractor inquiry. Therefore, Plaintiffs' classification as independent contractors was proper as a matter of law.

As set forth herein, Credico is entitled to summary judgment for any and each of these three reasons.

**STATEMENT OF FACTS**

Credico includes this brief factual background—in addition to its Statement of Undisputed Material Facts—for the purpose of outlining the relationships between the various parties in this action.

## I.  CREDICO'S BUSINESS RELATIONSHIP WITH SPRINT AND WALLACE MORGAN

Credico is a client broker and outsourced sales specialist in the direct sales and marketing industry.  Cr. 56.1 ¶ 1.  In that role, Credico contracts with large national and international clients, across multiple industries, that want to reach new customers and improve their customer acquisition rate.  *Id.* ¶ 2.  Specifically, Credico assists its clients by outsourcing face-to-face sales and marketing operations that the clients are unable to efficiently and effectively conduct themselves.  *Id.* ¶ 3.  To that end, when Credico retains a new client, Credico identifies and contracts with local sales and marketing companies (referred to as "independent sales offices" or "ISOs"), such as Wallace Morgan, that can provide effective direct sales service in a market of need.  *Id.* ¶ 6; Stip. Facts ¶¶ 15-17, 42.

Like most outsourced sales firms, Credico works for many different clients across multiple industries, including telecommunications services, home and office supplies, and residential energy services.  Cr. 56.1 ¶ 4.  Credico enters into separately negotiated contracts with each of its clients.  *Id.* ¶ 5.  As a result, Credico has certain contractual obligations that are unique to each campaign.  *Id.*  For example, most clients require certain "onboarding" documentation, such as background checks, to ensure that agents selling their products or services are properly vetted by

the ISO.  *Id.* ¶ 11.  In turn, Credico passes those client requirements down to the relevant ISOs through its subcontracts with the ISOs.  *Id.* ¶¶ 9-11.

As the client broker and outsourced sales specialist, Credico serves as an intermediary and liaison between the client and the subcontractor ISO.  *Id.* ¶ 12; Stip. Facts ¶ 23.  In that role, Credico ensures that the ISO is meeting the client's expectations and adhering to the client's specific campaign requirements.  Cr. 56.1 ¶ 13.

As relevant to this action, Sprint contracted with Credico (along with several of Credico's competitors) to assist in developing and outsourcing direct sales of Sprint's Assurance Wireless brand phones and services.  *Id.* ¶¶ 24-26, 30-32, 34.  Sprint's Assurance Wireless brand provides phones and cellular service to qualifying low-income households under the federally administered Lifeline Program.  *Id.* ¶ 22; Stip. Facts ¶ 37.  To qualify as a service provider under the Lifeline Program, Sprint is required to satisfy various state and federal regulations and guidelines.  Stip. Facts ¶ 34; Cr. 56.1 ¶¶ 23, 37-38, 43.

To ensure compliance with those regulations and guidelines and protect the Assurance Wireless brand, Sprint's contract with Credico mandates that Credico ensure that all field agents soliciting applications on the Assurance Wireless campaign comply with certain policies through quality assurance standards.  Cr. 56.1 ¶¶ 27-29, 35-36, 39-41.  These contract terms include, among other things, that agents only solicit applications from potential customers in Credico's designated market (including only certain counties in New York state), that agents complete Assurance Wireless's Lifeline product training prior to starting their work, that agents only use Sprint's marketing materials, and that agents not offer service plans other than those Sprint actually offers.  *Id.* ¶¶ 35, 41, 43.  The contract also obligates Credico to have the ISOs perform quarterly audits of agent activities to protect against fraudulent application submissions and to "investigate

suspected fraud" in the submission of Lifeline applications. *Id.* ¶ 35(k). And, if Sprint is penalized or fined by the Federal Communications Commission ("FCC"), the government agency that regulates the Lifeline Program, for fraudulent submissions by field agents working for Credico subcontractors, Credico is financially responsible for reimbursement of the fine. *Id.* ¶ 40.

Credico, in turn, passed these requirements down in its subcontracts with the various ISOs, such as Wallace Morgan, with which it has subcontracted to perform sales services on the Assurance Wireless campaign. Cr. 56.1 ¶¶ 10, 39, 42, 51, 52-56 (Credico-Wallace Morgan Subcontractor Agreement states that Wallace Morgan ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████).

## II. WALLACE MORGAN ENGAGES SALES AGENTS, INCLUDING PLAINTIFFS, TO SELL ASSURANCE WIRELESS PHONES AND SERVICES IN THE FIELD

### A. Only Wallace Morgan Exercised Any Control Over Plaintiffs' Day-to-Day Work As Sales Agents

Wallace Morgan recruited, interviewed, and engaged hundreds of sales agents, including Plaintiffs, to sell phones and cellular service on the Assurance Wireless campaign. Stip. Facts ¶¶ 32, 46-48; Cr. 56.1 ¶¶ 63, 65-66, 68-70. Plaintiffs entered into Independent Sales Representative Agreements with Wallace Morgan. Stip. Facts ¶¶ 49-51; Cr. 56.1 ¶¶ 71-73. When they first started, Plaintiffs received on-the-field sales training from other, more experienced, Wallace Morgan agents. Cr. 56.1 ¶¶ 90-91. Wallace Morgan also offered additional sales training during daily morning meetings at its office. *Id.* ¶ 92. Wallace Morgan also divvyed up sales locations amongst its various agents—though field agents who had made the most sales the previous day could select his/her team's location on a first-come, first-serve basis. *Id.* ¶¶ 110-111.

### B. Plaintiffs Sold Assurance Wireless Phones and Service In The Field

Plaintiffs, like other Wallace Morgan sales agents, spent the vast majority of their day out on the street, where they were responsible for identifying customers that might qualify for the Lifeline Program under federal regulations, and then selling Assurance Wireless phones and service to those customers. *Id.* ¶¶ 107-109, 146-149. Agents used a sales "pitch," which included a description of Assurance Wireless's service offering, as well as a comparison of Assurance Wireless's services to those offered by competing Lifeline service providers. *Id.* ¶¶ 150-153.

When Plaintiffs' sales pitch was successful, Plaintiffs helped the customer complete and submit the necessary information and paperwork to apply for Assurance Wireless service. *Id.* ¶ 154. The applications were submitted on electronic tablets, loaded with Assurance Wireless software, that Credico loaned to Wallace Morgan on a strict consignment basis. *Id.* ¶¶ 167-170; Stip. Facts ¶ 59. The completed application was electronically delivered to the National Lifeline Accountability Database ("NLAD"), which confirmed the customer's household was not already receiving Lifeline service (a requirement under the Lifeline Program), and to Solix, a third-party provider engaged by Sprint to verify that each customer's documentation and information met the Lifeline regulatory requirements. Stip. Facts ¶ 60; Cr. 56.1 ¶¶ 170-173, 175.

When Solix confirmed that a customer's application met the regulatory requirements, Solix sent a confirmation postcard to the customer's household. Cr. 56.1 ¶¶ 173, 175-177. Then, unless the customer returned the postcard to cancel service within ten days, Sprint sent an Assurance Wireless phone to the customer for activation. *Id.* ¶ 177. The government then paid Sprint (on a monthly basis), via subsidy, for providing cellular service to the low-income customer. *Id.* ¶ 21.

Plaintiffs (and other sales agents) commonly referred to an approved enrollment as a "clean sale." *Id.* ¶ 155. Plaintiffs were compensated on a commission basis for each "clean sale," at a

rate set by Wallace Morgan's Owner and President, Thomas Smith ("Smith").  *Id.* ¶¶ 183-185, 187.

**ARGUMENT**

Under Federal Rule of Civil Procedure 56(c), summary judgment *shall* be entered where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To defeat summary judgment, the non-moving party must come forward with affirmative evidence of "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  Because only a "genuine" issue of fact is sufficient, mere conclusory statements, conjecture or speculation will not suffice to create a genuine issue sufficient to avoid summary judgment.  *See Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003).  Further, although the Court is to view all evidence in a light favorable to the Plaintiff for purposes of this motion, the non-moving party is not entitled to the benefit of "unreasonable inferences" or "inferences at war with undisputed facts."  *Zahr v. Wingate Creek Acquisition Corp.*, 827 F. Supp. 1061, 1064 (S.D.N.Y. 1993) (citation omitted).

I.  **CREDICO WAS NOT PLAINTIFFS' JOINT EMPLOYER**

A.  **Joint Employer Standard**

Only an entity that qualifies as an "employer" can be liable for unpaid minimum wage and overtime.  29 U.S.C. §§ 206(a), 207(a)(1).  Thus, all of Plaintiffs' claims against Credico turn on

their ability to prove that Credico was their "joint employer" with Wallace Morgan.[2] Plaintiffs bear the burden of proving Credico's joint employer status. *See Wang v. Hearst Corp.*, 203 F. Supp. 3d 344, 350 (S.D.N.Y. 2016) ("Plaintiffs bear the burden of demonstrating that they are FLSA-protected 'employees.'").

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "Because the statute defines employer in such broad terms, and its definitional section uses the term it purports to define, [it] offers little guidance on whether a given individual is or is not an employer." *Jean-Louis v. Metro. Cable Cmmc'ns., Inc.*, 838 F. Supp. 2d 111, 120 (S.D.N.Y. 2011) (internal citation omitted) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). Nevertheless, it is generally recognized that a worker can simultaneously have more than one employer for purposes of the FLSA. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003); *see also* 29 C.F.R. § 791.2 (noting that an individual may simultaneously have more than one employer and that, if an entity qualifies as a joint employer, it is equally responsible for compliance with applicable FLSA provisions).

The determination of whether two separate entities jointly employ an individual is "based on 'the circumstances of the whole activity' viewed in light of 'economic reality.'" *Zheng*, 355 F.3d at 71 (citation omitted) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) & *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). "[C]ontrol of [the] employees" is the central issue in the joint employer determination. *Herman*, 172 F.3d at 135; *see also Lopez v. Acme Am. Envtl. Inc.*, 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012) ("When it

---

[2] The NYLL's standard for employer status is almost identical to the FLSA's standard. *See* NYLL § 190(3); 29 U.S.C. § 203(d). Thus, courts in this District regularly apply the same tests to determine joint employer status under the FLSA and NYLL. *See, e.g.*, *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010).

comes to 'employer' status under the FLSA, control is key."). Thus, joint employer liability arises only where "defendants . . . function as employers of the plaintiffs rather than mere business partners." *Zheng*, 355 F.3d at 76.

In applying the economic reality test the Second Circuit has instructed courts to consider a "nonexclusive and overlapping set of factors." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008) (citations omitted). Courts must first assess four factors of "formal control" that are "particularly relevant to the joint employment inquiry," namely whether the alleged joint employer: (1) has the power to hire and fire the employees; (2) supervises and controls the employees' work schedules or conditions of employment; (3) determines the employees' rate of pay or the method of payment; and (4) maintains employment records, (hereafter, the "*Carter* factors"). *Jean-Louis,* 838 F. Supp. 2d at 122 (citing *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).

The Second Circuit has also identified additional factors that are "illuminating" in determining whether a putative joint employer exercises "functional control":

> (1) whether the putative joint employer's premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations [*e.g.,* here, the ISOs] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to the putative joint employer's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the putative joint employer or its agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the putative joint employer.

*Jean-Louis*, 838 F. Supp. 2d at 122 (quoting *Zheng*, 355 F.3d at 71-72).[3] The court may also consider any other factors it deems relevant to its assessment of the "economic realities." *Id.*

---

[3] Concerned that they cannot satisfy the joint employer tests under this binding Second Circuit precedent, Plaintiffs devote four pages of their brief (Pls' Br. 41-44) to analyzing this question under non-binding Fourth Circuit law. For the reasons explained *infra* (*see* Section I(C)), the Court should reject that analysis.

(citation omitted). No one factor is dispositive; rather, all are viewed in the totality of the circumstance. *Id.* at 123. Thus, in order to rule in Credico's favor, on summary judgment the Court "need not decide that *every* factor weighs against joint employment." *Id.* at 136 (quoting *Zheng*, 355 F.3d at 76-77). Summary judgment can be appropriate even where some factors favor a joint employer finding or are neutral or unclear, especially where the other factors weigh strongly in the alleged employer's favor. *See Jean-Louis,* 838 F. Supp. 2d at 131; *Godlewska v. HDA*, 916 F. Supp. 2d 246, 262-65 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014).

