UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAIME MARTIN, and DANEISHA SINGLETON on
behalf of themselves and all others similarly situated, and
in Proposed New York Rule 23 Class,

                                 Plaintiff,

         -v-

SPRINT/UNITED MANAGEMENT COMPANY and
WALLACE MORGAN, INC.,

                        Defendants.

Index No. 15 CV 5237 (PAE/HBP)

**MEMORANDUM OF LAW**

VIA ECF

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WALLACE MORGAN'S**

**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT                                            1

II.   STATEMENT OF MATERIAL FACTS                                     2

      a.  The Parties                                                 2

      b.  Corporate Structure                                         3

      c.  The Lifeline Assistance Program                             4

      d.  Sprint                                                      5

      e.  Credico                                                     5

      f.  Wallace Morgan                                              6

      g.  Terms and Conditions                                        6

      h.  Method of Payment for Agents                                6

      i.  Equipment                                                   6

      j.  Agent Schedules and Meetings                                7

      k.  Termination                                                 7

      l.  Databases and Reporting                                     8

      m.  Reports                                                     8

      n.  Lifeline Regulations                                        9

III.  LAW AND ARGUMENT                                               10

      a.  Standard for Summary Judgment                              10

      b.  FLSA & NYLL                                                11

      c.  Analysis                                                    15

           i.   Plaintiffs were Properly Classified as Independent Contractors    15

           ii.  Plaintifs were Primarily Engaged to Make Sales or Obtain Orders or
                Contracts                                             23

           iii. Plaintiffs were Customarily and Regularly Engaged Away from
                Defendant's Place of Business                        32

IV.   CONCLUSION                                                     33

## TABLE OF AUTHORITIES

Page(s)

CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ......................................................................... 10

*Barfield v. N.Y. City Health and Hospitals Corp,*
537 F. 3d 132, 141-42 (2d Cir. 2008)......................................... 17

*Barnick v. Wyeth,*
522 F.Supp.2d 1257, 1264-65 (C.D. Cal. 2007) ........................ 29

*Brock v. Superior Care,*
840 F. 2d 1054, 1059 (2d Cir. 1988)............................... 13, 14, 26

*Brody v. AstraZeneca Pharmaceuticals, LP,*
2008 WL 6953957 (C.D. Cal. June 11, 2008).......................... 17

*Browning v. CEVA Freight, LLC,*
885 F. Supp. 2d 590, 599 (E.D.N.Y. 2012)................. 17, 18, 20, 21

*Chenensky v. New York Life Ins. Co.,*
2009 U.S. Dist. LEXIS 119549 (S.D.N.Y. Dec. 22, 2009)........... 11, 13, 14, 30, 31

*Christopher v. SmithKline Beecham Corp.,*
132 S.Ct. 2156 (2012) ............................................ 12, 13, 23, 26

*Dailey v. Just Energy Marketing Corp., et al.,*
Case No. 3:14-CV-02012 (N.D. Cal. July 23, 2015) ............... 28, 29

*DeSouza v. EGL Eagle Global Logistics LP.,*
596 F. Supp. 2d 456, 464 ((D. Conn. 2009) ............ 16, 19, 21, 22, 23

*Domenech v. Parts Authority, Inc.,*
2015 U.S. Dist. LEXIS 101214 (E.D.N.Y. Aug. 3, 2015) ......... 11, 32

*Falleson v. Paul T. Freund Corp.,*
2007 U.S. Dist. LEXIS 87473 (W.D.N.Y. Nov. 28, 2007)........... 14

*Flood v. Just Energy Mkt. Corp.,*
2017 WL 280820 (S.D.N.Y. Jan 20, 2017)............................ 13

*Godoy v. Rest. Opportunity Ctr. Of N.Y., Inc.,*
615 F. Supp. 2d 186, 192-193 (S.D.N.Y. 2009)..................... 16

*Gold v. New York Life Ins. Co.,*

730 F.3d 137 (2nd Cir. 2013) ............................................................................. 13, 14

*Hurt v. Commerce Energy,*
2013 U.S. Dist. LEXIS 116386 (N.D. Ohio Aug. 15, 2013) ............................ 14, 24

*Icicle Seafoods v. Worthington*,
475 U.S. 709,714 (1986) .................................................................................. 11, 14

*Kinney v. Artist & Brand Agency, LLC,*
2015 U.S. Dist. LEXIS 160465 (S.D.N.Y. Nov. 24, 2015) .................................... 27

*Matter of Hertz Corp,*
2 N.Y.3d at 734, 778 N.Y.S. 2d 743, 811 N.E. 2d 5 ............................................. 18

*Marcus v. AXA Advisors, LLC,*
307 F.R.D. 83 (E.D.N.Y. 2015) ........................................................ 11, 14, 21, 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) .............................................................................................. 11

*Ramos v. Baldor Specialty Foods, Inc.,*
687 F.3d 554, 558 (2d Cir. 2012) .......................................................................... 14

*Reiseck v. Universal Commc'ns of Miami, Inc.,*
591 F.3d 101,  104 (2d Cir. 2010) ......................................................................... 12

*Rutherford Food Corp. v. McComb.,*
331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947) ................................... 16

*Saleem v. Corp. Transp. Group, Ltd..*
2017 U.S. App. Lexis 6305 .............................................................................. 11, 17

*Scott v. Harris,*
550 U.S. 372 (2007) .............................................................................................. 11

*Slow v. Prestige Merchandising Co., Inc.,*
2011 U.S. Dist. LEXIS 105517 (E.D.N.Y. Sept. 19, 2011) ................................... 27

*United States v. Silk.,*
331 U.S. 704, 716, 67 S. Ct. 1463, 91 L. Ed. 1757, 1947-2 C.B. 167 (1947) ........ 16

*Velu v. Velocity Exp., Inc.,*
66 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) ............................................................. 21

*Vinole v. Countrywide Home Loans, Inc.,*
246 F.R.D. 637 (S.D. Cal. 2007) affirmed, 571 F.3d 935 (9th Cir. 2009) ............ 28

*Young v. Cooper Cameron Corp.,*

86 F.3d 201, 204 (2d Cir. 2009) ................................................................................. 13

**STATUTES**

29 U.S.C. §203(k) .................................................................................................. 13, 23

29 U.S.C. §206-207 .................................................................................................... 12

29 U.S.C. §207(a)(2) ............................................................................................. 10, 14

29 U.S.C. §213(a)(1) .................................................................................................. 13

47 C.F.R. § 54.410(a) ................................................................................................. 10

47 C.F.R. § 54.410(d)(1) ............................................................................................ 10

47 C.F.R. § 54.416(a)&(b) ......................................................................................... 26

47 C.F.R. § 54.422(a) ................................................................................................. 26

**OTHER AUTHORITIES**

29 C.F.R. §§541.500(a)(1)-(2) .............................................................................. 13, 15

29 C.F.R. §§541.500(a)(1)-(2); 541.501(a) .............................................................. 15

29 C.F.R. §541.501(b) and (c) .............................................................................. 11, 23

29 C.F.R. §541.502 ............................................................................................... 11, 32

12 NYCRR §§142-2.2, 142-2.14(c)(5) .................................................................. 13, 14

Fed. R. Civ. P. 56(c) .................................................................................................... 9

Local Rule 56.1 ............................................................................................................ 2

## I.    PRELIMINARY STATEMENT

The Court should grant summary judgment to Defendant WALLACE MORGAN, Inc. ("WM") because the undisputed material facts establish that Plaintiffs, who went into the field territories to obtain new customer contracts for Defendants, worked as outside salespersons and, therefore, were exempt from the minimum wage and overtime requirements of the Fair Labor Standards Act (FLSA) and New York Labor Law (NYLL).

Plaintiffs admit that their positions entailed going into field territories to sell to customers who qualified under the Lifeline Program, which is the Federal Communication Commission's ("FCC") program to help make communications services more affordable for low-income consumers. Currently, Lifeline provides subscribers a discount on monthly telephone service purchased from participating providers in the marketplace.

To be a provider of products and/or services for the Lifeline Assistance Program (the "Lifeline Program"), the provider must satisfy various state and federal regulations and guidelines. Plaintiffs were responsible for obtaining new customer contracts from prospective customers, and they were paid a commission for every successful contract submitted. Plaintiffs' own description of their job duties falls squarely within the plain language of the statute and regulations defining exempt "outside sales" work.

