UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JAMIE MARTIN and DANEISHA SINGLETON, on behalf of themselves and all others similarly situated, and the Proposed New York Rule 23 Class, | : : : : : | Case No. 15-cv-05237 (PAE/HBP) |
| Plaintiffs, | : : |  |
| -against- | : : |  |
| SPRINT/UNITED MANAGEMENT COMPANY, CREDICO (USA), LLC, and WALLACE MORGAN, INC., | : : : : |  |
| Defendants. | : : |  |

**DEFENDANT SPRINT/UNITED MANAGEMENT COMPANY'S
REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................2

I.      SPRINT IS NOT A JOINT EMPLOYER UNDER THE FLSA OR THE NYLL .............2

       A.      Sprint Did Not Hire or Fire Wallace Morgan Field Agents...................................3

       B.      Sprint Did Not Supervise or Control Agents' Work or Schedules ........................6

       C.      Sprint Did Not Control Agent Rate or Method of Pay ........................................10

       D.      Sprint Did Not Maintain Relevant Employment Records ....................................11

       E.      Sprint Did Not Provide Agents With Equipment in the Field ..............................12

       F.      Wallace Morgan's Business Could and Did Shift Between Clients .....................13

       G.      Defendants Presented Undisputed Evidence That Face-to-Face Sales is
             Routinely Outsourced in the Telecommunications Industry ................................14

       H.      Responsibility for the Assurance Wireless Campaign Does Not Shift from
             One Subcontractor to Another Without Material Changes....................................15

       I.      Sprint Did Not Supervise Wallace Morgan Agents, "Occasionally" or
             Otherwise ............................................................................................................16

       J.      Sprint Did Not Assume the Prerogatives of An Employer .................................17

       K.      Plaintiffs' Request that This Court Disregard Binding Precedent Should
             Be Rejected .........................................................................................................17

II.      PLAINTIFFS ARE EXEMPT OUTSIDE SALES PERSONS .........................................18

       A.      Plaintiffs Performed Exempt Sales Work ............................................................19

       B.      Plaintiffs Bore Other Indicia of Outside Salespersons ..........................................23

III.      DISPUTED ISSUES OF MATERIAL FACT PRECLUDE PLAINTIFFS' MOTION
         FOR SUMMARY JUDGMENT AS TO EMPLOYMENT STATUS .............................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barfield v. New York City Health and Hospitals Corp.*,
　537 F.3d 132 (2d Cir. 2008) ...................................................................................10, 11, 13

*Browning v. Ceva Freight, LLC*,
　885 F. Supp. 2d 590 (E.D.N.Y. 2012) ...................................................................................25

*Chenesky v. N.Y. Life Ins. Co.*,
　No. 07 Civ. 11504(WHP), 2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009) ............................20

*Christopher v. SmithKline Beecham Corp.*,
　567 U.S. 142 (2012).......................................................................................................... passim

*Flood v. Just Energy Mktg. Corp.*,
　No. 7:15-cv-2012 (KBF), 2017 WL 280820 (S.D.N.Y. Jan. 20, 2007) .....................20, 21, 23

*Godlewska v. HDA*,
　916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 2d 246 (2013).................... passim

*Gold v. N.Y. Life Ins. Co.*,
　730 F.3d 137 (2d Cir. 2013)...................................................................................................20

*Jacobsen v. Comcast Corp.*,
　740 F. Supp. 2d 683 (D. Md. 2010) .......................................................................................11

*Jean-Louis v. Metro. Cable Commc'ns, Inc.*,
　838 F. Supp. 2d 111 (S.D.N.Y. 2011).............................................................................. passim

*Lawrence v. Adderley Indus., Inc.*,
　No. CV–09–2309 (SJF)(ETB), 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011) ..................4, 5, 6

*Lepkowski v. Telatron Mktg. Grp., Inc.*,
　766 F. Supp. 2d 572 (W.D. Pa. 2011)......................................................................................8

*Nielsen v. DeVry, Inc.*,
　302 F. Supp. 2d 747 (W.D. Mich. 2003) ...............................................................................22

*Saleem v. Corp. Transportation Group, Ltd.*,
　854 F.3d 131 (2d Cir. 2017)............................................................................................24, 25

*Salinas v. Commercial Interiors, Inc.*,
　848 F.3d 125 (4th Cir. 2017) ................................................................................................18

*Sellers v. Royal Bank of Canada*,
    No. 12 Civ. 1577(KBF), 2014 WL 104682 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592
    F. App'x 45 (2d Cir. 2015) ........................................................................................24, 25

*Zheng v. Liberty Apparel Co.*,
    355 F.3d 61 (2d Cir. 2003) ........................................................................................ passim

## STATUTES

47 C.F.R. § 54.405 ...................................................................................................................8

47 C.F.R. § 54.409 ..............................................................................................................5, 23

47 C.F.R. § 54.410 ...........................................................................................................5, 8, 23

47 C.F.R. § 54.417 ...................................................................................................................8

47 C.F.R. § 54.420 ...................................................................................................................8

## RULES

Fed. R. Civ. P. 26 ...................................................................................................................15

## OTHER AUTHORITIES

U.S. Dep't of Labor News Release, "U.S. Secretary of Labor Withdraws Joint
    Employment, Independent Contractor Informal Guidance," June 7, 2017,
    https://www.dol.gov/newsroom/releases/opa/opa20170607 ....................................................1

Wage & Hour Div., U.S. Dep't of Labor, Administrator's Interpretation No.
    2016-01, 2016 WL 284582 (Jan. 20, 2016), *withdrawn*, June 7, 2017....................................1

Wage & Hour Div., U.S. Dep't of Labor, Administrator's Interpretation No.
    2015-01, 2015 WL 4449096 (Jul. 15, 2016), *withdrawn*, June 7, 2017 ...................................1

## INTRODUCTION

After extensive discovery, Plaintiffs lack evidence that Sprint exerted any relevant control over Wallace Morgan's field agents. They ignore controlling legal authority[1] and proclaim generally that the Fair Labor Standards Act and the New York Labor Law are expansive statutes that should be construed broadly, apparently irrespective of the facts, none of which weigh in Plaintiffs' favor. But the Court of Appeals has cautioned that the economic realities test is "manifestly *not* intended to bring normal, strategically-oriented contracting schemes within the ambit" of the wage and hour laws. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 76 (2d Cir. 2003). That is precisely what Plaintiffs would have the Court do here, and it should be rejected.

