UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

JAMIE MARTIN and DANEISHA
SINGLETON, on behalf of themselves and all
others similarly situated, and the Proposed
New York Rule 23 Class,

                         Plaintiffs,

            -v-

SPRINT UNITED MANAGEMENT CO.,
CREDICO (USA), LLC, and WALLACE
MORGAN, INC.,

                        Defendants.

------------------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/27/17

15 Civ. 5237 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

         Plaintiffs Jamie Martin and Daneisha Singleton bring this action on behalf of themselves

and similarly situated persons, alleging violations of the Fair Labor Standards Act, 29 U.S.C.

§ 201, *et. seq.* ("FLSA"), and the New York Labor Law, N.Y. Lab. Law § 650, *et. seq.*

("NYLL").  Plaintiffs served as field agents securing low-income customers to acquire wireless

telephones of defendant Sprint/United Management Company ("Sprint") pursuant to a federal

subsidy program.  They claim that they were misclassified as independent contractors, as

opposed to as employees.  Plaintiffs claim that, as a result, they were denied statutorily required

minimum wage and overtime compensation.  Plaintiffs claim that Sprint and co-defendants

Credico (USA), LLC ("Credico") and Wallace Morgan, Inc. ("Wallace Morgan") are jointly

responsible for this willful misclassification.  Plaintiffs further claim that defendants failed to

provide them with required wage notices and statements.

Pending now are the parties' cross-motions for summary judgment.  These motions raise three issues: (1) whether plaintiffs were employees rather than independent contractors under the FLSA and NYLL; (2) if so, whether Sprint and Credico were joint employers (with Wallace Morgan) of plaintiffs, such that they can be held liable for the alleged FLSA and NYLL violations; and (3) whether, even if plaintiffs are employees, they are exempt from FLSA and NYLL requirements as outside salespeople.

For the reasons that follow, the Court holds for defendants on the latter two issues. Specifically, the Court holds that, even assuming *arguendo* that plaintiffs were employees rather than independent contractors, (1) Credico and Sprint cannot be held liable as plaintiffs' joint employers, and (2) the outside sales exemptions to the FLSA and NYLL apply.  These rulings preclude liability altogether for Sprint and Credico, and they preclude liability for Wallace Morgan on plaintiffs' minimum-wage and overtime claims.  Accordingly, the Court grants defendants' motions for summary judgment and denies plaintiffs' motion for partial summary judgment.  As to the sole remaining claims—plaintiffs' wage-notice claims under the NYLL against Wallace Morgan—the Court, as explained below, commissions letter-memoranda from plaintiffs and Wallace Morgan as to the effect of the Court's rulings on these claims.

## I.      Background[1]

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to this motion, including: plaintiffs' memorandum of law in support of the motion for partial summary judgment, Dkt. 264 ("Pl. Br."); plaintiffs' Local Rule 56.1 statement, Dkt. 265 ("Pl. 56.1"); the declaration of Rachhana Srey in support of plaintiffs' motion for partial summary judgment, Dkt. 266 ("First Srey Decl."); Sprint's memorandum of law in support of its cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 272 ("Sprint Br."); Sprint's Local Rule 56.1 statement, Dkt. 273 ("Sprint 56.1"); Sprint's counter-statement to plaintiffs' Local Rule 56.1 statement, Dkt. 279 ("Sprint Counter 56.1"); the declaration of Nicole A. Eichberger in support of Sprint's cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 276 ("Eichberger Decl."); Credico's memorandum of law in support of its cross-

motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 278 ("Credico Br."); Credico's Local Rule 56.1 statement, Dkt. 280 ("Credico 56.1"); Credico's counter-statement to plaintiffs' Local Rule 56.1 statement, Dkt. 281 ("Credico Counter 56.1"); the declaration of Greta B. Williams in support of Credico's motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 283 ("Williams Decl."); Wallace Morgan's memorandum of law in support of its cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 290 ("Wallace Morgan Br."); the declaration of Joseph F. Tremiti in support of Wallace Morgan's cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 291 ("Tremiti Decl."); Wallace Morgan's Local Rule 56.1 statement, Dkt. 293 ("Wallace Morgan 56.1"); plaintiffs' memorandum of law in opposition to defendants' cross motions for summary judgment and reply in support of plaintiffs' motion for partial summary judgment, Dkt. 305 ("Pl. Opp. Br."); plaintiffs' counter-statement to Sprint's Local Rule 56.1 statement, Dkt. 301 ("Pl. Counter to Sprint 56.1"); plaintiffs' counter-statement to Credico's Local Rule 56.1 statement, Dkt. 302 ("Pl. Counter to Credico 56.1"); plaintiffs' counter-statement to Wallace Morgan's Local Rule 56.1 statement, Dkt. 300 ("Pl. Counter to Wallace Morgan 56.1"); the affidavit of Rachhana Srey in opposition to defendants' cross-motions for summary judgment, Dkt. 303 ("Srey Aff."); the declaration of Rachhana Srey in opposition to defendants' cross-motions for summary judgment, Dkt. 304 ("Second Srey Decl."); Sprint's reply memorandum of law in support of its cross-motion for summary judgment, Dkt. 311 ("Sprint Rep. Br."); the declaration of Elise M. Bloom in support of Sprint's cross-motion for summary judgment, Dkt. 312 ("Bloom Decl."); Sprint's reply Local Rule 56.1 statement, Dkt. 313 ("Sprint Rep. 56.1"); Credico's reply memorandum of law in support of its cross-motion for summary judgment, Dkt. 314 ("Credico Rep. Br."); Wallace Morgan's reply memorandum of law in support of its cross-motion for summary judgment, Dkt. 315 ("Wallace Morgan Rep. Br."); and the parties' joint statement of undisputed facts, Dkt. 259 ("JSF").

Plaintiffs object to the declaration of Vincent Buongiovanni in support of Sprint's cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment, Dkt. 277 ("Buongiovanni Decl."), as inadmissible under Federal Rule of Civil Procedure 26, *see* Pl. Counter to Sprint's 56.1 at 2. This dispute is moot, because the Court did not rely on that declaration in reaching its decision on the cross-motions for summary judgment.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

3

### A.     Factual Background

### 1.     The Lifeline Program

The federal government's Lifeline Program was founded in the 1980s with the goal of "ensur[ing] that low-income consumers have access to phone service." Pl. 56.1 ¶ 1. Under the program, designated telecommunications carriers may provide Lifeline Program services to eligible consumers in exchange for subsidies. *See* 47 C.F.R. §§ 54.201, 54.403(a). These subsidies are administered by the Universal Service Administrative Company ("USAC"), a not-for-profit corporation designated to perform this function by the Federal Communications Commission ("FCC"). Sprint Counter 56.1 ¶ 3. Since 2005, Lifeline Program services have included wireless service and phones in addition to traditional landline phones. Pl. 56.1 ¶ 2.

Lifeline Program services are available only to persons who meet certain qualifications, including having an income below applicable guidelines. JSF ¶¶ 35, 37. To be eligible for Lifeline Program services, applicants must also certify that they will not exceed the maximum of one Lifeline Program-enrolled mobile phone per household. *Id.* ¶ 35.

Telecommunications carriers are not required to charge consumers for Lifeline Program services, *see* Pl. 56.1 ¶ 4, but they may charge qualified low-income customers for additional services, *see* Sprint Counter 56.1 ¶ 4. For example, while Lifeline Program enrollees may receive a free wireless phone and a free preset amount of minutes and messages, Pl. 56.1 ¶ 6, enrollees may also purchase additional minutes and messages above this preset amount, Credico Counter 56.1 ¶ 6.

---

The parties' counter-statements of facts mark certain statements as "disputed" but, instead of identifying an actual factual inconsistency, often only offer additional context or dispute the relevance of the underlying facts. Where these counter-statements do not identify a true factual dispute, the Court treats the statement as undisputed.

### 2.    The Parties

Sprint is a telecommunications carrier that offers Lifeline Program products and/or services through Assurance Wireless, a brand that Sprint acquired in 2009. *Id.* ¶¶ 7, 35–37, 52. Sprint's receipt of subsidies from USAC is conditioned on Sprint's compliance with the applicable program regulations. Sprint Counter 56.1 ¶ 3. Sprint is also required to "[p]ublicize the availability of Lifeline service in a manner reasonably designed to reach those likely to qualify for the service." *See* 47 C.F.R. § 54.405(b).

To promote and market Lifeline services, Sprint contracts with third-party Outreach Agencies ("OAs"). Pl. 56.1 ¶ 14. Sprint also uses the National Lifeline Accountability Database ("NLAD"), which detects duplicate applications to make sure that qualified applicants do not receive more than one Lifeline Program benefit, either through the same or multiple providers. Sprint 56.1 ¶¶ 9–10.

Credico is an OA that has contracted directly with Sprint since September 2012. Pl. 56.1 ¶¶ 16, 18. Credico outsources sales and marketing services for its clients, which include other telecommunications carriers besides Sprint, to independent sales offices ("ISOs").[2] Pl. 56.1 ¶ 17; Credico Counter 56.1 ¶ 17. Sprint pays Credico on a monthly basis. Pl. 56.1 ¶ 187. In September 2013, Sprint and Credico entered into an Amended and Restated Outreach Agency Agreement (the "OA Agreement") effective September 1, 2013, amending their original agreement dated September 15, 2012. JSF ¶ 41; Pl. 56.1 ¶ 18. Attached to the OA Agreement was a copy of Sprint's Standard Operating Procedures ("SOPs"). JSF ¶¶ 39, 41. Under the OA Agreement, Credico was authorized to collect applications for Sprint's Assurance Wireless

---

[2] Credico's other clients include, but are not limited to, Verizon, Direct Energy, and AT&T. Credico 56.1 ¶ 4.

Program within delineated areas of New York (including the Bronx, Queens, and Manhattan). Pl. 56.1 ¶¶ 20, 93.  Credico was not permitted to subcontract or use third parties to collect applications for the Assurance Wireless Program without Sprint's prior written consent.  *Id.* ¶ 21.

Wallace Morgan is an ISO with whom Credico has subcontracted, with Sprint's consent, to collect applications for Sprint's Assurance Wireless Program.  Pl. 56.1 ¶ 22.  Credico assigned an "Account Manager" to Sprint to serve as a main point of contact between Sprint and Wallace Morgan.  *Id.* ¶¶ 23–24.  Wallace Morgan and Credico signed a subcontractor agreement, to which Sprint was not a party, dated October 17, 2014.  JSF ¶ 44; Sprint 56.1 ¶ 67.[3]  Wallace Morgan and Sprint signed a document entitled "Authorized Office Acknowledgment to Participate in Assurance Wireless Program."  First Srey Decl, Ex. 8.  It stated that Wallace Morgan would "only source Assurance Wireless products from [Credico] and no other distributors or master agents."  *Id.* at 1.  The document further stated that Wallace Morgan was "authorized to hire and train a team (referred to herein as "field agents" or "Staff") to promote Assurance Wireless in the field, solicit and process Assurance Wireless applications . . . and activate/program Assurance Wireless devices via the methods approved."  *Id.*

---

[3] The subcontractor agreement between Credico and Wallace Morgan stated, *inter alia*, that Wallace Morgan must (1) comply "with all applicable federal, state, county, and local laws, ordinances, regulations and codes"; (2) "comply and have its own employees comply with the Credico USA Code of Business Ethics and Conduct," as well as "any Credico USA Client Dress Code, Conduct Policy, and Operational Requirements"; (3) "[a]dher[e] to any Client pre-conditions to performing Services, such as drug testing and background checks with authorized providers and compliance with Client branding"; (4) "[t]rain[] its employees in accordance with Credico USA's Client requirements which may include, but is not limited to, attending class periodically"; and (5) "[s]olicit[] business on behalf of Credico USA Clients regarding their products or services . . . using the techniques and information as set out in Credico USA Clients' Training Guides."  Credico 56.1 ¶¶ 52–55.

Plaintiffs are field agents who were hired by Wallace Morgan to solicit and collect applications for wireless phones and services from individuals seeking to enroll in the Lifeline Program through Sprint's Assurance Wireless brand.  JSF ¶ 52.  Martin held the title of "account executive" from approximately March 29, 2015, and "corporate trainer" from approximately mid-April 2015, through May 7, 2015.  *Id.* ¶ 2.  Singleton held the title of "account executive" from approximately April 3, 2015, through mid-April 2015, and "corporate trainer" from approximately mid-April 2015 through May 7, 2015, *id.* ¶ 4.

### 3.    The Responsibilities of Field Agents

As noted, field agents on the Assurance Wireless campaign solicited and collected applications from potentially qualifying Lifeline Program applicants.  JSF ¶ 52 ("Plaintiffs understood their job duty to be collecting applications from potentially qualified individuals who wanted to enroll in the Lifeline Assistance Program through Assurance.").  Field agents may work on only one campaign at a time.  Pl. 56.1 ¶ 176.[4]

As set forth in Sprint's OA Agreement, field agents were required to "inform and educate potential customers about Assurance Wireless, determine and advise on an individual's qualification for the program and engage the eligible customers in the application process for Assurance Wireless."  Pl. 56.1 ¶ 59.  Field agents distributed Sprint-provided materials, visiting "targeted community locations and attending public or private community events."  *Id.*

In initially addressing potential applicants for phones pursuant to the Lifeline Program, field agents were required, as set forth in the Sprint SOPs, to begin by "utiliz[ing] an approved pitch that meets [Assurance Wireless] standards and clearly indicates only qualified applicants may receive . . . lifeline services."  Pl. 56.1 ¶ 60.  One such pitch, for example, could be: "Would

---

[4] Field agents cannot work on the Assurance Wireless campaign without an Agent ID.  *Id.* ¶ 181.

you like to find out if you qualify for a free lifeline service from Assurance Wireless[?]" *Id.* Use of a pitch that did not meet these standards could result in a field agent being "immediately removed from marketing at Assurance Wireless' sole discretion and not allowed to return without approval from Assurance Wireless." *Id.* ¶ 61.

Sprint's SOPs address the remainder of the interaction between field agents and potential applicants. For example, the SOPs state that field agents "must ask potential applicants if they currently have a lifeline phone with [Assurance Wireless] or any other carrier" and "if they have applied with [Assurance Wireless] or any lifeline carrier recently." *Id.* ¶ 62; Sprint Counter 56.1 ¶ 62. Plaintiffs and Sprint dispute whether Sprint's SOPs rigidly choreographed the steps for these interactions (along the lines of "first do this, next this") or instead offered more relaxed training guidelines without any such temporal dimension. *See* Pl. 56.1 ¶¶ 62–66; Sprint Counter ¶¶ 62-66. But the parties do not appear to dispute that the SOPs discussed ways in which field agents were to speak with potential applicants to explain the program and to assess the applicant's eligibility before submitting applications via a tablet. Pl. 56.1 ¶ 65; Sprint Counter 56.1 ¶ 65.