**B.      Credico Cannot Be Held Liable as a Joint Employer as a Matter of Law**

As detailed below, the undisputed evidence shows that Credico did not exercise formal or functional control over the terms and conditions of Plaintiffs' work at Wallace Morgan. This determination is buttressed by the fact that Credico's business model is a legitimate subcontracting relationship, widely recognized and followed in the outsourced sales industry—the exact kind of "normal, strategically-oriented contracting schemes" the Second Circuit has instructed should not be brought within the ambit of the FLSA. *Zheng*, 355 F.3d at 76. Under these facts, Credico is entitled to judgment as a matter of law.

**1.      Credico Did Not Exercise Formal Control Over Sales Agents**

**(i)      Credico Did Not Hire or Fire Wallace Morgan Sales Agents**

It is undisputed that Credico had no involvement in any facet of hiring Wallace Morgan sales agents. Cr. 56.1 ¶ 67 (Plaintiffs confirming they "didn't interview with anyone from Credico during the hiring process"), ¶ 69 (Smith confirming that Credico was ███████████████ ███████████████████████████ ); Stip. Facts ¶¶ 32, 46-47. Wallace Morgan, and Wallace Morgan alone, recruited potential sales agents, collected job applications from potential agents, and interviewed potential agents. Stip. Facts ¶¶ 46-47; Cr. 56.1 ¶¶ 63-68. Smith,

Wallace Morgan's Owner and President, offered Plaintiffs their positions, and Plaintiffs completed new hire paperwork at Wallace Morgan's direction. Cr. 56.1 ¶¶ 62, 69-71, 76. When Plaintiffs were promoted to Corporate Trainer, it was their Wallace Morgan supervisor (another opt-in plaintiff) who informed them of their change in title. *Id.* ¶ 79. Wallace Morgan was also solely responsible for decisions to terminate its relationships with agents. *Id.* ¶¶ 80-82. Indeed, both Plaintiffs testified that Smith made the decision to terminate them and communicated that decision to them. Stip. Facts ¶ 72; Cr. 56.1 ¶¶ 83-85.

The sworn admissions of Plaintiffs (and opt-in plaintiffs) could not be more clear: Credico was not involved in any aspect of the hiring or firing of Plaintiffs or any other Wallace Morgan sales agents.

Courts regularly dismiss claims against alleged joint employers where, as here, this factor weighs so heavily in defendant's favor, even on the pleadings. *See, e.g.*, *Lin v. Comprehensive Health Mgmt., Inc.*, 2009 WL 976835, at *2 (S.D.N.Y. Apr. 9, 2009) (dismissing complaint that lacked any allegation that defendant "had power to mak[e] hiring or firing decisions"); *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1156 (C.D. Cal. 2003) (granting summary judgment for alleged joint employer that "did not have the authority to recruit, hire, fire, layoff, or recall [the plaintiff] employees"). This Court should follow suit.

With the weight of authority and the factual record against them, Plaintiffs resort to trying to muddy the water.[4] Their arguments should be rejected.

---

[4] Plaintiffs may also claim—as they did with respect to Sprint—that this factor favors joint employment because "nothing in the contract[s] prevent[s] Credico from hiring its own Field Agents." Pls.' Br. at 30. This is absurd. Whether Credico (or Sprint) jointly employed Wallace Morgan sales agents with Wallace Morgan cannot possibly hinge on Credico's ability to hire its own employees, even if they were to perform similar duties. The only thing that is relevant is Credico's (lack of) control over Plaintiffs and other members of the collective—*i.e., Wallace Morgan* sales agents. Plaintiffs' own case law demonstrates this. *See Glatt v. Fox Searchlight Pictures, Inc.*, 293 F.R.D. 516, 526 (S.D.N.Y. 2013) (finding joint employment where alleged joint employer had the power to hire employees to work on the joint film project and "often did on other films").

*First*, Plaintiffs primarily contend that this factor somehow weighs in their favor because Credico had the power to "hire" Smith, Wallace Morgan's owner and president, who "provide[d] it with Field Agents for the Assurance Wireless campaign." Pls.' Br. at 36. But Credico did *not* "hire" Smith—it subcontracted with a separate entity, Wallace Morgan, to provide sales services to Credico's clients. Stip. Facts ¶¶ 16-17; Cr. 56.1 ¶¶ 44-45, 49-50.[5] And the record is undisputed that Smith has never been a Credico employee. Cr. 56.1 ¶ 15.

Moreover, Plaintiffs' two cited cases are inapposite because they do not, as here, involve two separate entities. Pls.' Br. at 36-37. Rather, the issue in those cases was whether an *individual* corporate executive could be held personally liable as a joint employer with his own company because he had hired the company's managerial staff, who had in turn hired the plaintiff employees. *See, e.g.*, *Herman*, 172 F.3d at 140 (holding fifty-percent owner of security guard company individually liable as joint employer of security guards where he had hired his co-owner to oversee and manage the guards); *Torres v. Gristede's Corp.*, 2011 WL 4571792, at *1-2 (S.D.N.Y. Sept. 23, 2011) (holding owner of company individually liable as employer where he signed all pay checks to class members and presided over the day-to-day operations of the company). Under Plaintiffs' logic, any time one company ("Company A") outsources services to another company that hires agents to carry out those services ("Company B"), Company A would be the joint employer of Company B's agents. Indeed, under Plaintiffs' interpretation, this factor would *always* counsel in favor of finding joint employment in subcontracting relationships— which would directly contravene the Second Circuit's clear directive that legitimate subcontracting relationships should not be brought within the ambit of the joint employer doctrine. *See Zheng*,

---

[5] Nor did Credico "hire" Smith as a consultant. Credico works with successful ISO owners, like Smith, who provide consulting services to other ISOs. Credico pays Smith's ISO, Wallace Morgan, a commission on sales from those ISOs to which Smith provides consulting services. Stip. Facts ¶¶ 26-29; Cr. 56.1 ¶¶ 14-17.

355 F.3d at 77.

*Second*, Plaintiffs misconstrue Sprint's and Credico's ability to "deactivate" an agent's Assurance Wireless code. Pls.' Br. at 37. Although Sprint and Credico had the power to deactivate a Wallace Morgan agent's code—meaning, remove the agent from the Assurance Wireless campaign—this right was limited to situations where agents had violated quality standards (*e.g.*, committed fraud on the Lifeline Program) or other requirements in Sprint's SOPs. Cr. 56.1 ¶¶ 81-82 ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████). This type of authority is perfectly consistent with a typical, legitimate subcontracting agreement. That is especially true, where—as here—the "quality control's purpose is to ensure compliance with the law or protect clients' safety." *Godlewska*, 916 F. Supp. 2d at 259; Cr. 56.1 ¶ 36 (Sprint's "Outreach Agency Agreements impose minimum standards on the conduct of the OA and the field agents (or its subcontractors) contract or employ are complying with state and federal laws relating to the Lifeline Program"), *see also id.* ¶¶ 35-37, 40-41. Accordingly, "deactivation" is not tantamount to termination of the agent's work at Wallace Morgan.

For these reasons, Courts routinely reject the argument that the ability to remove a subcontracted individual from work on a specific campaign or project weighs in favor of joint employment. *See, e.g.*, *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689 (D. Md. 2010) (holding Comcast's right to "deauthorize" cable technicians in the "context of quality control" did not establish joint employment); *Gonzalez v. Allied Barton Sec. Servs.*, 2010 WL 3766964, at *4 (S.D.N.Y. Sept. 7, 2010) (granting summary judgment in defendant's favor on joint employer claim because defendant's "ability to request reassignment [of plaintiff] did not constitute an employer relationship"); *Yacklon v. E. Irondequoit Cent. Sch. Dist.*, 733 F. Supp. 2d 385, 390

(W.D.N.Y. 2010) (holding defendant "had no power to hire or fire [plaintiffs]" where "all that it could do, under its contract . . . was to reject [plaintiff] as a driver on routes serving [defendant]").

In short, this case is "far afield" from cases in which the defendant "had the undisputed power to hire and fire at will agency employees referred to work on [its] premises." *Jean-Louis*, 838 F. Supp. 2d at 125. "On the contrary, considering the record as a whole, it is clear that [Credico] had no power to hire or fire any [sales agent, including Plaintiffs] but instead had the more limited power to de-authorize" an agent who failed to meet certain requirements set forth in Sprint's contract with Credico and Credico's subcontract with Wallace Morgan, many of which were required by law (*i.e.,* not engaging in fraud). *Id.* Accordingly, the first *Carter* factor does not support a finding that Credico jointly employed Wallace Morgan sales agents. *Id.*

### (ii) Credico Did Not Supervise Plaintiffs' Work or Control Plaintiffs' Work Schedules

"[S]upervision and control is probative of an employment relationship only when the oversight demonstrates effective control over the schedule and conditions of employment." *Jacobson*, 740 F. Supp. 2d at 690; *see also Rutherford*, 331 U.S. at 722. The Second Circuit has cautioned that this factor is particularly likely to be "misinterpreted to encompass run-of-the-mill subcontracting relationships." *Zheng*, 355 F.3d at 74. And, to prevent this, the Second Circuit has directed courts that "supervision with respect to contractual warranties of quality" has "no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.* at 75.

Here, the record could not be more clear that Wallace Morgan was the only party that in any way supervised or controlled the sales agents' work day-to-day, including their work schedules. Indeed, Plaintiffs themselves admitted in their depositions and interrogatory responses that representatives of Wallace Morgan, and Wallace Morgan *alone*, "supervised, directed,

assigned, or otherwise controlled . . . [their] work on the Assurance Wireless campaign."[6] Cr. 56.1 ¶ 105 (Martin also testifying that three individuals from Wallace Morgan "supervised [her] work" and that "no one from Credico supervised [her] work day-to-day"); *see also id.* ¶ 106. To the extent anyone did so, it was Wallace Morgan—not Credico—who trained Plaintiffs, suggested when to report to work and to morning "atmosphere" meetings, determined their daily sales locations, oversaw their work in the field (before they became Corporate Trainers), suggested when to return back to the office at the end of the day, and reviewed their sales numbers at the end of the day. *Id.* ¶¶ 90-92, 94-98, 100, 104-106, 110, 116, 119, 126-127, 136-137, 157. Indeed, Credico had no involvement in any of these activities. *Id.* In fact, Plaintiffs concede that they *never even* "*talked to anyone at Credico about [their] work.*" *Id.* ¶ 99 (also listing only Wallace Morgan personnel as individuals Plaintiffs have "communicated with" about their work); *see also id.* ¶ 87.

On these facts, Credico plainly was not Plaintiffs' joint employer. *See Jean-Louis*, 838 F. Supp. 2d at 125-26 (granting summary judgment on joint employer issue where subcontractor direct employer told plaintiffs when to report to work and assigned their work orders); *Godlewska*, 916 F. Supp. 2d 246 (holding factor counseled against finding of joint employment where direct employer determined plaintiffs' hours and location of work); *Zhao*, 247 F. Supp. 2d at 1160 (holding defendant was not joint employer where its subcontractor "scheduled [plaintiffs'] work, controlled worker shifts and hours of work, and [was] responsible for employee assignments"); *Diaz v. Consortium for Worker Educ., Inc.*, 2010 WL 3910280, at *4 (S.D.N.Y. Sept. 28, 2010) (dismissing plaintiffs' complaint that "contain[ed] no facts that indicate [putative joint employer]

---

[6] As noted *infra* at III(A), Wallace Morgan only provided sales agents with suggested schedules; the sales agents did not work on fixed schedules.

had any direct role in managing the plaintiffs"); *Lin*, 2009 WL 976835, at *2 (dismissing complaint that contained no allegations that alleged joint employer controlled work schedules or employment conditions).

Plaintiffs do not dispute that Credico had no control over sales agents' work schedules. *See* Pls.' Br. at 37. But, desperately trying to pin some liability on Credico, Plaintiffs now claim (notwithstanding their own deposition testimony and interrogatory responses to the contrary) that Credico supervised their work at Wallace Morgan. *Id.* Specifically, Plaintiffs point to certain operating procedures that Wallace Morgan was required to follow pursuant to its contract with Credico and the fact that Credico audited Wallace Morgan's performance under that subcontract. *Id.* But this argument runs counter to well-settled Second Circuit precedent that "supervision with respect to contractual warranties of quality . . . has no bearing on the joint employment inquiry." *Zheng*, 355 F.3d at 75.[7] Indeed, "[e]xercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions." *Godlewska*, 916 F. Supp. 2d at 259. This rule has been adopted by courts in nearly all other Circuits because imposing requirements and engaging in quality control efforts for the purpose of ensuring contractual warranties is "qualitatively different from the control exercised by employers over employees." *Jacobson*, 740 F. Supp. 2d at 692; *see also, e.g.*, *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004); *Crosby v. Cox Commc'ns, Inc.*, 2017 WL 1549552, at *5-6 (E.D. La. May 1, 2017); *Thornton v. Charter Commc'ns, LLC*, 2014 WL

---

[7] Plaintiffs also argue that Credico's involvement in "problems or 'escalations' between a Field Agent and a potentially qualified [Lifeline] applicant" demonstrates joint employer status. Pls.' Br. at 37. As an initial matter, Plaintiffs mischaracterize the record. Credico becomes involved in "escalations" related to potential fraud and aberrant behavior by agents that "may impact a client relationship." Cr. Resp. ¶ 157. Credico's involvement is usually limited to "high-level escalations," for example, an incident in which a sales agent shot a dog. Pls' 56.1 ¶ 157. This type of quality control measure, like the others on which Plaintiffs rely and which flow from Credico's contractual duties to Sprint, are irrelevant to the joint employer inquiry. *See Zheng*, 355 F.3d at 75.