Plaintiffs attempt to avoid the exemption by asserting that they do not perform "sales" within the meaning of the FLSA and the NYLL. Like virtually any sale, Lifeline sales were subject to cancellation for a variety of reasons in the ordinary course, which include but are not limited to: fraud, false addresses, more than one Lifeline phone per household, lack of low-income status, among others. Moreover, Plaintiffs cannot identify any instances in which Defendants arbitrarily rejected contracts.

1

As further detailed below, Plaintiffs' position is misguided. Plaintiffs strain to fit the relevant facts into an argument, which attempts to defeat the outside sales exemption. They focus on the independent contractor/employee dichotomy, as well as alleging that Plaintiffs do not perform "sales" within the meaning of the FLSA and the NYLL, in an attempt to avoid the substantive issue controlling the case at bar – that is, that Plaintiffs are the very type of individuals for whom the FLSA "outside sales" exemption was created. The exemption was created for those who spend the majority of their time in the field attempting to solicit new customers and obtain orders, which would result in new contracts. Thus, Plaintiffs were "primarily engaged in making sales or obtaining contracts." Based on the record as a whole, no other conclusion can be drawn.

## II.    STATEMENT OF MATERIAL FACTS

### a.    The Parties

Plaintiff JAMIE MARTIN ("MARTIN") is an adult individual who is a resident of New York. (Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF"), ECF No. 56-1and reattached hereto as Ex. A at ¶1. Plaintiff MARTIN held the title of "account executive" from approximately March 29, 2015 through mid-April 2015, and "corporate trainer" from approximately mid-April 2015 through May 7, 2015 (SUMF at ¶2).

Plaintiff Daneisha SINGLETON ("SINGLETON") is an adult individual who is a resident of New York (SUMF at ¶3). Plaintiff SINGLETON held the title of "account executive" from approximately April 3, 2015 through mid-April 2015, and as a "corporate trainer" from approximately mid-April 2015 through May 7, 2015 (SUMF at ¶4).

Defendant SPRINT/UNITED MANAGEMENT COMPANY ("SPRINT") is a subsidiary of Sprint Communications, Inc. SPRINT is a telecommunications company that provides, among other services, digital and wireless services to customers throughout the

2

United States. SPRINT acquired the Assurance Wireless brand when Virgin Mobile USA, L.P. became its wholly owned indirect subsidiary in 2009. SPRINT does business in New York and this District (SUMF at ¶¶5-8).

CREDICO (USA) LLC ("CREDICO") is a Delaware limited liability company. CREDICO is headquartered in Chicago, Illinois (SUMF at ¶¶9-10).

WALLACE MORGAN, Inc. ("WALLACE MORGAN") is a domestic corporation, with its headquarters in New York, New York. WALLACE MORGAN operates in interstate commerce, including in New York (SUMF at ¶¶12-13).

### b. Corporate Structure

CREDICO contracts with third parties ("subcontractors"). WALLACE MORGAN is one of the third parties with which CREDICO contracts. These subcontractors recruit and engage individuals ("Field Agents" or "Agents") (SUMF at ¶¶15-17).

During the applicable statutory period, CREDICO has had the following internal departments: finance/accounting; operations; sales; legal; and client relations. During the applicable statutory period, Jean Broaddus acted as CREDICO's Director of Client Relations within CREDICO's client services department, which encompasses account management and onboarding. (See BROADDUS depo., page 14 lines 5-7) (SUMF ¶¶18-19).

Ms. Broaddus oversees the "Team Lead/Senior Account Manager." The Team Lead/Senior Account Manager is also responsible for handling client concerns. Account Managers report to the Team Lead/Senior Account Manager. Account Managers are the main point of contact for CREDICO's clients on a campaign and the ISO owners on that campaign. At all relevant times, CREDICO assigned at least one Account Manager to SPRINT (SUMF ¶¶20-24).

During the applicable statutory period, the following CREDICO employees were Account Managers for Assurance Wireless and WALLACE MORGAN: Brazley Barnes, Stefan Mainhart, and Ilina Kravtchenko (SUMF ¶25).

CREDICO works with outside "Consultants," who are current or former ISO owners. Consultants work with ISO Owners. A "promoting owner," is an owner of an ISO who refers to CREDICO a new ISO owned by one of the promoting owner's former field agents.  To be an ISO owner, with whom CREDICO will contract, an individual must incorporate their own company and enter into an agreement with CREDICO (SUMF ¶¶26-29).

Thomas Smith has been an ISO owner, a "promoting owner," and Consultant. Thomas Smith is the president and owner of WALLACE MORGAN.  WALLACE MORGAN recruits and engages two categories of workers: "Field Agents" and office staff.  Office staff includes Human Resources employees and assistant managers who spend their workday managing the day-to-day operations of WALLACE MORGAN, including interviewing potential Field Agents (SUMF ¶¶30-33).

### c.   The Lifeline Assistance Program

To be a provider of products and/or services for the Lifeline Assistance Program(the "Lifeline Program"), the provider must satisfy various state and federal regulations and guidelines.  Subscribers who receive subsidies or services under the Lifeline Program must satisfy certain objective eligibility requirements, which currently include reviewing whether income is below certain established guidelines; evidence of the potential subscriber's participations in one of several qualifying government programs; the potential subscriber's certification that the maximum of one Lifeline Program enrolled mobile phone per household is not exceeded; and completion of specific identification and documentation provided by the potential subscriber (SUMF at ¶¶34-35).

4

### d. SPRINT, The Lifeline Assistance Program, Outreach Agencies and CREDICO

SPRINT acquired the Assurance Wireless brand as part of its acquisition of Virgin Mobile in 2009.  Since the acquisition, SPRINT has offered products and/or services for the Lifeline Program through the Assurance Wireless Brand.  The National Lifeline Accountability Database ("NLAD"), which is authorized by the FCC and maintained by USAC, flags duplicate applications to ensure that no qualified applicant receives more than one Lifeline Program benefit, either through the same provider or through multiple providers.  SPRINT provides a copy of the Standard Operating Procedures ("SOPs") to Outreach Agencies ("OAs") as an attachment to the Outreach Agreement. Agents must also acknowledge compliance with the federal guidelines governing the Lifeline Program and the SOPs (SUMF ¶¶36-40).

SPRINT and CREDICO entered into an Amended and Restated Outreach Agency Agreement (the "Outreach Agreement"), dated September 1, 2013, a true and correct copy of which has been produced at SPRMAR-000001-21 (SUMF at ¶41).

### e. CREDICO Sub-Contracts with WALLACE MORGAN

CREDICO contracts with over 200 ISOs across the country. WALLACE MORGAN had an office located at 40 Exchange Place, Suite 600 in New York. CREDICO signed a Subcontractor Agreement with WALLACE MORGAN on October 17, 2014, a true and correct copy of which has been produced as WM000033-42. The Subcontractor Agreement between CREDICO and WALLACE MORGAN provides that WALLACE MORGAN shall comply "with all applicable federal, state, county, and local laws, ordinances, regulations, and codes" in performing under the Agreement (SUMF at ¶¶42-45).

5

> **f.  Agent Engagement by WALLACE MORGAN for CREDICO's Client Campaigns**

WALLACE MORGAN interviewed applicants for positions as agents. WALLACE MORGAN representatives conducted Plaintiffs' interviews and decided which agents to work with. Some agents working for WALLACE MORGAN signed an Independent Sales Representative Agreement (SUMF at ¶¶46-48).

> **g.  Terms and Conditions of Agents' Work at WALLACE MORGAN**

Plaintiff MARTIN accepted an offer for a position as an account executive, and signed an Independent Sales Representative Agreement.  Plaintiff SINGLETON accepted an offer for a position as an account executive, and signed an Independent Sales Representative Agreement. Plaintiffs' Independent Sales Representative agreements state that Plaintiffs may provide similar or other services to companies also engaged in direct sales and marketing, provided that such activity did not interfere with the completion of an ongoing project for WALLACE MORGAN. *See* WM000117 (SUMF ¶¶49-51).

As agents working on the Assurance Wireless campaign, Plaintiffs understood their job duty to be collecting applications from potentially qualified individuals who wanted to enroll in the Lifeline Assistance Program through Assurance. WALLACE MORGAN offered training to agents.  Plaintiffs were promoted from account executives to corporate trainers (SUMF ¶¶52-54).

> **h.  Method of Payment for Agents**

Plaintiffs received their IRS Form 1099s from WALLACE MORGAN. WALLACE MORGAN paid Plaintiffs as 1099 contractors (SUMF ¶¶55-56).