The undisputed facts demonstrate unequivocally that Sprint is not a joint employer as a matter of law and should be dismissed from this lawsuit. Plaintiffs disregard factors that are relevant to the joint employment inquiry—*e.g.* the power to hire and fire agents, set their schedule or determine their working hours, classify them as employees or independent contractors, set their pay and their pay method, supervise their work, require them to work on premises and with the putative joint employer's tools like actual employees, and restrict their ability to do other work. Without any such evidence against Sprint, Plaintiffs resort to mischaracterizing the record to create "disputes" where none exist. They also devote an inordinate amount of attention to Sprint's compliance- and quality control-related processes that

---

[1] In addition to relying on out-of-circuit authority throughout their opposition/reply brief, Plaintiffs also rely on sub-regulatory authority, including two U.S. Department of Labor ("USDOL") Administrator's Interpretations ("AI"), 2015-01 (concerning independent contractors) and 2016-01 (concerning joint employment). On June 7, 2017, the USDOL withdrew both AIs. *See* U.S. Dep't of Labor News Release, "U.S. Secretary of Labor Withdraws Joint Employment, Independent Contractor Informal Guidance," June 7, 2017, https://www.dol.gov/newsroom/releases/opa/opa20170607. Plaintiffs' reliance on this informal guidance, which was never entitled to deference in the first instance, should be disregarded.

are driven by the Lifeline Program's extensive regulatory framework and the need to uphold the integrity of the Assurance Wireless brand, which courts routinely find do not impact the joint employment analysis.

Similarly, the claims against Sprint should be dismissed in their entirety on the alternative ground that Plaintiffs are exempt from the minimum wage and overtime requirements of the FLSA and NYLL under the outside sales exemption. Plaintiffs disregard the Supreme Court's directive that Plaintiffs' work on the Assurance Wireless campaign must be viewed through an industry-specific lens which takes into account the heavily regulated Lifeline Program for which they procured applications from prospective subscribers. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 164 (2012). Against this backdrop, Plaintiffs' primary duties, which are undisputed, constitute exempt outside sales work.

Finally, there are numerous material facts on the record that preclude entry of summary judgment for Plaintiffs on the issue of their employment status. Plaintiffs operated in the field with considerable latitude to maximize their profits, and they were compensated under a commission structure that rewarded independent initiative. The same compliance- and quality-control related processes that have no bearing on the joint employment inquiry are similarly irrelevant here.

Sprint is entitled to summary judgment as to all claims because it is (i) not a joint employer of Plaintiffs, and (ii) Plaintiffs fall within the scope of the outside sales exemption. Plaintiffs are not entitled to summary judgment on the issue of their employment status.

## <u>ARGUMENT</u>

## I.     SPRINT IS NOT A JOINT EMPLOYER UNDER THE FLSA OR THE NYLL

In their opposition/reply brief, Plaintiffs again attempt to blur the distinct lines between the three Defendants. Sprint, Credico, and Wallace Morgan are three wholly separate entities.

Sprint contracts with Credico to promote and market the Assurance Wireless brand through the Lifeline Program. Sprint is no different than any of Credico's other clients (of whom there are at least 15 besides Sprint). Credico, in turn, contracts with more than 200 ISOs, including Wallace Morgan, to market its clients' various campaigns. That is Credico's—not Sprint's—business model. Wallace Morgan's and/or Credico's actions, without any evidence of Sprint control, cannot be attributed to Sprint solely because Sprint utilizes Credico to market one of its brands.

Plaintiffs continue to argue that Sprint's Standard Operating Procedures ("SOP"), which set forth regulatory and quality control requirements, create Sprint control over Wallace Morgan's field agents. But the SOPs, which focus on the Lifeline rules and regulations, Assurance Wireless products, customer and sales service, and audits for compliance, are not indicative of *relevant* control under the joint employment analysis in this Circuit and are silent on the key issues (*i.e.,* how agents are classified; how or how much agents should be paid; how, when or for how long agents work; and day-to-day agent supervision). That Sprint has established processes and procedures to ensure regulatory compliance and prevent fraud does not transform Sprint into a joint employer under the economic realities test.

### A.     <u>Sprint Did Not Hire or Fire Wallace Morgan Field Agents</u>

Sprint had no involvement in the hiring or firing of Wallace Morgan field agents. Plaintiffs acknowledge that Wallace Morgan exercised "direct hiring responsibilities" for field agents. (Dkt. 305, Pls' Opp. at 19.) They also concede that Wallace Morgan advertised job openings for field agents (Dkt. 302, Credico 56.1 Resp. ¶ 63); recruited field agents (Dkt. 301, Sprint 56.1 Resp. ¶ 71); interviewed applicants for positions as field agents (Dkt. 259, Stip. Facts ¶ 46; Dkt. 302, Credico 56.1 Resp. ¶¶ 65-68); decided which agents it would work with (Dkt. 259, Stip. Facts ¶ 47); and offered Plaintiffs positions as account executives (Dkt. 301, Sprint 56.1 Resp. ¶ 75).

Rather, Plaintiffs contend, the facts that (i) Sprint required that agents hired by Wallace Morgan and assigned to the Assurance Wireless campaign complete background checks and (ii) Credico (*not* Sprint) issued Wallace Morgan's hires identification codes, is indicative of control over the hiring process.  (Dkt. 305, Pls' Opp. at 19.)  Requiring background checks—which are integral to preventing fraud in a government regulated program and ensuring basic safety because agents worked in a customer-facing role—is not considered control in hiring and does not support a finding of joint employment.  Nor is issuing administrative identification numbers (which Credico, not Sprint, issued.)  *See, e.g., Lawrence v. Adderley Indus., Inc.*, No. CV–09–2309 (SJF)(ETB), 2011 WL 666304, at *8 (E.D.N.Y. Feb. 11, 2011) (finding that drug testing and background-check policies and issuance of identification numbers for technicians did not indicate hiring control); *Godlewska v. HDA*, 916 F. Supp. 2d 246, 252 (E.D.N.Y. 2013) (holding that defendant did not have power to hire where it required criminal history record check and minimum qualifications for home attendants because the contractor alone decided which qualified applicants to hire), *aff'd*, 561 F. App'x 2d 246 (2013).

Plaintiffs' assertion that Sprint issued a "recruiting ban" is baseless.  (*See* Dkt. 277, Buongiovanni MSJ Decl. ¶ 17.)  Their insistence, without support, that email correspondence between Credico and Wallace Morgan—that does not mention Sprint or Assurance Wireless or include any Sprint senders or recipients—does not create a record where one plainly does not exist.  (*See* Pls' Ex. 82 and 110.)  What the record demonstrates is that Sprint required Credico to ensure that Assurance Wireless "events" (which is a term used to describe the everyday marketing of the campaign in authorized territories) were appropriately staffed to align with campaign objectives—Sprint did not dictate *who* actually marketed the campaign, or *how* the campaign was marketed.  (*Id.*; Pls' Ex. 6, Sprint's SOPs § 5(1)(b) at SPRMAR-0000028.)

Sprint did not have the ability to fire agents.  There is no dispute that Sprint and Credico had the ability to deactivate agents from the Assurance Wireless campaign for suspected fraud, or violation of the SOPs.  (Dkt. 259, Stip. Facts ¶ 73.)  It is imperative that Sprint, and its outreach agencies such as Credico, ensure that anyone who markets the Assurance Wireless campaign comply with the rigorous regulatory requirements of the Program, including consumer qualification and eligibility verification, and preventing the transmission of fraudulent information.  *See, e.g.* 47 C.F.R. §§ 54.409-410.  But there is no evidence in the record that Sprint ever instructed Credico or Wallace Morgan to terminate an agent's engagement with Wallace Morgan or prohibit an agent from working on any other client's campaign.  The legal distinction between the ability to remove an agent from one client's campaign, which does *not* suggest joint employment, and the ability to terminate an individual's employment, is routinely recognized by courts in this Circuit.[2]  *See, e.g., Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 124 (S.D.N.Y. 2011) (holding that defendant's ability to de-authorize a cable technician from installing cable at its customers' homes was not equivalent to firing); *Godlewska*, 916 F. Supp. 2d at 258 (finding that directing a contractor to remove a home attendant from a patient's case is not termination); *Lawrence,* 2011 WL 666304 at *3 (determining that defendant's ability to direct its contractor not to assign a technician to its installations did not constitute firing).