Using their Credico-provided tablet, field agents uploaded completed Lifetime Program applications to a third-party vendor called Solix so that the applications could be either approved or denied. JSF. ¶ 60; *see also* Pl. Counter to Sprint 56.1 ¶ 167 (noting ambiguity about whether it was actually Solix that determined whether an applicant met the regulatory qualifications but admitting that Solix conveyed information about whether applications had been approved or denied).

If an applicant qualified for a phone, he or she would have no contract or other agreement requiring activation of that phone or participation in the Lifeline Program. Pl. 56.1 ¶ 87. There

8

was never an exchange of money between field agents and potentially qualified applications. Pl. 56.1 ¶ 112. Field agents would inform qualified customers about add-ons permitting them to purchase additional minutes. Sprint 56.1 ¶ 169.

### 4.    The Schedules of Field Agents

Plaintiffs reported to work at Wallace Morgan's office. Credico 56.1 ¶ 100. Wallace Morgan operated its own office space located at 40 Exchange Place in New York City. Credico 56.1 ¶ 49. Plaintiffs did not report to or work in any Sprint facility, Sprint 56.1 ¶ 119, or any Credico office, Credico 56.1 ¶ 101.

Wallace Morgan required field agents to sign in upon arrival. Pl. 56.1 ¶ 67. Field agents working on the Assurance Wireless campaign could then pick up from the Wallace Morgan office a tablet provided by Credico. Field agents used these tablets in the field to review Lifeline Assistance Program applications. JSF ¶¶ 57–58.[5] Wallace Morgan was financially responsible for any damage or loss of the tablets. Credico 56.1 ¶ 168.

Wallace Morgan also offered "atmosphere" meetings, which could be held in the morning and/or at night, at the Wallace Morgan office. JSF ¶¶ 67–68. At these meetings, Wallace Morgan agents received guidance as to how to solicit Assurance Wireless applications. *See* Sprint 56.1 ¶ 138 ("'Atmosphere' meetings were meetings in which Wallace Morgan agents gathered to receive sales tips from others at Wallace Morgan."); Pl. Counter to Sprint 56.1 ¶ 138 (attendees of atmosphere meetings "would discuss . . . strategies on how to collect a higher number of approved Assurance Wireless Lifeline enrollment applications"). Field agents were

---

[5] Sprint did not issue or assign any tablets, but it did provide certain marketing materials about the Lifetime Assistance Program to Credico to provide to Wallace Morgan. JSF ¶¶ 63–64.

informed of the start time of atmosphere meetings by Wallace Morgan supervisors.  Credico 56.1 ¶ 126.

When heading out into the field with their tablets, field agents were not provided transportation to a particular territory; field agents paid for their own transportation.  Wallace Morgan 56.1 ¶ 60; Credico 56.1 ¶ 117.  Plaintiffs spent the majority of their time working in the field.  Sprint 56.1 ¶ 170.  Wallace Morgan informed field agents of their daily sales locations.  Credico 56.1 ¶ 110.  As noted, these locations had to be within broader territories approved by Sprint, which included the Bronx, Queens, and Manhattan.  Pl. 56.1 ¶¶ 20, 93.

Upon their return to the Wallace Morgan office at the end of work, field agents would report their application numbers and return their tablet.  JSF ¶¶ 70–71.  Wallace Morgan tracked the number of Lifeline Assistance Program applications that field agents obtained each day.  Id. ¶ 69.

The parties dispute the rigidity of field agents' schedules.  It is undisputed that Wallace Morgan provided a "suggested daily schedule" to field agents.  JSF ¶ 66.  In claiming that field agents' schedules were more regimented, plaintiffs point to a Wallace Morgan "Leadership Guide" document, which states that field agents must "[b]e in early every day," "[h]ave 100% attendance," "be in every day (including Saturday)" and "[c]all people at night and on weekends."  Pl. 56.1 ¶ 67.  In claiming that field agents' schedules were more malleable, Credico points to Singleton's testimony that her work hours varied and that Saturday work was not required.  Credico Counter 56.1 ¶ 67.  Credico also points to Singleton's testimony that some agents lacked a morning schedule, worked only certain days of the week, and "could have walked in any time and taken a tablet [computer]."  Id.

Martin estimated that, as an account executive at Wallace Morgan, she worked from 8 a.m. to 7 p.m. six days per week.  Credico 56.1 ¶ 130.  Martin testified that Saturdays were optional "[b]ut according to everybody else, if you wanted to move ahead, you would make Saturday."  *Id.*; Pl. Counter to Credico 56.1 ¶ 130.  Martin estimated that, as a corporate trainer at Wallace Morgan, she worked from 7:30 a.m. to 7 p.m. six days per week.  Credico 56.1 ¶ 132.

Singleton estimated that, as an account executive at Wallace Morgan, she worked from 7 a.m. to 5 p.m. or 6 p.m. six days per week.  *Id.* ¶ 129.  Singleton estimated that, as a corporate trainer at Wallace Morgan, she worked from 7 a.m. to 7 p.m. six days per week, unless she had something to do and only worked five days.  *Id.* ¶ 131.  Plaintiffs confirmed in their depositions that they never communicated with anyone at Credico about their work at Wallace Morgan or their work hours.  *Id.* ¶ 99.

Opt-in plaintiffs in this action testified as to their schedules, which varied significantly. For example, opt-in plaintiff David Gillens estimated that, as a field agent at Wallace Morgan, he worked from 6 a.m. to 9 p.m. or 10 p.m., Monday through Saturday, resulting in approximately 90–96 hours per week, *id.* ¶ 135(i), whereas opt-in plaintiff Sandra Mills estimated that she worked from 8:30 a.m. to 7 p.m., Monday through Friday, resulting in approximately 52.5 hours per week, *id.* ¶ 135(o).

### 5.    The Hiring of Field Agents

Wallace Morgan conducted field agents' interviews, including of plaintiffs, and made hiring decisions.  JSF ¶¶ 46–47.  In arranging their job interviews, prospective Wallace Morgan field agents corresponded only with Wallace Morgan.  Credico 56.1 ¶ 65.  Part of plaintiffs' interviews with Wallace Morgan took place at the Wallace Morgan office and part took place in the field, where plaintiffs learned about field agent responsibilities from Wallace Morgan

supervisors. *Id.* ¶¶ 66, 68. Wallace Morgan employees communicated with plaintiffs to extend offers of employment. *Id.* ¶ 70.

Some agents working for Wallace Morgan, including plaintiffs, signed "Independent Sales Representative Agreements." *Id.* ¶¶ 48-50. These stated that plaintiffs could provide similar or other services to companies that, like Wallace Morgan, were engaged in direct sales and marketing, as long as this other work did not interfere with ongoing work performed for Wallace Morgan. *Id.* ¶ 51.

Sprint's SOPs required that OAs like Wallace Morgan complete background checks for field agents collecting Lifeline Program applications on the Assurance Wireless campaign. Pl. 56.1 ¶ 32; Sprint Counter 56.1 ¶ 32.

Credico also required that field agents comply with Sprint's SOPs by completing a background check, signing a "zero-tolerance fraud letter," and taking Sprint's "Cyber Scholar" test. Credico 56.1 ¶ 33.

### 6. The Training of Field Agents

Wallace Morgan offered training to field agents. JSF ¶ 43. The parties do not appear to dispute that field agents were also required to complete online training provided by Sprint. Pl. 56.1 ¶ 34; *see* Sprint Counter 56.1 ¶ 34 (identifying plaintiffs' factual statement as "disputed" but acknowledging that "field agents who marketed and promoted the Assurance Wireless campaign were required to complete a one-time 'initial training'"). In this training, field agents received "an explanation of the terms of the Assurance Wireless service" as well as "the Application processing and collection process, eligibility verification process and related Assurance Wireless sales guidelines." Sprint Counter 56.1 ¶¶ 92–93.

Sprint's online training also addressed what field agents are "expected to know" and discussed "how to present yourself and act" as a field agent. Sprint Counter 56.1 ¶ 36. In a slide entitled "How should you look," Sprint instructed that field agents "must represent Assurance Wireless in an appropriate manner at all times," that "uniforms must be clean and neat," that "[n]ame badges including the agent's name and company must be worn and clearly visible at all times," that "Assurance Wireless provided t-shirts must be worn at all times while working events,"[6] and that, "[i]f you are in training, you should have a Trainee name badge and wear it at all times until your official name badge is provided to you." First Srey Decl., Ex. 12, at SPRMAR-000128. In another Sprint slide entitled "How should the event look," Sprint instructed that field agents must "[a]lways display, if required, all permits, licenses and permissions before the beginning of any Assurance Wireless event or activity" and "[n]o locally created merchandising/collateral may be utilized at any time without prior approval from Assurance Wireless." *Id.* at SPRMAR-000129. Other slides cautioned field agents not to "post, print, or publish any marketing materials or advertisements (print, radio, social media, etc.) without prior Assurance Wireless written permission" or "represent, market, or offer Assurance Wireless products or services" on any website. *Id.* at SPRMAR-000130.

In compliance with Sprint's OA Agreement with Credico, Credico was responsible for ensuring that each field agent working on the Assurance Wireless campaign completed Sprint's training. Sprint Counter 56.1 ¶ 39. Under the same agreement, Sprint was permitted to revise its training guidelines for any reason, after which Credico was responsible for ensuring that field

---

[6] Sprint's SOPs provided that "exemptions may be obtained . . . for permission to dress in professional attire instead of wearing [Assurance Wireless] t-shirts." Pl. 56.1 ¶ 49.

agents completed "re-training." *Id.* ¶ 40. For example, one email from a Credico employee gave

the following training update:

> All AW agents need to use this pitch starting immediately. Please communicate
> this to everyone tonight, and ensure everyone is using it in the field. . . . Opening
> Pitch: so that everyone is on the same page—You *can* say 'free' and/or 'lifeline'
> so long as it is in the same sentence as "**qualify for** and **Assurance Wireless**."

Credico Counter 56.1 ¶ 41.

Documents prepared by Credico set forth certain policies and rules for field agents. For

example, one such document listed "Agent Compliance Rules," including rules requiring

wearing ID badges visibly in the field and forbidding wearing shorts in the field. Pl. 56.1 ¶ 51.

There is testimony that the document was created after Sprint asked Credico to address ongoing

compliance issues, and that the document was "heavily based on suggestions from Sprint."

Credico Counter 56.1 ¶ 51. A different Credico document, entitled "Territory Management,"

stated that, "[i]n the event that an agent sells in territory that is assigned to another office, the

office forfeits all office profit for sales submitted and payable." *Id.* ¶ 52. Another "Business

Trip" document created by Credico addressed situations in which an ISO and its field agents

collected Lifeline Program applications outside of a normal approved territory. Pl. 56.1 ¶ 53.

Credico also created and implemented a "Compliance Improvement Plan" to enforce

compliance with Assurance Wireless program rules. Pl. 56.1 ¶ 151; *but see* Credico Counter

56.1 ¶ 151 (acknowledging creation of the Compliance Improvement Plan but claiming to have

done so at Sprint's request, in cooperation with Sprint, and in a manner heavily based on Sprint's

suggestions). Credico also conducted audits to ensure compliance with Sprint SOPs. Pl. 56.1 ¶

150; Credico Counter 56.1 ¶ 150.

Notwithstanding the online training, plaintiffs did not identify any Sprint personnel as

having (1) any knowledge as to, or (2) any supervision or other form of direction over, plaintiffs'

duties or training.  Sprint 56.1 ¶¶ 175–76.  Plaintiffs also did not identify anyone from Credico as

their manager or supervisor.  Credico 56.1 ¶ 104.  Martin and Singleton identified Wallace

Morgan supervisors Stuart Guarney, Nilda Ortega, Jose Gutierrez, and Smith as their managers.

Sprint 56.1 ¶ 178.  Plaintiffs identified only Wallace Morgan supervisors as having knowledge

about their job duties, *id.* ¶ 179, they did not identify anyone from Credico as having such

knowledge, Credico 56.1 ¶ 106, and they testified that they never spoke with anyone at Sprint

about their jobs, duties, or schedule, Sprint 56.1 ¶ 180.

### 7.    The Classification and Compensation of Field Agents

Until September or October 2015, all field agents at Wallace Morgan were classified as

independent contractors.  Pl. 56.1 ¶ 78.

Sprint and Credico both assert that they were not responsible for the independent

contractor classification.  Sprint Counter 56.1 ¶ 78 ("Sprint did not instruct Wallace Morgan to

classify agents on the Assurance Wireless campaign in any particular way."); Credico Counter

56.1 ¶ 78 ("Credico had no involvement with the classification of Wallace Morgan Field

Agents.").

In disputing that Sprint was not responsible for the independent contractor classification,

plaintiffs cite the "Authorized Office Acknowledgment to Participate in Assurance Wireless

Program" signed by Sprint and Wallace Morgan.  This prohibited Wallace Morgan from using

sub-dealers or subcontractors but permitted the use of 1099 independent contractors to work on

the Assurance Wireless campaign.  Pl. Counter to Sprint 56.1 ¶ 83 (citing First Srey Decl., Ex. 8

at WM000002).

In either September or October 2015, Wallace Morgan field agents were reclassified as

exempt employees pursuant to the FLSA and NYLL's outside sales exemptions.  Pl. 56.1 ¶ 80.

Plaintiffs assert that this change was made based in part on Credico's recommendation, citing evidence that Credico in 2016 changed its subcontractor agreement to ensure that ISOs like Wallace Morgan classified all agents as employees. *Id.* ¶ 81. Credico asserts that this evidence is "misleading and incomplete" and that Thomas "Tommy" Smith, the head of Wallace Morgan, was the only person that decided to reclassify field agents. Credico Counter 56.1 ¶ 80. Sprint and Credico both assert that the reclassification decision was ultimately Wallace Morgan's, not Sprint's or Credico's. Sprint Counter 56.1 ¶ 80 ("The record confirms that Sprint was not involved in any respect in that decision or decision-making process."); Credico Counter 56.1 ¶ 80 ("Wallace Morgan made the decision to reclassify . . . .").

While working at Wallace Morgan during the periods of time in which they were classified as independent contractors and outside sales employees, plaintiffs were not guaranteed minimum wage and overtime payments. They were instead paid on a commission basis for approved Assurance Wireless applications.[7] Pl. 56.1 ¶ 82; Credico Counter 56.1 ¶ 82. Field agents were also paid a commission if an applicant switched over to Assurance Wireless from a competing Lifeline Program service provider. Credico 56.1 ¶ 184. Wallace Morgan paid field agents via direct deposit. Credico 56.1 ¶ 193.