4794320, at *14 (E.D. Mo. Sept. 25, 2014); *Zampos v. W & E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 803 (N.D. Ill. 2013); *Lepkowski v. Telatron Mktg. Grp., Inc.*, 766 F. Supp. 2d 572, 579 (W.D. Pa. 2011); *Zhao*, 247 F. Supp. 2d at 1160.

Credico's quality control requirements and compliance efforts are certainly "qualitatively different" than run-of-the mill supervision by an employer over an employee because the need for quality control inspections (and any subsequent action therefrom) "ultimately stem[s] from the nature of [Credico's] business and the need to provide reliable service" to its clients, "not [from] the nature of the relationship between the [sales agents] and [Credico]." *Jacobson*, 740 F. Supp. 2d at 691. Credico had no relationship with Plaintiffs or the other Wallace Morgan sales agents. *See* Cr. 56.1 ¶¶ 99, 101-106, 138-145. Rather, each and every one of the procedures Plaintiffs cite derived from Credico's contractual obligations to Sprint. *See id.* ¶¶ 35, 42, 51. For example, Plaintiffs point to the fact that Credico circulated a "*Compliance* Improvement Plan" (emphasis added) that required Wallace Morgan to ensure its agents wore Assurance Wireless branded shirts and handed out Assurance Wireless marketing materials. Pls.' Br. at 37. But Credico was contractually obligated to ensure that occurred. Cr. 56.1 ¶¶ 35(h), 35(s), 51.

Nor was Credico a joint employer simply because Credico occasionally audited Wallace Morgan to ██████████████████████████████████████████ ████████████████ *Id.* ¶ 29 (citing Ex. 6, Wallace Morgan Dep. 48:23-24); *see Godlewska*, 916 F. Supp. 2d at 259; *Chen v. Street Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 286 (E.D.N.Y. 2005) ("[T]he Court will not consider evidence plaintiffs present with respect to this factor to the extent it concerns the presence of . . . quality control personnel."). Indeed, that too was an obligation in the contract with Sprint. Cr. 56.1 ¶¶ 29, 35, 51. And, notably, and in sharp contrast to supervision between an employer and an employee, Credico had no contact with Plaintiffs or

other sales agents themselves regarding the results of those audits (nor is there any evidence in the record that Plaintiffs were audited by Credico during their few weeks as sales agents). Cr. 56.1 ¶ 105; *see Moreau,* 356 F.3d 942, 950-51 (holding that defendants did not have the "authority to directly 'control'" plaintiffs when defendants did not communicate directly to plaintiffs "any complaints about [their] performance"). Instead, Credico provided feedback to Smith. Cr. 56.1 ¶ 105 ███████████████████████████████████████████████████████████████████ █████████████████████████).

Furthermore, the fact that Wallace Morgan's obligations under its subcontract with Credico (and Credico's quality control efforts thereto) flowed directly from Sprint's requirements demonstrates that they are *particularly* irrelevant to this inquiry because they largely derive from Sprint's obligations to comply with federal law as a Lifeline service provider. Cr. 56.1 ¶ 36-38, 43. Courts have consistently noted that this *Carter* factor gives no weight to any indirect supervision that stems from quality control undertaken specifically "to ensure compliance with the law or protect clients' safety." *Godlewska*, 916 F. Supp. 2d at 259-60; *see also Moreau*, 356 F.3d at 950-51; *Taylor v. Waddell & Reed Inc.*, 2010 WL 3212136, at *3 (S.D. Cal. Aug. 12, 2010) ("[C]ompliance with legal requirements is not indicative of control for purposes of establishing an employer-employee relationship.").

In sum, the fact that Credico "maintain[ed] specific standards to which [subcontractor Wallace Morgan] and [its sales agents]" had to adhere and then occasionally "monitor[ed] the [agents] to ensure that their performance satisfie[d] . . . expectations" is irrelevant to the joint employer inquiry, especially given that Wallace Morgan was "responsible for the day-to-day management of the [sales agents]." *Jacobson*, 740 F. Supp. 2d at 691; *see also Jean-Louis*, 838 F. Supp. 2d at 127 (granting summary judgment in favor of alleged joint employer and contrasting

(irrelevant) quality control efforts with (relevant) control over the "day-to-day manner" in which workers provide the service).

### (iii) Credico Did Not Classify Plaintiffs or Determine Their Rate of Payment

Notwithstanding Plaintiffs' attempts to parse the record, Wallace Morgan—not Credico—was responsible for all terms of Plaintiffs' engagement, including their classification status and their method of payment.

*First*, from Wallace Morgan's incorporation through approximately October 2015, Wallace Morgan classified all of its agents as independent contractors. Cr. 56.1 ¶¶ 197-198. Plaintiffs do not and cannot refute that Wallace Morgan alone made that determination. *Id.* Importantly, that means that it is undisputed Credico had *no* involvement in the classification of Plaintiffs, both of whom worked at Wallace Morgan before October 2015. Stip. Facts ¶¶ 2, 4.

Around October 2015, Wallace Morgan began having new agents sign arbitration agreements and also classify them as exempt outside sales employees. Cr. 56.1 ¶ 196. Citing Smith's testimony, Plaintiffs contend that Wallace Morgan reclassified its agents "upon the advice of Credico." Pls.' Br. at 38. But a simple review of Smith's testimony reveals that he, not Credico, made the decision to reclassify Wallace Morgan sales agents as exempt employees. Smith—who it bears mention has interests adverse to Credico's on the joint employer issue—testified (both in his individual and 30(b)(6) capacity for Wallace Morgan) that on a September 2015 conference call regarding other business attended by some Credico personnel, someone (he cannot remember who) brought up this lawsuit (which had been recently filed) and noted that arbitration agreements could provide ISO owners protection against such expense.[8] Cr. 56.1 ¶ 196 (*see* Ex. 1, Smith Dep.

---

[8] Indeed, Smith testified that Wallace Morgan's sales force was decimated by Plaintiffs' claims and statements that his agents were incorrectly paid such that Wallace Morgan's revenue dropped to about 20% its previous average. Cr. 56.1 ¶ 60.

45:14-46:16). Smith conducted further research and, in November 2015, made his own determination—which was unknown to (much less required by) Credico—to begin having Wallace Morgan agents sign arbitration agreements and to classify them as exempt employees. *Id.* ("I could have . . . classified as 1099 contractors [at another ISO Smith owns] and Credico would be none the wiser.").

Second, the record is clear that Credico did not set Plaintiffs' commission rate. Plaintiffs, however, claim Credico "determined how much the Field Agents and ISO owners would receive." Pls.' Br. at 38; Pls.' 56.1 ¶ 189. To support that contention, Plaintiffs parse the record and cite solely to "Commission Schedules" and "Office Payment Summaries" that Credico, in its intermediary broker role, provided to Wallace Morgan. *See* Pls.' Br. at 38. Notably absent from Plaintiffs' brief is any citation to the host of testimony, from both Credico and Wallace Morgan, that Smith set his agents' commission rate. *See, e.g.*, Cr. 56.1 ¶ 187 (Smith: "I can pay the [agents] whatever way I want and whatever amount I wish. In fact, I have done that for the last year [at a second ISO that contracts with Credico]."); *cf. id.* ¶ 188 (Plaintiff Martin testifying that if she had an issue with her payments, she "would have to talk to [her Wallace Morgan supervisor] Stuart and then Stuart would have to talk to Tommy [Smith]").

To be clear, Credico does not dispute that, for a period of time, it created and sent Commission Schedules and Office Payment Summaries to Wallace Morgan that, on their face, stated that Wallace Morgan "must" pay agents particular amounts in commission. Pls.' Br. at 38. But—in the face of unanimous testimony to the contrary—Plaintiffs cannot reliably claim that those documents "determined [agents'] rate of pay." Rather, these amounts were "broken out" as mere suggestions "per the request of the ISO and the consultants." Cr. 56.1 ¶ 190. Indeed, every entity and individual with knowledge on this issue testified that Wallace Morgan was permitted

to—and did—compensate its sales agents in any way that Smith saw fit. *See, e.g.*, Cr. 56.1 ¶ 187 (Smith: "I can pay the [agents] whatever way I want and whatever amount I wish. In fact, I have done that for the last year."), ¶ 187 (Smith: "I can decide what to pay to the representatives" regardless of what the payment summaries state), ¶ 190 (Credico 30(b)(6) confirming an ISO does not have to follow the commission schedule and ████████████████████████████ ████ ), ¶ 191 (Smith testifying he paid some Wallace Morgan sales agents a guaranteed minimum "base salary" and paid agents at another company he owns "over and above" the rate included in the commission schedule).

The record is equally clear that Credico has no knowledge of the amount Wallace Morgan (or any ISO) actually paid its agents. *Id.* ¶ 195 (Smith testifying that no one at Credico was aware of how Wallace Morgan decided to pay its sales agents), *id.* (Smith testifying that what Wallace Morgan actually pays sales agents would never show up on Credico Office Payment Summaries or Pay Reports).

With discovery complete, Plaintiffs have no evidence that contradicts the unequivocal testimony that Credico did not determine Plaintiffs' rate of pay—Smith did on behalf of Wallace Morgan. Accordingly, this factor weighs against a joint employment finding.[9]

### (iv)    Credico Did Not Maintain Sales Agents' Personnel Records

The fourth *Carter* factor also weighs in Credico's favor. Wallace Morgan maintained Plaintiffs' personnel files. *See* Cr. 56.1 ¶ 77. It also cannot be disputed that Credico did not maintain personnel records or any of the kind of records "most relevant to overtime obligations under the FLSA: records regarding "the *hours* worked by individual [sales agents]." *Jean-Louis*,

---

[9]   Plaintiffs' only cited case on this *Carter* factor, *Barfield v. New York City Health and Hospital Corporation*, is inapposite because, among other reasons, Credico indisputably did not track the hours of Plaintiffs or other Wallace Morgan sales agents—much less pay Wallace Morgan based on the agents' hours. 537 F.3d at 143; Cr. 56.1 ¶ 127.

838 F. Supp. 2d at 130 (citation omitted); Cr. 56.1 ¶ 77.[10]  Nor does Credico have access to 1099 forms, payroll, or any other information demonstrating the *pay* individual sales agents actually received from Wallace Morgan.  Cr. 56.1 ¶ 195.  Plaintiffs are well aware of this; indeed, when Plaintiffs sought additional Wallace Morgan payroll data in discovery, they moved the Court to compel *Wallace Morgan—not* Credico—to produce it, and Wallace Morgan—not Credico— subsequently produced it.  Dkt. Nos. 218, 235.

Nevertheless, Plaintiffs point to the fact that Credico (as directed by Sprint) reviewed certain onboarding documents.  Pls.' Br. 39.  Specifically, Credico reviewed Wallace Morgan's agent onboarding materials to ensure Wallace Morgan had obtained an online training confirmation, a signed Independent Sales Representative Agreement, a background check and drug test, and a signed Government Fraud Letter for each new agent.  Cr. 56.1 ¶¶ 77-78.  Credico was contractually obligated to review these onboarding materials pursuant to its contract with Sprint (which stems from Sprint's legal obligations under Lifeline regulations).  *Id.* ¶ 78.  Therefore, like Credico's minimal supervision for quality control, the fact that Credico receives and reviews these limited records is irrelevant to the joint employer inquiry.  *Godlewska*, 916 F. Supp. 2d at 262 (finding fourth *Carter* factor not satisfied where maintaining employment records was primarily subcontractor's responsibility and intermediary entity's review of certain records was "only an extension of [its client's] quality control procedures") (citation omitted).