> **i.  Equipment for Use in the Field**

CREDICO provided WALLACE MORGAN with tablets for use on the Assurance Wireless campaign to provide to agents.  Plaintiffs picked up a tablet from the WALLACE

MORGAN office each day that they worked on the Assurance Wireless campaign. Plaintiffs used the tablets they were provided with in the field. The tablets contained the Lifeline application that potentially qualified applicants needed to complete to submit an application (SUMF ¶¶57-60).

Agents submitted Lifeline program applications directly to Solix, a third-party vendor. Solix is not a CREDICO-contracted vendor. Agents picked up the tablets from, and returned them to WALLACE MORGAN's office. SPRINT did not issue or assign any tablets. SPRINT provides certain marketing materials about the Lifeline Program to CREDICO to provide to WALLACE MORGAN. WALLACE MORGAN agents may use the marketing materials that SPRINT makes available to CREDICO (SUMF ¶¶60-65).

### j.   Agent Schedules and Meetings

WALLACE MORGAN provided its field agents with a suggested daily schedule. WALLACE MORGAN offered "atmosphere" meetings at its office.  Atmosphere Meetings could be held in the morning and/or at night.  WALLACE MORGAN agents reported to WALLACE MORGAN the number of Lifeline Program applications they obtained each day. Plaintiffs reported their completed, submitted application numbers upon return to the WALLACE MORGAN office.  Plaintiffs would return the tablet they used that day to the WALLACE MORGAN office (SUMF ¶¶66-71).

### k.   Termination

WALLACE MORGAN terminated Plaintiffs MARTIN and SINGLETON.  SPRINT had authority to require that an agent who was suspected of engaging in fraud or failing to abide by the SOPs no longer work on the Assurance Wireless campaign.  CREDICO had authority to require that an agent who was suspected of engaging in fraud or failing to abide by SOPs

7

attached to the Outreach Agreement no longer work on the Assurance Wireless campaign (SUMF ¶¶72-74).

**l.    Data Bases and Reporting - ARC**

In connection with the Assurance Wireless campaign, CREDICO uses a system it refers to as "ARC." An "Active Rep List" can be generated from CREDICO's ARC system. An "Active Rep List" lists all Field Agents who are listed as "active," which means CREDICO has not received information from the ISO that these agents are no longer working on a campaign (SUMF ¶¶75-77).

**m.   Reports**

Commission Reports are created in Excel spreadsheet format. Commission Reports reflect all applications that were collected from the previous week and/or month by the ISOs and their Field Agents. Each Commission Report includes the following information (SUMF ¶¶78-80):

| Agent ID | Agency | Customer | First Name | Last Name | State | App ID | App |
|----------|--------|----------|------------|-----------|-------|--------|-----|
| CRE0101 | CREDICO | 148932638 | [Redacted] | [Redacted] | NY | 177667458 | 6/17/13 |
| CRE0101 | CREDICO | 148932930 | [Redacted] | [Redacted] | NY | 177667776 | 6/17/13 |
| CRE0101 | CREDICO | 148933551 | [Redacted] | [Redacted] | NY | 177668439 | 6/17/13 |
| CRE0101 | CREDICO | 148934315 | [Redacted] | [Redacted] | NY | 177669243 | 6/17/13 |

| App | Dec. | Denia | Address | Decision | Removed/Canceled | PC | DNP | Approved | Denied |
|-----|------|-------|---------|----------|------------------|-----|-----|----------|--------|
| 12:53:3 | 6/17/13 | | | X | | 6/17/13 | | | |

| | | | | | | | | | |
|-----|------|-------|---------|----------|------------------|-----|-----|----------|--------|
| 1:06:04 PM | 6/17/13 | | | X | | 6/17/13 | | | |
| 1:33:20 PM | 6/17/13 | | | X | | 6/17/13 | | | |

CREDICO prepares Office Payment Summary reports for WALLACE MORGAN through the ARC system. The first page of an Office Payment Summary provides the total

amount the ISO received based on the number of approved applications its Field Agents collected. The subsequent pages of an Office Payment Summary set forth an itemized breakdown of the following information for each Field Agent: (1) Badge Number; (2) Agent Name; (3) Agent Commissions, which lists "full pay," "advance," "remain," "recover," and "total"; (4) Owner Commissions, which lists "full pay," "advance," "remain," "recover." A true and correct example of an Office Payment Summary has been produced as WM000828-831 (SUMF ¶¶81-84).

ARC can generate Agent Commission Statements that contain the following information: (1) Agent Name; (2) Grand Total of compensation; (3) Current Sales Week; and (4) Pay Date. The Agent Commission Statements further provide the following information: (1) Client ID code; (2) Signed Date; (3) Customer Name; (4) Client Status/Reason; (5) Product; (6) Pay Action; (7) Amount; and (8) Total for Field Agent. A true and correct example of an Agent Commission Statement has been produced to Plaintiffs' Counsel as CREDICO_MAR00006658, an excerpt of which is below (SUMF ¶¶85-87):

**Agent Commission Statement**

Valeria Arnaudo            Wallace Morgan

| | | | | | | |
|---|---|---|---|---|---|---|
| Grand Total: | 20.00 | | 1150 6Th Ave., 5Th Floor, New York NY 10036 | | | |
| Current Sales Week: | Nov 30 - Dec 6 2014 | | | | | |
| Pay Date: | Dec 11, 2014 | | | | | |

Printed   12/8/2014                                             Page 1 of 1

**Assurance Wireless**                 Badge Number PCRE3005

| Client ID | Signed Date | Customer Name | Client Status/Reason | Product | Pay Action | Amount |
|---|---|---|---|---|---|---|
| **Previous Week** | | | | | | |
| 192069724 | 10/9/2014 | Patricia Maxwell | APPROVED | CELL | Full Payment | 10.00 |
| 192397266 | 10/13/2014 | Denise Walker | APPROVED | CELL | Full Payment | 10.00 |
| **Total for Assurance Wireless** | | | | | | **20.00** |
| | | Total For | Valeria Arnaudo | | | 20.00 |

### n. Lifeline Regulations

The ISO implements certification policies and procedures that enable consumers to demonstrate their eligibility for Lifeline assistance the Sales Agents as detailed in the 2012

Lifeline Reform Order, together with any additional state certification requirements.[1]  The National Lifeline Accountability Database ("NLAD"), which is authorized by the FCC and maintained by USAC, flags duplicate applications to ensure that no qualified applicant receives more than one Lifeline Program benefit, either through the same provider or through multiple providers.

Customers who enroll based on income eligibility do so through the electronic enrollment application.

The application and certification forms include the following disclosures: (1) Lifeline is a federal benefit and willfully making false statements to obtain the benefit can result in fines, imprisonment, de-enrollment or being barred from the program; (2) only one Lifeline service is available per household; (3) a household is defined, for purposes of the Lifeline program, as any individual or group of individuals who live together at the same address and share income and expenses; (4) a household is not permitted to receive Lifeline benefits from multiple providers; (5) violation of the one-per-household limitation constitutes a violation of the Commission's rules and will result in the applicant's de-enrollment from the program; and (6) Lifeline is a non-transferable benefit and the applicant may not transfer his or her benefit to any other person.[2]

### III. LAW AND ARGUMENT

#### a.      Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). After the movant has made the

---

[1] 2012 Lifeline Reform Order ¶ 61; 47 C.F.R. § 54.410(a).

[2] *See id.* ¶ 121; 47 C.F.R. § 54.410(d)(1).

initial showing that there is no genuine issue of material fact, the non-movant cannot rely on a mere scintilla of evidence, but must set forth "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis in original). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Applying this standard, there are no genuine of issues of fact requiring trial. Indeed, in cases such as the present one, where the question of how Plaintiff spent his time working is not disputed, whether those activities exempt him from the FLSA is a question of law – ideally suited for summary judgment. *Chenensky v. New York Life Ins. Co.,* 2009 U.S. Dist. LEXIS 119549, \*12 (S.D.N.Y. Dec. 22, 2009) (*citing Icicle Seafoods v. Worthington*, 475 U.S. 709,714 (1986).

As presented below, Defendant WALLACE MORGAN, Inc. is entitled to summary judgment as to all claims asserted by Plaintiff because no reasonable jury could possibly differ as to how Plaintiffs' function as independent contractors  – going territory to territory persuading potential customers to consummate a transaction to receive a Lifeline handset and associated service.   Such activities, by the plain language of the Act and interpreting regulations, conclusively establish that Plaintiffs were primarily engaged away from Defendant's place of business to make sales and obtain contracts, thereby qualifying them for the outside sales exemptions contained in the FLSA and NYLL.