Plaintiffs' argument that removal from the campaign was *de facto* termination similarly fails.  Wallace Morgan was, at all times, free to contract with other clients and work on other campaigns, and it likewise did not prohibit its agents from doing other work.  (*See* Dkt. 280,

---

[2] Plaintiffs cite no in-circuit authority for their contention and the case law they do cite (three cases of which are unpublished) are readily distinguishable.  Courts in this Circuit, as set forth above, do not conflate the ability to remove an agent from a campaign with the power to fire.

Credico 56.1 ¶ 50; Dkt. 259, Stip. Facts ¶ 51.)  Sprint cannot be held responsible for Wallace

Morgan's business decision to perform work for Credico exclusively during some period of time

because (i) Credico, not Sprint, was Wallace Morgan's client, and Sprint had no control over

what other campaigns Credico did or not did engage Wallace Morgan for, or (ii) whether

Wallace Morgan, in its own discretion, solicited other clients for work.  Moreover, Second

Circuit courts have not found exclusivity to be determinative with respect to the joint

employment analysis.  *See, e.g., Jean-Louis*, 838 F. Supp. 2d at 116 (during the relevant time

period, defendant's contractor had no other clients); *Lawrence*, 2011 WL 666304, at *2

(contractor had no other clients other than the defendant during the limitations period).

### B.    Sprint Did Not Supervise or Control Agents' Work or Schedules

The Court's analysis of the second formal control factor should begin and end with

Plaintiff's own admission that Sprint did not control "which workers work in which places [at]

which times."  (Dkt. 305, Pls' Opp. at 24 n.15.)  Plaintiffs also concede the other facts that are

critical to analyzing whether a defendant exercises requisite supervision or control:

- Wallace Morgan, not Sprint, assigned agents to client campaigns.  (Dkt. 273, Sprint 56.1 ¶¶ 85, 87.)

- Agents reported to Wallace Morgan's office to meet with their Wallace Morgan supervisors.  (*Id.* ¶ 115.)  They never reported to a Sprint facility.  (*Id.* ¶ 119.)

- Wallace Morgan was "predominantly responsible for [field agent] meetings and trainings.  (Dkt. 305, Pls' Opp. at 23.)

- Wallace Morgan held regular "atmosphere" meetings at its office.  (Dkt. 273, Sprint 56.1¶¶ 137-38; Dkt. 259, Stip. Facts ¶ 67.)

- If Sprint representatives attended Wallace Morgan meetings, it was to discuss the SOPs, collecting Lifeline Program applications, or to provide "update and news about the AW program."  (Dkt. 301, Sprint 56.1 Resp. ¶ 138; Dkt. 305, Pls' Opp. at 23.)

- Sprint's training did not include any information concerning agent pay, agent work schedule, or job classification.  (Dkt. 273, Sprint 56.1 ¶ 93.)

- Wallace Morgan provided agents with handbooks that set forth their policies and expectations for account executives and corporate trainers working on their clients' campaigns.  (*Id.* ¶¶ 94-95.)

- Wallace Morgan provided its field agents with a suggested daily schedule.  (Dkt. 259, Stip. Facts ¶ 66.)

- Wallace Morgan supervisors informed Plaintiffs of their expected work hours.  (Dkt. 273, Sprint 56.1 ¶ 114.)

- Wallace Morgan supervisors assigned Plaintiffs to locations within their authorized territories to collect Lifeline Program applications. (*Id.* ¶ 116.)

- Plaintiffs identified only Wallace Morgan representatives who supervised and/or directed their work on the Assurance Wireless campaign, or had any knowledge regarding their job duties.  (*Id.* ¶¶ 176, 178-180.)

- If Plaintiffs were going to call in sick or be absent from work, they contacted their Wallace Morgan supervisors.  (*Id.* ¶ 118.)

- Wallace Morgan promoted the Named Plaintiffs.  (*Id.* ¶¶ 96-97.)

- Wallace Morgan terminated the Named Plaintiffs.  (Dkt. 259, Stip. Facts ¶ 72.)

These are the facts that are integral to the joint employment analysis because they involve the day-to-day management and supervision of field agents, including their schedule and the hours they worked.  Plaintiffs attempt to pivot the inquiry to compliance and quality-control related functions, but that misconstrues the test.  The Court of Appeals has made clear that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate, subcontracting arrangement."  *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d Cir. 2003).

While Plaintiffs acknowledge that Sprint is required to ensure compliance with the Lifeline Program regulations and take steps to prevent waste, fraud, and abuse (Dkt. 273, Sprint 56.1 ¶ 2; Dkt. 280, Credico 56.1 ¶ 23), they take issue with the processes Sprint has implemented

to monitor and effectuate such compliance.[3]  But Sprint *is* required to "implement policies and procedures for ensuring that their Lifeline subscribers are eligible to receive Lifeline Services" 47 C.F.R. § 54.410(a), and it has done so, through for example, its SOPs and audits.  (Dkt. 273, Sprint 56.1 ¶ 2.)  Moreover, Sprint *is* obligated to "document compliance with all [FCC] and state requirements governing the Lifeline . . . program" and is audited by the government on its "overall compliance with the rules and . . .  internal controls regarding the[] regulatory requirements."  47 C.F.R. §§ 54.417(a), 54.420(a).  Courts are particularly accepting of quality control efforts designed to "ensure compliance with the law or protect clients' safety."  *Godlewska*, 916 F. Supp. 2d at 259-60.  Plaintiffs also try to argue that Sprint's SOPs and auditing functions go above and beyond their regulatory obligations because they include certain customer service standards.  But this too is considered a perfectly appropriate exercise of quality control that does not establish control of work schedules or conditions of employment.  *See, e.g., Zheng*, 355 F.3d at 75; *Lepkowski v. Telatron Mktg. Grp., Inc.*, 766 F. Supp. 2d 572, 579-80 (W.D. Pa. 2011) (quality control measures and customer service supervision is "qualitatively different" than control exercised by an employer over an employee (citing cases)).  In other words, the *nature* of the alleged control is critically important.