Martin earned a total of $980 during her employment, which averages to $196 per week, and Singleton earned a total of $1,300 during her employment, which averages to $260 per week. Pl. 56.1 ¶ 83.[8] Neither Martin nor Singleton were provided any benefits such as health

---

[7] Smith testified he did not pay all field agents exclusively on commission, and that some agents were paid on a guarantee basis, meaning "they would make a minimum amount each week no matter how many sales they did or how much time they worked." Credico Counter 56.1 ¶ 82

[8] These are weekly averages, not the amounts paid each week. As Credico emphasizes, the undisputed evidence does not establish that plaintiffs had uniform daily or weekly schedules. Credico Counter 56.1 ¶ 83.

insurance. Wallace Morgan 56.1 ¶ 47. Wallace Morgan provided plaintiffs with IRS Form 1099s. JSF ¶ 55.

The OA Agreement between Sprint and Credico set forth the compensation that Credico would receive per approved application. Pl. 56.1 ¶ 84; Sprint Counter 56.1 ¶ 84. Sprint "retain[ed] the right to change . . . the pay structure with over a month of written notice." Sprint Counter 56.1 ¶ 84 (internal quotation marks omitted). Sprint's online training for field agents did not provide any information as to field agents' compensation or classification. Sprint 56.1 ¶ 93.

Commission schedules created by Credico and referenced in Credico's subcontractor agreement with Wallace Morgan state that field agents "shall be paid" at certain rates per approved application. First Srey Decl., Ex. 7, 36–37. However, in testimony, Wallace Morgan and Credico representatives characterized these rates as advisory. For example, Credico employee Timothy J. Reedy characterized this as a "suggested rate," and stated that an ISO did not have to follow the commission schedule and that "the ISO owner can pay their representative what they would like." Williams Decl., Ex. 4 at 221–22.

### 8.     The Termination of Field Agents

Sprint and Credico both had the authority to require that a field agent suspected of fraud or failure to abide by the Standard Operating Procedures no longer work on the Assurance Wireless campaign. *Id.* ¶¶ 73-74.

Plaintiffs assert that Sprint and Credico had the power to direct an ISO to have field agents pulled from the field.   Pl. 56.1 ¶ 170 (citing Credico emails pulling agents from field). Credico acknowledges this capability but claims that this capability was exercised only for limited reasons, such as during an investigation of fraud or compliance issues. Credico 56.1 ¶

170.  Sprint points out that the evidence cited by plaintiffs establishes only that Credico, and not

Sprint, had the power to have agents pulled from the field.  Sprint Counter 56.1 ¶ 170.

The parties dispute whether Credico had the power to terminate field agents.  It is

undisputed that Credico had the power to require that any field agent suspected of engaging in

fraud or failure to abide by the SOPs no longer work on the Assurance Wireless campaign.  JSF

¶ 74.  But plaintiffs also contend that "Credico has the authority to fire or suspend any Field

Agent."  Pl. 56.1 ¶ 183.  In support, plaintiffs cite an email from Credico to Wallace Morgan

owner Tommy Smith, asking Smith to "suspend" certain agents from going into the field

pending an investigation, and an email from a Credico Account Manager stating: "starting this

week . . . any rep that has not had their audit will have their code shut off come this Monday."

Pl. 56.1 ¶ 183.  Credico claims that only Wallace Morgan could terminate its engagement with

field agents and that Credico's authority in this area did not extend beyond, as noted, requiring

that field agents not work on the Assurance Wireless campaign.  Credico Counter 56.1 ¶ 183.

The parties also dispute whether Sprint had the power to terminate field agents.  It is,

again, undisputed that Sprint had the power to require that any field agent suspected of engaging

in fraud or failure to abide by the SOPs no longer work on the Assurance Wireless campaign.

JSF ¶ 73.  But plaintiffs also claim, citing Sprint's SOPs, that "Sprint may terminate a Field

Agent if they fail to meet the performance requirements set forth in the Sprint SOPs."  Pl. 56.1 ¶

50.  The SOPs state that Sprint "will periodically review each OA back office operations and

sales event locations for compliance with the requirements and standards within the Master

Agreement and these SOPs," First Srey Decl., Ex. 6, at SPRMAR-000025,[9]  and that, "[b]ased

_____

[9] Under the OA Agreement, should an audit identify a breach of the SOPs, "Sprint requires
Wallace Morgan to promptly develop a corrective action plan and submit it to Sprint for review

18

on any negative audit results, Assurance Wireless may, in its sole discretion, take action, up to and including termination of the Master Agreement and/or *requiring any OA employee or field agent is removed from performing Assurance Wireless activities*." *Id.* (emphasis added).

In a similar vein, the parties dispute the reasons why Sprint could require the removal of a field agent. Plaintiffs contend that Sprint "has the authority to remove a Field Agent *for any reason*, not simply if it determines the Field Agent engaged in fraud or failed to comply with the SOPs," Pl. Counter to Sprint 56.1 ¶ 148 (emphasis in original), citing a provision in the SOPs that states Sprint may "'in its sole discretion'" terminate a field agent "'based on any negative audit results,'" *id.* (citing First Srey Decl., Ex. 6, at SPRMAR-000025). However, Sprint claims that this mischaracterizes the SOPs and that Sprint "could only seek the removal of an agent from the Assurance Wireless campaign for suspected fraud or failing to abide by the SOPS" and "could not 'terminate a field agent' from its engagement with Wallace Morgan." Sprint Counter 56.1 ¶ 50.

As to Sprint's process of evaluating field agents, the parties do not dispute that Sprint conducted "mystery shops," under which a "Sprint employee will represent himself as a potentially qualifying applicant and observe whether the Field Agent is performing his/her job in compliance with Sprint's SOPs," enabling Sprint to evalute "what the Field Agent says, their appearance, their knowledge of Assurance Wireless products and services, and whether they present the proper marketing materials and attestations." Pl. 56.1 ¶ 144; *see* Sprint Counter 56.1 ¶ 144; Credico Counter 56.1 ¶ 144.[10]

---

and approval." Pl. 56.1 ¶ 139. Sprint may suspend Wallace Morgan's activities until the correction is made if the breach cannot be corrected in a timely manner. *Id.*

[10] Credico identifies this factual allegation as "[d]isputed in part as misleading" because "[t]he 'mystery shop' assessments do not involve an evaluation of Field Agent job performance" but

The parties also do not dispute that both Martin and Singleton were ultimately terminated by Wallace Morgan. JSF ¶ 72. Singleton testified that "[Wallace Morgan owner] Tommy Smith told [her] [she] was fired," and that she never received a termination letter from Credico. Williams Decl., Ex. 20 at 107. Martin testified that that Smith directed another Wallace Morgan employee to terminate her. Williams Decl., Ex. 19 at 102. Plaintiffs do not dispute that no one from Sprint was present when Singleton and Martin were fired, and neither Singleton nor Martin ever discussed their terminations with anyone from Sprint. Sprint 56.1 ¶¶ 145–47.

In 2016, after plaintiffs initiated this action, Wallace Morgan stopped performing marketing services. Williams Decl., Ex. 1, at 56. Smith testified that it did so in part "[b]ecause the class action lawsuit meant that, legally, the lawyers for Martin and Singleton were able to email texts and communicate aggressively with every representative of Wallace Morgan, and that email suggested that we were paying improperly, which decimated my sales force." *Id.*

**B.    Procedural History**

On July 7, 2015, plaintiffs filed the initial complaint in this action, bringing claims against "Assurance Wireless LLC" and Wallace Morgan. Dkt. 1. On September 1, 2015, and September 14, 2015, respectively, Wallace Morgan and Sprint filed answers, Dkts. 31, 35, with Sprint's asserting that it had been incorrectly sued under the name Assurance Wireless LLC.

---

instead focus on compliance with Sprint SOPs. Credico Counter 56.1 ¶ 144. The Court treats Credico as having admitted the factual allegation in Paragraph 144 of plaintiffs' 56.1 statement because Credico's Counter 56.1 Statement does not identify a true factual dispute. Plaintiffs' 56.1 statement directly states that, during mystery shops, mystery shoppers "observe whether the Field Agent is performing his/her job *in compliance with Sprint's SOPs*." Pl. 56.1 ¶ 144 (emphasis added). While other portions of Plaintiff's 56.1 statement do assert more broadly that "Sprint . . . monitors Plaintiffs' job performance" through the mystery shops, *see* Pl. 56.1 ¶ 143, Paragraph 144 does not contain such an assertion.

On October 13, 2015, plaintiffs filed their First Amended Complaint ("FAC"), bringing claims against Sprint and Wallace Morgan.  Dkt. 48.

On October 23, 2015, plaintiffs filed a motion for conditional collective certification, Dkt. 52, as well as a supporting memorandum of law, Dkt. 53, and supporting declarations, Dkts. 54–64.

On October 27, 2015, answers to the FAC were filed by Sprint, Dkt. 66, and Wallace Morgan, Dkt. 67.

On November 13, 2015, Sprint filed a memorandum of law in opposition to the motion for conditional certification, Dkt. 70, as well as supporting declarations, Dkts. 71–72.  The same day, Wallace Morgan filed a memorandum of law opposing the same motion.  Dkt. 73.

On November 19, 2015, plaintiffs filed a reply in further support of the motion for conditional certification, Dkt. 77, and a supporting declaration, Dkt. 78.

On January 4, 2016, the Court conditionally certified a collective consisting of "all Wallace Morgan employees who gathered applications for enrollment in the Lifeline Program through Assurance Wireless at any point during the three years preceding the issuance of a Court-approved Notice." Dkt. 86.  The Court declined to certify a broader collective defined to include either "all Agents nationwide" or "all those employed by Credico." *Id.*

On February 12, 2016, plaintiffs filed a motion for leave to amend the FAC to add Credico (USA) LLC as a defendant, Dkt. 107, as well as a supporting memorandum of law, Dkt. 108, and a declaration.  Dkt. 109.  On February 25, 2016, Sprint filed a memorandum of law in opposition to this motion, Dkt. 120, and a supporting declaration, Dkt. 119.  On March 4, 2016, plaintiffs filed a reply, Dkt.127, and another supporting declaration, Dkt. 128.  On May 12, 2016, the Court granted plaintiffs' motion to amend the FAC.  Dkt. 145.

On May 16, 2016, plaintiffs filed their Second Amended Complaint ("SAC"), bringing claims against Credico as well as Sprint and Wallace Morgan. Dkt. 146. On June 2, June 24, and July 11, 2016, respectively, Sprint, Wallace Morgan, and Credico filed answers to the SAC. Dkts. 149, 158, 167.

On June 20, 2016, Wallace Morgan filed an answer to the SAC. Dkt. 158.

On June 24, 2016, the parties in this case and in the related case *Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298 (PAE), filed a letter addressing overlap between their FLSA collectives. Dkt. 163. The *Vasto* plaintiffs alleged that, while working as field agents at a Credico ISO called Cromex Inc. ("Cromex"), they had been misclassified as independent contractors and subjected to FLSA and NYLL violations. No. 15 Civ. 9298, Dkt. 1. The *Vasto* plaintiffs brought claims against Credico, Cromex, Credico's president Jesse Young, and Cromex's owner Meixi Xu. *Id.*

On September 8, 2016, the Court issued an order declining to consolidate this action with *Vasto* but directing counsel in the two cases "to communicate and coordinate their efforts so as to avoid duplicative discovery." Dkt. 185 at 2. The Court also held that, to avoid overlap between the two cases, while the *Martin* collective would remain as previously delineated, the *Vasto* collective would be limited to "[a]ll individuals who performed face-to-face marketing work for any U.S. subcontractor of Credico (USA) LLC, except Wallace Morgan, from June 16, 2013 to the present and who have been classified as independent contractors." *Id.*

On December 5, 2016, plaintiffs filed a motion for class certification under Rule 23, Dkt. 197, as well as a supporting memorandum of law, Dkt. 198, and a supporting declaration, Dkt. 199.

On March 3, 2017, all three defendants opposed the motion for class certification. *See* Dkts. 233, 236–37, 242–43. The same day, Credico filed a letter motion claiming that Singleton had spoliated relevant evidence and seeking relief. Dkt. 232.

On April 7, 2017, the parties filed their joint statement of undisputed facts. Dkt. 259.

On April 21, 2017, plaintiffs filed a motion for partial summary judgment, Dkt. 263, as well as a supporting memorandum of law, Dkt. 264; plaintiffs' 56.1 statement, Dkt. 265; and the declaration of Rachhana Srey, Dkt. 266.

On May 12, 2017, Sprint filed a cross-motion for summary judgment and opposition to plaintiffs' motion for partial summary judgment, Dkt. 271, as well as a supporting memorandum of law, Dkt. 272; Sprint's 56.1 statement, Dkt. 273; Sprint's counter-statement to plaintiffs' 56.1 statement, Dkt. 279 ("Sprint Counter 56.1"); and the declaration of Nicole A. Eichberger. Dkt. 276. The same day, Credico filed a cross-motion for summary judgment and opposition to plaintiffs' motion, Dkt. 274, as well as a supporting memorandum of law, Dkt. 278; Credico's 56.1 statement, Dkt. 280; and Credico's counter-statement to plaintiffs' 56.1 statement, Dkt. 281. The same day, Wallace Morgan filed a cross-motion for summary judgment and opposition to plaintiffs' motion. Dkt. 282. On May 18, 2017, after notification of a technical error, Wallace Morgan re-filed its cross motion and opposition, Dkt. 289, as well as a supporting memorandum of law, Dkt. 290, and the declaration of Joseph F. Tremiti, Dkt. 291. On May 19, 2017, Wallace Morgan re-filed its 56.1 statement. Dkt. 293.

On May 13, 2017, Credico filed the declaration of Greta B. Williams in support of its cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment. Dkt. 283.

On June 3, 2017, plaintiffs filed a memorandum of law in opposition to defendants' cross motions for summary judgment and reply in support of plaintiffs' motion, Dkt. 305; a counter-statement to Sprint's 56.1 statement, Dkt. 301; a counter-statement to Credico's 56.1 statement, Dkt. 302; a counter-statement to Wallace Morgan's 56.1 statement, Dkt. 300; and an affidavit and a declaration from Rachhana Srey. Dkts. 303–04.

On June 23, 2017, Sprint filed a reply memorandum of law, Dkt. 311, as well as the supporting declaration of Elise M. Bloom, Dkt. 312, and a reply 56.1 statement, Dkt. 313. The same day, Credico, Dkt. 314, and Wallace Morgan, Dkt. 315, filed reply memoranda.

On July 6, 2017, the Court held argument on the cross-motions for summary judgment.

## II.   Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by

"citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

## III.   Discussion

The parties' cross-motions for summary judgment raise three issues: (1) whether Sprint and Credico can be held liable as joint employers, (2) whether the outside sales exemption to the FLSA and NYLL applies, and (3) whether plaintiffs were employees or independent contractors.