For the same reasons, the fact that Credico maintains a record of sales made by agent code

---

[10]  This fact is just one of many reasons that the cases on which Plaintiffs rely here are distinguishable.  In *Barfield v. New York City Health and Hospital Corporation*, there was "no question" that the alleged joint employer maintained records of the hours worked by the plaintiffs.  537 F.3d at 144.  And in *Cordova v. SCCF, Inc.*, the court concluded that plaintiffs' joint employment allegations were sufficient to survive dismissal where the putative joint employer allegedly required the direct employer to use particular systems for tracking hours and wages, and allegedly "knew or should have known of, and had the authority to exercise control over" the accuracy of those records.  2014 WL 3512838, at *5 (S.D.N.Y. July 16, 2014).  There is no such evidence about Credico.

also fails to demonstrate that Credico "employed" the sales agents. Pls.' Br. at 39. Sprint specifically obligates Credico—as the outsourcing intermediary—to ensure that it is "protecting against fraudulent transactions." Cr. 56.1 ¶ 41. Moreover, Credico must track sales codes to perform one of its basic functions as an outsourced sales specialists—without invoices demonstrating sales by agent code, it would not be possible for Credico (or any outsourced sales broker) to ensure proper payment between the client and each of the subcontractor ISOs. *Id.* ¶¶ 35(m), 35(p).

In sum, Credico did not maintain the type of records regarding Plaintiffs and other Wallace Morgan sales agents that courts have found most indicative of a joint employer relationship (those regarding hours worked). Although Credico maintains certain other records about Plaintiffs, this is merely a function of Credico's contractual requirements with Sprint and its role as an outsourced sales broker. To hold this factor weighs in favor of joint employment, on this evidence, would contravene Second Circuit instruction that legitimate subcontracting arrangements not be brought within the ambit of the FLSA. *See Zheng*, 355 F.3d at 77.[11]

### 2. The Functional Control Factors Also Weigh Against a Finding That Credico Jointly Employed Plaintiffs

The remaining functional control factors set forth in *Zheng* also weigh against joint employment and demonstrate that Credico was not an employer of Plaintiffs or other Wallace Morgan sales agents.

---

[11] Plaintiffs' reliance on *Glatt v. Fox Searchlight Pictures Inc.* is misplaced. 293 F.R.D. 516. In *Glatt*, the court was persuaded by the fact that the putative joint employer required the production staff, who oversaw the plaintiff interns, to sign confidentiality agreements and employment agreements with the putative joint employer, and also did not allow them to be paid until they signed these agreements. *Id.* at 528. Here, however, neither plaintiffs nor their supervisors entered into confidentiality or employment agreements with Credico.

### (i) Sales Agents Have Never Been to Credico's Premises and Did Not Receive Equipment Directly From Credico

The Second Circuit has instructed courts to consider whether an alleged joint employer's "premises and equipment are used by its putative joint employees" because the "shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Zheng*, 355 F.3d at 72. In *Barfield*, for example, the Second Circuit concluded that a hospital was a joint employer of temporary agency-referred nursing staff who were required to report to the hospital, and who used the equipment at the hospital every day. 537 F.3d at 132. Because the temporary nurses worked directly on the hospital's premises, they were "directly supervised only by [hospital] staff." *Id.* at 146. Indeed, the temporary nurses were so intertwined with the hospital that they performed "the same work [] routinely performed by [the hospital's] full-time employees." *Id.*

This case bears no resemblance to *Barfield*. Plaintiffs concede that they have *never* been to Credico's office, that they cannot name a single employee who works there, and that they do not even know where the office is located (it is in Chicago). Cr. 56.1 ¶¶ 101-103. Instead, they reported solely to Wallace Morgan's office in New York. *Id.* ¶ 100.

Plaintiffs note that "Credico provided the tablets Field Agents used to collect Assurance Wireless Lifeline Applications." Pls.' Br. at 40. While there is no dispute about this, the record is also undisputed (1) that those tablets were loaned to Wallace Morgan (on a strict consignment basis), Cr. 56.1 ¶ 167, (2) that Wallace Morgan was solely responsible for maintaining its tablets, *id.* ¶¶ 168-169, and (3) that Plaintiffs received their tablets from (and returned them to) Wallace Morgan's office—Credico did not distribute the tablets to agents directly, *id.* ¶¶ 165-166, 169. Thus—unlike in *Barfield*—Plaintiffs' use of the tablets did not subject them to control by Credico or to performing work typical of Credico employees. Indeed, Credico employees have never

performed the face-to-face sales work that Plaintiffs performed.  *Id.* ¶ 7.  Rather, these facts "signal[] typical outsourcing by" Credico that must "not fall within the ambit of the FLSA." *Barfield*, 537 F.3d at 147.

### (ii)     Wallace Morgan's Business Could Have Shifted From One Outreach Agency to Another

The second *Zheng* factor is whether Wallace Morgan "had a business that could or did shift as a unit from one putative joint employer to another."  The fact that Wallace Morgan "could" work with other client brokers that competed with Credico (or on other client campaigns not sourced through Credico) is relevant because the subcontract "is less likely to be part of a subterfuge arrangement."  *Zheng*, 355 F.3d at 72.  Although Wallace Morgan did only contract with Credico as a broker, Smith previously owned another sales and marketing company through which he had contracted with a broker other than Credico.  Cr. 56.1 ¶ 46.  And Wallace Morgan's contract with Credico expressly authorized Wallace Morgan to work with other brokers or other client campaigns outside of those sourced by Credico.  Cr. 56.1 ¶ 50.

Most importantly, Wallace Morgan had its own resources (office staff and sales force) such that it legitimately could seek work from other brokers (or directly from other clients) at any time. *See* Stip. Facts ¶¶ 32-33.  Thus, Wallace Morgan was not dependent on Credico to conduct its business.  *Zheng*, 355 F.3d at 75 n.12 (instructing that this factor weighs in favor of joint employment only where the subcontractor is "without the resources to work for any other contractor").  That Wallace Morgan did not take that opportunity does not create a genuine issue of fact regarding Credico's (non)status as a joint employer.  *See id.* at 72 (stating that the "absence of a broad client base" is still "perfectly consistent with a legitimate subcontracting relationship").

### (iii)  Using Subcontractors for Face-to-Face Sales is a Widespread Practice in the Industry

The third *Zheng* factor is the extent to which the work performed is a "discrete line-job that was integral to [the] process of production." *Id.* at 72. The Second Circuit has specifically cautioned courts not to apply this factor too broadly because otherwise it could be "implicated in *every* subcontracting relationship" as "all subcontractors perform a function that a general contractor deems 'integral.'" *Id.* at 73. To avoid applying this factor inappropriately, courts must look to "industry custom and historical practice." *Id.* Where "the practice of using subcontractors to complete a particular task is widespread" in the industry, this factor weighs against joint employment because "it is unlikely [the subcontractual relationship is] a mere subterfuge to avoid complying with labor laws." *Id.*

Subcontracting face-to-face sales services is undeniably common in the Lifeline industry and across the direct sales and marketing industry at large. Cr. 56.1 ¶¶ 18-20. As to the Lifeline industry, there is no dispute that Sprint contracts with multiple outreach agencies (Credico competitors) to sell its Assurance Wireless phones and services. *Id.* ¶ 18. With respect to the direct sales industry more broadly, Credico and its competitors contract to outsource direct sales campaigns across multiple products and services, including, but not limited to, office supplies, energy service, and (non-Lifeline) telecommunications services. *Id.* ¶¶ 19-20. Thus, this factor weighs heavily in Credico's favor because Credico's subcontractual relationship with Wallace Morgan (and other sales companies) are not mere "subterfuge[s] to avoid compl[iance] with labor laws." *Zheng*, 355 F.3d at 73.

### (iv)  Sales Agents Were Tied to Their ISOs and/or Supervisors at their ISOs, Not Credico

The fourth factor courts examine in analyzing functional control is "whether responsibility under the contracts could pass from one subcontractor to another without material changes."

*Zheng*, 355 F.3d at 72.  Where, as here, workers "work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that [purported joint employer], this factor does not in any way support the determination that a joint employment relationship exists." *Id.* at 74.  In other words, the question is whether Plaintiffs were "tied to [Credico] . . . rather than to an ostensible direct employer." *Id.* at 74.

Plaintiffs certainly were in no way "tied to Credico."  They admit that they have never been to Credico's office, cannot name anyone who works there, and never even spoke to anyone at Credico about their work as sales agents.  Cr. 56.1 ¶¶ 99, 101-106.  Nevertheless, Plaintiffs claim this factor weighs in their favor because agents can transfer from one ISO to another.  Pls.' Br. at 40.  For example, as Plaintiffs note, agents transferred from Red Ten to Plato Group DBA Wallace Morgan, *i.e.*, Wallace Morgan before it had completed the incorporation process.  *Id.*  But it was because of the Red Ten agents' relationship with Smith—not their relationship with Credico—that these agents transferred to Wallace Morgan.  Smith worked at Red Ten as "acting manager" for nearly a year before the owner of Red Ten decided that he "didn't want to perform sales any longer."  Cr. 56.1 ¶ 47.  Because "[Smith] saw the opportunity to take the sales force and have them work" for him, he began incorporating his own company.  *Id.* ¶ 48.  To hold Credico to be a joint employer merely because it subcontracts with multiple different ISOs in the same area would "find[] no support in the law or in our country's commercial practices."  *Zheng*, 355 F.3d at 74 n.11.

### (v)  Credico Exercised Minimal Supervision Over Sales Agents

The fifth *Zheng* factor is "the degree to which the [alleged joint employer] supervise[d] the plaintiffs' work."  *Id.* at 74.  As the court cautioned, however, this factor "can be misinterpreted to encompass run-of-the-mill subcontracting relationships."  *Id.*  Thus, even "*extensive* supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and

conditions of the Plaintiff's employment." *Id.* at 75 (emphasis added). "By contrast, supervision with respect to contractual warranties of quality . . . has no bearing on the joint employment inquiry." *Id.*

As detailed above, Credico's minimal supervision over Wallace Morgan has no bearing on the hours sales agents work or other key terms and conditions of their work. *Supra* at I(B)(1)(ii). Moreover, the supervision that Credico does undertake is directly tied to efforts to ensure the quality of Wallace Morgan's performance under the subcontract (and thereby ensure compliance with Credico's obligations to Sprint and Sprint's obligations as a Lifeline provider). Those actions are "qualitatively different" from the type of control exercised by an employer, and thus this factor weighs strongly against joint employment. *Moreau*, 356 F.3d at 950-51.

### (vi)    Plaintiffs Were Not Required to Work Exclusively for Credico

The final *Zheng* factor is whether "the purported joint employees worked exclusively or predominantly for the putative joint employer . . . [because] [i]n those situations, the joint employer may *de facto* become responsible . . . for . . . traditional indicia of employment." 355 F.3d at 75. Thus, the question here is whether Plaintiffs worked exclusively or predominantly on campaigns sourced through Credico. It is not disputed that Plaintiffs worked solely on the Assurance Wireless campaign while engaged as sales agents at Wallace Morgan. Stip. Facts ¶ 52. That fact, however, is not particularly surprising given that Plaintiffs only worked as sales agents for a period of weeks. *Id.* ¶¶ 2, 4. On the other hand, at least one of the opt-in plaintiffs subject to discovery in this action had also worked for years at another ISO that had been sourced solely by DS-MAX, a competing broker company that Gillens described as "similar" to Credico. Cr. 56.1 ¶ 75. On these facts, it cannot be said that Credico "*de facto* bec[a]me responsible" for Plaintiffs' hours worked and pay received. *Zheng*, 355 F.3d at 75. Therefore, this factor counsels against joint employer status.

### C.    Plaintiffs' Reliance on Fourth Circuit Authority is Irrelevant

Recognizing that they cannot meet their burden under the clear directives of the Second Circuit and other courts in this District, Plaintiffs instead ask the Court to consider and apply "an entirely new joint employment test," which asks an entirely different "threshold question," and is comprised of an entirely different set of factors. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 136, 141-42 (4th Cir. 2017). In fact, Plaintiffs devote as many pages to analysis of this four-month old, non-precedential Fourth Circuit opinion as they do analyzing whether Credico is a joint employer under the case law and factors that are binding upon this Court. *See* Pls.' Br. at 41-44. *Salinas* not only provides a new test that conflicts with this Circuit's binding precedent, but it also specifically rebukes and contravenes Second Circuit directives that typical subcontracting relationships not be subsumed into the FLSA by the joint employer doctrine. *See id.* at 41 & n.10 (noting the Fourth Circuit "abandoned use of its economic realities test" and "further criticized" *Zheng* and similar tests); *see also Salinas*, 848 F.3d at 143-44. Thus, to the extent the *Salinas* test would lead to a different result in the present action (which it would not, *see infra*), it is irrelevant because this Court is required to apply and abide by Second Circuit precedent unless overruled by that court or the Supreme Court. *Ithaca Coll. v. NLRB*, 623 F.2d 224, 228 (2d Cir. 1980); *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 243 n.6 (S.D.N.Y 2008).