**b.     Law: FLSA & NYLL**

In Saleem v. Corp. Transp. Group, Ltd., 2017 U.S. App. Lexis 6305, \*11-12 (2d Cir. 2017) the Court provided an analysis and discussion as to the methodology to engage in to determine if an individual is an "employee".  The court explained:

"[The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. section 203 (e) (1). "An entity 'employs' an individual under the FLSA" if it "suffer[s} or permit[s] that individual to work." *Zheng v. Liberty Apparel Co.*, 355 F..3d 61,66 (2d Cir. 2003) (alterations in original) (quoting 29 U.S.C. section 203 (g) ); see also 29 U.S.C. section 203 (d) (defining "employer" as "any person acting directly or indirectly in the interest of any employer in relation to an employee"). In light of the definition's circularity, courts have endeavored to distinguish between employees and independent contractors based upon factors crafted to shed light on the underlying economic reality of the relationship. As the district court recognized, this Court has focused on "the totality of the circumstances" in addressing our "ultimate concern…whether, as a matter of economic reality, the workers depend upon someone else's business for opportunity to render service or are in business for themselves." Superior Care, 849 F.2d at 1059; see also *Goldberg v. Whitaker House Coop, Inc*., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d. 100 (1961) ("[E]conomic reality rather than 'technical concepts' is to be the test of employment."

The court in Marcus v. AXA Advisors, LLC., 307 F.R.D. 83, 92 (E.D.N.Y. 2015)

summarized the independent contractor exemption from New York labor laws as follows:

"[I]n New York, to determine whether an individual is an independent contractor or employee, courts examine the degree of control exercised by the purported employer. See *Matter of O'Brien v. Spitzer*, 7 N.Y. 3d 239, 242, 851 N.E.2d, 1195, 818 N.Y.S.2d 844 (N.Y. 2006) ("an employee is someone who works for another subject to substantial control…[;] a person who works for another subject to less extensive control is an independent contractor."). The factors relevant to assessing control include "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll[,] and (5) was on a fixed schedule…" *Velu v. Velocity Exp., Inc*., 666. F.Supp. 2d 300, 307 (E.D.N.Y. 2009)(citing *Bynog v. Ciriani Group. Inc.*, 1 N.Y.3d 193, 198, 802 N.E. 2d 1090, 770 N.Y.S.2d 692 (N.Y. 2003). These five factors, however, are not exhaustive. *Hart v. Rick's Cabaret Int.'l, Inc.*, 967 F. Supp 2d 901.923 (S.D.N.Y. 2013) (citing cases). Courts also consider the employer's control and supervision of the putative employee. See *In re Hertz Corp*., 2 N.Y.3d 733, 735, 811 N.E.2d 5, 778 N.Y.S.2d 743 (N.Y. 2004) ("An employer-employee relationship exists when the evidence demonstrates that the employer exercises control over the results produced by claimant or the means used to achieve the results.")."

The FLSA imposes minimum-wage and maximum-hour requirements on employers. 29 U.S.C. §§ 206-207. Those requirements, however, do not apply to workers employed "in the capacity of outside salesm[e]n." *Id.* § 213(a)(1); *see also Christopher v. SmithKline Beecham Corp.,* 132 S. Ct. 2156, 2161 (2012). "Because the FLSA is a remedial law, [courts] must narrowly construe its exemptions." *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir. 2010) (footnote omitted). Moreover, an employer bears the burden of establishing

that an exemption applies. *See Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir. 2009).

An "outside salesman" is an employee "(1) [w]hose primary duty is: (i) making sales . . .; or (ii) obtaining orders or contracts for services or for the use of facilities," and "(2) [w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a) (defining "outside salesman" as authorized by the FLSA exemption provision, 29 U.S.C. § 213(a)(1)); *see also* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (noting that the NYLL's overtime provision is subject to the FLSA exemptions); *Gold v. N.Y. Life Ins. Co.,* 730 F.3d 137, 140, 145 (2d Cir. 2013) (same).

A sale "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). The U.S. Supreme Court has explained that "other disposition" must be interpreted to mean "those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity."[4] *Christopher,* 132 S. Ct. at 2171-72.

Courts also consider whether the employee bears indicia of an outside salesperson. Such indicia, or "hallmark activities," include "(1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Chenensky v. N.Y. Life Ins. Co.,* No. 07 Civ. 11504, 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009) (citing 29 C.F.R. § 541.700).

Plaintiffs point to a recent decision from this Court in *Flood v. Just Energy Mkt. Corp.*, 2017 WL 280820 (S.D.N.Y. Jan 20, 2017).  Therein, a case was cited from the Northern District of Ohio involving Just Energy subsidiaries that examined factors such as "whether the employees: (1) receive commission compensation; (2) receive specialized sales training; (3) must

13

solicit new business; (4) were hired for their sales experience; and (5) were directly supervised." *Hurt v. Commerce Energy, Inc.,* No. 12 Civ. 758, 2013 WL 4427257, at *5 (N.D. Ohio Aug. 15, 2013) (footnotes omitted).

In all cases, it is clear that "[t]he question of how the [employees] spent their working time . . . is a question of fact. However, the question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir. 2012) (alterations in original) (quoting *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986)).

Thus, to establish a claim under the FLSA and NYLL, and survive summary judgment, Plaintiffs must prove that: (1) they were employees eligible for overtime and, therefore, not exempt from the law's minimum wage and overtime requirements, and (2) that they worked overtime for which they were not compensated. *See* 29 U.S.C. §207(a)(2); *Falleson v. Paul T. Freund Corp.,* 2007 U.S. Dist. LEXIS 87473 (W.D.N.Y. Nov. 28, 2007).

The exemption, as embodied in the New York statute, does not meaningfully differ from the federal standard.  It is well-settled that New York's exemption is defined and applied in the same manner as the FLSA. 12 NYCRR §§142-2.2, 142-2.14(c)(5); *Gold v. New York Life Ins. Co.,* 730 F.3d 137, 145 (2nd Cir. 2013); *Marcus v. AXA Advisors, LLC,* 307 F.R.D. 83, *94 (E.D.N.Y. 2015); *Chenensky,* 2009 U.S. Dist. LEXIS 119549, *13.

A threshold issue for consideration is whether the plaintiffs were properly classified as independent contractors by the defendant WALLACE MORGAN.  A secondary issue in this matter is the application of the outside sales exemption in the event that Plaintiffs are determined to be employees of Defendant WALLACE MORGAN Inc.

The exemption provides that an exempt "outside salesman" is any employee whose primary duty is (1) "making sales" within the meaning of section 3(k) of the FLSA or "obtaining

14

orders for contracts or services" and (2) who is customarily and regularly engaged away from the employer's place of business in performing his primary duty. 29 C.F.R. §§541.500(a)(1)-(2); 541.501(a).

        **c.**    **Analysis**

                i.   <u>Plaintiffs Were Properly Classified as Independent Contractors who are Not Subject to the Minimum Wage and Overtime Requirements of the FLSA and NYLL.</u>

The economic realities and minimal degree of control surrounding the Plaintiffs, MARTIN'S and SINGLETON'S engagement with Defendant, WALLACE MORGAN were such that they operated as independent contractors and not employees of the Defendant. First and foremost, the parties entered into an Independent Sales Representative Agreement. (SUMF at ¶¶46-48). That agreement afforded the Plaintiffs the latitude and opportunity to provide similar or other services to companies also engaged in direct sales and marketing, so long as such activity did not interfere with the completion of an ongoing project for WALLACE MORGAN. (SUMF at ¶51; Also *See* WM000117"). Territories would be designated by Defendant, WALLACE MORGAN to enable the Plaintiffs as "Independent Sales Representatives" to achieve success in their marketing activities. The Sales Representatives were free to move around the territory and that was solely up to the field agent's discretion. See, SINGLETON depo., Page 230, lines 21-25; page 231, lines 2-18. The duties of the Sales Representatives were far from onerous and afforded wide latitude to the Plaintiffs in how they would carry out their sales and marketing activities. For example, there were no prohibited or proscribed breaks, activities such as going to lunch were also discretionary. In describing her activities while in the field, the Plaintiff, SINGLETON repeatedly used the words "at my discretion" and "optional". (See SINGLETON depo., page 239, lines 8-25; page 240, lines 2-12).