　　*Jean-Louis* is instructive.  In *Jean-Louis,* a district court in this Circuit applied the economic realities test on analogous facts and concluded that defendant Time Warner did not

---

[3] Plaintiffs' Exhibit 127, is reflective of their flawed approach.  Plaintiffs omit several federal regulations governing the Lifeline Program.  For example, the regulations require that Sprint "[p]ublicize the availability of Lifeline service in a manner *reasonably designed* to reach those *likely to qualify* for the service."  *See* 47 C.F.R. § 54.405(b) (emphasis added).  Many of the so-called "requirements" that Plaintiffs include in Exhibit 127 are processes/guidelines to ensure compliance with that regulation (and others), such as prohibiting the use of misleading sales tactics and requiring agents to use language in their pitch that clearly indicates only qualified applicants may receive Lifeline service.  *See* Pls' Ex. 127 at 2-3.  Moreover, even accepting Plaintiffs' self-serving characterization of isolated provisions of the SOPs as true, none of them indicate control that is relevant to the joint employment analysis.

jointly employ cable technicians.  838 F. Supp. 2d 111.  Time Warner created installation work orders for technicians, specified the services required, and provided a time frame in which that customer's services had to be performed by technicians engaged by one of Time Warner's contractors.  *Id.* at 126.  The court rejected the plaintiffs' argument that these directives amounted to controlling the technicians' work days, pointing out that there is a "difference between affecting and supervising or controlling," and that the important facts were that the contractor organized the work orders into routes, assigned those routes to technicians, instructed technicians when to report in the morning, and communicated directly with them about absences and lateness, *i.e.* the contractor "decide[d] which technicians will work on which job, and whether a technician will work on any jobs[.]"  *Id.*  The court similarly rejected the plaintiffs' argument that the hundreds of weekly audits and customer surveys Time Warner conducted and provided to the contractor made Time Warner the technicians' "de facto supervisors."  *Id.* at 127. The court found that these efforts were to ensure "quality service" to its customers and did "not show that Time Warner controls the day-to-day manner in which technicians provide that service."  *Id.*  Nor did Time Warner's customer care or training of technicians on their products and technical issues weigh in favor of employer status.  *Id.*

Like in *Jean-Louis*, Sprint does not exert any relevant control over field agents.  Plaintiffs make much of agents only being able to market the Lifeline Program in authorized territories, and the SOP requirement that events are appropriately staffed.  But this is no different than providing a contractor with a list of installation work orders and locations, and time frames to install, and instructing them to fulfill the orders.  The key is that Sprint did not instruct Credico or Wallace Morgan as to who to assign to any particular location within the authorized territory, or how many hours or on what schedule any particular agent should work.  Moreover, Sprint's

SOPs and audits are exactly the type of quality control courts, as in *Jean-Louis*, have deemed irrelevant to the joint employment analysis.  For example, Sprint does require that field agents include certain words and phrases in their pitch to potential subscribers because part of an agent's job is to assess eligibility for the Lifeline Program, a critical component of the regulatory framework to prevent fraudulent subscriptions.  Likewise, because agents interface with eligible subscribers from application submission through phone activation, they must be able to provide basic customer service.  Wallace Morgan meetings in which Sprint conveyed SOP requirements and product-related information are no different.  None of the requirements that Plaintiffs highlight impact in any way their work schedules, hours or conditions, or indicate supervision.

### C.   Sprint Did Not Control Agent Rate or Method of Pay

Plaintiffs concede that "Wallace Morgan decided the exact rates to provide directly to Agents." (Dkt. 305, Pls' Opp. at 25.)  They also state that, "Sprint determined the amount Credico received for each approved Lifeline enrollment application that was collected by Field Agents.  Credico, in turn, determined how much compensation the Wallace Morgan office and its Field agents will receive for each approved Lifeline enrollment application." (Dkt. 301, Sprint 56.1 Resp. ¶ 105.)  Further, there is no dispute that Wallace Morgan provided Field Agents with paychecks, IRS Form 1099 and W-2s. (Dkt. 273, Sprint 56.1 ¶ 112.)  There is no evidence to support the chain of causation Plaintiffs seek based on the evidence.

*Barfield v. New York City Health and Hospitals Corp.*, upon which Plaintiffs exclusively rely, does not apply here.  537 F.3d 132 (2d Cir. 2008).  The case does not support Plaintiff's argument because the court determined that the third *Carter* factor relating to rate and method of payment was "inconclusive" and "[did] not tilt decisively either way." *Id.* at 144-145.  The facts are also very different.  In *Barfield*, the putative joint employer, Bellevue Hospital, worked directly with the plaintiffs to schedule and approve their working hours on Bellevue's premises.

*Id.* at 136.  Bellevue supervisors kept records of the hours the plaintiffs worked on premises, controlled how many hours they could work, calculated their hours worked, and then paid the plaintiffs' job agency an hourly rate based on Bellevue's records.  *Id.* at 138, 144-45.  The job agency then passed down an hourly rate of pay to plaintiffs based on the hours calculated and controlled by Bellevue.  *Id.*  There is no such involvement by Sprint here.  The record demonstrates that Sprint negotiated compensation for Lifeline Program applications with Credico, and its involvement ended there.  (Dkt. 273, Sprint 56.1 ¶ 40; *see, e.g.,* Pls' Ex. 5, OA Agreement § 9, at SPRMAR-000009.)  There is no evidence that Sprint was involved in any negotiation of compensation between Credico and Wallace Morgan, or between Wallace Morgan and field agents.  (*See* Dkt. 277, Buongiovanni MSJ Decl. ¶¶ 13-14.).  Under these attenuated circumstances, where Sprint is not even alleged to have set compensation with the contractor who engaged the agents, courts distinguish between affecting compensation, and determining it—the former of which weighs *against* a finding of joint employment.  *See, e.g., Jean-Louis*, 838 F. Supp. 2d 111, 129-30 ("To be sure, any company A that provides revenue to company B affects what company B pays its employees, but the test is whether a putative joint employer determines pay rates, not whether it affects them."); *Jacobsen v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010) (plaintiffs' argument regarding pay would "dramatically expand the FLSA to subsume traditional independent contractor relationships").

**D.**    **Sprint Did Not Maintain Relevant Employment Records**

Plaintiffs do not dispute that Sprint did not maintain "traditional personnel records or records of the hours Field Agents work."  (Dkt. 305, Pls' Opp. at 26.)  Under the relevant authority, these are the records germane to the fourth formal control factor.  *See Barfield*, 537 F.3d at 144 (the kinds of employment records "most relevant to overtime obligations under the FLSA:  the hours worked [by plaintiffs]").  Plaintiffs attempt to substitute their own holding for

11

*Barfield*, but they do not dispute that Wallace Morgan maintains agents' independent sales representative agreements, tax forms, and paystubs.  (Dkt. 273, Sprint 56.1 ¶ 111.)  Additionally, the only documents Sprint requires Credico to keep (tax forms, background checks, training records, and agent acknowledgement of training) have nothing to do with the hours the agents allegedly worked.  (*Id.* ¶¶ 109, 111-112.)  Plaintiffs conclusorily assert that Sprint "monitors and tracks Field Agents marketing in real time" (Dkt. 305, Pls' Opp. at 26), *i.e.* Sprint is able to access information in Quickbase regarding where OAs are staffing Assurance Wireless events, but they fail to mention that the only evidence on the record, which they do not dispute, is that Sprint uses this information so that it can determine where to perform mystery shops and audits. (*See* Dkt. 277, Buongiovanni MSJ Decl. ¶¶ 20-23; Dkt. 273, Sprint 56.1 ¶ 125.)  There is zero evidence that Sprint uses Quickbase for any other purpose.  Thus, the records that Plaintiffs identify are " 'only an extension'…[of] quality control procedures" and not relevant to the joint employment analysis.  *Godlewska*, 916 F. Supp. 2d at 262 (citation omitted).