### A.   Joint Employer

Sprint and Credico seek summary judgment on the ground that the evidence would not permit a finding that they were "joint employers" of plaintiffs. In other words, they argue, even assuming plaintiffs were employees, they were employees only of Wallace Morgan, and only Wallace Morgan can be held liable for any FLSA and NYLL violations.

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has emphasized that this is an expansive definition with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). An individual may simultaneously have multiple "employers" for the purposes of the FLSA, in which event, "all joint employers are responsible,

both individually and jointly, for compliance with all of the applicable provisions of the [FLSA]." 29 C.F.R. § 791.2(a).

"[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Barfield v. New York City Health & Hospitals Corp.,* 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961)).  The determination of whether defendants are plaintiffs' joint employers is to be based on "the circumstances of the whole activity," *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947), viewed in light of "economic reality," *Goldberg,* 366 U.S. at 33, 81 S.Ct. 933; *see also Barfield,* 537 F.3d at 141–42 (employment is "to be determined on a case-by-case basis by review of the totality of the circumstances").  "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 (2d Cir. 1984)).

"When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme Am. Envtl. Co., Inc.,* No. 12 Civ. 511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012); *see also Herman,* 172 F.3d at 135 ("[C]ontrol of employees is central to deciding whether appellant should be deemed an employer.").  In assessing economic reality, the Second Circuit has articulated two tests for determining whether an employment relationship existed for the purposes of the FLSA: one relating to formal control and the other to functional control.

The formal control test inquires "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment

records.'" *Carter*, 735 F.2d at 12 (quoting *Bonnette v. Calif. Health & Welfare Agency,* 704 F.2d

1465, 1470 (9th Cir. 1983)).

> Formal control does not require continuous monitoring of employees, looking
> over their shoulders at all times, or any sort of absolute control of one's
> employees. Control may be restricted, or exercised only occasionally, without
> removing the employment relationship from the protections of the FLSA, since
> such limitations on control do not diminish the significance of its existence.

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 939 (S.D.N.Y.2013) (citing *Herman*, 172

F.3d at 139) (internal quotation marks omitted).

  As to the functional control test, the Second Circuit has identified a number of factors

pertinent to determining whether a person or entity, even if lacking formal control, exercised

"functional control" over an employee.  In *Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61, 71–

72 (2d Cir. 2003), which involved an employer and its subcontractors, the Circuit identified the

following non-exclusive factors:

> (1) whether [the alleged employers'] premises and equipment were used for the
> plaintiffs' work; (2) whether the [subcontractors] had a business that could or did
> shift as a unit from one putative joint employer to another; (3) the extent to which
> plaintiffs performed a discrete line job that was integral to [the alleged
> employers'] process of production; (4) whether responsibility under the contracts
> could pass from one subcontractor to another without material changes; (5) the
> degree to which [the alleged employers] or their agents supervised plaintiffs'
> work; and (6) whether plaintiffs worked exclusively or predominantly for [the
> alleged employers].

*Id.; accord Barfield v. N.Y.C. Health & Hosp. Corp.,* 432 F. Supp. 2d 390, 392–93 (S.D.N.Y.

2006), *aff'd,* 537 F.3d 132 (2d Cir. 2008).

  Under NYLL, the standard for employer status is nearly identical to that of the FLSA.

*Compare* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in

the interest of an employer in relation to an employee . . . ."), *with* NYLL § 190(3) ("'Employer'

includes any person, corporation, limited liability company, or association employing any

individual in any occupation, industry, trade, business or service.").  Accordingly, courts in this

27

District regularly apply the same tests to determine whether entities were joint employers under NYLL and the FLSA. *See Spicer v. Pier Sixty LLC,* 269 F.R.D. 321, 335 n. 13 (S.D.N.Y.2010); *see also Glatt v. Fox Searchlight Pictures Inc.,* 293 F.R.D. 516, 526–27 (S.D.N.Y.2013) (collecting cases); *see also Hart,* 967 F. Supp. 2d at 940 (citing *Irizarry v. Catsimatidis,* 722 F.3d 99, 117 (2d Cir. 2013)) ("To be sure, the New York Court of Appeals has not yet resolved whether NYLL's standard for employer status is coextensive with the FLSA's, but there is no case law to the contrary.").

For the reasons that follow, the Court finds that, as a matter of law, neither Sprint nor Credico can be held liable as plaintiffs' joint employer.

### 1.    Sprint

On the undisputed facts, Sprint satisfies neither the formal or functional control tests for joint employer status.

#### a.    Formal Control

##### i.    Hiring and Firing

The Court first assesses whether plaintiffs have adduced evidence sufficient to support a determination that Sprint hired or fired field agents.

This case bears a considerable resemblance to *Jean-Louis v. Metro. Cable Communications, Inc.*, 838 F. Supp. 2d 111 (S.D.N.Y. 2011), in which plaintiffs were employees of Metropolitan Cable Communications, Inc. ("Metro"), who worked as technicians installing telecommunications services provided by Time Warner Cable of New York City ("Time Warner"). The technicians sued Metro, alleging FLSA violations, and claimed that Time Warner was liable for these violations as the technicians' joint employer. In holding that Time Warner was not the technicians' joint employer as a matter of law, the district court reasoned that the

first formal control factor had not been satisfied because Time Warner played an insufficient role in the hiring process:

> In terms of hiring, the undisputed evidence shows that Time Warner does not receive applications from putative Metro technicians; interview or review applicants; inform applicants that they have been hired; or provide new hires with employment forms. It is further undisputed that none of the Plaintiffs met or communicated with any Time Warner employee prior to being hired as a Metro technician. . . . In short, Metro, not Time Warner, has the power to hire Metro technicians.

*Id.* at 123. The district court reached this conclusion notwithstanding the fact that "Time Warner require[d] Metro to conduct criminal background checks of applicants." *Id.*

Here, the record is similarly clear that Wallace Morgan, not Sprint, had the power to hire field agents. Wallace Morgan scheduled and conducted interviews, made hiring decisions, and extended offers of employment. JSF ¶¶ 46–47; Credico 56.1 ¶¶ 65–66, 68, 70. That Sprint required agents hired by Wallace Morgan to complete background checks before being assigned to the Assurance Wireless campaign, Sprint Counter 56.1 ¶ 49, does not demonstrate Sprint's control over the hiring process. *Cf. Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 509 (S.D.N.Y. 2015) (defendant exercised formal control over restaurant's waiters under FLSA and NYLL where defendant "personally hired the Restaurant's management team, including its executive chef"). Nor does the fact that new Wallace Morgan hires received Sprint identification codes that were necessary to work on the Assurance Wireless campaign, *see* Pl. Opp. Br. at 28, establish such control. *Cf. Lawrence v. Adderley Industries, Inc.*, No. 09 Civ. 2309 (SJF) (ETB), 2011 WL 666304, at *3 (E.D.N.Y. 2011) (telecommunications company lacks power to hire technicians employed by contractor even though "[a] technician cannot work on a . . . job [for the company] without an identification badge").

The record is similarly clear that Wallace Morgan, not Sprint, had the power to fire field agents. The parties do not dispute that Martin and Singleton were informed of their termination by a Wallace Morgan employee, that no one from Sprint was present at the time, and that neither Martin or Singleton ever discussed the termination with anyone from Sprint. *See* Sprint 56.1 ¶¶ 145–147; Pl. Counter to Sprint 56.1 ¶¶ 145–157.

Plaintiffs counter that Sprint had the power to fire field agents because Sprint had the power to require that field agents no longer work on Sprint's Assurance Wireless campaign. The decisions in a series of analogous cases are to the contrary. In *Jean-Louis*, the district court distinguished between a power to fire and Time Warner's "power to 'de-authorize' any Metro technician from installing Time Warner services at customers' home while employed by Metro." *Jean-Louis*, 838 F. Supp. 2d 124. The district court reasoned that the power to de-authorize in such a context differed from a firing decision because technicians could continue to perform other work for Metro. *See id.* ("[I]t is undisputed that a Metro technician whom Time Warner has prohibited from perform installation work while employed by Metro may continue working for Metro in some other capacity, say as a dispatcher or warehouse worker, or leave Metro and later perform installations while working as a technician for another company."). Time Warner's exercise of its de-authorization power was thus "not the same as a decision to either (a) prevent a Metro technician from working for Metro altogether; or (b) prevent a Metro technician from working for another service company that does installation work for Time Warner" and it was therefore "difficult to describe a decision by Time Warner that has neither consequence as equivalent to a decision to fire a Metro technician." *Id.*

The district court drew a similar distinction in *Godlewska v. HDA*, in which home healthcare attendants employed by a not-for-profit contractor brought FLSA claims against the

contractor as well as a city agency that engaged the contractor to administer home attendant services to city residents. 916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014). In granting the city agency's motion for summary judgment on the ground that it was not a joint employer, the district court distinguished between the agency's power to direct the contractor to remove a home attendant from a particular patient's case and the power to terminate the home attendant. *See id.* at 258 (although the city agency could "direct [the contractor] to remove [a] home attendant from [a] particular patient's case," there was "no evidence, . . . that [the city agency] ha[d] power . . . to require [the contractor] to fire a home attendant entirely").

The same distinction also carried the day in *Lawrence v. Adderley Industries, Inc.*, 2011 WL 666304. There, the district court held that CSC Holdings LLC i/s/h Cablevision Systems Corporation ("Cablevision"), a telecommunications company, had not exercised formal control over technicians employed by Adderley Industries, Inc. ("Adderley"), a contractor, such that Cablevision could be considered the technicians' joint employer under the FLSA. *Id.* at *11. In *Lawrence*, Cablevision had "maintain[ed] a list of approved workers, *i.e.*, individuals authorized to install its equipment, and any individual not on that list [could not] install Cablevision equipment." *Id.* at *3. Cablevision had the power to "direct Adderley not to assign an individual who was previously employed by one of its other contractors and had been disciplined or fired for bad performance to a Cablevision project" and to "remove[] technicians from its list of approved workers." *Id.* Notwithstanding this "de-authorization" power, the district court held that, "[b]ased upon the evidence in the record, there [was] no genuine dispute as to a material fact that Cablevision did not . . . have the power to hire and fire [Adderly] technicians." *Id.* at *8.

Here, tellingly, plaintiffs do not point to any evidence that Sprint had the power to terminate a field agent's employment at Wallace Morgan or ability to work on any other Wallace Morgan campaign. And as the cases above instruct, Sprint's power to de-authorize Wallace Morgan field agents from working on the Assurance Wireless campaign does not equate to the power to terminate.

Accordingly, the Court finds that the first formal control factor does not support a finding that Sprint jointly employed Wallace Morgan field agents.

### ii.      Work Schedules and Conditions

The Court next assesses whether plaintiffs have adduced evidence sufficient to support a finding that Sprint supervised and controlled plaintiffs' work schedules or conditions of employment.

As to plaintiffs' work schedules, the record is clear that Wallace Morgan dictated these. Field agents reported to work at Wallace Morgan's office and never to any Sprint facility. Sprint 56.1 ¶¶ 115, 119. Field agents attended atmosphere meetings at Wallace Morgan's office, JSF ¶ 67, and were informed of the start time of these meetings by their Wallace Morgan supervisors, Credico 56.1 ¶ 126. Wallace Morgan supervisors assigned field agents to territories in which to collect applications each day, albeit within the general regions of New York City that had been approved by Sprint for Assurance Wireless application collection. Sprint 56.1 ¶ 116; Pl. Counter to Sprint 56.1 ¶ 116. When plaintiffs were to call in sick or be absent from work, they would contact their supervisors at Wallace Morgan. Sprint 56.1 ¶ 118. When asked who managed their work and had knowledge of their duties and responsibilities, plaintiffs identified only Wallace Morgan employees. *Id*. ¶¶ 178–179. Both Martin and Singleton testified that they never spoke to anyone at Sprint about their jobs with Wallace Morgan, their duties, or their work hours. *Id*. ¶

180; *see Jean-Louis*, 838 F. Supp. 2d at 126 ("the undisputed facts appear to demonstrate that

Metro rather than Time Warner 'supervised and controlled employee work schedules' where "[i]t

is . . . undisputed that Metro tells its technicians when to report in the morning; that technicians

contact Metro if they are running late or will be absent; and that no Plaintiff ever contacted Time

Warner about those issues").

In claiming that Sprint controlled their schedules, plaintiffs stress that Sprint employees

have attended meetings at Wallace Morgan, and that Sprint has the power to have agents pulled

from certain areas in the event of overproduction. *See* Pl. Opp. Br. at 32.  But the formal control

factor requires greater involvement on the putative joint employer's part.  For example, in *Jean-

Louis*, the district court found that Time Warner did not control Metro technicians' schedules

where, even though Time Warner gave Metro certain time windows during which Metro should

perform certain jobs, it was "Metro, not Time Warner, [that] decide[d] which technicians will

work on which job and whether a technician will work on any jobs in that period at all."  838 F.

Supp. 2d at 126.  Similarly, in *Hugee v. SJC Group, Inc.*, the district court found that a security

guard employed by SJC Group, Inc. ("SJC"), a subcontractor of NESCTC Security Agency, LLC

("NESCTC"), had failed to demonstrate that NESCTC controlled his work schedule or

conditions of employment even though the guard "was required to report by telephone to

NESCTC each day upon his arrival to and departure from a worksite and to fill out NESCTC,

and not SJC, timesheets."  No. 13 Civ. 0423 (GBD), 2013 WL 4399226, at *5 (S.D.N.Y. Aug.

14, 2013).  In finding such requirements "insufficient to demonstrate supervision or control over

Plaintiff's work schedules or conditions of employment," the district court emphasized the

Second Circuit's admonition that

> "the degree to which defendants supervise the plaintiffs' work . . . can be
> misinterpreted to encompass run-of-the-mill subcontracting relationships . . . .

> Although . . . a defendant's extensive supervision of a plaintiff's work is
> indicative of an employment relationship . . . such extensive supervision weighs
> in favor of joint employment only if it demonstrates effective control of the terms
> and conditions of the plaintiff's employment."

*Id.* (quoting *Zheng*, 355 F.3d at 74–75). The court noted that the plaintiff had "concede[d] that

he was given day-to-day instruction about assignments or scheduling by" an employee of SJC.

*Id.* (internal quotation marks omitted).

Nor have plaintiffs adduced evidence sufficient to show that Sprint supervised or

controlled Wallace Morgan field agents' work conditions. Plaintiffs emphasize (1) Sprint's

SOPs, which address methods for collecting applications, territories of collection, and

appropriate attire, Pl. Br. at 41, (2) Sprint's requirement of "auditing" field agents, including

through mystery shops, and of tracking application numbers, and (3) Sprint's requirement of

certain online training and testing, as well as Sprint's attendance at certain Wallace Morgan

meetings and Sprint's role in notifying field agents of changes to the SOPs. *See* Pl. Br. at 41–42;

Pl. Opp. Br. at 22–23.

Sprint's SOPs do not give rise to an employer-employee relationship. Plaintiffs cite no

case demonstrating that such general conduct standards suffice to establish such a relationship.