To be clear, *Salinas* does not repudiate Second Circuit authority alone—the Fourth Circuit admits that this new approach is in fundamental conflict with nearly all other established joint employer tests. *Salinas*, 848 F.3d at 136-37, 140 (listing several of the "myriad existing tests" that, like *Zheng*, the Fourth Circuit believes "improperly" derive from the *Bonnette* functional control factors). The extent to which *Salinas* contravenes widespread precedent is highlighted by Plaintiffs' reliance on *Hall v. DIRECTV, LLC*, 846 F.3d 757 (4th Cir. 2017). In *Hall*, the court applied the new *Salinas* test and held that DirectTV, an intermediary outsourcing service provider,

and a subcontractor all three jointly employed technicians that serviced DirectTV's customers in the field. *Id.* The great weight of authority amongst federal (and state) courts, however, is telecommunications service providers "are not joint employers of contract technicians who install those services." *Jean-Louis*, 838 F. Supp. 2d at 123; *see also, e.g.*, *Lawrence v. Adderly Indus., Inc.*, 2011 WL 666304, at *11 (E.D.N.Y. Feb. 11, 2011); *Jacobson,* 740 F. Supp. 2d at 683; *Rodriguez v. Metro Cable Commc'ns, Inc.*, No. 21517/2008 (N.Y. Sup. Ct. July 26, 2011).

What's more, the level of "formal control" exhibited in *Salinas* by the alleged joint employer (a household general contractor) over its subcontractor's employees *far exceeds* the level of control Credico exerted over Plaintiffs. In *Salinas*, for example, the court found it important that the general contractor: (1) "continuously supervised Plaintiffs" and provided feedback and direction "through one-on-one instruction;" (2) required plaintiffs to tell people they were employees of the general contractor; (3) dictated plaintiffs' hours and, at times, required that Plaintiffs work additional hours or on additional days; (4) instructed its subcontractor how to staff the project and when to pay overtime; (5) controlled and worked on the same premises that Plaintiffs worked on (the renovation site); (6) once provided a house for plaintiffs to live in while working on the job site; and (7) recorded plaintiffs' hours on timesheets and maintained those timesheets. *Salinas*, 848 F.3d at 146-47. Plaintiffs cannot dispute that Credico did not come close to exercising this level of control over Wallace Morgan sales agents—indeed, Credico did none of these things.

*      *      *

As set forth above, an examination of the relevant formal and functional control factors easily leads to the conclusion that Credico was not Plaintiffs' joint employer. While Credico took certain steps to ensure that Wallace Morgan (and its agents) were adhering to certain contractual

requirements and quality assurance standards, the law in this Circuit is clear that these types of activities are "perfectly consistent with a typical, legitimate subcontracting arrangement" and therefore not indicative of a joint employer relationship. *Zheng*, 355 F.3d at 74-75. To hold that Credico was Plaintiffs' joint employer under these facts would convert nearly all subcontractor relationships into joint employer relationships and run afoul of binding Second Circuit precedent. In sum, the Court should grant Credico's motion for summary judgment on the issue of joint employer.[12]

## II. PLAINTIFFS' CLAIMS FOR MINIMUM WAGE AND OVERTIME FAIL BECAUSE THEY WERE EXEMPT OUTSIDE SALESPERSONS

Even if Credico was Plaintiffs' joint employer—which it was not—and regardless of whether Wallace Morgan properly classified Plaintiffs as independent contractors, *see infra*, Plaintiffs' FLSA and NYLL claims fail because they were exempt from minimum wage and overtime as outside salespersons. The FLSA and NYLL exempt from their minimum wage and overtime requirements "any employee employed . . . in the capacity of outside salesman." 29 U.S.C. § 213(a)(1); *see also* 12 NYCRR §§ 142-2.2, 142-2.14(c)(5). An individual is considered to be working as an "outside salesman" if (1) his "primary duty" was either "making sales" as defined in the Act or "obtaining orders or contracts for services," and (2) he was "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. §§ 541.500(a)(1)-(2), 541.501(a); *see also Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013) (NYLL outside sales exemption is applied in same manner as FLSA).

---

[12] If the Court is not inclined to grant Credico's motion, then, at best, the issue of joint employer is a fact issue for the jury to decide. Summary judgment in Plaintiffs' favor certainly is not warranted.

Notably, Plaintiffs concede that they meet the second prong of the exemption. Pls' Br. 19, n.2 ("Plaintiffs do not dispute they were regularly engaged away from Defendants' place of business when performing their primary job duty."). With respect to the first prong of the exemption, Plaintiffs also admit that their "primary job duty [was] collecting Assurance Wireless Lifeline applications." *Id.*

The only question that remains is whether Plaintiffs' work soliciting potential Assurance Wireless customers constituted "[m]aking sales" or "[o]btaining orders or contracts for services." 29 C.F.R. § 541.501(a). As set forth below, the FLSA's expansive definition of exempt sales work, coupled with the factual record, leave no question at all; Defendants are entitled to summary judgment as a matter of law. Indeed, in cases where, as here, how the plaintiff spent his time is not in dispute, whether the plaintiff's work qualifies for an FLSA exemption is a question of law ideally suited for summary judgment. *See, e.g.*, *Chenensky v. N.Y. Life. Ins. Co.*, 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009).

### A. Plaintiffs Were Unmistakably Engaged to Make Sales and/or Obtain Orders or Contracts for Assurance Wireless Services

The FLSA broadly defines "sales" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k); 29 C.F.R. § 541.501(b) (noting "sales" under the Act also includes "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property"). "Exempt outside sales work" also includes work undertaken to "obtain[] orders or contracts for services." *Id.* § 541.501(c). The Act does not require that employees necessarily consummate final and binding sales or orders to qualify as exempt: employees must merely "direct efforts toward the consummation of a sale." *Flood v. Just Energy Mktg. Corp.*, 2017 WL 280820, at *5 (quoting 29 C.F.R. § 541.503(c)). In other words, an "employee is clearly engaged in sales activity" if she

simply "directs [her] efforts at persuading a particular customer to purchase a product and is compensated on the basis of [her] success in doing so." *Dailey v. Just Energy Mktg. Corp.*, 2015 WL 97103, *3 (N.D. Cal. July 23, 2015) (citation omitted). As the United States Supreme Court has recognized, the Act's definition of "sale" is "more expansive than the term's ordinary meaning" and must be "interpreted as including those arrangements that are tantamount, in a particular industry, to a paradigmatic sale." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2171-72, n.18 (2012). As explained below, and despite Plaintiffs' arguments to the contrary, in the Lifeline industry, soliciting and signing up a qualified customer for a Lifeline phone and service is "tantamount" "to a paradigmatic sale"—even though the customer does not pay the bill (the government does). *See id.*

Under both the common usage of the term "sales" and the Act's expanded definition and case law interpreting it, Plaintiffs (and other Wallace Morgan sales agents) plainly were "selling" Assurance Wireless phones and services. They (1) identified potential Assurance Wireless customers in the field, (2) approached those potential customers, (3) determined whether the potential customers were likely to qualify for Lifeline services, (4) "pitched" the potential customers, including by describing Assurance Wireless's products and services to them and by comparing those to the offerings of competitor Lifeline service providers, and they did all this with (5) the goal of "convince[ing]" those customers to sign up for Assurance Wireless phone service. Cr. 56.1 ¶¶ 146-150, 153. When Plaintiffs' pitch was successful, they assisted the customer in filling out the required information and submitted it to a third party to determine if the applicant qualified under the federal regulations governing the Lifeline program. *Id.* ¶¶ 154, 170; Stip. Facts ¶¶ 59-60. If the customer did, in fact, qualify under these objective federal regulations, the customer received an Assurance Wireless phone from Sprint. Cr. 56.1 ¶¶ 171-177. While this

phone was provided free of charge to the *customer*, the government paid *Sprint*, via subsidy, for providing cellular service to the customer. *Id.* ¶ 21. In return, Plaintiffs were paid a commission for what was commonly referred to by Plaintiffs and other sales agents as a "clean sale." *Id.* ¶¶ 155-156, 183-185. Plaintiffs also went through the same process to induce current Lifeline participants to switch to Assurance Wireless service from one of Sprint's competitor Lifeline service providers. *Id.* ¶¶ 153, 184. This process demonstrates a typical sale and/or order for telephone service.

1. **The Fact that the Government Pays for Certain Assurance Wireless Phones and Services Does Not Negate That Plaintiffs Made the Sales and Obtained the Orders**

Plaintiffs contend they did not "make sales" because Assurance Wireless phones and services are paid for (at least in part) by federal subsidy and not by the Assurance Wireless customers whom they solicited. Pls.' Br. at 20-23. This argument is belied both by common sense and United States Supreme Court precedent.

It simply is not the case that the solicited party himself must make a monetary payment in order for a transaction to be deemed a "sale." To be sure, the nature of a salesperson's job and responsibilities does not change simply because the customer is not paying for the product or services *himself*—but rather a third party (the government) is paying someone else (Sprint) to provide the service. To hold otherwise would mean, for example, that a car salesperson who sells a car to a customer at a dealership does not make a "sale" if the car is paid for—as is so often the case—by a bank loan rather than the customer. And—even more relevant here—certainly a grocer "sells" milk or produce regardless of whether the customer pays with cash or with food stamps (for which the grocer later receives payment from the government). Likewise, a sales representative (like Plaintiffs) who solicits a potential customer to enroll for an Assurance Wireless

phone and service plan "sells" that phone and service plan. It makes no difference that it is ultimately the government—and not the customer—who pays the bill.

The Supreme Court's jurisprudence in this area is also instructive. In *SmithKline*, the plaintiff-petitioners argued that pharmaceutical sales representatives did not "make sales" because they only solicited nonbinding commitments from doctors, who in turn wrote the prescriptions for the patients who ultimately purchased the drugs. 132 S. Ct. at 2169. But the Court rejected that position. *Id.* at 2172. In interpreting 29 C.F.R. § 541.501, which defines "sales" to include "*any sale . . . or other disposition*," the Court made clear that the modifier, "any," and the "catchall phrase," "other disposition," ensure that even "transactions that might not be considered sales in a technical sense" and all "arrangements that are tantamount, in a particular industry, to a paradigmatic sale" qualify as exempt sales work. *Id.* at 2171-72 (emphasis added). The regulations do not permit any narrower construction. *Id.* at 2172. Thus, even though the "unique regulatory environment" surrounding pharmaceuticals only permits pharmaceutical sales representatives to solicit nonbinding commitments from *the doctors who write prescriptions*, rather than from the *patients who actually purchase and pay for drugs*, their work in soliciting doctors to prescribe their products "comfortably" constitutes exempt sales work. *Id.*

Notwithstanding Plaintiffs' strained attempt to distinguish *SmithKline*, *see* Pls.' Br. at 21-22, Plaintiffs, like the exempt sales representatives in *SmithKline*, did "the most that [they] were able to do to ensure the eventual disposition of" Assurance Wireless phones and services given the "unique regulatory environment." *Id.* Plaintiffs solicited potential customers to choose Assurance Wireless over other Lifeline providers and assisted them in enrolling for the service. Cr. 56.1 ¶¶ 147, 150, 153-154. Because Plaintiffs "function[] in all relevant respects as [] outside sales[persons]" they may not be excluded from the outside sales exemption based on the

"technicalit[y]" that sales made in the Lifeline industry are not "ordinary." *SmithKline*, 567 U.S. at 2172 n.23. Indeed, "[i]t would be anomalous" to hold that Plaintiffs are not exempt from minimum wage and overtime, while "at the same time exempting employees who function identically to [Plaintiffs] in every respect except that they sell" telecommunication services to customers who can afford to pay for the services themselves. *Id.* at 2173. Accordingly, Plaintiffs "ma[d]e sales within the meaning of . . . the Act." 29 C.F.R. § 541.500(a)(1)(i).

Plaintiffs' argument that they did not "obtain orders or contracts" (under Section 541.500(a)(1)(ii)) for Assurance Wireless services because the customer made no monetary payment is flawed for similar reasons. *See* Pls' Br. 25. Plaintiffs cite the regulation's statement that orders or contracts should be those "*for which a consideration will be paid by the client or customer*," 29 C.F.R. § 541.501(c) (emphasis added), and argue that Lifeline customers provide no consideration. But Plaintiffs conflate consideration with monetary payment.