The subject agreement as signed by the Plaintiffs unequivocally stated that, "The parties expressly intend and agree that  Representative  (Plaintiffs, MARTIN and SINGELTON) is performing all services hereunder as an independent contractor.  Nothing herein shall create nor be deemed to create any association, partnership, joint venture or relationship or employer and employee between the parties hereto.  Further, Representative agrees that it will not hold itself out as an employee, affiliate, partner, joint-venture, co-principal, or co-employer with Corporation or any of its affiliates."  Finally, the "Independent Sales Representative Agreement" was an at-will agreement, freely terminable by either party without any penalty.   Contractual language "fixing the relationship between [the Plaintiff and the Defendant], although not dispositive, provides strong evidence of the parties' intentions."  DeSouza v. EGL Eagle Global Logistics LP, 596 F. Supp. 2d 456, 464 ((D. Conn. 2009).

Defendant acknowledges that "[W]hile contracts manifest the parties' intent, they do not necessarily reflect economic realities.  Thus, in order to distinguish employees from independent contractors, federal courts generally apply a five-part test drawn from United States v. Silk, 331 U.S. 704, 716, 67 S. Ct. 1463, 91 L. Ed. 1757, 1947-2 C.B. 167 (1947).  In particular, courts consider:

 (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the performance or duration of the working relationship, and  (5) the extent to which the work is an integral part of the employer's business.  Godoy v. Rest. Opportunity Ctr. Of N.Y., Inc., 615 F. Supp. 2d 186, 192-193 (S.D.N.Y. 2009).

These factors are not exhaustive, and courts are cautioned to keep in mind the totality of the circumstances surrounding the economic reality,  See Rutherford Food Corp. v. McComb,

331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947); Brock v. Superior Care, 840 F. 2d

1054, 1059 (2d Cir. 1988) (rejecting mechanical application of the test); see also Barfield v. N.Y.

City Health and Hospitals Corp., 537 F. 3d 132, 141-42 (2d Cir. 2008) ("[T]he various factors

relied upon by this court… state  no rigid rule for the identification of an FLSA employer.  To

the contrary…they provide a nonexclusive and overlapping set of factors to ensure that the

economic realities test mandated by the Supreme Court is sufficiently comprehensive and

flexible to give proper effect to the broad language of the FLSA." (internal citations omitted).

See, Browning v. CEVA Freight, LLC., 885 F. Supp. 2d 590, 599 (E.D.N.Y. 2012).

Turning first to the degree of control exercised by Defendant, WALLACE MORGAN

over the Plaintiffs, there was not sufficient control to establish an employer-employee

relationship. Plaintiff, SINGLETON confirmed that she could work less than five days a week if

she had proper cause.  SINGLETON depo., page 78, lines 11-13.  As stipulated by the parties,

WALLACE MORGAN provided its field agents with a suggested daily schedule ((SUMF at

¶66) and WALLACE MORGAN offered "atmosphere" meetings at its offices which could be

held in the morning and/or at night.  ((SUMF at ¶66, 67).  The lack of a fixed or mandated daily

schedule is a factor to be considered in concluding that the Plaintiffs were acting as independent

contractors.

"[T]he ability to choose how much to work also weighs in favor of independent
contractor status.  See *Herman*, 161 F.3d at 304; *Arena v. Plandome Taxi, Inc.*, No. 12 CV 1078
(DRH)(WDW), 2014 U.S. Dist. LEXIS 51967, 2014 WL 1427907, at *5 (S.D.N.Y. Apr. 14,
2014)(noting fact that  transportation company "dictated the hours the drivers worked" supported
employee status);   *Arena v. Delux Transp. Servs.*, Inc., 3 F. Supp. 3d 1, 10 (E.D.N.Y. 2014)
(noting fact  "that Defendants had little control over when Plaintiff drove, how much he drove or
how frequently" "very persuasive[ly] supported independent contractor status.); cf.   *Berger
Transfer & Storage*, 85 F. 3d at 1378 (affirming finding of independent contractor status based in
part on "considerable autonomy regarding when and how long they would work" under common
law agency test).  Here, Plaintiffs' schedules were not merely "relatively flexible," *Doty v. Elias*,
733 F.2d 729, 723 (10th Cir. 1984) (emphasis added), but rather were entirely of their making.
    Saleem v. Corp. Transp. Group, Ltd., 2017 U.S. App. Lexis 6305, *24.

The Defendant similarly did not exercise control over whether the Plaintiffs would be required to attend daily sales meetings. These meetings are also referred to as "atmosphere meetings". Rather, they are available to field agents who may want additional sales training and tips on how to be more productive in the field. (See SINGLETON depo., page 219, lines 2-23; page 220, lines 6-16 (confirming there were field agents who bypassed the atmosphere meetings and went straight into the field)). The atmosphere meetings did not start at a fixed time and varied based upon the number of people that arrived. (See, SINGLETON depo., page 202, lines 20-24. Plaintiff, SINGLETON confirmed that she did not have a fixed time to return to the office, and additional "Bell and Gong" meetings in the evening did not occur at fixed times.) (See SINGLETON depo., page 231, lines 19-2; page 232, lines 2-18.) Even where attendance at meetings on a periodic basis is required, this would not weigh against a finding of independent contractor status as a matter of law. See, Browning v. CEVA Freight, LLC., 885 F. Supp. 2d 590, 607 (E.D.N.Y. 20120 in which the District Court stated,

"[A]s for the final pieces of evidence – namely that the Plaintiffs were required to wear uniforms; put logos on their vehicles; remain in frequent contact with the Defendants; and attend monthly meetings – these are not dispositive and do not weigh against a finding of independent contractor status as a matter of law. See DeSouza, 596 F. Supp. 2d at 464 ("Some of the above-mentioned impositions mentioned by the Plaintiff, such as wearing a uniform, having a logo on his truck, or providing paperwork to the Defendant, were ancillary to his independent driving, and the imposition of timetables and schedules does not strip an independent contractor of his status."); In re Empire State Towing and Recovery Ass'n, 15 N.Y.3d 433, 938 N.E. 2d 984, 912 N.Y.S. 2d 551 (2010) ("Moreover, the fact that O'Connell had to submit periodic reports and attend meetings 'is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either" (quoting Matter of Hertz Corp., 2 N.Y.3d at 734, 778 N.Y.S. 2d 743, 811 N.E. 2d 5) ).

In addition, the Plaintiff, SINGLETON, confirmed that she carried out sales activities with different field agents, and that she operated autonomously in the field. (See SINGLETON depo., page 211, lines 21-25; page 212, lines 2, 7-13). As an account executive, Plaintiff,

SINGLETON confirmed she did not need to report to any supervisors.   (See SINGLETON depo., page 213, lines 8-13).

The requirements that field agents (such as the Plaintiffs in this case) acknowledge compliance with the federal guidelines governing the Lifeline Program and SPRINT's Standard Operating Procedures ((SUMF at ¶40), as well as offering training to field agents ((SUMF at ¶53) and field agents reporting the number of Lifeline Program Applications they obtain ((SUMF at ¶69, 70), are incidental to the role of the Plaintiffs acting as independent contractors engaged in outside sales activities. Basic requirements such as pledging compliance with federal guidelines governing the Lifeline Program and adherence to SPRINT's operating procedures, and reporting the number of Lifeline program applications obtained to facilitate tracking figures and calculating an agents' commissions do not rise to the level of control to classify the Plaintiffs, MARTIN and SINGLETON'S as "employees" of Defendant, WALLACE MORGAN. The Plaintiffs had great independence and latitude in carrying out promotion and sales of the Lifeline Program.  Even when requirements are imposed upon an individual such as appearing at the company headquarters at the same time every day, wearing a uniform, displaying a logo, and returning to the company to deliver paperwork, such requirements do not strip an independent contractor of such status.  See, DeSouza v. EGL Eagle Global Logistics, LP, 596 F. Supp. 2d 456, 464 (D. Conn. 2009).  Plaintiff, SINGLETON, acknowledged that she had the option of wearing shirts with the Assurance Wireless logo and she chose not to wear such a shirt.  See, SINGLETON depo., page 222, lines 9-25.  The lack of a required dress code was also confirmed by Tommy Smith of WALLACE MORGAN.  (See, depo. of WALLACE MORGAN by Tommy Smith, page 53, lines 5-14).