       E.       <u>**Sprint Did Not Provide Agents with Equipment in the Field**</u>

Given the number of undisputed facts concerning the agents' equipment, Plaintiffs' statement that this factor "tilt[s]…slightly in Plaintiffs' favor" is wrong.  (Dkt. 305, Pls' Opp. at 32.)  These are the key undisputed facts:  Field agents never performed work at any Sprint facility.  (*Id.*; Dkt. 273, Sprint 56.1 ¶ 119.)  Credico provided Wallace Morgan with the tablets that agents used in the field to help potentially qualified applicants complete Lifeline Program applications.  (Dkt. 259, Stip. Facts ¶¶ 57, 59.)  Plaintiffs picked up and returned those tablets to Wallace Morgan's office.  (*Id.* ¶¶ 58, 62.)  Sprint did not assign or issue tablets to agents.  (*Id.* ¶ 63.)  Plaintiffs have no evidence that Sprint required the use of equipment or marketing materials. (Dkt. 305, Pls' Opp. at 32.)  The basis for this "dispute" (which Plaintiffs invent) is language in the SOPs that provides that Sprint will make marketing materials available, and that

any marketing materials not created by Sprint require pre-approval before using them.  (*See* Dkt. 273, Sprint 56.1 ¶ 134.)  But even assuming *arguendo* that Sprint required field agents to use marketing materials concerning Assurance Wireless products and services, this technical information is not what actually enabled the agents to do their job.  The underpinning of this factor is whether plaintiffs shared a putative joint employer's premises and equipment, the way its employees would, to separate legitimate subcontracting relationships from atypical arrangements.  *See Zheng*, 355 F.3d at 72.  For example, in *Barfield*, this factor weighed in favor of joint employment because the plaintiffs worked on Bellevue's premises, using only Bellevue's equipment to do the same work "routinely performed" by Bellevue's full-time employees.  537 F.3d at 146-47.  Here, using Assurance Wireless marketing materials out in the field to persuade eligible subscribers to apply for service in no way subjected the agents to Sprint control or to performing work Sprint employees perform.

### F.     Wallace Morgan's Business Could and Did Shift Between Clients

Plaintiffs ignore the Court of Appeals' caution that "the absence of a broad client base is" not "anything close to a proxy for joint employment (because they are both perfectly consistently with a legitimate subcontracting relationship)."  *Zheng*, 355 F.3d at 72.  Their focus on the argument that Credico engaged Wallace Morgan exclusively for "a substantial portion of the relevant time period,"  (Dkt. 305, Pls' Opp. at 32), is misplaced for several reasons.

First, the relevant inquiry in analyzing this functional control factor is whether a business "*could* or did shift as a unit from one putative joint employer to another." *Zheng*, 355 F.3d at 72 (emphasis added).  The undisputed evidence is that Credico's contract with Wallace Morgan permitted Wallace Morgan to work with other clients besides Credico.  (*See* Dkt. 280, Cred. 56.1 ¶ 50; Pls' Ex. 7, Subcontractor Agmt.)  Sprint did not, through Credico or directly, prohibit Wallace Morgan from serving other clients.  (Dkt. 277, Buongiovanni MSJ Decl. ¶ 10.)  Indeed,

this is apparent because Plaintiffs admit that Wallace Morgan did service other Credico clients, including Verizon and Direct Energy.  (Sprint 56.1 Resp. ¶¶ 59-60.)  That Wallace Morgan decided not to engage with entities other than Credico, despite its express authorization to do so, cannot be attributed to Credico, let alone Sprint, which was just one of Credico's clients.

Second, Plaintiffs' argument that Wallace Morgan's work with Credico's client Direct Energy should be disregarded because Direct Energy is not a Lifeline Program provider misconstrues this factor.  It is the *contractor's* business model that is relevant.  Wallace Morgan described itself as being a sales company that marketed, promoted, and sold other companies' products and services to consumers.  (Eichberger MSJ Decl.[4] Ex. E, Wallace Morgan ("WM") Tr. 14:13-21; Pls' Ex. 7, Subcontractor Agmt.)  Wallace Morgan has never held itself out to be in the Lifeline Program business, and Wallace Morgan's actual client—Credico—is in the direct sales business.  Any company which engaged Wallace Morgan to market, promote or sell products, therefore warrants consideration under this factor.

Finally, the relevant inquiry is whether a "*business organization* [can] shift[] as a unit from one putative joint employer to another," not whether individual agents worked on more than one campaign at a time.  *Zheng*, 355 F.3d at 72.  Because Wallace Morgan could have sought business from other contractors, and because there is evidence that it worked on multiple campaigns during its engagement with Credico, this factor weighs in favor of Sprint.  *Id.*

## G.    Defendants Presented Undisputed Evidence That Face-to-Face Sales is Routinely Outsourced in the Telecommunications Industry

Plaintiffs attempt to distance themselves from the position they took in their opening brief that the third *Zheng* factor "has limited application outside the context of a product

---

[4] "Eichberger MSJ Decl." refers to the Declaration of Nicole A. Eichberger, dated May 12, 2017 (Dkt. 276).

manufacturing line." (Dkt. 264, Pls' Br. at 35-36.)  They now claim that analysis of this factor

under the circumstances here presents an "imperfect" analogy.  (Dkt. 305, Pls' Opp. at 33.)  They

also ignore the Court of Appeals' directive, which is to consider "industry custom and historical

practice" because widespread practices that are common in a particular industry are "unlikely to

be a mere subterfuge to avoid complying with labor laws."  *Zheng*, 355 F.3d at 73.

Sprint, Credico, and Wallace Morgan have submitted undisputed evidence that

subcontracting face-to-face sales is common in the telecommunications and direct sales

industries (including for Lifeline Program marketing and promotion), based on their personal

knowledge and experience.  (*See* Dkt. 72, Buongiovanni Cond. Cert. Decl. ¶¶ 12-14; Dkt. 280,

Credico 56.1 ¶¶ 19-20; Eichberger MSJ Decl. Ex. E, WM Tr. 220.)  That Plaintiffs have no

evidence to dispute sworn testimony from persons knowledgeable about industry practices is not

the result of a lack of discovery as they claim.  There was full-blown discovery in this matter,

and Plaintiffs had the opportunity to examine each of the witnesses above as to the statements

they made.[5]  Accordingly, this factor weighs against a finding of joint employment.

### H.    Responsibility for the Assurance Wireless Campaign Does Not Shift from One Subcontractor to Another Without Material Changes

The fourth functional control factor examines whether the "same employees would

continue to the same work in the same place" if an entity terminated its relationship with a

contractor.  *Zheng*, 355 F.3d at 74.  There is no evidence of that here.  Sprint has numerous OAs

which perform marketing services for Assurance Wireless in different territories, and Credico

works with more than 200 ISOs.  (Dkt. 273, Sprint 56.1 ¶ 22.).  Moreover, there is no need to

speculate, because Wallace Morgan *did* cease operations in January 2016, and Credico assigned

---

[5] Sprint identified Mr. Buongiovanni in its Rule 26 disclosures, and he submitted a sworn declaration in opposition to conditional certification prior to his deposition, which Plaintiffs took. Plaintiffs had the opportunity to examine him on the declaration and any other issue in this case.

a different ISO with different agents to do the marketing work.  (Dkt. 273, Sprint 56.1 ¶ 65.)