Courts have widely held that "[e]xercising quality control by having strict standards and

monitoring compliance with those standards does not constitute supervising and controlling

employees' work conditions." *Godlewska*, 916 F. Supp. 2d at 259; *see also Chen v. Street Beat

Sportswear, Inc.*, 364 F. Supp. 2d 269, 286 (E.D.N.Y. 2005) ("[T]he Court will not consider

evidence plaintiffs present with respect to this factor to the extent it concerns the presence of . . .

quality control personnel."). Courts instead have distinguished between the circumstances where

the putative joint employer "'maintains specific standards to which the [putative joint employer's

contractors] and [the contractors' employees] must adhere, and regularly monitors the

34

[contractor's employees] to ensure that their performance satisfies [the putative joint employer's] expectations," which does not itself establish supervision and control of work conditions, and the circumstances where the putative joint employer "'is . . . responsible for the day-to-day management of the [contractor's employees].'" *Lawrence*, 2011 WL 666304, at *9 (quoting *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010)).

The Second Circuit's recent decision in *Saleem v. Corporate Transportation Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017), is in accord. There, black-car drivers asserted FLSA and NYLL claims against owners of black-car "base licenses" and certain affiliated entities. *Id.* at 134. The black-car drivers had signed agreements with certain defendants that required the black-car drivers to follow "Rulebooks." *Id.* at 136. These were manuals that "set[] out certain standards of conduct." *Id.* The Rulebooks included, *inter alia,* prohibitions on "harassing customers or other drivers and submitting fraudulent vouchers," "a dress code, which required drivers to dress neatly in specified business attire," and "guidelines for keeping vehicles clean." *Id.* The defendants insisted upon compliance with the Rulebooks and could hold hearings and impose penalties in the event of noncompliance. *Id.* Nevertheless, the Second Circuit held that the Rulebooks did not render the black-car drivers defendants' employees, as defendants "wielded virtually no influence over other essential components of the business." *Id.* at 149.

That Sprint may have conducted or directed evaluations of field agents, monitoring their productivity and compliance, does not establish control, as such quality control efforts differ from day-to-day control. Again, *Jean-Louis* is instructive. Plaintiffs there presented extensive evidence of monitoring by Time Warner, including:

> that sixteen full-time Time Warner personnel conduct 800–900 random quality
> control assessments per week on what amounts to some 4% of all jobs; that Time
> Warner contracts to obtain real-time feedback regarding Metro installations
> directly from Time Warner customers; that Time Warner uses its assessments and

the ECHO results to compile extensive and detailed data regarding these
assessments; and that Time Warner provides this data to Metro and discusses it
with Metro in monthly meetings.

838 F. Supp. 2d at 127. But, the district court held, such efforts did not reflect a joint employer

relationship: "[A]ll of this evidence shows that Time Warner makes efforts to ensure that Metro

is providing quality service; the evidence does not show that Time Warner controls the day-to-

day manner in which technicians provide that service." *Id.* It held: "Plaintiff's evidence

regarding Time Warner's quality control assessments cannot establish control of work schedules

or conditions of employment under the law of this Circuit." *Id.* at 128; *see also Zheng*, 355 F.3d

at 75 ("[S]upervision with respect to contractual warranties of quality and time of delivery has no

bearing on the joint employment inquiry, as such supervision is perfectly consistent with a

typical, legitimate, subcontracting arrangement.").

Evidence that Sprint played a limited role in training Wallace Morgan field agents—by

requiring initial training and testing, attending meetings where application soliciting strategies

were discussed, and communicating SOP updates—also does not establish Sprint's control over

the conditions of their employment. In *Jean-Louis*, the district court found insufficient evidence

that "Time Warner personnel were present at, participated in, and provided materials for some

training sessions regarding customer care and new equipment" and that Time Warner "sent

Metro 'Tech Tips' and other training communications that Metro distributed to technicians."

838 F. Supp. 2d at 127. To be sure, the court there noted that Time Warner did not play any role

in technicians' "initial training, or were present at any time other than during random quality

control assessments when Metro technicians performed installations." *Id.* at 128. Here, in

contrast, Sprint undisputedly played a role in initial training. Those initial efforts, however, were

not extensive. Far more consequential is that plaintiffs could not identify any Sprint employee as

their supervisor or managers, or as knowing of their work tasks and responsibilities.

Here, it was Wallace Morgan that trained field agents, JSF ¶ 63, gave field agents their work assignments, Sprint 56.1 ¶ 116, and managed and supervised field agents, *id.* ¶¶ 178–179. While Sprint may have had a degree of influence over field agents' work, it is not enough to show meaningful control by Sprint over plaintiffs' work schedules or conditions of employment.

### iii.     The Rate and Methods of Payment

The Court inquires next whether Sprint set plaintiffs' rate and method of payment.  At the outset, no evidence was adduced that Sprint prohibited or discouraged Wallace Morgan from assigning its employees to work as field agents on the Assurance Wireless campaign.  Sprint prohibited Wallace Morgan from subcontracting work on that campaign to other entities who were not 1099 contractors, but that did not bar Wallace Morgan from assigning its own employees—at whatever pay rate they and Wallace Morgan had set—to such work.  And Sprint did not otherwise dictate the pay of the field workers, however they were classified.  Plaintiffs emphasize that Sprint determined the sum that Credico received for each approved Lifeline enrollment application collected by field agents.  Pl. Counter to Sprint. ¶ 105.  While that feature of Sprint's relationship with Credico presumably limited the sum left over for Wallace Morgan and therefore the money Wallace Morgan had available to pay field agents working on the campaign, it did not set the agents' pay rates.  *See Jean-Louis*, 838 F. Supp. 2d at 129–30 ([T]he test is whether a putative joint employer determines pay rates, not whether it affects them.").

Plaintiffs rely on *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132 (2d Cir. 2008), *see* Pl. Opp. Br. at 34, in which the Second Circuit held Bellevue Hospital ("Bellevue") to be a joint employer.  Bellevue, the Circuit noted, had "exerted some control over [the] pay" of plaintiffs, who were employees of referral agencies. 537 F.3d at 144.  Bellevue had "calculated the hours [plaintiffs] worked and . . . then paid the agencies an hourly rate for those

hours, so that the agencies, in turn, paid [plaintiffs] an hourly rate for the exact same hours." *Id.*

Thus, the Circuit found, "Bellevue's calculations conclusively determined the number of hours

for which [plaintiffs] would be paid" and "the hourly rate Bellevue paid the referral agencies

effectively set a cap on the hourly rate that the agencies would pay [plaintiffs]." *Id.* at 144–145.

Bellevue's actions decisively dictating the plaintiffs' pay are not matched by any actions taken

by Sprint here.  And, in *Barfield*, the Circuit found that "the third [formal control] factor, relating

to the determination of the rate and method of a worker's payment," was only "inconclusive."

*Id.* at 144.  The Circuit's joint employer decision turned on other factors: "the first, second, and

fourth [formal control] factors all strongly support[ed] Bellevue's status as [plaintiffs'] joint

employer." *Id.*

　　　　The facts of *Jacobson v. Comcast Corp.* more closely track those here.  There, a district

court in Maryland rejected technicians' argument "that Comcast had control over their wages

because it paid . . . contractors on a per service basis and the contractors, in turn, paid their

technicians on a per service basis." 740 F. Supp. 2d at 692.  The court reasoned that such an

arrangement was consistent with, and indeed "typical of," a relationship between a client and an

independent contractor:

> Comcast does not issue the technicians' pay checks, pay stubs, or W–2s, nor do
> the technicians submit pay records or timesheets to Comcast. . . . To find that
> th[e] arrangement [to pay contractors on a per service basis] places Comcast in
> control of [the technicians'] wages *would dramatically expand the FLSA to
> subsume traditional independent contractor relationships*. . . . The [ Contractors],
> not Comcast, determine whether to pay their employees on a per service or salary
> basis, and at what rate.

*Id.* (emphasis added); *see also Lawrence v. Adderly*, 2011 WL 666304, at *9–10 (adopting this

reasoning).

Here, it is undisputed that Wallace Morgan provided plaintiffs with their paychecks and IRS Form 1099s. *See* Pl. Counter to Sprint 56.1 ¶109. Smith, Wallace Morgan' owner, testified that "[I]t's me that decides what my guys get paid." Eichberger Decl., Ex. E, at 206. And although Smith referenced a recommendation from *Credico* as to field agents' compensation rate, Smith did not testify that he received any such recommendation from *Sprint*. *Id.* The evidence thus does not tie Sprint to the decision how to compensate field agents. Sprint's actions may fairly be argued to have had an indirect influence on the rate. But in the end, the rate was set by Wallace Morgan. This factor therefore does not favor of a finding of formal control.

### iv.    Records

The Court turns last to whether Sprint maintained plaintiffs' employment records.

Plaintiffs note that Sprint had access to a database with information regarding the identities and work locations of field agents, and that Sprint tracked the customer applications that field agents submitted each day. *See* Pl. Br. at 44. But plaintiffs do not dispute the centrally relevant fact: that Sprint "does not maintain traditional personnel records or records of the hours Field Agents work." Pl. Opp. Br. at 35; *cf. Barfield*, 537 F.3d at 144 ("[T]here is no question that Bellevue maintained employment records on the matter most relevant to overtime obligations under the FLSA: the hours worked at the hospital by temporary employees."). And plaintiffs have not adduced evidence suggesting that Sprint maintained the records it held "beyond quality control purposes." *Hugee*, 2013 WL 4399226, at *7. Sprint's SOPs instead require that "[e]mployee/subcontractor files [including IRS documentation, background check results, and training records] . . . be kept and made available to Assurance Wireless *for auditing and compliance reasons*." First Srey Decl., Ex. 6 (emphasis added). Where "maintaining employment records is primarily [a contractor's] responsibility, and [a putative joint employer's]

review of certain records is 'only an extension' of [the putative joint employer's] quality control procedures, . . . the fourth [formal control] factor is not satisfied." *Godlewska*, 916 F. Supp. 2d at 262 (quoting *Jacobson*, 740 F. Supp. 2d at 692.).

Accordingly, this final factor does not weigh in favor of a finding of formal control.

None of the four factors favors a finding that Sprint had formal control over plaintiffs. The Court therefore inquires next to the factors bearing on whether Sprint exercised functional control over plaintiffs.

### b.    Functional Control

#### i.    Premises and Equipment

"[W]hether a putative joint employer's premises and equipment are used by its putative joint employees . . . is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Zheng*, 355 F.3d at 72. "Although . . . shared premises . . . is [not] anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship), the factfinder can use these readily verifiable facts as a starting point in uncovering the economic realities of a business relationship." *Id.*

Here, the record is clear that field agents never used Sprint's premises. Field agents always reported to work at Wallace Morgan and attended meetings in the Wallace Morgan office. Sprint 56.1 ¶¶ 115, 119; JSF ¶ 67. Plaintiffs did not report to or work in any Sprint facility. Sprint 56.1 ¶ 119.

Plaintiffs concede that "Field Agents did not perform work at any of Sprint's places of business," but they argue that this factor nonetheless "tilt[s] . . . slightly in Plaintiffs' favor"

because Sprint "did supply the equipment and Lifeline marketing materials that Field Agents were required to use in . . . performing their duties." Pl. Opp. Br. at 41.

In fact, Sprint's role as a supplier of equipment appears to have been quite limited. Sprint did provide certain marketing materials about the Lifeline Assistance Program to Credico to provide to Wallace Morgan. JSF ¶¶ 63–64. Field agents also "wore either a name tag or an Assurance Wireless t-shirt." Sprint. Br. at 29. The record does not, however, identify these marketing materials as *required* equipment for field agents. *See* JSF ¶ 65 ("Wallace Morgan agents *may* use the marketing materials . . . .") (emphasis added). And field agents picked up their tablets—the equipment used to upload Lifetime Program applications—from Wallace Morgan, and this equipment was supplied not by Sprint but by Credico. JSF ¶¶ 57–58. Wallace Morgan was financially responsible for any damage or loss of the tablets. Credico 56.1 ¶ 168. Wallace Morgan field agents were responsible for their own transportation; they did not, for example, travel throughout the field in Sprint-provided vehicles. Wallace Morgan 56.1 ¶ 60; Credico 56.1 ¶ 117.

In *Jean-Louis*, the court found that this factor weighed against a finding of joint employer status despite the fact that the plaintiff technicians visited Time Warner facilities annually to receive Time Warner identification badges and received from Time Warner a piece of equipment called a "lock box key" "which provided access to cable connections in the field. 838 F. Supp. 2d at 132. The court reasoned that "the fact that Time Warner provides that lone piece of equipment is overwhelmingly outweighed by what Time Warner does not provide and the fact that Metro technicians visit Time Warner facilities only once per year." *Id.*

Here, similarly, the fact that Sprint provided limited pieces of equipment is outweighed by the fact that field agents never visited Sprint facilities, never used Sprint-provided transportation, and received their tablets from Wallace Morgan and Credico.

Accordingly, the first functional control factor is not satisfied.

### ii.      Whether Immediate Employer's Business Shifts as Unit

The next functional control factor inquires whether Wallace Morgan "had a business that *could* or did shift as a unit from one putative joint employer to another." *Jean-Louis*, 838 F. Supp. 2d at 132 (quoting *Zheng*, 355 F.3d at 72) (emphasis added). "This factor 'is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client.'" *Jean-Louis*, 838 F. Supp. 2d at 132 (quoting *Zheng*, 355 F.3d at 72). "Nevertheless, the Second Circuit has cautioned that 'the absence of a broad client base,' like 'shared premises,' is not 'anything close to a perfect proxy for joint employment (because they are both perfectly consistent with a legitimate subcontracting relationship).'" *Jean-Louis*, 838 F. Supp. 2d at 132 (quoting *Zheng*, 355 F.3d at 72).

Here, Wallace Morgan's Subcontractor Agreement with Credico stated that Wallace Morgan was "under no exclusive arrangement with Credico USA and may provide similar services to other companies or individuals, provided that such other activity does not interfere with the completion of an ongoing project with Credico USA." First Srey Decl., Ex. 7, at WM000034. Plaintiffs dispute that Wallace Morgan actually provided similar services to other companies or individuals, Pl. Counter to Credico 56.1 ¶ 50, but the test here turns on Wallace Morgan's capability—whether it "*could* shift as a unit from one putative joint employer to another." *Jean-Louis*, 838 F. Supp. 2d at 132 (citation omitted); *id.* at 132-33 (although, "during

42

the period at issue in this case, Metro technicians performed work only for Time Warner," this function control factor was not satisfied where Metro had its own resources, could seek work from other cable companies, and had provided installation services for another company).