"Consideration" (undefined in the FLSA) "has been explained to be 'any act of the plaintiff from which the defendant, or a stranger, derives a benefit or advantage.'" Black's Law Dictionary (10th ed. 2014). Plaintiffs have not and cannot provide any authority for the proposition that "consideration" in Section 541.501 is limited exclusively to monetary payment.

In any event, Assurance Wireless customers do take action that "derive[s] a benefit or advantage" to Sprint. By choosing Sprint (rather than a competing Lifeline program) to be the sole provider of Lifeline service to his household, the customer also grants Sprint exclusive rights to the sole federal subsidy allotted to his low-income household.[13] *See* Cr. 56.1 ¶¶ 21, 172 (noting that a consumer's household may only subscribe to *one* Lifeline service). Accordingly, Plaintiffs

---

[13] The fact that Lifeline providers compete with each other for the right to provide these "free" services demonstrates that Lifeline providers derive financial benefit from obtaining customers (even though customers do not make payment themselves). For example, in their pitch, sales agents compare Assurance Wireless Lifeline services with services offered by competing Lifeline providers. Cr. 56.1 ¶ 153.

are also exempt because they "obtain[ed] orders . . . for [Assurance Wireless services] . . . for which a consideration [was] paid." 29 C.F.R. § 541.500(a)(1)(ii).

### 2. All Parties in this Case—Including Plaintiffs Themselves—Considered Their Work To Be Sales

Plaintiffs themselves considered what they were doing to constitute sales. *See* Cr. 56.1 ¶¶ 202 (Martin's contemporaneous, handwritten notes describing her personal weekly goal at Wallace Morgan as "30 clean sales" and discussing techniques useful to "increase sales"), *id.* (confirming that when she wrote "sales" she was referring to "getting people to sign up for [Assurance Wireless] phones").[14] Singleton also referred to submitting a qualified application as a "clean sale" and as "getting the orders for the Lifeline phone." *Id.* ¶¶ 155, 204. And in subsequent employment applications Martin described her Wallace Morgan responsibilities as "sell[ing] Insurance [sic] Wireless phones." *Id.* ¶ 205.

Courts, including those in this District, have found it persuasive that the plaintiff herself considered her work to be "sales," in concluding that the outside sales exemption applied. *See, e.g.*, 2017 WL 280820, at *4 ("In plaintiff's own words, he was a 'salesperson.'"); *Menes v. Roche Labs. Inc.*, 2008 WL 6600518, at *2 (C.D. Cal. Jan. 7, 2008).[15]

And Plaintiffs are not alone—every party to this litigation considers the work field agents do to be "making sales." For example, Sprint's Standard Operating Procedures (which are incorporated into both Sprint's contract with Credico and Credico's contract with Wallace

---

[14] Plaintiff Singleton had similar notes but "misplaced them." Cr. 56.1 ¶ 188.

[15] Plaintiffs attempt to diminish the clear importance of *their own* characterizations of their work as "sales" by quoting case law that courts should "look beyond labels and job descriptions." *See* Pls.' Br. at 20, n.3. But Plaintiffs completely mischaracterize these authorities, which hold that courts should look past labels that the *employer* (not the worker) placed on the job and focus instead on the actions "actually performed on a daily basis." *Miranda-Albino v. Ferrero, Inc.*, 455 F. Supp. 2d 66, 76 (D.P.R. 2006). These cases do not—as Plaintiffs argue—discourage (rather they implicitly encourage) the Court to consider the *worker's* own characterizations of the work they "actually performed." *Id.*

Morgan) state that "[e]ach agent must adhere to the *sales* guidelines set forth" within and that Sprint maintains the right to audit the "*sales* [t]actics" an ISO employs to protect the "customer's *sales* experience." Cr. 56.1 ¶ 206 (emphases added). Smith similarly described the work his company (Wallace Morgan) did as "sales"; specifically, ████████████████████████ ████████ *Id.* ¶ 207 (emphasis added). In Credico's opinion, "the most important duty of a field agent is to provide a quality *sale* to a customer." *Id.* ¶ 208 (emphasis added).

Notably, too, the FCC itself, which regulates the Lifeline program, refers to agents who sign people up for a competitor Lifeline provider as "sales agents." *Id.* ¶ 209. And it also bears mention that the named Plaintiffs in the related *Vasto* action—who also worked on the Assurance Wireless campaign but as sales agents for a different ISO—repeatedly referred to their work as "making sales" in their complaint and sworn declarations to this Court. *See, e.g.*, *Vasto et al., v. Credico (USA) LLC, et al.*, Case No.: 15-cv-9298 (S.D.N.Y.), Dkt. No. 1 ¶ 33 (alleging the ISO, Cromex, required Plaintiffs "to . . . report to a specific location to make sales, and use Defendants' sales methods when attempting to sign up new customers"); *id.* at Dkt. No. 38-2 ¶ 22 (plaintiff Vasto reported "the number of sales" at the end of the day); *id.* at Dkt. No. 38-4 ¶ 13 (plaintiff Zheng made "a sales pitch to potential customers"). All of these facts undermine Plaintiffs' attempt to now characterize their work for Wallace Morgan as something other than what it was— sales.

A recent decision issued by Judge Forrest is particularly instructive. On markedly similar facts, Judge Forrest ruled in defendants' favor on summary judgment, finding a face-to-face sales and marketing agent exempt as an outside salesperson. *Flood*, 2017 WL 280820. In *Flood*, the court held that the employee was exempt as an outside salesperson because he spent "approximately 75 to 80 percent of his time" in the field "solicit[ing] customers for [defendant's]

energy services," "received sales training," and "was paid entirely on commission." *Id*. at *1, *5; *see also SmithKline*, 567 at 2174 (holding exemption applied to pharmaceutical sales representatives because their "end goal was not merely to make physicians aware of the medically appropriate uses of a particular drug. Rather, it was to convince physicians actually to prescribe the drug in appropriate cases.").

For these reasons, Plaintiffs qualify as exempt outside salespersons under the Act.[16]

**B.    Plaintiffs' Work Also Exhibits All The "External Indicia" Of Sales**

In addition to analyzing both prongs of the outside sales regulation (29 C.F.R. § 541.500), some courts have also analyzed external indicia that are common in a salesperson.[17]    An examination of these external indicia only "strengthens the conclusion" that Plaintiffs' work constituted "making sales" or "obtaining orders or contracts for services" as required by the regulation. *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 758 (W.D. Mich. 2003). Plaintiffs' brief does not analyze these indicia at all, likely because—in addition to meeting both elements of the outside sales exemption under 29 C.F.R. § 541.500—Plaintiffs' work (like all Wallace Morgan sales agents') exhibited each and every one of these indicia, thus, "provid[ing] weighty support"

---

[16]    Plaintiffs devote much of their argument to cherry-picked quotes from comments that Sprint submitted to the FCC (in a proceeding wholly unrelated to the FLSA and NYLL), arguing that it would be improper to subject low-income Lifeline consumers to substantial state taxes and 911 fees. *See* Pls.' Br. at 21. But those quotes—which are not attributable to Credico in any event—are irrelevant to this determination. Sprint simply stated that the Indiana statute at issue, which required a "retail transaction" to take effect, should not apply because Sprint "does not collect a fee from a [Lifeline] consumer." Dkt. No. 54-9. No one disputes that Sprint did not collect a fee from Lifeline customers, nor is Sprint's statement contrary to Defendants' positions in this case. As explained above (*see* Section II(A)(1)), the fact that the government, rather than Assurance Wireless customers, pays for the phone services does not remove Plaintiffs from the outside sales exemption.

[17]    To be clear, there is no statutory or regulatory requirement that a salesperson (especially a salesperson who clearly and unmistakably falls within the exemption) must also demonstrate any of the external indicia of sales. Courts in this Circuit have generally looked to the indicia in "mixed duties" cases where the employee engaged in both sales and non-sales work to determine whether the work was "primarily" sales work. *Flood*, 2017 WL 280820, at *5, n.5.

that an exempt classification comports with the legislative purpose of the outside sales exemption.[18] *Baum v. AstraZeneca L.P.*, 605 F. Supp. 2d 669, 683 (W.D. Pa. 2009).

*First*, like most salespersons, Plaintiffs "generate[d] commissions for [themselves] through [their] work." *Flood*, 2017 WL 280820, at *4 (citation omitted). Plaintiffs admit that they were paid exclusively on a commission basis per clean sale. Cr. 56.1 ¶¶ 183-185. "Compensation based wholly or in significant part on commission correlates with a finding that the employee does sales work." *Nielsen*, 302 F. Supp. 2d at 757. Indeed, Plaintiffs testified that they were motivated to work longer hours because the more people they signed up for Assurance Wireless, the more money they earned. Cr. 56.1 ¶ 186.

*Second*, "[i]ndependent[] solicit[ation] [of] new business is another indicator of sales activities." *Nielsen*, 302 F. Supp. 2d at 758. It is undisputed that sales agents were responsible for soliciting new customers for Assurance Wireless. Cr. 56.1 ¶ 146 (Singleton testified her job was "to start conversations with potential customers" and "try[] to get people to sign up for the[] phones")); *see also, generally*, *id.* ¶¶ 147-153.

*Third*, *all* of Plaintiffs' work soliciting potential Assurance Wireless customers was done away from Wallace Morgan's place of business. *Id.* ¶¶ 107-109.

*Fourth*, Plaintiffs' work was "unsuitable to an hourly wage." *Flood*, 2017 WL 280820, at *4 (citation omitted). As Smith testified, Wallace Morgan sales agents "spent so much time away from [him]" and "worked all different hours" such that "it was not in [his] interest to look into paying them hourly." Cr. 56.1 ¶ 198; *see also id.* ¶¶ 120, 129-135 (named plaintiff and opt-in

---

[18] Courts in the Second Circuit consider "(1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Flood*, 2017 WL 280820, at *4 (quoting *Chenensky*, 2009 WL 4975237, at *5); *see also Nielsen*, 302 F. Supp. 2d at 756-58.

plaintiffs worked widely varying schedules despite all being sales agents for Wallace Morgan), ¶ 128 (sales agents took breaks of varying lengths and varying numbers).

*Fifth*, it is well-settled that the level of supervision exercised over Plaintiffs' sales work is consistent with an exempt classification. Indeed, multiple direct sales and marketing field agents have been held to be outside sales exempt on summary judgment with equal or even greater levels of supervision, including in this District. In *Flood*, for example, Judge Forrest concluded that the plaintiff was an exempt outside salesperson where he was provided an orientation manual, attended daily morning meetings at the sales office, was provided a script to use while making sales, and was required to wear an identification badge and company shirt, ride out in a group to the field, work in a designated area each day, and work a fixed schedule. 2017 WL 280820, at *2; *see also, e.g.*, *Jewell Tea Co. v. Williams*, 118 F.2d 202, 205-208 (10th Cir. 1941) (exempt plaintiff was assigned a specific sales territory, given a required weekly sales quota, required to report to work by a certain time, required to attend meetings for further instruction and discussion of sales problems in the field, and his progress was monitored by his supervisor).

*Further*, Wallace Morgan provided Plaintiffs specialized sales training, which is also "indicative of whether an employee is engaged in sales." *Nielsen*, 302 F. Supp. 2d at 757. This training included shadowing a more experienced salesperson for several days or longer in the field, Cr. 56.1 ¶ 90, and attending morning training meetings (which typically lasted approximately an hour) in the sales office, during which the agents "rehears[ed]" "customer-and-agent" interactions and different "tactics" and "techniques" to be successful in those interactions, *id.* ¶ 92.

Because, in addition to falling within both prongs of Section 541.500, Plaintiffs exhibited each and every indicia of a salesperson, they were exempt from minimum wage and overtime requirements under the outside sales exemption.

## C.    Plaintiffs' Remaining Arguments Are Baseless and Irrelevant

Plaintiffs strain to argue that the Court should nevertheless not apply the outside sales exemption to them for a handful of groundless reasons. None of the reasons are contemplated by the statutory or regulatory terms of the exemption—nor do they alter Plaintiffs' fundamental status as exempt outside salespersons.

### 1.    The Fact that Assurance Wireless Applications Could Be Rejected Under Lifeline Regulations Or Cancelled By the Customer Does Not Negate Plaintiffs' Exempt Status

Plaintiffs contend that they did not perform exempt sales work because they did not have the ability to fully consummate a sale or order. Pls.' Br. at 21-22. Specifically, they rely on the fact that the applications they solicited were subsequently checked against Lifeline regulation requirements for approval and that the customers made no binding commitment to activate the phone and keep the service. *See id.* at 22-23, 25.