19

While the Plaintiffs were provided territories within which to carry out sales activities, such a designation does not result in a level of control tantamount to an "employer-employee" relationship.  As noted by the decision in Browning, *supra.*,

"The mere fact that the employer directs as to the things to be done without control over the methods or means of doing them does not make the contractor a servant." N.Y. Jur. Agency section 392.  Thus, the fact that the employer gave the person employed directions with regard to particular places at which the stipulated work was to be performed, that the employer specified the destinations to which articles to be conveyed by a person employed for transportation work, that the employer occasionally gave instructions to the person employed to deliver goods as to whether the goods were to be delivered inside our outside, and as to whether the goods should be segregated according to type or that the employer directed the person employed to give special attention to one particular portion of the work does not affect the independence of the contract where the employer is concerned only with the result and not the means or methods employed to attain it."
Browning v. CEVA Freight, LLC., 885 F. Supp. 2d 590, 606 (E.D.N.Y. 2012).

Separate and apart from the issue of the degree of control, the Plaintiffs had wide latitude to engage in and take on other employment or assignments.   The "Independent Sales Representative Agreement" signed by the Plaintiffs ((SUMF at ¶51) states, "It is understood and agreed that Representative is under no exclusive arrangement with Corporation and may provide similar or other services to companies also engaged in direct sales and marketing provided that such activity does not interfere with completion of an ongoing project for Corporation." This ability to seek opportunities in sales and marketing from other companies was confirmed by the Plaintiff.  (See, SINGLETON depo, page 116, lines 16-25; page 1176, lines 2-7).

The District Court in Browning, *supra.*  considered this factor in determining an individual's status as an independent contract.

"[T]he next relevant inquiry is whether the Plaintiffs were free to engage in other employment.   Certainly, the ability to take on other employment supports a finding of independent contractor status.  Once again, the Defendants emphasize the parties' contractual relationship only and  the Agreements clearly indicate that the Plaintiffs may work for another employer.  However, the Plaintiffs content that this possibility was only theoretical and that it was practically impossible to do so because they were told by supervisors that their vehicle could only be used for CEVA purposes…As an initial matter, the Court finds that the fact that the Plaintiffs did not actually take on additional employment, does not automatically result in a

denial of the Defendants' motion for summary judgment.  See, e.g. Velu, 666 F.Supp. 2d at 307 ("Plaintiff has not chosen to avail himself to the opportunity to work for other shipping companies, but that is by choice.")  More importantly,  the Court finds that the Plaintiffs could perform work for other companies, even if it was practically difficult to do so.  There are no disputed issues of material fact in this regard and the Court finds that, in light of the totality of the circumstances analyzed here,  the fact that the Plaintiffs   worked exclusively for the Defendants does not necessarily lead to the conclusion that they qualify as employees under the NYLL when few, if any, other factors support that determination."
Browning v. CEVA Freight, LLC., 885 F. Supp. 2d 590, 603 (E.D.N.Y. 2012).

The ability to engage in other employment is an indicant of lack of control under the NYYL and weighs in favor of independent contractor status.  See, Marcus v. AXA Advisors, LLC., 307 F.R.D. 83, 92 (E.D.N.Y. 2015), citing as authority Velu v. Velocity Exp., Inc., 66 F. Supp. 2d 300, 307 (E.D.N.Y. 2009).

The Plaintiffs also controlled their own financial destiny, by working on a commission basis. See, SINGLETON deposition, page 63, lines 12-22.  The method of payment is yet another factor in determining that the Plaintiffs were properly classified as independent contractors.  In DeSouza v. EGL Eagle Global Logistics LP, 596 F. Supp. 2d 456, 466 the Defendant paid the Plaintiff by an "on the job" basis.  The Plaintiff was not paid a salary or by the hour.  This was found to weigh in favor of finding that the Plaintiff was an independent contractor. See also, Marcus v. AXA Advisors, LLC., 307 F.R.D. 83, 92 (E.D.N.Y. 2015).

The Plaintiffs, MARTIN and SINGLETON also seized upon the  opportunity for advancement and promotion based upon their outside sales performance, and this was born out by the fact that they were promoted from account executives to corporate trainers within a short period of time.  ((SUMF at ¶2, 4).  The Plaintiff MARTIN followed a "law of averages" in trying to maximize sales and commissions, and the Plaintiff MARTIN filled in daily/weekly goal sheets setting out sales targets. (See, MARTIN depo., page 194, lines 5-25; page 195, lines 1-10. Plaintiff, SINGLETON, also filled out daily/weekly goal sheets.  SINGLETON depo., page 229, lines 3-5).

The undisputed facts reflect that with respect to Plaintiff, MARTIN, she was not provided any benefits such as health insurance (see MARTIN depo., page 147, lines 2-9) and no such benefits were provided to Plaintiff, SINGLETON (see SINGLETON depo., page 118, lines 2-8). In addition, the Defendant, WALLACE MORGAN, issued 1099 forms to the Plaintiffs. (See (SUMF at ¶55, 56).  These factors should weigh in favor of finding that the Plaintiffs were independent contractors.  See, <u>DeSouza v. EGL Eagle Global Logistics, LP</u>, 596 F. Supp. 2d 456, 466-467 (D. Conn. 2009); <u>Marcus v. AXA Advisors, LLC.</u>, 307 F.R.D. 83, 92 (E.D.N.Y. 2015).

The Plaintiff, MARTIN, travelled to upstate New York and South Carolina in furtherance of sales activities.  These travels and associated expenses were borne strictly by the Plaintiff. See, MARTIN deposition, page 201, lines 20-25, page 202, lines 2-13 and 19-25, page 203, lines 2-10.  During these trips, the Plaintiff MARTIN was not accompanied by any supervisor(s). MARTIN depo., page 203, lines 8-10.  Plaintiff, SINGLETON, also travelled to South Carolina at her own expense, figuring that her commissions would more than offset such a trip. (See, SINGLETON depo., page 182, lines 23-25; page 183, lines 3-21).  Such travels well beyond any assigned territory, reflect the autonomy typically vested in an independent contractor. In addition the Plaintiffs paid for these travels as an investment in their own sales activities and to generate commissions.

The absence of any fixed duration for the Plaintiffs to provide sales services is yet another indication of the proper classification of the Plaintiffs as "independent contractors." Under the "Independent Sales Representative Agreement" there was no stated duration as to the term of Plaintiffs' engagement and the agreement could be terminated at will by either party. ((SUMF at ¶49, 50).  The operative provision of the Independent Sales Agreement as agreed to by the Plaintiffs states at section 9 (b), "Termination.  Either party may terminate this Agreement

at any time, giving the other party written notice, and no damages or other compensation shall be payable to either party on account of such termination." This "at-will" arrangement should again be a factor supporting classifying the Plaintiffs as "independent contractors". See the analysis of "Duration of Relationship" set forth in DeSouza v. EGL Eagle Global Logistics, LP, 596 F. Supp. 2d 456, 465 (D. Conn. 2009).

Given the totality of the circumstances surrounding the Plaintiffs services as Filed Agents with Defendant, WALLACE MORGAN as set forth above, the economic reality of their activities and the factors analyzed above should lead to the conclusion that the Plaintiffs were properly classified as "independent contractors" and were not "employees" subject to the provisions of the FLSA and NYLL.

ii. Plaintiffs Were Primarily Engaged to Make Sales or Obtain Orders or
Contracts

The Act broadly provides that the terms "sales" or "sell" *include* "any sale exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. §203(k); *see also* 29 C.F.R. §541.501(b). Significantly, exempt outside sales work includes "not only the sale of commodities, but also '*obtaining orders or contracts* for services...'" 29 C.F.R. §541.501(c) (emphasis added). In fact, in expanding the application of the outside sales exemption, the Supreme Court recognized that the FLSA's definition of "sale" is "more expansive than the term's ordinary meaning." *Christopher v. SmithKline Beecham Corp.,* 132 S.Ct. 2156, 2171, n.18 (2012).

In their own words, Plaintiffs were performing sales (See MARTIN depo., page 110). They approached prospective customers with the goal of soliciting customers and obtaining new customer contracts for SPRINT (See MARTIN depo., pages 110-113). They worked to sell "airtime" and texting services, which would qualify under any interpretation of the Act.

23

"Airtime" or minutes are a commodity that actually gets traded by and among telecommunications companies. The customer also receives a handset, which is certainly a commodity. The phone plans are a service provided to the customer, paid through the Universal Service Fund ("USF"), a tax charged to all wireless customers, serviced through the "facilities" of the carrier SPRINT, and overseen by Government Agency, Universal Service Administrative Company ("USAC"). SPRINT receives payment from the USF, which is overseen by USAC, so a transaction for sale is hardly arguable. The customer must be annually re-certified to continue to receive service and for SPRINT to continue to receive residual payments under the program. Plaintiffs operated with specific goals in mind - procure sales and receive commissions. They developed all customers on their own.