Plaintiffs conclusory assertions that field agents "switch[ed] from ISO to ISO without changing

the nature of their job with Assurance Wireless" and "seamlessly transferred to another ISO to

continue their work" when Wallace Morgan ceased operating is without any support in the

record.[6]

## I.   Sprint Did Not Supervise Wallace Morgan Agents, "Occasionally" or Otherwise

Plaintiff's vague assertion that Sprint "actively, if only occasionally" supervised Wallace

Morgan field agents is likewise without any evidence.  (Dkt. 305, Pl. Opp. at 34.)  To the extent

Plaintiffs are again referring to Sprint's SOPs and audits, "supervision with respect to contractual

warranties of quality…has no bearing on the joint employment inquiry."  *Zheng,* 355 F.3d at 75,

*see also Godlewska*,  916 F. Supp. 2d at 264-65 (exercising quality control to ensure that

contractor "delivered quality service and complied with legal requirements" is not supervision).

Moreover, Plaintiffs do not dispute that they were unable to identify a single Sprint

representative who had any knowledge about their jobs, or who supervised or directed their work

in any way, and instead only identified Wallace Morgan supervisors.  (*See* Dkt. 273, Sprint 56.1

---

[6] Plaintiffs cite no support in their brief for this point.  (*See* Dkt. 305, Pls' Opp. at 34.)  To the extent they are referring to two emails included in their response to Credico's 56.1 Statement, neither substantiate their allegations.  Plaintiffs' Exhibit 154 concerns the assignment of credentials to *one* field agent, and there is no information concerning what campaign the agent had worked on previously.  In Plaintiffs' Exhibit 155, there is no reference to the Assurance Wireless campaign at all and the email is dated in March 2015, when Credico had also engaged Wallace Morgan for a Direct Energy campaign.  (Dkt. 273, Sprint 56.1 ¶ 60.)  And in any event, even if this constituted evidence that Credico facilitated the transfer of agents from ISO to ISO, the continuity would be between Credico and the agents, not *Sprint* and the agents.

¶¶ 175-180; Dkt. 280, Credico 56.1 ¶¶ 104, 106, 119.)[7]  Sprint did not supervise the agents'

work, manage them on a day-to-day basis, or determine their hours or work schedules.

### J.      Sprint Did Not Assume the Prerogatives of An Employer

The Court of Appeals has differentiated between a situation where a joint employer has

exercised control such that it becomes "*de facto*…responsible… for the amount workers are paid

and for their schedules" and where "a subcontractor performs [] a majority of its work for a

single customer [and] there is no sound basis on which to infer that the customer has assumed the

prerogatives of an employer."  *Zheng*, 355 F.3d at 75.  Sprint fits squarely into the latter

category.  Sprint contracts the marketing and promotion of the Assurance Wireless campaign to

Credico, among other OAs.  (Dkt. 273, Sprint 56.1 ¶¶ 37-39.)  It is Credico's prerogative which

of its more than 200 ISOs it chooses to subcontract the Assurance Wireless campaign or any

other client campaigns to.  Eichberger MSJ Decl. Ex. C, Sprint Tr. 301-303.)  It is not disputed

that Credico did subcontract other campaigns to Wallace Morgan, and expressly authorized

Wallace Morgan to seek other business as well.  (*See* Pls' Ex. 7, Subcontractor Agmt. § 5(d), at

WM000034; Dkt. 301, Sprint 56.1 Resp. ¶¶ 59-60.)  Under these circumstances, Sprint in no way

assumed the prerogatives of an employer for Wallace Morgan's field agents.

### K.      Plaintiffs' Request that This Court Disregard Binding Precedent Should Be Rejected

Throughout their brief, Plaintiffs rely on a smattering of non-binding law review articles,

sub-regulatory authority (which has now been withdrawn by the USDOL), and out-of-circuit

case law, because it is plain that the law in this Circuit compels the conclusion that Sprint is not a

---

[7] That the Named Plaintiffs reported harassment to their Wallace Morgan supervisors and not
anyone at Sprint (because they did not know anyone at Sprint), and that they only sued Wallace
Morgan in their recently filed harassment/retaliation lawsuit is not "immaterial and irrelevant,"
as Plaintiffs contend.  (*See* Dkt. 305, Pls' Opp. at 21 n.14; Dkt. 273, Sprint 56.1 ¶¶ 181-184.)
Rather, it underscores the complete absence of Sprint supervision.

joint employer.  In a last ditch effort, Plaintiffs assert that "[t]he *Zheng* factors are not dispositive," (Dkt. 305, Pls' Opp. at 36) and request that the Court circumvent binding authority and adopt the Fourth Circuit's test in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017).  *See* Dkt. 305, Pls' Opp. at 36-37.  That suggestion is improper and must be rejected. However, as discussed in Sprint's moving brief, applying the *Salinas* test here would amount to a distinction without a difference.  (*See* Dkt. 272, Sprint's Br. at 13-14 n.6.)  The *Salinas* test asks whether a putative joint employer is so closely associated with a contractor that they together established or co-determined the "*essential* terms and conditions of a worker's employment." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 141 (4th Cir. 2017).  Sprint is wholly distinct from both Credico and Wallace Morgan, and its involvement with field agents does not extend beyond establishing processes for complying with the Lifeline Program regulations and upholding the integrity of its brand through quality control monitoring.  These were not the "essential" terms and conditions relevant to the *Salinas* court, just like they are not essential under the economic realities test in the Second Circuit.  *See* Dkt. 272, Sprint's Br. at 13-14 n.6.

## II.   PLAINTIFFS ARE EXEMPT OUTSIDE SALES PERSONS

There are no material factual disputes as to the duties of field agents.  Field agents engaged by Wallace Morgan and assigned to the Assurance Wireless campaign spent the supermajority of their time in the field, obtaining Lifeline Program applications from eligible subscribers.  (Dkt. 259, Stip. Facts ¶ 52; Dkt. 273, Sprint 56.1 ¶ 170.)  Field agents identified and approached potential Assurance Wireless customers in the field, utilized a pitch to proactively engage potential applicants, asked them questions, and provided them with information concerning the program.  (Dkt. 273, Sprint 56.1 ¶ 164; Dkt. 280, Credico 56.1 ¶¶ 148, 150; Pls' Ex. 6-7.)  They "typically worked in the field on their own" and their goal was to collect as many applications as possible, because the more approved applications they obtained, the more

commission they earned.  (Dkt. 273, Sprint 56.1 ¶ 165; Dkt. 280, Credico 56.1 ¶¶ 113, 171, 174.)