Moreover, as plaintiffs concede, Wallace Morgan worked on Credico campaigns other than Sprint's. Pl. Counter to Sprint 56.1 ¶ 55 ("Wallace Morgan contracted with Credico to provide services for three companies: Sprint/Assurance Wireless; Direct Energy; and Verizon."). While plaintiffs stress that *field agents* "may only work on one campaign at a time," *id.*, the relevant question as to this factor is *Wallace Morgan's* ability to serve other clients.

Wallace Morgan offered marketing and promotional services for other companies and was under no obligation to offer these services to Sprint alone even only for Credico clients. Accordingly, this factor, too, weighs against a finding of functional control.

### iii.    Whether Plaintiffs Have Discrete Line Jobs

The third functional control factor "examines the extent to which Plaintiff performed a discrete line job that was integral to the purported joint employer's process of production. *Hugee*, 2013 WL 4399226, at *9. "Interpreted broadly, this factor could be said to be implicated in every subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service." *Jean-Louis*, 838 F. Supp. 2d at 133–134 (quoting *Zheng*, 355 F.3d at 73) (emphasis in original). Accordingly, this factor is examined on a spectrum:

> [o]n one end of the spectrum lies piecework on a producer's premises that requires minimal training or equipment, and . . . [o]n the other end of the spectrum lies work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology.

*Hugee*, 2013 WL 4399226, at *9 (quoting *Zheng*, 355 F.3d at 73). "[C]ourts have questioned whether this factor translates well outside of the production line employment situation." *Godlewska*, 916 F. Supp. 2d at 263 (internal quotation marks and alterations omitted); *see also Jean–Louis*, 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product.").

Here, this factor does not signal joint employment. To be sure, field agents' work is obviously important, and arguably integral, to this aspect of Sprint's business: field agents solicit Lifeline Program applications, and successful applications yield subsidies for Sprint. But plaintiffs' manufacturing analogy—they call field agents "the first step in the production line," Pl. Opp. Br. at 42—is strained, as, in fact, plaintiffs admit, *see id.* (acknowledging that the analogy is "imperfect"). The marketing and outreach services that the field agents provide for Sprint are ultimately just that, services. *Cf. Hugee*, 2013 WL 4399226, at *9 ("As a security guard, Plaintiff was a service provider and did not perform a discrete line job. . . . Thus, the third [functional control] factor weighs against a finding of joint employment.").

Moreover, even where the work performed by a subcontractor's staff has been closely akin to a line job, the Second Circuit has "resist[ed] the temptation to say that any work on a so-called production line—no matter what product is being manufactured—should attract heightened scrutiny." *Zheng*, 355 F.3d at 73. Rather, the Circuit has reasoned that, "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." *Id.* at 73.[11] Here, the evidence as to

---

[11] The Circuit has held that, "if plaintiffs can prove that, as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the

industry custom is limited.  But defendants have offered the testimony of Credico employee Jean

Broaddus to the effect that outsourcing is common in the direct sales and marketing industry.

*See* Credico 56.1 ¶¶ 19–20 (citing Williams Decl., Ex. 2, at 47-48, 51).  Broaddus testified that

"outsourcing direct sales" was "very common," and that Credico's main competitors "structur[e]

their operations in a similar fashion as Credico" by "contract[ing] to independent sales offices."

Williams Decl., Ex. 2, at 47–48.  Plaintiffs weakly counter that they "do not have sufficient

discovery to respond to whether Credico's outsourced business model is common in the direct

sales and marketing industry at large."  Pl. Counter to Credico 56.1 ¶ 19.  But discovery here was

extensive, and at the summary judgment stage, plaintiffs are accountable for the evidentiary

record they have built or not built.  The record contains no evidence refuting Broaddus's

testimony that such a model is common.

   Accordingly, the third functional control factor does not favor joint employer status.

### iv. Whether the Contractors Are Fungible

   The fourth factor examines "whether responsibility under the contracts could pass from

one subcontractor to another without material changes."  *Zheng*, 355 F.3d at 72.  "[T]his factor

weighs in favor of a determination of joint employment when employees are tied to an entity . . .

rather than to an ostensible direct employer."  *Id*.  On the other hand, where "employees work for

an entity (the purported joint employer) only to the extent that their direct employer is hired by

that entity, this factor does not in any way support the determination that a joint employment

relationship exists."  *Id*.

---

prevalence of that device may, in particular circumstances, be attributable to widespread evasion
of labor laws."  *Id*. at 73–74.  Plaintiffs have not made any such showing in this case.

"[T]he Second Circuit has stated that if the fourth factor 'weigh[ed] in favor of joint employment when a general contractor uses numerous subcontractors who compete for work and have *different* employees,' the fourth factor 'would classify nearly all subcontracting relationships as joint employment relationships—a result that finds no support either in the law or in our country's practices.'" *Jean-Louis*, 838 F. Supp. 2d at 135 (quoting *Zheng*, 355 F.3d at 74 n.11) (emphasis in original).  Accordingly, "the fourth factor asks not whether all of the putative joint employer's contractors do the same work but whether, if the putative joint employer hired one contractor rather than another, 'the *same* employees would continue to do the *same* work in the *same* place.'" *Jean-Louis*, 838 F. Supp. 2d at 135 (quoting *Zheng*, 355 F.3d at 74) (emphasis in original).

This factor is inconclusive.  Favoring defendants, it is undisputed that Sprint does not hire field agents; Sprint contracts with OAs, which contract with ISOs, which hire field agents.  In finding against joint employment, the court in *Jean-Louis* noted that, because "the undisputed evidence shows that, rather than hiring technicians, Time Warner hires contractors who hire technicians, all the evidence suggests that when an Installation Company dissolves, technicians wishing to continue working on behalf of Time Warner are required to apply and be hired for a position from another Installation Company." *Id.* (internal quotation marks and alterations omitted).

At the same time, there is some evidence suggesting that Wallace Morgan field agents might not necessarily work for Sprint "'only to the extent that their direct employer is hired by that entity.'" *Id.* (quoting *Zheng*, 355 F.3d at 72).  It is undisputed that field agents could "transfer from Credico campaign to Credico campaign." Pl. 56.1 ¶ 128; Credico Counter 56.1 ¶ 128; Sprint Counter 56.1 ¶ 128.  And field agents could transfer between two Credico ISOs that

were both working on Sprint's Assurance Wireless campaign.  Pl. 56.1 ¶ 129; Sprint 56.1 ¶ 128;

*see* Credico Counter 56.1 ¶ 128 ("Field Agents may decide to transfer from one ISO to another

ISO, which may or may not subcontract with Credico to work on the same campaigns.").  There

are emails from a Credico employee referencing transfers of agents between offices.  *See, e.g.*,

Second Srey Decl., Ex. 154–55.  Therefore, although the evidence is conjectural insofar as it

requires guesswork about a scenario that never came to pass, there is some evidence that could

support an inference that Wallace Morgan's field agents "would continue [providing outreach

services for Sprint] if [Sprint] severed its relationship with [Wallace Morgan]."  *See Jean-Louis*,

838 F. Supp. 2d at 135.

The fourth functional control factor therefore is inconclusive.  Unlike the preceding

factors, it does not favor a grant of summary judgment to Sprint.

<strong>v.     Supervision</strong>

The fifth functional control factor assesses "the degree to which [Sprint] or [its] agents

supervised plaintiffs' work."  *Zheng*, 355 F.3d at 72.  As reviewed above in connection with the

second formal control factor, plaintiffs have not adduced evidence sufficient to support a finding

that Sprint played a significant role in supervising plaintiffs.  *See supra* Section III(A)(1)(a)(ii).

"The inquiry under this factor is 'largely the same' as the inquiry under the second [formal

control] factor and is the most relevant factor in determining whether a purported joint employer

exercises functional control over plaintiffs."  *Godlewska*, 916 F. Supp. 2d at 264 (quoting *Jean-

Louis*, 838 F. Supp. 2d at 126 n.7).  Although "there is evidence that [Sprint] supervised

[Wallace Morgan field agents] in some minimal capacity[,] . . . on balance, even considering all

of the evidence in the light most favorable to Plaintiffs," this functional control factor cannot

support a finding that Sprint jointly employed plaintiffs.  *Jean-Louis*, 838 F. Supp. 2d at 135.

47

### vi.    Exclusive or Predominant Work

The sixth functional control factor assesses "whether plaintiffs worked exclusively or predominantly for [Sprint]." *Zheng*, 355 F.3d at 72.  The record is clear that, during the relevant time period, plaintiffs only worked on Sprint's Assurance Wireless campaign.  Field agents were prohibited from working on more than one primary campaign at a time.  Pl. 56.1 ¶¶ 127, 176; Sprint Counter 56.1 ¶ 127, 176.  This factor therefore does weigh in favor of functional control. *See Jean-Louis*, 838 F. Supp. 2d at 136 ("The parties do not dispute that, during the time period at issue in this case, Metro technicians performed installations only for Time Warner. Accordingly, this factor weighs in favor of finding that Time Warner jointly employed Metro technicians.").

### vii.    Overall Assessment

Considering the six factors together, only the sixth factor favors plaintiffs' claim of functional control, whereas four (the first, second, third, and fifth) favor Sprint's contrary claim. And even if the Court were to treat the fourth factor as favoring plaintiffs rather than being inconclusive, the balance of factors would still weigh strongly against finding Sprint's functional control. *See Godlewska*, 916 F. Supp. 2d at 265 (on balance no functional control even where "the overlapping second, sixth, and, to a lesser extent, fourth [functional control] factors are satisfied"); *see also Jean-Louis*, 838 F. Supp. 2d at 136 (where "the undisputed facts show that almost every factor weighs against finding that Time Warner jointly employed Metro technicians" and "[t]he only factor weighing in favor of that finding is that Metro technicians only install cable for Time Warner, "that fact alone [cannot] as a matter of law sustain the conclusion that Time Warner jointly employed Metro technicians").

Accordingly, the Court finds that Sprint neither formally nor functionally controlled Wallace Morgan field agents. Sprint therefore cannot be held liable for the claimed FLSA and NYLL violations as a joint employer.

### 2. Credico

The Court also finds that Credico neither formally nor functionally controlled plaintiffs.

#### a. Formal Control

##### i. Hiring and Firing

As to the first formal control factor, the record reflects that Wallace Morgan alone hired and fired field agents. *See supra* Section III(A)(1)(a)(i).

With respect to the power to hire field agents, plaintiffs argue that Credico hired Wallace Morgan's owner, Smith, and that "Credico's power to hire Thomas Smith is indicative of joint employment." Pl. Br. at 46. Plaintiffs, however, have not adduced evidence establishing that Credico ever hired Smith. Plaintiffs posit that Credico "hired Tommy Smith to provide it with Field Agents who would collect applications for the Assurance Wireless campaign," Pl. Br. at 46 n.9, but they have not cited any case authority to the effect that entry into a subcontracting agreement constitutes a "hiring" of the subcontractor's owner.

Beyond the fact of a subcontracting agreement between Credico and Wallace Morgan, plaintiffs have adduced no evidence that Credico "hired" Smith. There is no evidence of any employment agreement between Credico and Smith. To be sure, the record does reflect that Credico "works with outside 'Consultants,' who are current or former ISO owners," that "Consultants work with ISO Owners," and that "Thomas Smith has been [a] Consultant." JSF ¶¶ 26–27, 30. But plaintiffs have not pointed to evidence connecting Smith's consulting work for Credico to his operation of Wallace Morgan. There is no evidence that Smith's consulting

services for Credico involved the operation of Wallace Morgan generally or the management—including hiring and firing—of its field agents specifically.[12]

The two cases on which plaintiffs rely in arguing that Credico's relationship with Smith established Credico's power to hire and fire the field agents employed by Wallace Morgan are inapposite. The issue in each was instead whether an individual executive of a corporation could be held liable as a joint employer of certain of its employees. In *Herman v. RSR Security Services Ltd.*, the Second Circuit held that a 50% owner of a security guard company was individually liable alongside the company as a joint employer of security guards. 172 F.3d 132 (2d Cir. 1999). The Circuit reasoned that "the fact that he hired individuals who were in charge of the guards is a strong indication of control." *Id.* at 140. In *Torres v. Gristede's Operating Corp.*, the district court held that a company's owner was individually liable as an employer where he hired certain employees to manage defendants. No. 04 Civ. 3316 (PAC), 2011 WL 4571792, at *2 (S.D.N.Y. Sept. 9, 2011), *as corrected* (Sept. 23, 2011), *aff'd in part, vacated in part sub nom. Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013). These cases do not speak to the different issue here, which is whether there was a joint employer relationship between two distinct companies.

Notably, other than highlighting Credico's ties to Smith, plaintiffs do not present other evidence establishing Credico's control over the field-agent hiring process. Credico employees did not correspond with prospective field agents in setting up their interviews, Credico 56.1 ¶ 65, did not conduct any interviews of prospective field agents, *id.* ¶¶ 66-67, did not determine which

---

[12] To the extent plaintiffs imply that that Smith's consulting work for Credico made him a Credico employee, there is testimony to the contrary: Credico employee Ilina Kravtchenko testified that consultants "are not employees of Credico. They're usually ISO owners." Williams Decl., Ex. 8, at 235.

specific field agents would be hired, *id.* ¶ 69, and did not personally extend offers to field agents, *id.* ¶ 70; *see also supra* Section III(A)(1)(a)(i).  And, for the same reasons discussed above as to Sprint, the Court rejects plaintiffs' claim that Credico's power to have a Wallace Morgan field agent removed from working on the campaign of a Credico's client such as Sprint, *see* JSF ¶ 74; Pl. 56.1 ¶ 183; Credico Counter 56.1 ¶ 183, meant that Credico had the power to fire such a field agent. *See supra* Section III(A)(1)(a)(i).

Accordingly, the first formal control factor does not favor a finding of joint employer status.

### ii.    Work Schedules and Conditions

As to the second formal control factor, as reviewed above, the record reflects that plaintiffs' work schedules or conditions of employment were controlled by Wallace Morgan. *See supra* Section III(A)(1)(a)(ii).  Plaintiffs never communicated with anyone at Credico about their work or their work hours.  Credico 56.1 ¶ 99.

Plaintiffs' argument as to this factor focuses on the field agents' work conditions rather than on their schedules. *See* Pl. Br. at 47.  Plaintiffs argue that Credico supervised and controlled their work conditions because Credico enforced Sprint's SOPs and created a "Compliance Improvement Plan," designed to "measure and enforce the Assurance Program Rules."  First Srey Decl., Ex. 17; *see* Pl. Br. at 47.  Plaintiffs also note that Credico employees attended certain atmosphere meetings, conducted audits, and intervened when certain "high-level escalations" occurred with field agents, such as when an "agent shot a dog in the field,"  Pl. 56.1 ¶ 157; Credico Counter 56.1 ¶ 157; Second Srey Decl., Ex. 112 at 85; *see* Pl. Br. at 47.  But, as reviewed above, such "quality control" monitoring and enforcement does not constitute supervision and control of work conditions for purposes of this formal control factor. *See supra*

Section III(A)(1)(a)(ii) (citing, *e.g.*, *Godlewska*, 916 F. Supp. 2d at 259; *Chen*, 364 F. Supp. 2d at 286; *Jean-Louis*, 838 F. Supp. 2d at 127–128). Plaintiffs have not adduced evidence that Credico involved itself in the "'day-to-day the day-to-day management'" of Wallace Morgan field agents. *Lawrence*, 2011 WL 666304, at *9 (quoting *Jacobson*, 740 F. Supp. 2d at 692).