One court in this District has already held that Plaintiffs' argument "makes no sense." *Flood*, 2017 WL 280820, at *4. "There is nothing in the FLSA or the NYLL that limits the definition of an outside salesperson to someone who has the unfettered discretion to finalize a binding sale." *Id.* at *5 (collecting DOL guidance rejecting a "categorical interpretation" of "sales" that requires a binding and final commitment); *see also Baum*, 605 F. Supp. 2d at 680 ("[T]he statutory language does not require a final sale, complete and consummated."). Rather, as set forth above, exempt sales work merely requires that the worker "direc[t] efforts toward the consummation of a sale." *Flood*, 2017 WL 280820, at *5 (quoting 29 C.F.R. § 541.503(c)).

Thus, in *Flood*, the court summarily rejected plaintiff's argument that he should not be designated as an outside salesman because "he had no authority to approve a new customer." *Id.* at *2, 4. But neither Plaintiffs nor Flood is able to identify "any situation where [the defendants] arbitrarily rejected a sale." *Id.* at *4. Instead, both Just Energy and Solix (Sprint's vendor) do

"little other than make sure there were no technical or legal issues with processing the contracts."
*Flood*, 2017 WL 280820, at *5 (sales rejected if resident's information could not be verified); Cr.
56.1 ¶¶ 171-176 (Solix "rejects" Assurance Wireless applications if the customer does not qualify
under FCC regulations, for example, his household is already receiving Lifeline service).

Like Flood, Plaintiffs were also "the last salesperson[s] to touch the customer." *Flood*,
2017 WL 280820, at *4. Plaintiffs were "responsible for culling potential customers from
ineligible" ones, and "[they] and only [they]" tried to convince those customers to use Assurance
Wireless. *Id.* at *5; Cr. 56.1 ¶¶ 146-147 (Martin confirming "it was [her] job to convince the
customers to sign up for the [Assurance Wireless] phones"). Once Solix approved an application,
it sent a confirmation postcard to the customer's address and, shortly thereafter, Sprint shipped the
customer the phone. Cr. 56.1 ¶ 177. In the interim, no one else—not Sprint, not Credico, not
Wallace Morgan—"affirmatively ma[d]e further contact with the customer to consummate the
sale," which makes it "particularly" clear that Plaintiffs "engaged in sales activity and not mere
general promotion of [Assurance Wireless]." *Dailey*, 2015 WL 4498430, *3.

Plaintiffs' authorities do not hold otherwise and are facially distinguishable. Plaintiffs try
to compare themselves to college and army recruiters who were held not to be making sales under
the exemption. *See* Pls.' Br. at 22-23 (citing *SmithKline*, 132 S. Ct. at 2174 and *Clements v. Serco
Inc.*, 530 F.3d 1224 (10th Cir. 2008)). But, unlike Plaintiffs, these non-exempt recruiters left it up
to their employers to subjectively "decid[e] whether to make a contractual offer of its [] services
to the applicant." *SmithKline*, 132 S. Ct. at 2174 (citation omitted); *see also Clements,* 530 F.3d
at 1226 (recruiters took their recruits to be interviewed by U.S. Army officials). Thus, the
recruiters' work merely "paved the way" by promoting the product and passing off the recruit to
others who subjectively approved and made the sale. Likewise, in Plaintiffs' final case, *Kinney v.*

*Artist & Brand Agency LLC*, 2015 WL 10714080, at *20 (S.D.N.Y. Nov. 25, 2015), the non-exempt employees merely connected "clients and buyers" and then "relied" on them to consummate contracts on their own.

But, as detailed above, Plaintiffs did not "pave[] the way for a sale made by someone else": (1) Assurance Wireless orders were approved as long as the applicant met objective criteria and (2) no other individual affirmatively contacted the customers to close the sale. Cr. 56.1 ¶¶ 172, 175, 177. Thus, if Plaintiffs are to be compared to recruiters at all, they are more aptly compared to the *exempt* college recruiters in *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747 (W.D. Mich. 2003); DeVry (unlike most colleges) had purely "*objective*" admissions criteria ("requiring only a high school diploma or GED and certain test scores") and "automatically admitted" any applicant who met that criteria. *Id.* at 756 (emphasis added).[19]

### 2. The Exemption Applies to Plaintiffs Even Though They, Individually, Did Not Earn Many Commissions

Finally, in a last gasp to keep their claims afloat, Plaintiffs argue that this Court should remove them from the outside sales exemption because their commission earnings during their five-week stint at Wallace Morgan were not substantial. Plaintiffs point out that courts have noted (in *dicta*) that outside salespeople "*typically*" make well more than minimum wage. Pls.' Br. at 26 (emphasis added). This argument is fatally flawed for multiple reasons.

*First*, nothing in the text of the Act or regulation requires that outside salespeople be highly compensated. Indeed, the outside sales exemption—unlike most other FLSA exemptions, such as the administrative exemption (*see* 29 C.F.R § 541.200)—expressly does *not* include a salary basis

---

[19] Plaintiffs' argument regarding the purchase of additional minutes or text messages (*see* Pls' Br. at 24-25) is irrelevant. Credico does not dispute that Plaintiffs did not sell additional minutes or text messages. But the fact that Assurance Wireless customers may later purchase additional products or other add-on services from another salesperson does not mean Plaintiffs' efforts directed towards consummation of the first sale/order is retroactively stripped of its exempt status.

requirement. 29 C.F.R. § 541.500(c) ("The requirements of subpart G (salary requirements) . . . do not apply to the outside sales employees.").

*Second*, to require that an employee earn minimum wage (or "well above" it as Plaintiffs suggest) to qualify as an outside salesperson would render the exemption itself moot: there would be no reason to have an exemption if only those who, in fact, receive minimum wage qualified. Worse, such a requirement would force those who employ outside salespeople to undertake the difficult and costly task of trying to accurately track their hours worked.

*Third*, if total earnings were considered in the exemption analysis, as Plaintiffs suggest, some Assurance Wireless sales agents might be considered exempt (because they were successful and made many commissions), while others, who *performed the same primary duty but with less success*, might not be exempt. *SmithKline*, 132 S. Ct. at 2172. This is the very type of "anomalous" result that the Court warned against in *SmithKline*. *Id.* at 2173. If two workers "function identically . . . in every respect," the exemption must apply to them equally. *See id.*

\* \* \*

Because Plaintiffs, as sales agents at Wallace Morgan, made sales and obtained orders for phone service, they were exempt from minimum wage and overtime under the outside sales exemption and summary judgment should be entered in Credico's favor.

## III. PLAINTIFFS WERE PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS

Plaintiffs' claims must fail for the separate and independent reason that they depend on the assumption that they were employees, while in fact Wallace Morgan properly classified them as independent contractors.

Courts in the Second Circuit apply the "economic realities test" when determining if an individual is an employee or an independent contractor under the FLSA. *Godoy v. Rest.*

*Opportunity Ctr. of N.Y., Inc.*, 615 F. Supp. 2d 186, 192 (S.D.N.Y. 2009).  The ultimate inquiry is whether the workers "depend upon someone else's business for the opportunity to render service or are in business for themselves."  *Id.*  at 193 (citation omitted).  Specifically, courts consider five factors: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."  *Id.* at 192-93 (citation omitted).  No single factor is dispositive; employment under the FLSA is "a flexible concept to be determined on a case-by-case basis by a review of the totality of the circumstances."  *Id.* at 193 (citation omitted).

New York courts assessing independent contractor status under the NYLL consider a different non-exhaustive set of factors that more narrowly focus on the relationship between the parties.  These factors include whether the worker: "(1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule."  *Bynog v. Cipriani Grp.*, 1 N.Y.3d 193, 198 (N.Y. 2003).

A.      **Plaintiffs Were Independent Contractors Under the FLSA**

As an initial matter, Plaintiffs' brief repeatedly attempts to piggyback on this Court's decision in *Hart v. Rick's Cabaret International, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013).  But this case is a far cry from *Hart*, where the defendant "regulated" and micromanaged "almost every aspect of the dancers' behavior" including chewing gum, having "a bad attitude," using a cell phone, using a handbag or purse, using public restrooms, their appearance, weight, and breath, the exact height of their shoes, and the length (and exact number) of dresses they owned.  *Id.* at 913-15.  As set forth below, the amount of control exercised by Wallace Morgan was minimal at best.  The totality of the factors demonstrates that Plaintiffs were properly classified as independent

contractors.

**_First, Wallace Morgan exercised minimal control over agents' "manner and means of accomplishing" sales_**.  Moreover, what little control Wallace Morgan did exert over agents' work is largely irrelevant to this inquiry as a matter of law because (also unlike in _Hart_) it was undertaken for purposes of compliance with federal law.  _Cf. Hart_, 967 F. Supp. 2d at 916 ("[T]he vast majority of [defendant]'s Guidelines had nothing whatsoever to do with safety concerns or compliance with law.").

In the field, Wallace Morgan sales agents were free to go where they pleased and approach whom they pleased to sell Assurance Wireless phones and service, provided it was within Wallace Morgan's contracted sales territory.  Cr. 56.1 ¶¶ 112, 148.  While it is true that not all agents could go to the same specific location within Wallace Morgan's territory at the same time, the best performing sales agents were given their first choice of location each day.  _Id._ ¶ 110.  And, importantly, some of the opt-in plaintiffs testified that once agents were out in the field, they could "improvise" or "freelance" outside of their location to collect applications.  _Id._ ¶ 112.  For example, opt-in plaintiff Fabian-Castillo "freelanced" "as far as Buffalo."  _Id._

Wallace Morgan also exercised little to no supervision over its sales agents when they were out in the field.  Plaintiffs confirmed that after their one week of in-the-field sales training, they still went into the field as account executives with their Wallace Morgan trainer/supervisor but were "more unassisted" and "did [their] own thing."  _Id._ ¶ 113 (citing Ex. 20, Singleton Dep.).  And, just two weeks later, as Corporate Trainers, Plaintiffs went out into the field by themselves without supervision.  _Id._ ¶ 114 (Singleton testified that as a Corporate Trainer "there was no supervision because I am the supervision").  Indeed, Wallace Morgan sales agents worked independently to establish their own sales force by recruiting other independent sales

representatives. *Id.* ¶ 115. They viewed these individuals as an investment, trained them on successful sales techniques, and established and monitored the progress of their sales goals. *Id.*

Plaintiffs' contention that they worked a "fixed schedule" is also belied by their own testimony, as well as that of opt-in plaintiffs, who reported daily and weekly schedules that varied widely from each other and those described by Singleton and Martin. *Cf. Id.* ¶¶ 129-135. For example, some agents reported that they worked Monday through Friday (*Id.* ¶¶ 135(e), 135(o)), others reported that they worked Monday through Saturday (*Id.* ¶¶ 135(b), 135(d), 135(f), 135(i)), and still others reported they worked Monday through Friday and one Saturday per month (*Id.* ¶¶ 135(a), 135(q)). Likewise, agents reported widely varying start times—ranging from 5:45 am to 9:00 am, with many times in between (*see, e.g., id.* ¶¶ 135(b) (5:45 a.m.), 135(a) (7:00 a.m.), 135(g) (8:00 a.m.))—and end times, ranging from 5:00 pm to 10:00 pm (*see, e.g., id.* ¶¶ 129 (5:00 p.m.), 135(a) (7:30 p.m.), 135(d) (10:00 p.m.)). This wide variation is not consistent with Plaintiffs' contention that Wallace Morgan set a uniform, fixed schedule for its sales agents. *See* Pls.' Br. at 12. Rather, it is consistent with Smith's testimony that Wallace Morgan agents worked at their own convenience. Cr. 56.1 ¶¶ 119-121.

Indeed, Plaintiff Singleton—who reported a different schedule in deposition than she did in her Complaint (*cf.* Cr. 56.1 ¶ 133 (8:00 a.m. to 7:00 p.m. five days per week) & ¶ 129 (7:00 a.m. to 5:00 p.m. six days a week))—confirmed that she "didn't have a fixed schedule, fixed hours, every day." *Id.* at ¶ 120. Rather, she was given a suggested schedule that she "didn't necessarily always fulfill" because she "took a day off or added a day on, fluctuating." *Id.* An opt-in plaintiff also noted that he took several days off to take care of personal matters. *See, e.g., id.* ¶¶ 123-124. Agents were also free to take breaks "on a need-be basis" and "at [their] discretion" when they were in the field. *Id.* ¶ 128.