Plaintiffs would also agree that they were compensated like a typical salesperson. Their pay was premised exclusively on the results of their success in soliciting customers and obtaining new customer sales for SPRINT's Lifeline product. They were paid on a commission basis for all successful sales (See MARTIN depo., pages 110, 112-113) and were also eligible to "grow" based on performance (See MARTIN depo., pages 18, 24). These admissions, in and of themselves, should end the inquiry.

Critically, there is *nothing in the Act* that provides that the act of "selling" has additional requirements in order for a worker to be treated as exempt in the outside sales context. Nonetheless, Plaintiffs assert that their work was not "sales" because (1) the product was free, (2) no retail transaction took place because SPRINT was not paid by the customer, (3) agents were allegedly instructed on where and at what times to sell, (4) for which they were provided tools and scripts to make their sales pitches more effective, and (5) they were just gathering and collecting low income consumer applications for enrolment in a government funded assistance program. (*See generally* Plaintiff's Motion for Partial Summary Judgment).

None of these requirements are found anywhere in the Act or interpreting regulations and cannot be used to transform what is clearly sales activity into something else.

### a.  The Product/Service was not Free

Agents worked to sell "airtime" and texting services. The phone plans, which are marketed by SPRINT, through its subsidiary Assurance Wireless, are services provided to the customer, paid through the Universal Service Fund ("USF"), a tax charged to all wireless customers, serviced through the "facilities" of the carrier SPRINT, and overseen by Government Agency, Universal Service Administrative Company ("USAC"). In other words, regular cellular customers pay this "tax," which gets collected by a USAC, and issued to qualifying low-income consumers in order to lower telecommunications costs. If the customer wants to "top up" his/her minutes and texts, they would need to purchase those from SPRINT (See MARTIN depo., page 181, lines 9-19; See SINGELTON depo., page 213 lines 24-25; page 214 lines 2-14). SPRINT may push for all services issued by the ISOs and their agents to fall under the Lifeline subsidy amount, but this is more about gaining customers because having customers to "top up" immediately would subdue sales. SPRINT receives payment from the USF, which is overseen by USAC. The customer must be annually re-certified to continue to receive service and for SPRINT to continue to receive residual payments under the program. SPRINT carries the cost of paying the ISO, the agents, the phones, and the "airtime" from a cash flow perspective until sixty (60) days, which is when payment occurs for the first thirty (30) days. In other words, this service is hardly free.

SPRINT submits a Form 497 on the eighth (8th) days of each month in order to be paid on day thirty (30) for the previous month. SPRINT submits an annual FCC Form 481 filing to the Commission by July 1st of each year, certifying the Company's business and affiliate information, and terms and conditions of any voice telephony plans offered to Lifeline

subscribers.[3] The Company also submits an annual Form 555 filing to the Commission certifying, under penalty of perjury, that the Company: (1) has policies and procedures in place to ensure that its Lifeline subscribers are eligible to receive Lifeline services; and (2) that the Company is in compliance with all federal Lifeline certification procedures.[4] The Company provides the results of its re-certification efforts, performed pursuant to section 54.410(f) of the Commission's rules, annually by January 31st, for its re-certification efforts of the previous year.[5] Clearly, unlike what Plaintiffs suggest, SPRINT is not engaged in offering free products or services to the public.

> b. *A Sale Does Not Have To Be Final At The Territory For The Plaintiff To Be Engaged In The Act of Selling.*

The plain and unambiguous term "orders or contracts" as delineated in the regulations is not – and has never been – qualified by the terms such as "binding," "irrevocable" or "consummated." "[W]hen an employee who has extended an offer to sell obtains a 'firm commitment to buy,' that transaction amounts to a 'contract to sell.'" *Christopher,* 132 S.Ct. at 2171, n.20. In *Christopher*, the Court reasoned that pharmaceutical representatives – who at best could obtain only "non-binding commitments" from physicians to prescribe drugs – fell within the scope of the exemption. "[An employee] who obtains such a commitment is 'directly involved' in this transaction. Thus, once a pharmaceutical sales representative and a physician have fully completed their agreement, it may be said that they have entered into a 'consummated transaction.'" *Christopher,* 132 S.Ct. at 2166, n.12.

Similarly, in *Brody v. AstraZeneca Pharmaceuticals, LP,* 2008 WL 6953957, *5 (C.D. Cal. June 11, 2008), the court rejected the argument that the lack of authority to "consummate" a

---

[3] *See* 47 C.F.R. § 54.422.

[4] *See* 47 C.F.R. § 54.416(a).

[5] *See* 47 C.F.R. § 54.416(b).

sale renders the work performed non-exempt. The court reasoned that the exemption merely requires "selling" and not the specific "consummation of sales." *Id.* "[E]ven though Plaintiff never consummated sales himself, such sales were nevertheless considered 'his own' in that sales were tracked within his geographical area and Plaintiff received incentive awards based in part on changes in market share in his area. Accordingly, Plaintiff 'engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling.'" *Id.* at *8, *quoting* 1949 Weiss Report at 83.

Plaintiffs may argue that SPRINT, through Solix or otherwise, may have the requisite ability to cancel the service if they uncover ineligibility, fraud, or abuse. All that is required is that Plaintiffs directed their efforts toward their own sales – and not those of others – regardless of whether or not the customer or SPRINT could theoretically cancel a signed contract for fraud . "If an employee 'does not consummate the sale *nor direct efforts toward the consummation of a sale*, the work is not exempt outside sales work.'" *Slow v. Prestige Merchandising Co., Inc.,* 2011 U.S. Dist. LEXIS 105517 (E.D.N.Y. Sept. 19, 2011) (emphasis added). In that case, the court denied summary judgment where the plaintiff worked as a "canvasser" who merely arranged sales appointments for others. *See also Kinney v. Artist & Brand Agency, LLC,* 2015 U.S. Dist. LEXIS 160465 (S.D.N.Y. Nov. 24, 2015) (plaintiff did not obtain commitments, but introduced customers to others to consummate the contracts). In the case before this Court, Plaintiffs were not canvassers. It is undisputed that they directed their efforts toward their own sales, not those of others. They were the last salesperson to interact with the customer and no other salesperson followed them to close the deal. (See MARTIN depo., page 112 lines 19-25; page 113 lines 3-6; See SINGLETON depo., page 217 lines 14-17; page 63 lines 12-19; page 86 lines 120-20; page 101 lines 21-25; page 102 lines 2-10).

More squarely on point and on much more markedly similar facts, another federal court has held that door-to-door salespeople fall within the scope of the outside sales exemption. In granting summary judgment to Just Energy in *Dailey v. Just Energy Marketing Corp.*, *et al.,* Case No. 3:14-CV-02012 (N.D. Cal. July 23, 2015) (previously filed electronically at ECF No. 56-37 and attached hereto as Ex. F)[6], the district court concluded that the plaintiff – exactly like the Plaintiffs in this case – spent more than half her time knocking on doors soliciting new customers for Just Energy's services. Her sales were also subject to a third-party verification call and no other salesperson followed the plaintiff in *Dailey* to complete the sale. Also like Plaintiffs here, the plaintiff in *Dailey* operated with sales goals in mind, considered herself a top performer and earned commissions on every successful contract. Although she argued (as we anticipate Plaintiff will do here) that she was not engaged in "making sales" because contracts could be rescinded under certain circumstances (fraud, abuse, or ineligibility), it is worth noting rescission of an approved transaction in this fact pattern required a showing of tampering, fraud or abuse in the application process (See SINGLETON depo., page 197 line 19-25; page 198 lines 2-23). Most importantly, the court reasoned that a company's ability to rescind an agreement does not mean that a plaintiff does not "make sales" or "obtain contracts" within the meaning of the FLSA and that "selling" need not involve the literal execution of contracts. *Id.* at n. 1:

"Adopting Plaintiff's argument would exalt form over substance. "If an employee directs his efforts at persuading a particular customer to purchase a product and is compensated on the basis of his success in doing so then the employee is clearly engaged in sales activity and not

---

[6] California's law regarding the outside sales exemption, like the NYLL, tracks federal law. *Vinole v. Countrywide Home Loans, Inc.,* 246 F.R.D. 637 (S.D. Cal. 2007) affirmed, 571 F.3d 935 (9th Cir. 2009), *cited in Brody v. AstraZeneca Pharmaceuticals, LP,* 2008 WL 6953957 (C.D. Cal. June 11, 2008).

mere general promotion of the product.... This is particularly so when...it has not been alleged that any other employee will affirmatively make further contact with the customer to consummate the sale."