Once an application is submitted, Solix, a third-party vendor, determines whether an application

should be approved. (Dkt. 259, Stip. Facts ¶ 60; Dkt. 273, Sprint 56.1 ¶ 168; Dkt. 280, Credico

56.1 ¶ 173.)  Plaintiffs and other Wallace Morgan agents referred to approved applications as

"clean sales."  (Dkt. 302, Credico 56.1 Resp. ¶ 155.)

The question is whether, as a matter of law, Plaintiffs' undisputed responsibilities

constitute "making a sale" or "obtaining orders or contracts for services."  Under the relevant

legal authority, Plaintiffs performed qualifying sales work.

### A.     <u>Plaintiffs Performed Exempt Sales Work</u>

Plaintiffs argue that Plaintiffs did not make qualifying "sales" or "services" under the

FLSA or NYLL because:  (i) the products and services are subsidized, and (ii) the Lifeline

Program application is a non-binding commitment because subscribers did not have to activate

the phone and/or their applications could be denied.  Each argument should be rejected.

First, Plaintiffs have no support for the proposition that Lifeline Program subscribers had

to pay directly for Assurance Wireless products or services in order for the transaction to be a

qualifying sale.  In *Christopher*, the Supreme Court mandated that courts take a "functional"

approach to the outside sales analysis and defined "sales" to be "reasonably interpreted as

including those arrangements that are tantamount, i*n a particular industry* to a paradigmatic sale

of a commodity."  567 U.S. at 164 (emphasis added).  Plaintiffs' duties must be evaluated in the

context of the heavily regulated Lifeline Program.  Here, the "arrangement" at issue is one in

which the products and services are subsidized by a governmental entity.  (Dkt. 273, Sprint 56.1

¶¶ 1-2 4, 8.)  This does not make the products and services "free"; it means that the end-user is

not the party who is paying for the service.  Indeed, Sprint receives a monetary benefit (*i.e.*, a

subsidy) for each activated phone subscription obtained by a field agent.  (*Id.*)

19

Plaintiffs attempt to distinguish the facts here from the relevant legal authority on the basis that the case law cited by Defendants involved different industries, and thus, a different framework for sales.  (Dkt. 305, Pls' Opp. at 40.)  But whether the outside sales exemption applies, based on the specific parameters of the industries in which the plaintiffs worked, is precisely what *Christopher* directs courts to analyze.  567 U.S. at 164 (noting that the regulations "represent an attempt to accommodate industry-by-industry variations in the methods of selling commodities").  For example, in *Flood v. Just Energy Mktg. Corp.*, the court determined that the plaintiff performed exempt sales work by obtaining commitments from customers for energy services, even though the utility company had final discretion as to whether to accept the new customer.  No. 7:15-cv-2012 (KBF), 2017 WL 280820, *5 (S.D.N.Y. Jan. 20, 2007).  Similarly, in *Gold* and *Chenesky*, the Court of Appeals and the Southern District of New York, respectively, affirmed application of the outside sales exemption to insurance salespersons, rejecting the plaintiffs' argument in both cases that their primary duties involved researching and making recommendations, because these steps were crucial parts of selling the insurance.  *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013); *Chenesky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504(WHP), 2009 WL 4975237, at *6 (S.D.N.Y. Dec. 22, 2009).  Here too, the court must evaluate whether the field agents made sales in the context of the extensively-regulated and subsidized Lifeline Program, for which Plaintiffs earned commissions for each approved application they procured.

Plaintiffs next contend that they are not outside salespersons because they did not necessarily "close" sales in the field.  (Dkt. 305, Pls' Opp. at 40-42.)  But the Supreme Court has expressly rejected that such a requirement exists, holding that a "non-binding commitment" from doctors (who had *no* control over whether their patients would ultimately choose to buy the

drugs they prescribed) constituted a sale under the regulations.  *Christopher*, 567 U.S. at 146.

The *Flood* applied the principle articulated in *Christopher* earlier this year in this Circuit, and

held that plaintiff "directed efforts towards the consummation of sale," even though the

defendant retained authority to reject the energy services applications he collected.  2017 WL

280820, at *5 ("There is nothing in the FLSA or the NYLL that limits the definition of an

outside salesperson to someone who has unfettered discretion to finalize a binding sale.").

Just as there was no guarantee that patients would ultimately purchase the drugs the

doctors committed to prescribe in *Christopher*, or that the defendant energy company would

approve every energy contract obtained by the plaintiff in *Flood*, here too there is theoretically

the possibility that a subscriber will choose not to activate a phone, or that an application will not

be accepted.  Plaintiffs, however, distort the record with respect to why and how applications

may not "close."  First, the reasons for denials included in the Credico Commission Schedule

cited by Plaintiffs reflect fraud prevention measures that are designed to ensure that Lifeline

Program phones and service are only provided to eligible and qualified subscribers.  *See* Pls' Ex.

38, Subcontractor Commission Schedule.  For example, some of the reasons applications are

denied include because the applicant's income did not meet the guidelines (ID 600); Lifeline

Program service already exists in the applicant's household (ID 610); or the applicant had been

approved with another Lifeline Program carrier within the past 60 days (ID 674).[8]  *Id.*  Plaintiffs

also parrot language from the OA Agreement between Sprint and Credico regarding discretion

---

[8] Plaintiffs' assertion that "60 different reasons" are provided for application denial is
disingenuous.  Even a cursory review of the document reveals that many of the reasons for denial
are quite similar (*e.g.* there are multiple codes for insufficient income documentation; there are
state-specific denial codes).  Regardless, all of the codes are designed to ensure compliance with
the Lifeline Program regulations.  Discretionary denials—even if there was evidence of such a
thing here, which there is not—would not prevent application of the exemption.  *See, e.g., Flood*,
2017 WL 280820 at *4 (energy service agreement contained clause that acceptance of the
agreement was at the energy services company's "sole discretion.").

Sprint has with respect to providing service (Dkt. 305, Pls' Opp. at 41), but they do not point to a single instance in which Sprint arbitrarily denied or discontinued service to any customer that resulted in a non-payment of commission to a field agent.  In fact, as support for their argument, they cite an email in which Sprint agrees *to pay* Credico for denied applications.  (*See* Dkt. 280, Cred. 56.1 ¶ 172; Pls' Ex. 153, Jan. 30, 2013 email from V. Buongiovanni.)