Accordingly, this second formal control factor also is not satisfied as to Credico.

### iii.      Rate and Methods of Payment

Plaintiffs argue that Credico controlled field agents' rate and methods of payment because (1) Wallace Morgan reclassified field agents from independent contractors to outside sales employees on Credico's advice, and (2) Credico created "Commission Schedules" and "Office Payment Summaries" and sent these documents to Wallace Morgan, and the documents stated that Wallace Morgan must pay agents particular amounts in commission. *See* Pl. Br. at 48.

As to the first point, plaintiffs have not come forward with evidence that the decision how to classify workers was made by anyone other than Wallace Morgan. Smith testified that, in fall 2015, Credico "made a recommendation . . . that [Wallace Morgan] agents be classified as employees," but Smith clarified that he alone made the ultimate decision regarding classification, Second Srey Decl., Ex. 111 at 199; *see also id.* ("I'm the only person that would decide that . . . ."), much as he alone had made such decisions before Credico's recommendation, *id.* at 203 ("It was all my decision."). Moreover, Smith testified, to his knowledge, Credico was not aware how Wallace Morgan classified its employees:

> Q.      So is it your testimony that Credico was not aware of whether Wallace Morgan was classifying its field agents as an independent contractor or an employee?
> A.      Yes

*Id.* at 202. And while Credico's recommendation may have influenced Wallace Morgan's classification decision, that does not establish control by Credico over that decision. As noted,

"the test is whether a putative joint employer determines pay rates, not whether it affects them." *Jean-Louis*, 838 F. Supp. 2d at 129–30.

In contrast, Credico's Commission Schedules and Office Payment Summaries provide stronger support for plaintiffs as to this factor. The Commission Schedules state that "Commissions shall be paid as follows" and then set out specific amounts for an ISO and for the ISO's representatives. For example, Credico's August 23, 2013, Commission schedule stated:

Commissions shall be paid as follows:

| Product | Rep | Office |
|---|---|---|
| Assurance Wireless-Approved Sale | $4.00 | $2.50 |

Second Srey Decl., Ex. 95. Credico also presented Office Payment Summaries to Wallace Morgan, listing field agents' names and amounts of pay for each. Second Srey Decl., Ex. 98. Plaintiffs also point to a Credico document that states that "[o]ffices must pay agent commission following the established rates on the commission policy; no deviation on commission should be made." Second Srey Decl., Ex. 92 at CREDICO_MAR-00014970.

Defendants counter by citing testimony by Smith as well as Credico employees to the effect that, in practice and as understood by Credico and the ISOs, "[t]he rate specified in the commission schedules is merely a suggestion, and the subcontractor owners are free to distribute their payments as they see fit." Credico Counter 56.1 ¶ 192. Smith testified that he could and did decide payment rates without restriction from Credico, and that he paid agents at rates that went above those set forth in the Credico documents. Williams Decl., Ex. 1 at 87 ("I can pay the [field agents] whatever way I want and whatever amount I wish.").

There is thus a factual dispute on this issue. It goes to the heart of this formal control factor. If Credico's Commission Report rates were mandatory, then Credico exercised control over field agents' rate of payment. If, however, these rates were merely suggestions, and if both

Credico and Wallace Morgan understood that Wallace Morgan was free to set pay rates without pushback from Credico, then such control did not clearly rest in Credico's hands. On summary judgment, the Court cannot resolve that dispute. For purposes of each side's cross-motion on the joint employment issue, the Court must assume, *arguendo*, that this factor is resolved contrary to the movant.

As to Credico's motion, however, the fact that the third factor is construed against it does not preclude a finding that Credico did not exercise formal control over plaintiffs. Where the formal control factors considered as a whole clearly disfavor a finding of such control, the Court may so find. In *Godlewska*, for example, the district court held that the first, second, and fourth formal control factors weighed against formal control while the third factor was inconclusive. 916 F. Supp. 2d at 262. On that record, the court held, there was no formal control, even if the defendant were assumed to have determined plaintiffs' rate and method of payment:

> [T]he [formal control] test is not satisfied because the [defendant] did not have the power to hire and fire, did not supervise and control plaintiffs' schedules and conditions of employment, and did not maintain employment records. In light of my finding that the first, second, and fourth [formal control] factors are not satisfied, the record's inconclusiveness as to the third [formal control] factor is immaterial.

*Id.* The Court accordingly—having held that the first and second factors disfavor formal control—turns to the fourth factor. Should that factor, too, not be satisfied, that Credico may have determined the pay rates and methods of Wallace Morgan field agents would not preclude entry of summary judgment. *See id.*

### iv.    Records

Plaintiffs argue that Credico maintained employment records because it (1) tracked each field agent's pay, and (2) required certain training and maintained records of field agents' training. Pl. Br. at 49. The parties do not dispute that Credico maintains a file containing each

agent's name, photograph, independent sales representative agreement, and background check results. Pl. 56.1 ¶¶ 219–220; Credico Counter 56.1 ¶¶ 219–220.

However, Credico, like Sprint, "never 'maintained employment records on the matter most relevant to overtime obligations under the FLSA: the *hours* worked' by individual [field agents]." *Jean-Louis*, 838 F. Supp. 2d at 130 (quoting *Barfield*, 537 F.3d at 144) (emphasis in *Jean-Louis*). "This is not a case where a putative joint employer 'signs off on' time sheets completed by each plaintiff, 'verif[ies] the number of hours worked by each' plaintiff and 'then provides records of the hours worked' to the plaintiff's contractor employer who uses the records to compensate the plaintiff on a per-hour basis." *Jean-Louis*, 838 F. Supp. 2d at 130 (quoting *Barfield*, 537 F.3d at 136).

Moreover, Sprint's SOPs required Credico to keep records of information such as background check results and training records "for auditing and compliance reasons." First Srey Decl., Ex. 6 at SPRMAR-000030. Where a putative joint employer's activities with respect to employment records constitutes "only an extension of . . . quality control procedures," this formal control factor is not satisfied. *Godlewska*, 916 F. Supp. 2d at 262 (internal quotation marks omitted); *see also Jean-Louis*, 838 F. Supp. 2d at 131 (because Time Warner's records . . . do not translate into Metro technicians' per hour compensation but are instead maintained largely as part of Time Warner's quality control process, those records do not weigh in favor of finding that Time Warner jointly employs the technicians.").

Accordingly, the fourth formal control factor does not favor joint employer status. Because the first and second factors are likewise unsatisfied, Credico did not exercise formal control of Wallace Morgan field agents. The Court turns next to the issue of functional control.

      **b.**      **Functional Control**

###### i.        Premises and Equipment

As to whether plaintiffs used Credico's premises, the record is clear that plaintiffs never reported to or worked at any Credico office.  Credico 56.1 ¶ 101.  Neither Singleton nor Martin could name a single person who worked at Credico's office.  *Id.* ¶ 103.  Singleton also testified that she did not even know where Credico's office was located.  *Id.* ¶ 102.

As to whether Credico's equipment was used by plaintiffs, it is undisputed that Credico supplied certain equipment—the tablets that plaintiffs used to collect applications—and that plaintiffs picked up these tablets at the Wallace Morgan office before heading out into the field each day.  JSF ¶¶ 57–58.

This functional control factor is therefore inconclusive.  The lack of use of premises weighs against a finding of functional control, but the use of Credico equipment weighs in favor.

###### ii.        Whether Immediate Employer's Business Shifts as Unit

Wallace Morgan had a business that could or did shift as a unit from one putative joint employer to another.  This factor therefore does not favor a finding of functional control.  *See supra* Section III(A)(1)(b)(ii).

###### iii.        Whether Plaintiffs Have Discrete Line Jobs

Given the nature of plaintiffs' work, as providers of a service rather than as discrete line job workers, the third functional control factor also does not favor a finding of functional control, notwithstanding the importance of field agents generally to Credico's operations.  *See supra* Section III(A)(1)(b)(iii).

###### iv.        Whether the Contractors Are Fungible

Because plaintiffs have identified some evidence that could support an inference that field agents "would continue [providing outreach services for Credico] if [Credico] severed its

relationship with [Wallace Morgan]," *Jean-Louis*, 838 F. Supp. 2d at 135, the fourth functional control factor is inconclusive, *see supra* Section III(A)(1)(b)(iv).

### v.      Supervision

As addressed in connection with the second formal control factor, plaintiffs have not adduced evidence sufficient to support a finding that Credico played a significant role in supervising plaintiffs; rather, Wallace Morgan controlled plaintiffs' day-to-day schedules and work conditions. *See supra* Section III(A)(2)(a)(ii).

### vi.      Exclusive or Predominant Work

During the relevant time period, plaintiffs only worked on Sprint's Assurance Wireless campaign, as subcontracted through Credico. This factor therefore favors a finding of functional control. *See supra* Section III(A)(1)(b)(vi).

### vii.      Overall Assessment

Ultimately, after analyzing the relevant functional control factors, the Court finds that, "on balance," *Godlewska*, 916 F. Supp. 2d at 265, Credico did not exercise functional control over Wallace Morgan field agents, *see Zheng*, 355 F.3d at 76–77 ("[T]he Court need not decide that *every* factor weighs against joint employment.") (emphasis in original). The first and fourth factors are inconclusive; the second, third, and fifth disfavor a finding of functional control; and the sixth alone favors such a finding. Of these factors, "*[m]ost importantly*, the fifth [functional control] factor is not satisfied; [Credico] did not supervise plaintiffs' work, manage plaintiffs on a day-to-day basis, or evaluate plaintiffs' performance" beyond quality control assessments. *Godlewska*, 916 F. Supp. 2d at 265 (emphasis added). "In short, [Credico] did not relate to plaintiffs as an employer." *Id.* (finding no functional control where "the overlapping second, sixth, and, to a lesser extent, fourth [functional control] factors are satisfied").

Accordingly, although the joint employer question as to Credico presents a closer question than as to Sprint, the Court finds that Credico, too, neither formally nor functionally controlled Wallace Morgan field agents. It therefore cannot be held liable for the claimed FLSA and NYLL violations as a joint employer.

## B.     The Outside Sales Exception

The next issue raised by the cross-motions is whether, even if plaintiffs were employees rather than independent contractors, the outside sales exception to the FLSA and NYLL apply.

### 1.   Applicable Legal Standards

The FLSA's minimum wage and maximum hour requirements for the payment of employees do not apply to "an employee employed . . . in the capacity of an outside salesman." 29 U.S.C. § 213(a)(1). The NYLL incorporates this "outside sales" exception. *See* NYLL § 651 ("'Employee' includes any individual employed or permitted to work by an employer in any occupation, but shall not include any individual who is employed or permitted to work . . . as an outside salesman[.]"); *see also Kinney v. Artist & Brand Agency LLC*, No. 13 Civ. 8864 (LAK) (DF), 2015 WL 10714080, at *12 (S.D.N.Y. Nov. 25, 2015), *report and recommendation adopted*, No. 13 Civ. 8864 (LAK), 2016 WL 1643876 (S.D.N.Y. Apr. 22, 2016); *Gold v. N.Y. Life Ins. Co.,* 730 F.3d 137, 145 (2d Cir. 2013); *Cangelosi v. Gabriel Bros. Inc.*, No. 15 Civ. 3736 (JMF), 2015 WL 6107730, at *2 (S.D.N.Y. Oct. 15, 2015).

"'An employee employed in the capacity of an outside salesman' is an employee (1) whose 'primary duty' is 'making sales,' or 'obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer,'" and (2) "'[w]ho is customarily and regularly engaged away from the employer's place or places of

business in performing such primary duty.'" *Kinney*, 2015 WL 10714080, at *12 (quoting 29 C.F.R. § 541.500(a)).

"Primary duty" refers to "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

"A sale 'includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.'" *Flood v. Just Energy Mktg. Corp.*, No. 15 Civ. 2012 (KBF), 2017 WL 280820, at *4 (S.D.N.Y. Jan. 20, 2017) (quoting 29 U.S.C. § 203(k)). "The U.S. Supreme Court has explained that 'other disposition' must be interpreted to mean 'those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity.'" *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 164 (2012)).

"Courts also consider whether the employee bears indicia of an outside salesperson." *Flood*, 2017 WL 280820, at *4. As to that inquiry, courts consider the "hallmark activities" of an outside sales employee, such as "(1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage." *Chenensky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504 (WHP), 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009). "The question of how an employee spends his time working is one of fact, but the question of whether those activities exempt him from the FLSA is one of law." *Id.*

### 2. Discussion

For the reasons that follow, the Court holds that plaintiffs fall under the outside sales exemption because (1) the field agents' primary duty was sales, (2) the field agents customarily

and regularly engaged in that primary duty away from Wallace Morgan's place of business, and (3) the field agents bore the indicia of outside salespeople.

a.     **Sales as Primary Duty**

There is no material dispute of fact as to field agents' primary duty.  The field agents solicited and collected applications for wireless phones and services from individuals seeking to enroll in the Lifeline Program through Sprint's Assurance Wireless brand.  JSF ¶ 52.

This work involved the following: field agents approached potential Assurance Wireless applicants, engaged them with a "pitch" about Assurance Wireless, provided information regarding Lifeline Program services, asked questions, and uploaded applications via tablet.  Pl. 56.1 ¶ 60; Sprint 56.1 ¶ 164; Pl. Counter to Sprint 56.1 ¶ 164; Credico 56.1 ¶ 148; Pl. Counter to Credico ¶ 148.

As noted, a potential recipient of Lifeline Program services may receive only one Lifeline Program enrolled mobile phone per household.  JSF ¶ 35.  Sprint's SOPs therefore required field agents to "ask potential applicants if they currently have a lifeline phone with [Assurance Wireless] or any other carrier" and "if they have applied with [Assurance Wireless] or any lifeline carrier recently."  Pl. 56.1 ¶ 62; Sprint Counter 56.1 ¶ 62.

Plaintiffs were incented to collect as many successful applications as possible, and to encourage their targets to enroll in the Lifeline Program *through Sprint* as opposed to through some other telecommunications carrier, because plaintiffs were paid on a commission basis for approved applications, Pl. 56.1 ¶ 82; Credico Counter 56.1 ¶ 82, and were also paid a commission if an applicant switched over to Assurance Wireless from a competing Lifeline Program service provider, Credico 56.1 ¶ 184.