That agents reported working somewhat similar or overlapping schedules is not inconsistent with an independent contractor relationship because "the very nature of plaintiff[]s' work . . . obliged [them] to work . . . at certain times" in order to successfully solicit potential customers. *Sellers v. Royal Bank of Canada*, 2014 WL 104682, at *6 (S.D.N.Y. Jan. 8, 2014) (citation omitted). Here, Plaintiffs' job was to solicit and collect enrollment applications from potential Assurance Wireless customers *on the street*. CR 56.1 ¶¶ 107, 122 (Smith explained that agents typically came in by 10:00 a.m. because otherwise there ███████████████████████ ████████████████████████████████████). It is, therefore, wholly unremarkable that Plaintiffs and other Wallace Morgan sales agents generally performed their work during similar daytime hours when there were likely to be the most potential customers out on the street—and not, for example, in the middle of the night. Rather, what is important for the purposes of the independent contract inquiry, and what the record demonstrates, is that agents "all worked [at] varying times" during those daytime hours. *Browning v. Ceva Freight LLC*, 885 F. Supp. 2d 590, 609 (E.D.N.Y. 2012).

Finally, nearly all of the purported evidence of "control" on which Plaintiffs rely, for example, the fact that agents were required to use Sprint marketing materials (Pls.' Br. at 14), is irrelevant to this inquiry because those requirements stemmed from Sprint's obligations to comply with federal law as a Lifeline service provider. Cr. 56.1 ¶¶ 36, 51. As this Court recognized in *Hart*, for example, where regulations are implemented "to assure compliance with law, those regulations are not evidence of the [entity]'s control over its [workers]." 967 F. Supp. 2d at 916; *Taylor v. Waddell & Reed Inc.*, 2010 WL 3212136, at *3 (S.D. Cal. Aug. 12, 2010). Nor can the fact that Wallace Morgan (or Sprint) occasionally "audited" its agents to ensure they were complying with those directives represent control relevant to the independent contractor-employee

determination.  *Id.*; *Desimone v. Allstate Ins. Co.*, 2000 WL 1811385, at *13 (N.D. Cal. Nov. 7, 2000) (holding that mandatory meetings to ensure insurance sales agents complied with state and federal law did not make them employees under similar state law).[20]  This factor therefore weighs in favor of independent contractor status.

**Second, sales agents had opportunity for profit or loss**.  "This factor relates to whether Plaintiff[s] had a varying opportunity for profit (and risk of loss) in [their] work for [Wallace Morgan], and, relatedly, whether [they] made personal investments in that work, such as by incurring [their] own business expenses."  *Kinney*, 2015 WL 10714080, at *15.  Here, despite Plaintiffs' claim that agents invested in, at most, fold-out tables (Pls.' 56.1 ¶ 101), the record is clear that Wallace Morgan sales agents regularly undertook personal business expenses in the course of traveling to and testing new markets that might potentially hold a significant number of untapped qualifying customers.  Cr. 56.1 ¶ 118.  Indeed, Wallace Morgan sales agents, including Plaintiffs, paid for their own rental cars, hotels, and gas to fund these business trips in an attempt to increase their profits.  *Id.*  Plaintiffs also paid for their own transportation to the field within New York City.  *Id.* ¶ 117.  Accordingly, Plaintiffs' authority—in which the workers had "not [been] asked to invest in . . . their own jobs"—is readily distinguishable.  *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191 (S.D.N.Y. 2003); *see also Kinney*, 2015 WL 10714080, at *15 (noting that commission-based work weighs in favor of independent contractor classification unless the worker "puts *none* of his own money at risk") (emphasis added); *Thomas v. City of Hudson*, 1996 WL 280828, at *8 (N.D.N.Y. May 20, 1996) (holding plaintiffs did not

---

[20]  Plaintiffs' authorities regarding the importance of these compliance directives and oversight—none of which involved requirements ensuring compliance with the law—are therefore materially distinguishable and irrelevant here.  *See, e.g.*, *Schwind v. EW & Assocs.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) (employer communicated with plaintiff about the progress of his work at least a dozen times a day); *Hart*, 967 F. Supp. 2d at 916 ("[T]he vast majority of [defendant]'s Guidelines had nothing whatsoever to do with safety concerns or compliance with law.").

invest significantly where they were reimbursed for gas and travel expenses).

It is also undisputed that Plaintiffs and other Wallace Morgan sales agents "received commissions rather than a salary." *Kinney*, 2015 WL 10714080, at *5; Cr. 56.1 ¶ 172. This fact "tends to indicate" that they were independent contractors because their opportunity for profit rose and fell solely on their own initiative, work ethic, and skill. *Kinney*, 2015 WL 10714080, at *15; *see also* Cr. 56.1 ¶ 186 (Plaintiffs were motivated to increase their sales because they were paid on commission). For these reasons, this factor also favors a finding that Plaintiffs were independent contractors.

***Third***, ***Plaintiffs' work selling Assurance Wireless phones and services required independent initiative and skill.*** Plaintiffs' own testimony makes this clear. While it is true that Wallace Morgan did not require prior sales experience of its agents, the record is undisputed that Plaintiffs *did* have prior experience in sales. Cr. 56.1 ¶¶ 75, 158. As Plaintiff Singleton testified, however, her work selling Assurance Wireless phones and service required much more skill and independent initiative than her previous work in retail sales. *Id.* ¶ 159. As she explained it, in her work in prior positions she just "stood behind a register most of the day or just basically people came up to [her] and asked [her] questions," but with "her position at Wallace Morgan, [she] had to use [her] personality of not being shy and being personable to approach people." *Id.* ("[N]othing that I had before could prepare me for that; it just was in me already."). Other agents also testified that their work was not, as Plaintiffs' brief claims, "simple," Pls.' Br. at 9, but that it required skill and initiative that the "great performers" tried to teach to the "bad performers." *Id.* ¶ 161 (opt-in plaintiff testifying he helped to train many agents, including Plaintiffs, because he "was one of the best").

The fact that Plaintiffs' earnings depended on their own skill and independent initiative in

pitching to customers and closing sales is indicative of independent contractor status. *See Browning*, 885 F. Supp. 2d at 609.[21]

**Fourth**, *the permanence and duration of Plaintiffs' engagement was mutually determinable.* Contrary to Plaintiffs' contention that the Independent Sales Representative Agreement between Wallace Morgan and Plaintiffs demonstrates employee status because of the indefinite relationship, that agreement explicitly provided that it could be terminated by either party at any time without any damages or other compensation due. Cr. 56.1 ¶ 74. As courts have held in determining the independent contractor issue in other contexts, a "mutual termination provision," such as this one, "is consistent either with an employment-at-will relationship or parties in a continuing contractual relationship." *DeSimone*, 2000 WL 1811385, at *15 (citation omitted). This is especially true here, where Wallace Morgan also did not require Plaintiffs to commit exclusively to performing sales services for Wallace Morgan. Cr. 56.1 ¶ 73; *see also Kinney*, 2015 WL 10714080 at *16 (freedom to engage with others is a "related consideration" for the fourth factor); *DeSimone*, 2000 WL 18113855, at *15.[22]

### B. Plaintiffs Were Independent Contractors Under the NYLL

Plaintiffs were properly classified as independent contractors under the NYLL for similar reasons.

**First**, *Plaintiffs worked at their own convenience.* As detailed above (pp. 49), testimony and interrogatory responses from the sales agents subjected to discovery in this action make clear

---

[21] Plaintiffs' authority is inapposite. In two cases, the work at issue (driving a car) involved no specialized skill or training at all. *See Ansoumana*, 255 F. Supp. 2d at 191 & *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 326 (S.D.N.Y. 2001). In *Hart*, the Court relied on several other cases that had already held "hustling" by exotic dancers does not constitute skilled work. 967 F. Supp. 2d at 920. And, in *Brock v. Superior Care*, 840 F.2d 1054, 1060 (2d Cir. 1988), the court actually found this factor weighed in favor of independent contractor status.

[22] Credico does not dispute the fifth factor—that Plaintiffs performed services that are "integral" to Wallace Morgan's business as a sales and marketing company. But "this factor alone cannot 'alter the overall impression that [the putative workers] are economically independent.'" *Scruggs v. Skylink, Ltd.*, 2011 WL 6026152, at *8 (S.D. W. Va. Dec. 2, 2011) (internal quotation marks and citations omitted).

that Wallace Morgan did not impose a fixed schedule on its agents. Rather, Wallace Morgan provided a suggested schedule for those looking to achieve more sales (and thereby more commissions) and develop a sales team of their own. Cr. 56.1 ¶ 120-121 (opt-in plaintiff Fabian explained not adhering to the suggested schedule was "frowned upon" because it showed the agent "was not taking the program serious[ly]"). Agents were therefore free to work at their own convenience if they were not concerned with developing and training their own sales team. *Id.* ¶ 121; *see also id.* ¶ 124 (opt-in plaintiff testifying he stopped working as an agent in 2014 because in the winter months "[i]t was getting too cold" and then returned to work as an agent after a later interview), ¶ 123 (opt-in plaintiff testifying he did not work on days that he wanted to tend to other "personal matters"). This factor thus favors Credico.

*Second*, **Plaintiffs were free to engage in other employment**. Plaintiffs' Independent Sales Representative Agreement stated: ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████ Cr. 56.1 ¶ 73.

The fact that Plaintiffs chose not to work elsewhere is not particularly persuasive, particularly given that they only worked at Wallace Morgan for approximately five weeks. Indeed, at least one other sales agent did work another job while working at Wallace Morgan as a sales agent. *Id.* ¶ 125. This factor supports a finding that Plaintiffs were independent contractors.

*Third*, **it is undisputed that Plaintiffs did not receive fringe benefits**, which counsels in favor of independent contractor status. *Browning*, 885 F. Supp. 2d at 605.

*Fourth*, **Plaintiffs were paid as IRS Form 1099 contractors.**[23] New York courts find the

---

[23] As noted, *supra*, Wallace Morgan sales agents hired in or around (and after) October 2015 were classified as W-2 employees, exempt as outside salespersons.

treatment of the payment for tax purposes to be "a significant consideration" in this context. *Hernandez v. Chefs Diet Delivery, LLC*, 915 N.Y.S.2d 623, 626 (N.Y. App. Div. 2011); *Gagen v. Kipany Prods., Ltd.*, 27 A.D.3d 1042, 1043 (N.Y. App. Div. 2006); *Kinney*, 2015 WL 10714080 at *20. And here, agents were undisputedly paid as 1099 non-employees, they were compensated on a commission basis, and Wallace Morgan did not withhold taxes from these payments. "Thus, this factor weighs in favor of a finding that the Plaintiffs are independent contractors." *Browning*, 885 F. Supp. 2d at 605.

***Fifth, and finally, the evidence demonstrates that Wallace Morgan did not impose a "fixed schedule" upon its sales agents.*** *Supra* at 49.

\*     \*     \*

As set forth above, a review of the applicable factors—in light of the record in this case under the totality of the circumstances—reveals that Wallace Morgan sales agents were properly classified as independent contractors.[24]

## <u>CONCLUSION</u>

For the foregoing reasons, Credico respectfully requests that the Court enter summary judgment in its favor on each of the issues of joint employer status, the outside sales exemption, and independent contractor status, and deny Plaintiffs' Motion for Partial Summary Judgment.

---

[24] Certainly, at minimum, the undisputed facts make clear that Plaintiffs have not carried their burden of proving their employee status and that material fact disputes preclude an award of summary judgment in Plaintiffs' favor. *See, e.g.*, *Kinney*, 2015 WL 10714080, at *18-19 (denying plaintiff's motion for summary judgment where there were factual disputes regarding the nature of the parties' relationship as an employee or independent contractor).

Dated: May 12, 2017

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Jason C. Schwartz
    Jennifer H. Rearden
    Gabrielle Levin
    200 Park Avenue, 48th Floor
    New York, New York 10166
    Telephone: 212.351.3901
    Facsimile: 212.351.5301
    jrearden@gibsondunn.com
    glevin@gibsondunn.com

    Theodore J. Boutrous, Jr.
    (admitted *pro hac vice*)
    333 South Grand Avenue
    Los Angeles, CA 90071-3197
    Telephone: 213.229.7000
    Facsimile: 213.229.7520
    tboutrous@gibsondunn.com

    Jason C. Schwartz (admitted *pro hac vice*)
    Greta B. Williams (admitted *pro hac vice*)
    Ryan C. Stewart (admitted *pro hac vice*)
    1050 Connecticut Avenue, N.W.
    Washington, D.C. 20036-5306
    Telephone: 202.955.8500
    Facsimile: 202.467.0539
    jschwartz@gibsondunn.com
    gbwilliams@gibsondunn.com
    rstewart@gibsondunn.com

    *Attorneys for Defendant Credico (USA) LLC*