 *Id.* at 5, *citing Barnick v. Wyeth,* 522 F.Supp.2d 1257, 1264-65 (C.D. Cal. 2007).

Plaintiff, nonetheless, will likely point to *Hurt v. Commerce Energy*, 2013 U.S. Dist. LEXIS 116386 (N.D. Ohio Aug. 15, 2013), in which the district court, based on facts identical to *Dailey* (and this case as well), denied summary judgment by improperly reading a requirement that exempt salespeople must have unfettered authority to bind the companies they represent into the statute and regulations. *Id.* at **2, 12, 15. Importantly, the *Hurt* court also recognized that "Plaintiffs obtained contracts," but did not otherwise specifically analyze that issue. *Id*. at *15. Instead, the Court reached an outcome based on dissimilar cases. We are quite certain that not of this shall remain relevant herein, as the Plaintiffs in this matter consummate the transaction singularly, perform a real time verification of the application facts, activate the phone, and hand the handset to the customers to take with them.

In contrast, the *Dailey* court found it significant that the district court in *Hurt* did not analyze whether the *Hurt* plaintiffs obtained orders or contracts. *Id.* at 7. Moreover, the *Dailey* court specifically questioned *Hurt's* premise that the company's right to rescind destroyed the exemption. "[T]he Department of Labor's Comments to its regulations implementing the FLSA reinforce that 'selling' need not involve the literal execution of contracts...The Department emphasized that '[e]mployees have a primary duty of making sales if they obtain 'a commitment to buy' from the customer and are credited with the sale." *Id.* at 7, n.1, *citing* 1949 Weiss Report at 83. "[T]he test is whether the person is actually engaged in activities *directed toward* the consummation of his own sales, *at least to the extent of obtaining a commitment* to buy **from the person to whom** he is selling." 1949 Weiss Report at 83 (italics in original, bold added). The

*Dailey* court further declined to read a requirement that orders or contracts actually be "consummated" into the exemption. *Id.* at 7. Herein, the Plaintiffs certainly engaged in activities directed towards consummation of their own sales, and obtained commitments from consumers for Lifeline services, by which SPRINT is compensated through USF as governed by USAC. Indeed, Plaintiff were paid commissions based on those sales.

Accordingly, the court held that because the plaintiff performed exempt outside sales work, she was not entitled to minimum wage and overtime and summary judgment was properly warranted in Just Energy's favor. Defendants respectfully submit that this Honorable Court adopt the reasoning and analysis of *Dailey* and enter summary judgment in Defendants' favor on Plaintiff's claims.

      c.     *Whether or not Plaintiff was provided with sales goals, sales territories, transportation or scripts – or even required to attend sales meetings – does not alter the nature of the work performed.*

The Act, the regulations, well-reasoned case law – and even Plaintiffs themselves, – agree that the work at issue in this case was sales activity. The only way Plaintiffs' case can survive is if they can convince this Court that "exempt sales" requires something more than just the act of selling. While the Supreme Court has recognized that the FLSA's definition of "sale" is "more expansive than the term's ordinary meaning", *Christopher, supra,* Plaintiffs ask this Court to do precisely the opposite and restrict the meaning and read additional, unwritten requirements into the law.

In *Chenensky,* 2009 U.S. Dist. LEXIS 119549, the court granted summary judgment for defendant, finding that the plaintiff, an insurance agent, was exempt as an outside salesman. However, in that case, because the plaintiff did more than simply sell (and provided customers with financial advice), the Court conducted an analysis into whether selling was the plaintiff's

primary duty by considering five factors: (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is suitable to an hourly wage *Id.* at *13. When analyzing these factors here, the court concluded that "[t]here is no issue of disputed fact regarding Chenensky's workday – it was the six-step Sales Cycle where Chenensky solicited new business, presented available products to prospects, obtained a commitment to purchase, and ultimately received a commission-based salary." *Id.* at *14.

As was the case in *Chenensky,* Plaintiffs here spent most of their time in the field (as opposed to an office) meeting prospective customers in territories. See *id* at 5-6. (See MARTIN depo., page 113 lines 23-25; page 114 lines 2-10) They developed and approached prospective customers, gathered information regarding their eligibility, and presented them with information about products and services provided. See *id at 4-5* (See MARTIN depo., page 137 lines 5-9; page 138 lines 18-24). Also like in *Chenensky,* Plaintiffs here were compensated on a commission-based system, but those were subject to reversal for certain reasons, such as ineligibility, fraud, and abuse. *Id.* at *7. Neither this Plaintiff nor Chenensky had a regular workday. If they were performing their jobs correctly, they were out in the field, visiting customers and persuading them to use SPRINT/Assurance Wireless' marketed telecommunications products/services. On these facts, the court held that the plaintiff's primary duty was plainly sales. "There is no issue of disputed fact regarding Chenensky's workday – it was the six-step Sales Cycle where Chenensky solicited new business, presented available products to prospects, obtained a commitment to purchase, and ultimately received a commission-based salary." *Id.* at *14.

The only factor that could possibly be disputed is how much supervision Defendants exerted over the Plaintiff's work activities. Even if Plaintiffs' testimony was true, it would not render what Plaintiffs did as non-sales activity. In fact, it only strengthens Defendants' argument. Plaintiffs will assert that they were required to attend meetings during which they practiced sales techniques and were motivated to sell. They weren't required to generate specific sales goals. (See MARTIN depo., page 94 lines 18-25; page 195 lines 2-10) They were not provided transportation to a particular sales territory. (See MARTIN depo., page 202 lines 2-13; 19-25; page 203 lines 2-7). Once Plaintiffs were out in the field they were on their own with little or no supervision. While pitching a customer for a potential sale, they were the only persons standing in front of and interacting with the customer and were certainly the last salespeople to interact with the customer. (See SINGLETON depo., page 211 lines 21-25; page 212 line 2; page 213 lines 8-13). Regardless of the level of supervision, it cannot be seriously disputed that all of these factors taken together paint the picture of a true salesperson. Sales is sales – regardless of the context. Accordingly, Plaintiffs fall squarely within the outside sales exemption and his claims should be dismissed as a matter of law.

iii.  Plaintiffs were Customarily and Regularly Engaged Away from Defendant's Place of Business

The second part of the exemption – that Plaintiff was customarily and regularly engaged away from Defendant's place of business – is conceded (MARTIN Dep 30-33, 113-115). Moreover, the precise type of work Plaintiffs performed is addressed in the DOL regulations: "The outside sales employee is an employee who makes sales at the customer's place of business or, *if selling door-to-door, at the customer's home.*" 29 C.F.R. §541.502 (emphasis added). *See also Domenech v. Parts Authority, Inc.,* 2015 U.S. Dist. LEXIS 101214 (E.D.N.Y. Aug. 3, 2015) (primary duty was making sales away from employer's place of business). Plaintiffs were

indisputably primarily engaged away from WM's place of business. (See MARTIN depo., page 113 lines 23-25; page 114 lines 2-10) Thus, the only question that remains is whether Plaintiff's activities were aimed at making sales or obtaining contracts or orders for services. The answer to this question is clear and unmistakable.

Any other arguments offered by Plaintiffs on applicability of the outside sales exemption fail to raise triable issues of fact.

## IV. CONCLUSION

Plaintiffs' attempts to raise triable issues of fact in regard to the classification of the Plaintiffs as employees rather than independent contractors, and the alleged inapplicability of the FLSA outside sales exemption fall short of the mark. Accordingly, for all the foregoing reasons, Defendant WALLACE MORGAN, Inc. respectfully requests that this Honorable Court dismiss Plaintiffs' claims in their entirety and award summary judgment in WALLACE MORGAN's favor.

Date: May 12, 2017

Respectfully submitted,

*/s/Joseph F. Tremiti*

TREMITI LLC
30 Wall Street
8th Floor
New York, NY 10005
Direct 973.615.3026
info@trmitilaw.com

LAWRENCE J. SHAPIRO & ASSOCIATES, P.A.
175 SW 7TH ST
Suite 1600
Miami, FL 33130
Direct. 305.285.0623
ljshapirolaw@aol.com

ALTIERI & ASSOCIATES P.L.
936 SW 1st Avenue
Suite 414
Miami, FL 333130
936 SW 1st Ave
Suite 414
Miami, FL 33130 USA
Email. Chad@AltieriPA.com
Cell.   305.562.4981
Direct. 305.909.7849

## CERTIFICATE OF SERVICE

I hereby certify that this Motion and all related documents have been filed via ECF and in turn, served electronically on all counsel of record this 12th Day of May 2017

34