Finally, Plaintiffs attempt to distinguish themselves from the college recruiters in *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747 (W.D. Mich. 2003) on the basis that Plaintiffs' duties here "stopped once an application was received," while the recruiters in *Nielsen* performed certain follow-up.  Plaintiffs argue that they are more like the recruiters in an opinion letter issued by the USDOL almost 20 years ago.  (Dkt. 305, Pls' Opp. at 41.)  Sprint refers the Court to its analysis as set forth its moving brief as to why the USDOL informal guidance they rely upon has no application here, *see* Dkt. 272, Sprint's Br. at 30 n.12, and does not repeat that argument.  But one additional point bears note:  One of the key inquiries in the relevant case law is whether, in "directing efforts at consummating a sale," the outside sales representative did "the most that [they] were able to do to ensure the eventual disposition of" the sale in the context of the specific industry in which they were selling.  *Christopher*, 567 U.S. at 177.  In *Christopher*, the most plaintiffs could do was obtain a non-binding commitment from doctors.  In *Nielsen*, the recruiters, by virtue of their roles at the colleges, were in a position to follow-up with applicants they had persuaded to apply.  Here, the most field agents could do was assess eligibility for the Lifeline Program, persuade eligible subscribers to apply, and help facilitate the completion and submission of their applications.  By virtue of their role, and the objective criteria utilized to determine whether an applicant could receive Lifeline Program service, field agents could not engage in any follow up with eligible subscribers.  There can be no dispute that the field agents

did as much as could possibly be done to make a "sale" or "obtain an order for services." *See Flood*, 2017 WL 280820, at *4 ("If [plaintiff] was not making the sale, who was?  No one?  This makes no sense.  Indeed, [the plaintiff] was paid *commissions* based directly on the sales he had made.  The proof is in the pudding, so to speak.").

### B.     Plaintiffs Bore Other Indicia of Outside Salespersons

The undisputed facts demonstrate that field agents satisfy the outside sales requirement set forth in the regulations, and that is sufficient to find in Sprint's favor as a matter of law. However, to the extent it aids the Court in its analysis, the Plaintiffs participated in several "hallmark activities" that further illustrate that they fit squarely within the exemption. *See Flood*, 2017 WL 280820 at *5 n. 5 (noting that the additional factors can lend further support for application of the exemption).  First, there is no dispute that Plaintiffs were paid on a commission basis or that they performed the vast majority of their work in the field.  (Dkt. 301, Sprint 56.1 Resp. ¶ 170, 173-174; Dkt. 302, Credico 56.1 Resp. ¶ 109.)  Additionally, Plaintiffs concede they were not typically supervised in the field, and the "supervision" they argue—audits and SOP guidelines—is recycled from their other arguments and not relevant here.  (Dkt. 302, Credico 56.1 Resp. ¶ 113.)  Likewise, Plaintiffs' argument that they did not solicit new business because they were not permitted to sell door to door, and did not develop ongoing relationships, is not persuasive.  The Lifeline regulations require that each household have only one Lifeline subscriber, thus Plaintiffs could *only* solicit new business, and the nature of their interactions with prospective subscribers is the product of the regulated environment in which they worked. *See* 47 C.F.R. §§ 54.409(c), 54.410(d).  Finally, Plaintiffs' work is the type of work unsuitable for an hourly wage.  It is undisputed that Plaintiffs spent the supermajority of their time away from the office and typically without supervision.  (Dkt. 301, Sprint 56.1 Resp. ¶ 170; Dkt. 302, Credico 56.1 Resp. ¶¶ 113-114.)

III.    **DISPUTED ISSUES OF MATERIAL FACT PRECLUDE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO EMPLOYMENT STATUS**

Based on the record, including but not limited to the Plaintiffs' own testimony concerning how they operated as field agents, there are disputed issues of material fact that are central to the independent contractor analysis.[9]  Plaintiffs contend that Sprint sufficiently controlled the means and manner of their work.  The "control" that they cite, however, is the same compliance- and quality-control related processes they mistakenly rely on with respect to the joint employment analysis, which is irrelevant.  For example, in *Saleem v. Corp. Transportation Group, Ltd.*, 854 F.3d 131, 136 (2d Cir. 2017), the Court of Appeals determined that a rulebook, which set forth conduct standards and a dress code, and which was enforced with monetary penalties, did not transform independent contractors into employees.

Additionally, Plaintiffs have failed to proffer any evidence that Sprint controlled their schedules; rather, the evidence demonstrates that none of the Defendants prohibited agents from taking on other work, and that Plaintiffs did operate with flexibility which centered on the sales they each wanted to generate.  (Dkt. 259, Stip. Facts ¶¶ 51, 66; Pls' Ex. 43 at MARTIN0000874; Dkt. 273, Sprint 56.1 ¶¶ 113-114; Eichberger MSJ Decl. Ex. A, Martin Tr. 213:4-214:13, Ex. E, WM Tr. 95:7-25, 159:22-160:14.)  The "dispositive point" is not the number of hours worked for a contractor, but the fact that plaintiffs were free to engage in other engagements.  *Sellers v. Royal Bank of Canada*, No. 12 Civ. 1577(KBF), 2014 WL 104682, at *7 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592 F. App'x 45 (2d Cir. 2015).  To the extent the Plaintiffs allege that they worked

---

[9] Plaintiffs improperly added "additional facts" and responses thereto, in their Response to Sprint's 56.1 Statement.  *See* Dkt. 301.  Paragraphs 189-195 concern Defendants' opposition to Plaintiffs' motion for summary judgment as to their independent contractor status.  They have no place in Sprint's 56.1 Statement (which is specifically for a *moving* party's material facts).  Paragraphs 187-188 rebut allegations Plaintiffs made concerning Credico, which are also not material to *Sprint's* motion for summary judgment.  The Court should disregard Plaintiffs' characterization of these purported "facts" and their responses.

at similar times, this is more a reflection of the agents working at times in which they could maximize potential subscriber traffic, and ultimately the amount of commission they earned. This too, is not indicative of an employer/employee relationship. *See Sellers*, 2014 WL 104682, at *6; *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 609 (E.D.N.Y. 2012).

Sprint has further proffered evidence that field agents bore other indicia of independent contractor status, including that they believed they were in business for themselves, and were compensated like independent contractors.  (Eichberger MSJ Decl. Ex. K, Toussaint Tr. 37:3-14, 41:19-23, Ex. B, Singleton Tr. 135:10-12; Ex. L, Gillens Tr. 43:3-7; Bloom MSJ Decl.[10] Ex. AL, Martin Tr. 193:15-23, Ex. AM, Gutierrez Tr. 145:11-146:15.)  Contrary to Plaintiffs' assertion, this is an indicator of independent contractor status.  *See Saleem*, 854 F.3d at 141.

These indicators of independence weigh against a finding of employer status, but at best for Plaintiffs create an issue of fact that cannot be decided on a dispositive motion.  Ultimately, however, Sprint's connection to Wallace Morgan's field agents was so remote and attenuated that even if Plaintiffs were found to be employees, they were certainly not Sprint's employees.

## **CONCLUSION**

For the foregoing reasons, Sprint respectfully requests that the Court grant its cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment, and dismiss Plaintiffs' complaint in its entirety with prejudice as against Sprint.

---

[10] "Bloom MSJ Decl." refers to the Declaration of Elise M. Bloom, dated June 23, 2017 and filed herewith.

Dated: New York, New York
       June 23, 2017

PROSKAUER ROSE LLP

By: s/ *Elise M. Bloom*
    Elise M. Bloom
    Gregory I. Rasin
    Steven D. Hurd
    Mark W. Batten (*pro hac vice*)
    Nicole A. Eichberger (*pro hac vice*)

Eleven Times Square
New York, New York 10036-8299
Phone: 212.969.3000
Fax: 212.969.2900
ebloom@proskauer.com
grasin@proskauer.com
shurd@proskauer.com

*Attorneys for Defendant*
SPRINT/UNITED
MANAGEMENT COMPANY