60

The parties dispute, however, whether this work is properly characterized as sales. This question, one of applying law to fact, is for the Court. *See Flood*, 2017 WL 280820, at *4 ("[T]he question of how [plaintiffs] spent their working time is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.") (internal quotation marks and alterations omitted).

Plaintiffs make two principal arguments why their work as field agents seeking to induce applicants to enroll in the Lifeline Program via Sprint's particular brand of products and services did not constitute sales. First, they note, the field agents did not obtain a binding commitment from the potential applicant. As plaintiffs note, there was never a contract between Sprint and a qualified applicant, and at the point the field agent engaged with the applicant, defendants had not extended a binding offer to the applicant to provide him or her with a phone nor yet made a decision whether the applicant was eligible under the Lifeline Program to receive one. *See* Pl. Br. at 30–31, 35. Second, plaintiffs note, the products and services that the field agents promoted to applicants were ultimately provided free of charge to qualifying applicants. Standard talk minutes and text messages on the phones provided were free, and while an enrollee could later purchase additional minutes or messages, the field agents had no role in that transaction. *See id.* at 30, 34.

Plaintiffs' first argument fails because an employee need not have created binding sales or orders to be considered an outside salesperson. "There is nothing in the FLSA or the NYLL that limits the definition of an outside salesperson to someone who has the unfettered discretion to finalize a binding sale." *Flood*, 2017 WL 280820, at *5; *see also Baum v. AstraZeneca LP*, 605 F. Supp. 2d 669, 680 (W.D. Pa. 2009), *aff'd on other grounds*, 372 F. App'x 246 (3d Cir. 2010) ("[T]he statutory language does not require a final sale, complete and consummated.").

61

Rather, it is enough for employees to have "'direct[ed] efforts toward the consummation of a sale.'" *Flood*, 2017 WL 280820, at *5; *see also Dailey v. Just Energy Mktg. Corp.*, 2015 WL 4498430, at *3 (N.D. Cal. July 23, 2015) (an "employee is clearly engaged in sales activity" where she "directs [her] efforts at persuading a particular customer to purchase a product and is compensated on the basis of [her] success in doing so") (citation omitted).

Judge Forrest's decision in *Flood v. Just Energy Marketing Corp.* is instructive. There, the plaintiff brought FLSA and NYLL claims on behalf of himself and other door-to-door workers who solicited new accounts for Just Energy Marketing Corp., Just Energy New York Corp., and Just Energy Group, Inc. (collectively, "Just Energy"), companies which marketed and sold gas and electricity. 2017 WL 280820. The plaintiff argued that he was not an outside salesperson because he lacked authority to approve a new customer for an energy contract with Just Energy; Just Energy had the final discretion whether to accept a new customer, and the contracts for Just Energy services were not effective until Just Energy approved them. *Id.* at *2. Judge Forrest rejected that argument, reasoning: "If he was not making the sale, who was? No one? This makes no sense. Indeed, he was paid commissions based directly on sales he had made. The proof is in the pudding, so to speak." *Id.* at *4.

Here, as in *Flood*, plaintiffs' efforts were plainly directed towards the consummation of a sale. Field agents' job involved persuading potentially qualifying customers to fill out an application for Lifeline Program services and to induce current Lifeline Program enrollees to switch to Sprint's Assurance Wireless brand from other Lifeline Program service providers that competed with Sprint. If the customer was found qualified, he or she would receive products and services from Sprint, and the field agent would receive a commission. *See Sydney v. Time Warner Entertainment-Advance/Newhouse P'ship*, No. 13 Civ. 286 (FJS), 2017 WL 1167284, at

62

*4-5 (N.D.N.Y. Mar. 28, 2017) (territory sales representatives' "primary duty was making sales" where "the entirety of their job was focused on acquiring new customers" for installation services for which they were paid on commission).

Plaintiffs' second argument is based on the fact that the qualifying applicants did not themselves pay money to Sprint for its products and services. Instead, as beneficiaries of the Lifeline Program, they received Sprint's products and services gratis. But Sprint was otherwise compensated for its each consummated sale: It was paid subsidies by the federal government— through USAC—for providing these products and services pursuant to the Lifeline Program. The field agents' classification as exempt outside salespeople is not precluded by the fact that a third party, the government, paid the agents' principal, Sprint. For purposes of the outside sales exemption, there is no requirement that payment to outside salespeople come directly from the customer. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) (pharmaceutical sales representatives made sales when soliciting nonbinding commitments from doctors to write prescriptions for patients, who ultimately purchased pharmaceuticals). Here, as counsel for Credico analogized at argument, qualifying Lifeline Program applicants effectively possessed (courtesy of the federal program) a "virtual voucher" for Lifeline Program services, and the field agents' job was to persuade these applicants to spend that voucher on Sprint. *See* Dkt. 319 at 52.

Accordingly, the Court finds that the field agents' primary duty while working at Wallace Morgan was sales.

### b.     Away From Employer's Place or Places of Business

It is undisputed that the field agents spent the majority of their work hours performing their duties in the field, away from the Wallace Morgan office. Sprint 56.1 ¶ 170; Pl. Counter to Sprint 170. Accordingly, as plaintiffs concede, *see* Pl. Br. at 29 n.2, plaintiffs meet the outside

sales exemption's requirement that they be "'customarily and regularly engaged away from [Wallace Morgan's] place or places of business in performing [their] primary duty.'" *Kinney*, 2015 WL 10714080, at *12 (quoting 29 C.F.R. § 541.500(a)).

### c.   Indicia of Outside Salesperson

The field agents also bore many indicia of outside salespeople.  They independently solicited new business in the form of new applications for Lifeline Program services through Assurance Wireless.  They received a commission-based salary.  Sprint 56.1 ¶¶ 173–74.  The field agents "worked away from the office, with minimal supervision, and they were rewarded for their efforts with incentive compensation." *Christopher*, 567 U.S. at 166.

These characteristics of the field agents' work resemble the circumstances of *Chenensky v. New York Life Insurance Co.*, in which the district court found that the outside sales exemption applied where the plaintiff "solicited new business, presented available products to prospects, obtained a commitment to purchase, and ultimately received a commission-based salary." 2009 WL 4975237, at *6.  The district court there also found persuasive the fact that the plaintiff "spent a majority of his time outside of the New York Life office, free from a manager's day-to-day supervision." *Id.*

Similarly, in *Nielsen v. Devry Inc.*, a district court in Michigan held that the outside sales exemption applied to "field representatives" employed by Devry, Inc., "a for-profit company that provides career-oriented, technology-based higher education at more than 25 campuses nationwide." 302 F. Supp. 2d 747, 750 (W.D. Mich. 2003).  The field representatives' job was "to identify potential students, persuade them to apply, and follow through with them to ensure they ultimately pay tuition and begin classes." *Id.*  In finding that the outside sales exemption applied, the district court relied in part on the fact that the field representatives were paid a salary

with a "commission-like feature." *Id.* at 757.  The district court reasoned that "[c]ompensation based wholly or in significant part on commissions correlates with a finding that the employee does sales work." *Id.*

To be sure, compared to some outside salespeople, the work of Wallace Morgan field agents was not inherently "unsuitable to an hourly wage," *see* Pl. Opp. Br. at 52:  Inasmuch as the field agents had to report to the Wallace Morgan office at the beginning and end of each workday to receive and return their tablets, JSF ¶¶ 58, 70–71, an hourly wage arrangement was presumably administratively feasible.  The presence of ample other "hallmark activities" of outside salespeople, however, supports finding that this exemption applies. *Chenensky*, 2009 WL 4975237, at *5.

Accordingly, the Court holds that, even if plaintiffs were employees of Wallace Morgan, they were exempt under the FLSA and NYLL as outside salespeople.

### C.      Employees vs. Independent Contractors

The third and final issue raised by the cross-motions for summary judgment is whether plaintiffs were properly classified as independent contractors rather than employees under the FLSA and NYLL.

Were the Court to have occasion to reach this issue, the well-established standards under the FLSA and NYLL would govern.

The FLSA defines an "employee" as "any individual employed by an employer"; it defines "employ" as "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g). "The definition is necessarily a broad one in accordance with the remedial purpose of the Act." *Brock v. Superior Care,* 840 F.2d 1054, 1058 (2d Cir. 1988); *see also United States v. Rosenwasser,*

323 U.S. 360, 363 (1945); *Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748, 754 (9th Cir.1979).

The Second Circuit has adopted an "economic realities" test to determine, under the FLSA, whether an individual is an employee or an independent contractor. The factors considered include:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Brock,* 840 F.2d at 1058–59; *see also Gayle v. Harry's Nurses Registry Inc.,* 2009 WL 605790, at *5 (E.D.N.Y.2009). This test is inherently case-specific, and no single factor is dispositive; "rather, the test is based on a totality of the circumstances" analysis, with the ultimate question being whether the "workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock,* 840 F.2d at 1059; *see also Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947) ("[T]he determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). Employee "status does not require the continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees"; even if an employer's control were "restricted, or exercised only occasionally," that does not remove the employee from FLSA protection. *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999); *see also Donovan v. Janitorial Servs., Inc.,* 672 F.2d 528, 531 (5th Cir. 1982). That an employer does not exercise control continuously or consistently "does not diminish the significance of its existence." *Irizarry,* 722 F.3d at 111.

The NYLL's definition of "employee" is nearly identical. *Compare* 29 U.S.C.A. § 203(e)(1) ("[T]he term 'employee' means any individual employed by an employer."), *with*

66

NYLL § 190(2) ("'Employee' means any person employed for hire by an employer in any

employment."). "Employer" is also defined similarly in the two statutes. *Compare* 29 U.S.C. §

203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an

employer in relation to an employee . . . ."), *with* NYLL § 190(3) ("'Employer' includes any

person, corporation, limited liability company, or association employing any individual in any

occupation, industry, trade, business or service.").

"A determination of whether a worker qualifies as an employee under the NYLL depends

upon factors such as whether he or she '(1) worked at his [or her] own convenience, (2) was free

to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll,

and (5) was on a fixed schedule.'" *Thomas v. TXX Servs., Inc.*, 663 F. App'x 86, 89 (2d Cir.

2016) (quoting *Deboissiere v. Am. Modification Agency*, No. 09 Civ. 2316 (JS) (MLO), 2010

WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010). The determination turns on "the degree of control

exercised by the purported employer over the results produced or the means used to achieve the

results." *Bynog*, 1 N.Y.3d at 198. As under the FLSA, under the NYLL, it is not significant how

the parties defined the employment relationship or how the worker identified herself on tax

forms. *See Sandrino v. Michaelson Assocs., LLC.*, No. 10 Civ. 7897 (BSJ), 2012 WL 5851135

(S.D.N.Y. Nov. 19, 2012) ("The test for whether a person is deemed to be an independent

contractor for purposes of New York Labor Law does not depend, however, on what the person

has labeled themselves. Instead, the analysis is a question of fact which hinges on whether the

employer exercises either control over the results produced or over the means used to achieve the

results.") (citation omitted); *Hernandez v. Chefs Diet Delivery, LLC*, 81 A.D.3d 596, 599 (2d

Dep't 2011) ("While the manner in which the relationship is treated for income tax purposes is

certainly a significant consideration, it is generally not singularly dispositive" (citing *Gagen v. Kipany Prods., Ltd.*, 27 A.D.3d 1042, 1043 (3d Dep't 2006))).

Although FLSA and NYLL labor law analyses are separate, "[t]here is general support for giving FLSA and the New York Labor Law consistent interpretations." *Topo v. Dhir*, No. 01 Civ. 10881 (PKC), 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004); *see also Jiao v. Shi Ya Chen*, No. 03 Civ. 0165 (DCF), 2007 WL 4944767, at *19, n. 12 (S.D.N.Y. 2007) (collecting cases); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 189 (S.D.N.Y.2003).

Here, in light of the preceding rulings, there does not appear to be any occasion, under either statute, to examine whether plaintiffs, as field agents, were employees or independent contractors. The Court's ruling that the "outside sales exemption" applies precludes plaintiffs' minimum wage and overtime claims. And plaintiffs' claims against Sprint and Credico are separately interred by the Court's ruling that, even if plaintiffs were employees of Wallace Morgan, neither Sprint nor Credico was a joint employer.

There is, however, one open question, which is whether plaintiffs' wage notice claims under the NYLL against Wallace Morgan remain viable in light of the finding that the outside sales exemption applies. The SAC asserts claims under two NYLL wage-notice provisions. SAC ¶¶ 199–206. First, under the NYLL, "[e]very employer" is required to provide each employee "at the time of hire" with written notice that includes her rate of pay, the basis for that pay rate, the regular pay day designated by the employer, and other related information. NYLL § 195(1)(a). Second, under the NYLL, employers also are required to provide notice "with every payment of wages" that includes the dates of work covered by that payment, rates of pay, and deductions, among other information. NYLL § 195(3).

Plaintiffs' and Wallace Morgan's submissions on the cross-motions for summary judgment do not squarely address whether the applicability of the outside sales exemption vitiates the need for Wallace Morgan, if an employer, to comply with these provisions. The submissions appear implicitly to treat these NYLL claims as applicable only to employees as to whom the outside sales exception does not apply. Were these provisions applicable to employees as to whom that exception applied, the Court might then need to resolve whether plaintiffs were employees as opposed to independent contractors.

Accordingly, for the time being, the Court leaves open the question whether summary judgment is merited in favor of Wallace Morgan on plaintiffs' NYLL wage-notice claims. To enable a resolution of that claims, the Court instead commissions limited briefing from the affected parties (plaintiffs and Wallace Morgan) on these questions: (1) Under the NYLL, where the outside sales exemption applies, is an employer nevertheless bound to comply with the statute's wage-notice provisions (§§ 195(1)(a) and (3))? And, (2) if so, how do the parties wish to proceed with respect to these claims? (*E.g.*, do plaintiffs wish to pursue these claims? With the federal claims now eliminated, ought the Court exercise supplemental jurisdiction over these state-law claims?). The Court directs plaintiffs to file a letter-memorandum as to these points within two weeks. Wallace Morgan's letter-memorandum in response is due one week later.

## CONCLUSION

For the foregoing reasons, the Court (1) denies plaintiffs' motion for partial summary judgment and (2) grants' defendants' cross-motions for summary judgment. The effect of this ruling is to grant summary judgment for Sprint and Credico on all claims against them, and to grant summary judgment for Wallace Morgan on all claims against it, save for plaintiffs' wage-notice claims under the NYLL, as to which the Court commissions supplemental briefing. As

discussed here, plaintiffs' letter-memorandum as to the NYLL wage-notice claims is due two weeks from the date of this decision, and Wallace Morgan's letter-memorandum as to those claims is due one week thereafter.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 197, 232, 234, 238, 240, 263, 271, 274, and 289.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 27, 2017
      New York, New York